**Claim no. CL-2018-000297**

**CL-2018-000404**

**CL-2018-000590**

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND & WALES**

**COMMERCIAL COURT**

**BETWEEN:-**

**SKAT**

**Claimant**

**and**

**SOLO CAPITAL PARTNERS (IN SPECIAL ADMINISTRATION) & OTHERS**

**Defendants**

---

**DEFENCE OF THE SANJAY SHAH DEFENDANTS**

---

**A.   PRELIMINARY MATTERS** ................................................................................................**4**

**A.1.**   ABUSE OF PROCESS (MULTIPLE PROCEEDINGS) ..........................................................**4**
**A.2.**   ABUSE OF PROCEEDINGS (ACCESS TO DOCUMENTS) ....................................................**6**
**A.3.**   JURISDICTION AND PROPER LAW ............................................................................**7**
**A.4.**   LIMITATION ......................................................................................................**8**
**A.5.**   NO WAIVER OF PRIVILEGE ..................................................................................**9**
**A.6.**   DEFECTIVE PLEADED CASES ..............................................................................**10**

**B.   INTRODUCTION** ......................................................................................................**10**

**B.1.**   THE CLAIMANT'S STANDING ..............................................................................**10**

1

C.   SUMMARY OF DEFENCE ........................................................................................11

D.   DEFENDANTS ......................................................................................................15

E.   DIVIDEND WHT REGIME ....................................................................................16

F.   THE WHT APPLICATIONS ...................................................................................16

G.   THE WHT REPRESENTATIONS...........................................................................16

G.1.   THE AGENT REPRESENTATIONS AND THE CUSTODIAN REPRESENTATIONS .........................17
G.2.   FALSITY OF THE WHT REPRESENTATIONS ..............................................................17

H.   PROCEEDS OF THE WHT APPLICATIONS ...........................................................30

H.1.   PAYMENTS BY SKAT .........................................................................................30
H.2.   TRANSFERS TO SCP ..........................................................................................30
H.3.   TRANSFERS TO THE ALLEGED FRAUD DEFENDANTS ...................................................31
H.4.   PURCHASE OF CONTROLLING SHAREHOLDING IN VARENGOLD BANK AG.........................31
H.5.   PURCHASE OF 100% OF THE SHARES IN DERO BANK AG ...........................................34

I.   THE WHT SCHEME ............................................................................................35

J.   APPLICABLE LAW ..............................................................................................42

K.   ENGLISH LAW CLAIMS AGAINST THE ALLEGED FRAUD DEFENDANTS .............42

K.1.   TORT CLAIMS ...................................................................................................42
(A)   DECEIT..............................................................................................................42
(B)   UNLAWFUL MEANS CONSPIRACY ...........................................................................45
(C)   LOSS.................................................................................................................45
K.2.   EQUITABLE CLAIMS ...........................................................................................46
(A)   DISHONEST ASSISTANCE......................................................................................46
(B)   KNOWING RECEIPT ............................................................................................47
(C)   EQUITABLE COMPENSATION OR AN ACCOUNT OF PROFITS ...........................................47
K.3.   UNJUST ENRICHMENT/RESTITUTION .....................................................................48
K.4.   PROPRIETARY CLAIMS.........................................................................................48

L.   ENGLISH LAW CLAIMS AGAINST THE NON-FRAUD DEFENDANTS .....................48

M.   ALTERNATIVE DANISH LAW CLAIMS ................................................................48

M.1.   DANISH LAW.....................................................................................................49
M.2.   DAMAGES CLAIMS AGAINST THE ALLEGED FRAUD DEFENDANTS ..................................49

| | | |
|---|---|---|
| M.3. | DAMAGES CLAIMS AGAINST OTHER DEFENDANTS | 50 |
| M.4. | UNJUST ENRICHMENT/RESTITUTION CLAIMS | 50 |
| M.5. | PROPRIETARY CLAIM | 50 |

**N. INTEREST** ................................................................................................................ **50**

**O. CURRENCY OF CLAIMS** ..................................................................................... **51**

**P. PRAYER FOR RELIEF** ......................................................................................... **51**

**Q. CONCLUSION** .......................................................................................................... **51**

1    This is the Defence of the 6th, 9th, 30th, 32nd, 34th, 35th, 44th, 45th, 46th, 47th, 48th, 49th, 50th, 51st, 53rd, 54th, 55th, 56th, and 57th Defendants to the First Claim, the 4th, 18th, 19th, and 21st Defendants to the Second Claim, and the 8th Defendant to the Third Claim (collectively, the "Sanjay Shah Defendants"). Particular note should be made of the following Sanjay Shah Defendants at this stage:

1.1.    The 35th Defendant to the First Claim (Elysium Global (Dubai) Limited) has not acknowledged service to the claim form for the reasons set out in paragraphs 4 to 14 below. This defence is provided wholly without prejudice to the aforesaid Defendant's right to challenge jurisdiction should SKAT fail to consolidate proceedings against this Defendant as opposed to pursuing it in both the DIFC and this jurisdiction.

1.2.    Judgment in default has been entered against the 17th, 24th, 68th Defendants to the First Claim, 22nd Defendant to the Second Claim, and 4th and 5th Defendants to the Third Claim (respectively Elysium Global (UK) Ltd (in liquidation), Solo Capital Limited (in liquidation), Syntax GIS Ltd (in liquidation), Polaris Capital Limited and Polaris Capital (One) Limited). This Defence shall be amended to the extent necessary if these Defendants' application to set aside default judgment is granted.

2      The Sanjay Shah Defendants adopt the defined terms used by the Claimant ("SKAT") in
       the Particulars of Claim but strictly without any admissions as to the accuracy of the
       same.

3      Save where the context dictates otherwise, references to paragraph numbers are to
       paragraphs in the Amended Particulars of Claim.

## A.   PRELIMINARY MATTERS

### A.1.  Abuse of Process (multiple proceedings)

4      In addition to this claim, SKAT has also brought proceedings (i) in Dubai, UAE ("on-
       shore Dubai") against Sanjay Shah, T&S Capital, and Ganymede Cayman Ltd; and (ii)
       in the Dubai International Financial Centre Court of First Instance ("DIFC") against
       Elysium Global (Dubai) Limited and Elysium Properties Limited (collectively referred
       to as "the Dubai Proceedings" and "the Dubai Defendants" respectively).

5      The short history of the commencement of the London, DIFC and on-shore Dubai
       proceedings is as follows:

   5.1.    A claim form was issued in London on 4 May 2018.

   5.2.    The on-shore Dubai proceedings were issued against forty eight defendants on
           15 July 2018.

   5.3.    A second claim form was issued in London on 15 June 2018.

   5.4.    The DIFC proceedings were issued on 28 June 2018.

   5.5.    The on-shore Dubai proceedings were discontinued following the court's
           direction of 9 July 2018 that single claims needed to be issued against each
           defendant.

   5.6.    The on-shore Dubai proceedings were re-issued against Elysium Global (Dubai)
           Ltd, T&S Capital, Ganymede Cayman Ltd and Sanjay Shah on 15 August 2018.

   5.7.    The on-shore Dubai proceedings were discontinued (again) against Elysium
           Global (Dubai) Ltd on 3 October 2018.

5.8. A third claim form was issued in London on 11 September 2018.

5.9. The on-shore Dubai proceedings against T&S Capital were thereafter discontinued a second time.

5.10. The on-shore Dubai proceedings against Ganymede have since been joined to the proceedings against Mr Sanjay Shah, Rajen Shah and SCP. The Sanjay Shah Defendants understand that Usha Shah remains a party to this re-issued and consolidated claim pending SKAT's appeal against the order of the on-shore Dubai court striking out the claim against her.

6 In a DIFC judgment given on 23 September 2018, Justice Sir Jeremy Cooke stated: "I have already indicated in the course of discussion with counsel that it appears to me self-evident that the substantive matters that are in dispute should be the subject of litigation in one jurisdiction only and that the findings there should be binding in one way or another on all the relevant parties that form part of what I may loosely call Mr Shah's empire. To collapse the multiple proceedings into one set of proceedings would seem to make obvious sense and the taking of tactical steps by one side or another does not advance matters further in the context of ultimate resolution of the dispute and simply leads to increased cost, delay and work all round."

7 The Defendants have offered to consolidate the claim in London and be bound in all other jurisdictions by any findings made in this jurisdiction. SKAT have declined to engage with this proposal, preferring instead to maintain the advantage to itself of continuing multiple abusive proceedings.

8 The Dubai Proceedings will be decided in accordance with UAE and DIFC law respectively, but raise identical or similar issues to those which will be decided in this claim. Those issues include, in particular, whether the WHT Representations were false, and whether the WHT Representations were made dishonestly by the Dubai Defendants.

9 The Dubai on-shore court has ordered a panel of three experts ("the Dubai Expert Panel") to be appointed. The Dubai Expert Panel's role will be to prepare a report assessing SKAT's allegations.

10    In the course of preparing their report (currently due to be served on 1 July 2019), the Dubai Expert Panel may wish to conduct an interview with Mr Sanjay Shah ("the Dubai Interview") which is likely to take place well in advance of any trial in this claim. It is not anticipated that there will be any reciprocal opportunity for the Dubai Defendants to put questions to SKAT's witnesses in the Dubai Proceedings.

11    In their capacity as the claimant in the Dubai Proceedings, SKAT are entitled to attend the Dubai Interview and submit to the Dubai Expert questions to be put to Mr Sanjay Shah. The Sanjay Shah Defendants aver that this amounts to an opportunity to conduct a pre-trial cross-examination of Mr Sanjay Shah, in a manner that is oppressive and unfair.

12    Further or alternatively, SKAT have obtained permission from the DIFC Court to use documents secured under the Search and Seize Order obtained in that jurisdiction in Dubai, Malaysia, USA and London without consolidating the claims against the Sanjay Shah Defendants, notwithstanding the DIFC Court's comments that consolidation should occur. See paragraph 6 above.

13    The DIFC has ordered the defendants to those proceedings to file a defence on 14 May 2019. Subject to any applications the parties may make, the DIFC will in due course provide directions to enable the Claimant the opportunity to attempt to prove its allegations. It is anticipated the directions will involve the disclosure of documents, exchange of witness statements, exchange of expert reports, and a trial. In circumstances where the DIFC litigation is against two defendants only, is anticipated that the aforesaid stages will be ordered to occur well in advance of any trial in the London proceedings. The DIFC proceedings will therefore afford SKAT an opportunity to cross-examine Mr Sanjay Shah in advance of the London trial. The Sanjay Shah Defendants aver that this amounts to an opportunity to conduct a pre-trial cross-examination of Mr Sanjay Shah, in a manner that is oppressive and unfair.

14    The Sanjay Shah Defendants will say that proceeding both with this claim and the Dubai Proceedings amounts to an abuse of the Court's process.

### A.2.  Access to Documents

15    A search and seize order was granted in favour of SKAT on 28 June 2018, pursuant to which approximately 13 million documents were seized.

6

16   The Sanjay Shah Defendants have not reasonably been able to interrogate the aforesaid documents for the purposes of preparing this defence. In correspondence between the parties, SKAT has asserted that such a review is not necessary, because the contents of the aforesaid documents should be known to the Sanjay Shah Defendants. This speculative and unrealistic assertion is denied. In the premises, this Defence is served following only a very limited review of the aforesaid documents, and no adverse inference can properly be drawn against the Sanjay Shah Defendants if in due course additional averments are able to be made once the seized documents have been interrogated.

## A.3.  Jurisdiction and proper law

17   SKAT alleges that, as a matter of Danish tax law, no WHT refund was due in respect of the WHT Applications. Such an allegation is necessarily implicit in SKAT's assertions that:

  17.1.   The WHT Applicants were not entitled to make the WHT Applications. And

  17.2.   SKAT is entitled to be repaid the rebates from the Defendants and/or those who received the same on notice of the WHT Applications.

18   The claim is, therefore, an attempt by SKAT to seek payment of Danish tax monies in accordance with its own revenue, customs or administrative law. As such, the English courts have no jurisdiction to consider the claim.

19   In the premises, it is denied that the Rome II Regulation No. 864/2007 (EC) ("the Rome II Regulation") applies or is of any relevance, as alleged or at all.

20   If (contrary to the above) the Rome II Regulation does apply, the summary of the provisions of the Rome II Regulation at paragraph 55 is noted but no admissions are made. The Sanjay Shah Defendants reserve the right to make submissions by reference to all applicable laws, regulations, principles, authorities etc. at the appropriate time.

21   Paragraph 56 (applicable law) is denied. In light of all of the matters set out in the Particulars of Claim and the Defence, the law applicable to SKAT's claims is Danish law, alternatively English law. It is noted that SKAT have not provided any particulars

as to why it is said that their claim is manifestly more closely connected with England & Wales than with Denmark, in circumstances where the claim:

21.1.    Is brought by the Danish tax office.

21.2.    Concerns payments made in Danish Kroner for relief from Danish dividend withholding taxes.

21.3.    Relates to alleged representations regarding shares in Danish companies (and dividends declared by those companies) made to the Danish tax office through an application process regulated by Danish tax law. And

21.4.    Seeks recovery (at least as regards the tortious/equitable claims) in Danish Kroner.

## A.4. Limitation

22    SKAT is required to prove that the sums claimed are not barred by limitation under Danish law (alternatively, English law). The Particulars of Claim refer collectively to facts and matters (for example, representations and payments made) during periods spanning a number of years. It is therefore impossible for the Sanjay Shah Defendants to identify with precision which parts of SKAT's claim are barred by limitation. Accordingly, SKAT is required to prove, for the whole of its claim, that the sums claimed are not barred by limitation.

23    Under Danish law, the claim is subject to the Danish Limitations Act. The Sanjay Shah Defendants will rely upon the Danish Limitations Act in respect of any part of SKAT's claim for which the cause of action accrued more than 3 years before the commencement of:

23.1.    The First Claim (as to those Defendants who are parties to the First Claim).

23.2.    The Second Claim (as to those Defendants who are parties to the Second Claim). Or

23.3.    The Third Claim (as to those Defendants who are parties to the Third Claim).

24    If and to the extent that SKAT seek to rely on section 3 of the Danish Limitations Act to extend the primary limitation period, they are put to proof as to the date on which they had sufficient knowledge (actual or constructive) for the purposes of the Danish Limitations Act.

25    Further and alternatively, if (contrary to what is pleaded above) English law is applicable to SKAT's claim, the claim is subject to the Limitation Act 1980.

26    The Sanjay Shah Defendants will rely upon sections 2 and/or 5 and/or 21 of the Limitation Act 1980 in respect of any part of SKAT's claim for which the cause of action accrued more than 6 years before the commencement of:

    26.1.    The First Claim (as to those Defendants who are parties to the First Claim).

    26.2.    The Second Claim (as to those Defendants who are parties to the Second Claim). Or

    26.3.    The Third Claim (as to those Defendants who are parties to the Third Claim).

27    If SKAT seeks to rely on section 32 of the Limitation Act 1980 to extend the primary limitation period, they are put to proof as to the date on which they had sufficient knowledge (actual or constructive) for the purposes of the Limitation Act 1980.

28    If, contrary to this Defence, the Sanjay Shah Defendants were constructive trustees as alleged (which is denied), SKAT is barred by its own laches from maintaining any claim against the Sanjay Shah Defendants, as pleaded or at all, by reason of the passage of time that has passed between the events in question and the dates on which these proceedings were commenced. In all the circumstances it would now be inequitable to grant the relief sought.

### A.5. No waiver of privilege

29    Nothing in this Defence may be taken as an express or implied waiver of any legal professional privilege (including, for the avoidance of doubt, advice privilege and litigation privilege).

30   Without prejudice to the foregoing, the Sanjay Shah Defendants obtained internal and external legal advice. The external legal advisers are listed in Appendix 1 to this Defence.

31   The Sanjay Shah Defendants reasonably infer that each of the aforesaid external legal advisers carried out full anti-money laundering checks in compliance with their prevailing legal and regulatory obligations before (i) accepting the Sanjay Shah Defendants and/or Solo Capital Partners as clients; (ii) providing advice to the aforesaid clients; and (iii) accepting payment from the aforesaid clients.

32   In the premises, it is inferred that that each external legal adviser (including the lawyers who now represent SKAT) satisfied themselves that their clients were not engaged in any conduct said in this claim to be unlawful.

### A.6. Defective Pleaded Cases

33   As regards the definition of "Fraud Defendants" and "Non-Fraud Defendants", the following inadequacy in SKAT's pleaded case is noted:

   33.1.   The 16th Defendant (Solo Group Services Ltd) to the First Claim and the 14th (Roxy Ventures LLC Solo 401K Plan) and 17th (Fiveways Consultancy FZE) Defendants to the Second Claim are not defined either as Fraud Defendants or Non-Fraud Defendants and no relief is sought against these Defendants.

   33.2.   The 63rd Defendant (Martin Smith) to the First Claim is defined as both a Fraud Defendant and a Non-Fraud Defendant. Since the definitions are intended to be mutually exclusive, it is unclear what SKAT alleges against the 63rd Defendant.

34   By reason of the matters in paragraph 33 above and subject to, *inter alia*, limitation issues, the Sanjay Shah Defendants reserve their right to amend this defence if and to the extent that it is alleged in due course that the Sanjay Shah Defendants had any relevant interactions with the aforesaid four defendants.

### B.   INTRODUCTION

### B.1. The Claimant's standing

35   As to paragraph 1 (description and legal status of SKAT):

10

35.1.  Whilst it is admitted that SKAT was a function of the Danish Government until 1 July 2018, no admissions are made that it was entitled to and/or able to bring a claim in a "*private capacity*" outwith this function at any time. The meaning of the expression "private capacity" is in any event not understood and is assumed to be an attempt to avoid or overcome the jurisdictional bar to the claim as per paragraph 18 above.

35.2.  It is not admitted that SKAT continued to be entitled to commence and/or continue its claims against the Sanjay Shah Defendants after 1 July 2018 (the date on which it was replaced by 7 new agencies, including Skatteforvaltningen). And

35.3.  The allegation that the Sanjay Shah Defendants have committed "*civil wrongs*" is also assumed to be an attempt to avoid or overcome the jurisdictional bar as per paragraph 19 above. In any event, it is denied that the Sanjay Shah Defendants have committed and/or are liable to SKAT for any such "*civil wrongs*" as alleged or at all.

36  The Sanjay Shah Defendants plead to the remainder of this claim without prejudice to the foregoing.

## C.  SUMMARY OF DEFENCE

37  As to paragraph 3 (and by way of summary of the Sanjay Shah Defendants' case, further particularised below):

37.1.  The background set out at sub-paragraphs (a) and (b) is admitted, save that the sums paid by SKAT are not admitted and SKAT is put to proof of the same.

37.2.  As to sub-paragraph (c), SKAT is required to prove that the alleged representations were made at all, and it is denied that those representations were made by the Sanjay Shah Defendants. In any event, the representations were true. SCP's commercial activities included provided clearing services for a lawful and legitimate form of dividend arbitrage.

37.3.  It is denied that the WHT Representations were false, and denied that any of the Sanjay Shah Defendants were dishonest and/or fraudulent, as is alleged at

11

paragraphs (d) and (e). SCP provided clearing services for clients to engage in lawful and legitimate trading strategies that were conducted at all times in accordance with Danish law: doing so was neither dishonest nor unlawful.

37.4.   This case has caused significant embarrassment to SKAT and to the Danish government generally. This is particularly so because dividend arbitrage trading is a widely known and wholly legitimate trading strategy. Other European governments have taken steps to limit such trading activity where they have chosen to do so. SKAT is attempting, through this claim and through other steps the Danish government (or constituent parts thereof) has taken since approximately 2015, retrospectively to amend Danish fiscal law and to cover up or remedy SKAT's earlier failure to limit such trading activity and thereby attack the Defendants, who have done nothing dishonest nor illegitimate.

37.5.   SKAT will be expected to provide full disclosure of (i) its knowledge of and internal discussions about dividend arbitrage trading; (ii) all briefing papers and/or other documents it provided to any other arm of the Danish government (including members of the Danish government) on dividend arbitrage trading and/or the matters relating to this litigation; (iii) full details of any meetings it had with other arms of the Danish government (including members of the Danish government); and (iv) full details of all and any information provided to the Danish government on dividend arbitrage trading from other European member states.

37.6.   As to sub-paragraph (f), the Sanjay Shah Defendants repeat that the SCP's commercial activities included provided clearing services for a lawful and legitimate form of dividend arbitrage. The Particulars of Claim seeks to characterise the scheme as illegitimate by using emotive terms such as "a complex web of transactions" and "extensive use of offshore vehicles." Such allegations are embarrassing for want of particularity, probative of nothing, and in any event of no relevance. The fact that the trading strategies involved a degree of complexity and companies in multiple jurisdictions has no bearing on the question of whether those strategies were dishonest or fraudulent. Indeed, it fails to identify the *sine qua non* of dividend arbitrage trading, which is that such trading only arises where a WHT regime discriminates against some

shareholders (e.g. domestic shareholders) but not others (e.g. companies located in third-party countries) thereby generating a wholly rational and lawful reason for these two categories of actual/potential shareholders to engage in transactions at or around the dividend payment date.

37.7. The Sanjay Shah Defendants deny they had any intention to launder money, as is alleged at paragraph (f) or at all. It is also denied that the Sanjay Shah Defendants deceived SKAT, as alleged or at all. The Sanjay Shah Defendants operated wholly lawful and legitimate corporate structures.

37.8. The allegations at sub-paragraphs (g) and (h) that Mr Sanjay Shah was "the primary individual responsible for the scheme" and was together with other Defendants "joint tortfeasors" are embarrassing for want of particularity. Specific responses to SKAT's allegations regarding Mr Sanjay Shah's involvement (and that of the other Sanjay Shah Defendants) in SCP's commercial activities are set out in this Defence and summarised in paragraph 38 below.

37.9. As to sub-paragraph (i) (proper law), it is averred that Danish law (or alternatively, English law) is applicable to SKAT's claims.

37.10. Sub-paragraph (j) (summary of claim against Non-Fraud Defendants) is noted.

38   It is denied that the "primary individual responsible" is Mr Sanjay Shah (as is alleged at paragraph 3(g)). This description is a gross and misleading simplification of the corporate structures of many of the Defendants to this claim. Whilst Mr Sanjay Shah was the ultimate beneficial owner of SCP, it is wrong to describe him as the directing mind of this company at all, alternatively from January 2014 onwards. Mr Sanjay Shah is a highly successful serial entrepreneur with interests in a large number of companies in the finance industry in numerous jurisdictions. By way of summary (and without prejudice to the foregoing):

38.1. SCP's commercial activities included provided clearing services for lawful and legitimate dividend arbitrage trading. No false representations were made. Mr Sanjay Shah's role was limited. None of the dividend arbitrage trades (more

13

particularly described at paragraph 56 below) were designed by Mr Sanjay Shah, nor did he execute any trades.

38.2. Mr Sanjay Shah, in his capacity as director of those Defendants and on those dates more properly set out at Defence to Schedule 5B, took steps to engage employees and directors with knowledge and expertise in the fields of (amongst other things) dividend arbitrage trading, compliance and law. Mr Sanjay Shah took reasonable steps to ensure that trading activity was only carried out after consulting with suitably qualified lawyers and/or accountants and at all times in accordance with the legal advice received. He was entitled to and did rely on persons employed by (amongst others) SCP to ensure that trading activity was at all times conducted in accordance with the advice received.

38.3. Mr Sanjay Shah ceased to have any management role in SCP from 16 January 2014 respectively. Thereafter he had no management functions in what were by then substantial companies.

38.4. From 2013 onwards Mr Sanjay Shah, as a serial and highly successful entrepreneur, took steps to acquire and develop legitimate business interests in Varengold and Dero banks. From January 2014 onwards his focus was on expanding his proprietary interests in regulated deposit-taking banks.

38.5. Mr Sanjay Shah took reasonable steps to ensure that the SCP's commercial activities were at all times the focus of internal scrutiny by staff employed in companies of which he was the ultimate beneficial owner in circumstances where he was at all times aware that dividend arbitrage trading in general is highly sensitive to changes in fiscal law, finance law and double taxation conventions.

38.6. Mr Sanjay Shah established West Point Derivatives Limited, Telesto Markets LLP, and Old Park Lane Capital as prime brokerages that were intended to be entirely separate from and compete with SCP. Each of these firms were intended to have their own compliance departments and to develop independent trading strategies in accordance with the legal and accounting advice they each received. However, (and in a mark of Mr Sanjay Shah's separation from the management

14

of SCP) Anne Stratford, the CEO of SCP, took steps to appoint herself as CEO of the three aforementioned potential competitors to SCP. The Sanjay Shah Defendants refer generally to their Defence to Schedule 5B (section A3).

38.7.   If (which is denied) any of the Defendants made or caused third parties to make misrepresentations to the Claimant or otherwise made WHT reclaim applications when they were not entitled to the same, Mr Sanjay Shah is in no way personally responsible for such actions.

38.8.   If (which on the current evidence is denied) any of the Defendants were in any way part of an unlawful conspiracy to defraud SKAT as alleged or at all, Mr Sanjay Shah was in no way part of the same.

38.9.   In the premises, Mr Sanjay Shah made no representations at all and is not part of any alleged conspiracy to defraud SKAT as alleged or at all.

39   Further or alternatively, the alleged association between the Sanjay Shah Defendants and Indigo, North Channel Bank, Lindisfarne, Graham Horn, Rajen Shah, Anupe Dhorajiwala and Craig Price ("**the Competitors**") is misconceived:

39.1.   As more fully particularised in Mr Sanjay Shah's witness statement dated 17 January 2017, from 2014 onwards the Competitors traded in competition with SCP.

39.2.   Where the Amended Particulars of Claims makes rolled-up references to companies that are or were beneficially owned by Mr Sanjay Shah and the aforesaid Competitors, the Sanjay Shah Defendants have no knowledge about the activities of the Competitors as alleged or at all and accordingly make no admissions as to the acts and/or omissions of the Competitors.

## D.   DEFENDANTS

40   Save that it is denied that the Sanjay Shah Defendants are in breach of the disclosure orders, paragraph 4 does not contain any factual allegations, and is simply noted.

41   The Sanjay Shah Defendants adopt the definitions given at paragraph 5.

15

## E.   DIVIDEND WHT REGIME

42   As to paragraph 6 (generic description of WHT), no admissions are made that WHT is a "common fiscal device", as the phrase is inadequately precise to be able to respond thereto. Without prejudice to the foregoing, it is admitted that withholding taxes refer to tax deductions that a payer is legally obliged to apply at source before remitting the net balance to the payee.

43   Paragraphs 7 and 8 (effect of section 65 and 69B(1) Danish Withholding Tax Act 1967) is admitted.

44   Paragraph 9 (double taxation treaties) is noted. No admissions are made as to the proper meaning and effect of the double taxation treaties referred to.

45   In the premises (only) that SKAT has adopted the word "completing" in paragraph 10(a) to be a synonym for "signing", paragraph 10 (contents of Tax Relief Form) is admitted. The Sanjay Shah Defendants will rely on the Tax Relief Form for its full meaning and effect.

46   Paragraph 11 is denied (signor of Tax Relief Form). The reclaim form need not be signed by the person who completed it. It is signed by an individual purporting to be (as relevant) the actual or an authorised representative of (i) the beneficial owner; or (ii) the agent who is making the application on behalf of the beneficial owner.

47   Paragraph 12 is admitted on the basis that it appears to assert that SKAT has discretion whether to accept the application.

## F.   THE WHT APPLICATIONS

48   Paragraph 13 (period of claim) does not contain an allegation requiring a response.

49   Paragraphs 14 to 16 are admitted insofar only as they refer to the WHT Applications more fully particularised in Schedule 1. No admissions are made as to the accuracy of Schedule 1.

50   Paragraphs 17 and 18 are admitted.

## G.   THE WHT REPRESENTATIONS

### G.1. The Agent Representations and the Custodian Representations

51    Paragraph 19 (Agent Representations) is not admitted. Save that the Sanjay Shah
      Defendants have been provided with copy Tax Relief Forms in respect of those WHT
      Applications which have been exhibited to affidavits provided in these proceedings (and
      in materially identical proceedings commenced by SKAT in other jurisdictions), SKAT
      is put to strict proof that the Agent Representations were made in respect of any or all of
      the WHT Applications.

52    Paragraph 20 (belief of SKAT) is not admitted.

53    Paragraph 21 (Custodian Representations) is denied if it distinguishes between dividend
      payments traceable to the Danish company and dividend compensation payments to
      WHT Applicants. In either circumstance a qualifying shareholder was and is entitled
      under Danish law to make a WHT Application. In the premises, any qualifying
      shareholder was entitled to make the WHT Representations. Without prejudice to the
      foregoing, save that the Sanjay Shah Defendants have been provided with copy Credit
      Advice Notes in respect of those WHT Applications which have been exhibited to
      affidavits provided in these proceedings (and in materially identical proceedings
      commenced by SKAT in other jurisdictions), SKAT is put to strict proof that the Credit
      Advice Notes contained the Custodian Representations as alleged or at all.

54    Paragraph 22 does not contain any factual allegations, and is simply noted.

### G.2. Falsity of the WHT Representations

55    Paragraphs 23 (WHT Representations were false) is denied and/or the premise is false:

      55.1.    Paragraphs 23(a) and (b) are denied. The WHT Representations (insofar as
               made) were true. The WHT Applicants owned the relevant shares and received
               dividend payments in respect of the same.

      55.2.    Paragraph 23(c) is misconceived, fails to understand the proper nature of
               modern banking and finance transactions and is accordingly denied. Danish
               companies do not pay "*the dividend*" to "*the shareholder*", whether or not the
               shareholder in question is the WHT Applicant. Shares are dematerialised which
               means that they are not numbered or identifiable. Rather, there is a collective

17

inventory of shares held at VP Securities A/S with which in turn securities accounts are held by credit institutions. In the premises, share ownership exists only in the form of book entries with the relevant credit institutions.

55.3.   Paragraph 23(d) is denied. To the best of the Sanjay Shah Defendants' belief, the representations which were made, were honestly made. Paragraph 37 above is repeated.

56   Save that no representations were made by the Sanjay Shah Defendants, the WHT Representations were true:

56.1.   At all relevant times the true position was as follows (and the Sanjay Shah Defendants reasonably believed such matters to be true):

56.1.1.   Danish exchange traded companies deposited shares ("Equities") with a VP Securities A/S, a depository register ("the Registry"). Any onwards purchaser thereafter gained a fractional co-ownership interest in the shares held by the Registry, VP Securities. No shareholder was or became entitled to any specific individual and identifiable share certificates (as none exist). In the premises, a purchaser of Equities did not acquire the Equities previously owned by the seller but only a claim vis-à-vis the Registry or the credit institution.

56.1.2.   A credit institution reported (and was required to report) updated information to the Registry only if the aggregate trading activity carried out by clients of the credit institution changed from one settlement period to the next settlement period.

56.1.3.   The Danish publicly listed companies that are the subject of this claim each issued Equities which were held in the Registry.

56.1.4.   Danske Bank held custody accounts with VP Securities A/S which (to the best of Mr Sanjay Shah's knowledge and belief) in turn held custody accounts for other banks and/or credit institutions ("the Credit Institutions").

18

56.1.5.  SCP held custody accounts with clients of the Credit Institutions during the periods more fully particularised below.

56.1.6.  The WHT Applicants held custody accounts with SCP.

56.1.7.  By reason of the interlocking contracts between the WHT Applicants, SCP, the Credit Institutions and the Registry, where a WHT Applicant entered into a purchase contract for Equities (more particularly set out below), this contract resulted immediately in the unconditional ownership by the purchaser of the legal and economic ownership of Equities. The purchaser thereafter bore the risk of directional movement in the publicly listed equity value of the relevant company, including the default risk.

56.1.8.  The aforesaid contracts caused the WHT Applicants to be owners of the shares wholly in accordance with (amongst other matters):

    56.1.8.1.SKAT's legal guidance (at section C.B.2.1.6.1) concerning the acquisition of shares, namely that "a share has been acquired or disposed of at the time when there is a final and binding agreement on the acquisition or disposal." And

    56.1.8.2.Karnov's legal commentary relating to section 23 of the Danish Share Advance Tax Act: "The decisive factor in determining the time of disposal is when there is a final and binding agreement on the divestment. For shares traded on a regulated market, this will be the documented trading date used."

56.1.9.  In the premises, the WHT Applicants were each the beneficial owners of shares within the meaning of the treaties referred to at paragraph 9 of the Amended Particulars of Claim.

56.1.10. Where the WHT Applicants purchased Equities cum-dividend and did not sell those shares before the relevant cut-off moment, the WHT Applicants were accordingly entitled to receive dividend payments

including (if relevant under the applicable double tax conventions) withholding tax refunds.

56.1.11. The WHT Applicants, in the WHT Representations made on their behalf, did not purport to seek a WHT refund for any individualised shares.

56.1.12. A WHT Applicant's right to receive dividend payments was not affected by any separate contract that it might and/or did enter into to limit its exposure to directional movements in the publicly listed price of the company during the period it held shares in the aforesaid company.

56.1.13. Without prejudice to the generality of the foregoing, where a WHT Applicant entered into a contract to sell Equities (by entering into contracts known as a future, a forward or an option), such contracts did not result in any transfer of the WHT Applicant's legal or economic ownership interest in shares it had separately purchased and accordingly the WHT Applicant's right to dividend payments (if any) would be unaffected.

56.2.  Before reaching the above reasonable beliefs SCP and the Sanjay Shah Defendants and/or their directors took all reasonable steps to (i) engage employees and directors with knowledge and expertise in the fields of (amongst other things) dividend arbitrage trading, compliance and law; (ii) instruct suitably qualified lawyers and/or accountants to advise on trading strategies and the corporate structures of the Solo Group; and (iii) ensure that trading activity was only carried out in accordance with the legal advice received. The Sanjay Shah Defendants were entitled to and did rely on persons employed by (amongst others) SCP and Solo Capital Limited to ensure that trading activity was at all times conducted in accordance with the foregoing.

56.3.  Further, Mr Sanjay Shah reasonably believed that the trading strategies deployed by SCP were similar to strategies that Mr Sanjay Shah had deployed and/or had seen deployed during his periods of employment at Credit Suisse

(London) (2001 to 2003), ING Bank (London and New York) (2003 to 2007), and Rabobank International (London) (2007 to 2008). To the best of Mr Sanjay Shah's knowledge and belief, the trading strategies at each of those banks were deployed only after relevant specialist legal and tax advice had been obtained, and were on all occasions carried out in accordance with any such advices received and such other processes required by the aforesaid credit institutions.

56.4.    From approximately June 2012 onwards, SCP, the Sanjay Shah Defendants and/or their directors, in reliance on the matters aforesaid, became a client of JP Morgan through which it cleared futures. During this period, SCP established a clearing platform called Global Securities Services ("GSS"). The aforesaid defendants reasonably believed that a qualifying pension fund domiciled in the USA ("USPF") would be entitled to claim a full refund of the tax withheld pursuant to the convention referred to at paragraph 9(a) of the Amended Particulars of Claim, should the USPF choose to conduct the following transactions ("The Futures Trade"):

56.4.1.    USPF purchases Danish Equities either via a regulated inter-dealer broker or via purchasing NYSE LIFFE single-stock, physically delivered listed flex future contracts regarding the relevant Equities.

56.4.2.    During the relevant period SCP cleared future contracts through JP Morgan, SEB and Citi Bank.

56.4.3.    The purchase of the Equities takes place prior to the ex-dividend date but no later than the dividend approval date, meaning the date where the dividend is finally approved for distribution (generally meaning the date of the annual general shareholders meeting) ("Dividend Approval Date"). The settlement date of the Equities would be on or after the dividend record date. In the case of physically delivered listed futures contracts, the expiry of the futures contract would be no later than the Dividend Approval Date.

56.4.4.    USPF receives the dividend which had been declared on the Equities on Dividend Approval Date ("Danish Dividend").

56.4.5. On purchase of the Equities, the USPF would hedge its long exposure on the Equities by selling exchange-traded, cash settled single stock futures over the Equities ("the Short Derivative"). The price of the Short Derivative would take into account a proportion of the expected Danish Dividend in calculating the strike price of the Short Derivative but no adjustment would be made if the actual dividend amount was more or less than the expected dividend amount.

56.4.6. In the period before sale (more fully particularised at paragraph 56.4.7 of this Defence) the Equities would be lent out under a stock loan (using a standard Global Master Securities Lending Agreement) to an unrelated party which could be located in any jurisdiction, in order to minimise financing costs. The period of the stock loan would in general be no greater than 3 months and the stock loan would be cash collateralised. The stock loan transaction would be commenced on or after the ex-dividend date (with settlement of the stock loan occurring on the same day as the settlement date of the purchase) but always after the Dividend Approval Date and the borrower of the Equities would not receive any dividend on the Equities.

56.4.7. Subsequently, the USPF would simultaneously: (i) sell the Equities via an inter-dealer broker, (ii) recall the stock loan, and (iii) enter into a long futures position over the Equities in order to close out the short futures position created in paragraph 56.4.5 above. The long futures position would expire on the same date as the short futures position created in paragraph 56.4.5 above.

56.5. On approximately 13 February 2014 SEB informed SCP that it was competing with SEB's own business model and accordingly did not wish to continue to provide clearing services for SCP.

56.6. At or around this time SCP entered into negotiations to transfer its business from SEB to Citigroup. Citigroup thereafter approved SCP to become a client of the bank but then reversed its decision upon disclosure provided by SCP as to its GSS business which Citigroup identified as being a competing business.

56.7. From approximately late February 2014 onwards, SCP and the Sanjay Shah Defendants and/or their directors, in reliance on the matters aforesaid, reasonably believed that a USPF or a qualifying company incorporated in Labuan, a federal territory in Malaysia ("MalayCo") would be entitled to a full refund of withholding tax should it choose to conduct the Futures Trade (more particularly described at paragraph 56.4 above) with the variant that the USPF/MalayCo could choose to hedge its long position over the counter through forward contracts as the Short Derivative instead of cash settled single stock futures ("The Forwards Trade").

56.8. During 2014 the processing of the Forwards Trade was carried out through SCP by means of three automated systems developed on behalf of SCP and owned by entities in the Elysium Group (collectively "the Platform"):

56.8.1 Octave (order generation software), held static data including Danish companies' dividend dates and amounts that was able to generate and deliver electronic trading signals to BrokerMesh if an executing broker wished to proceed with a purchase or sale of shares.

56.8.2 BrokerMesh (order matching software), a portal that received electronic messages from Octave and then subsequently distributed such messages to executing brokers who had qualifying clients for a trade match on the basis of the underlying company, the number of shares in the proposed transaction, the price and timing of execution. BrokerMesh then executed the trade and sent the resulting execution to TAS.

56.8.3 TAS (post-trade processing), a book and record system that held information containing all client trade and share positions.

56.9 All Equities trades were reported to the FCA via the LSE UnaVista MiFIR Reporting Portal. All future trades were reported on the LIFFE exchange.

56.10 During the periods in which Mr Sanjay Shah held managerial positions at SCP, he instituted appropriate corporate governance controls including the following policies, processes and procedures:

23

56.10.1 Employing suitably qualified employees with experience in compliance and corporate governance.

56.10.2 Seeking suitably qualified external advice and/or input on matters of strategic importance to SCP (including proposed trading strategies).

56.10.3 When implementing trading strategies taking reasonable steps to ensure that the same were carried out lawfully and/or in accordance with the advice that had been received, namely: (i) front office controls; (ii) internal compliance and management oversight; and (iii) external auditors.

56.10.4 SCP's external auditors, Moore Stephens, confirmed compliance with all regulatory and accounting standards. The auditor did not report any offence, error, or non-compliance with law and regulation, fraud, or material weakness, and did not report that there had been any attempt made to mislead auditors.

56.11 Further or alternatively, during the periods in which Mr Sanjay Shah held managerial positions at SCP:

56.11.1 Any and all technical work to develop SCP's trading strategies was carried out by employees of SCP and/or consultants engaged by SCP, and not Mr Sanjay Shah personally.

56.11.2 From 2009 Raj Shah and Guenther Grant-Kar were employed to develop an efficient and lawful dividend arbitrage trading strategy. They sought and obtained approval of their structure from Norton Rose.

56.11.3 From 2010 Graham Horn was employed alongside Messrs Raj Shah and Grant-Kar to develop efficient and lawful dividend arbitrage trading strategies.

56.11.4 From 2011 onwards when SCP transitioned into a prime brokerage, Priyan Shah and Gerry O'Callaghan were employed to develop efficient and lawful dividend arbitrage trading strategies and from 2013

these individuals ceased to be employees but continued to provide services to SCP through Agrius Capital.

56.11.5  At all relevant times during his period of managerial oversight at SCP, Mr Sanjay Shah supervised the work of the aforesaid senior employees and consultants insofar as he was reasonably required and/or able to do. If, which is denied, any unlawful trading strategies were developed and/or deployed during the aforesaid period the same are in no way attributable to Mr Sanjay Shah personally.

56.12  From January 2014 Mr Sanjay Shah had ceased to have any day-to-day managerial role at SCP upon the appointment of Ms Stratford, with such matters being her responsibility, in her role as Chief Executive Officer.

56.13  From the date of her appointment Ms Stratford had control of and responsibility for the operations of SCP, including responsibility to obtain relevant legal opinions and ensuring SCP (and other associated entities) complied with its legal and regulatory obligations.

56.14  From January 2014 Mr Sanjay Shah was not able to authorise, approve or reverse decisions taken by Ms Stratford. For example, Ms Stratford appointed herself as Chief Executive Officer of Telesto, Old Park Lane, and West Point directly contrary to the wishes of Mr Sanjay Shah.

56.15  Ms Stratford exercised control of SCP (and its related entities) by undertaking independent recruitment decisions to both employ new members and to dismiss employees (for example, Priyan Shah, Mr O'Callaghan and Mr Patterson) who had been recruited by Mr Sanjay Shah.

57  As to paragraph 24 (inferences that WHT Representations were false) is denied save as expressly admitted in the sub-paragraphs below and/or to the extent (only) that the same is consistent with the factual averments in paragraph 56 above:

57.1  Paragraph 24(a) is not admitted.

57.2  Paragraph 24(b) is denied to the extent that WHT Applicants made applications in accordance with the Futures or Forwards Trade.

57.3    Paragraph 24(c) is not admitted. The Sanjay Shah Defendants have not been provided with copies of the responses referred to and are not responsible for the content of the same.

57.4    Paragraph 24(d)(i) and (ii) are denied. The WHT was received by the USPF/MalayCo. The fees agreed by SCP (for the provision of custody and clearing services) and the WHT Applicants represented standard market rates.

57.5    Paragraph 24(d)(iii) is embarrassing for want of particularity and in any event denied. SCP made payments only in accordance with its contractual obligations. Where payments were made to other companies within the Solo Group, the same were at the prevailing market rate for the services in question. To the extent that SKAT seek to draw an adverse inference from the jurisdictions in which entities in the Solo and/or Elysium Group were registered the same is denied.

57.6    Paragraph 24(e) is denied. Paragraph 56 above is repeated.

57.7    Without prejudice to the generality of the foregoing, paragraph 24(e)(v) is misconceived and in any event denied. Dividend arbitrage trading concerns the difference between: (i) the price of a share purchased by the USPF/MalayCo cum-dividend and the price of the hedge (future/forward contract) sold by the USPF/MalayCo, and (ii) the net dividend and the expected WHT refund. The USPF and MalayCo were entitled to and did make or cause to make WHT Applications, but the positive return sought in the transactions related to the aforesaid arbitrage. Any return based on the WHT payment alone would have generated a substantial loss for each USPF and MalayCo.

57.8    As to paragraph 24(e1) (the "BaFin Report"):

        57.8.1    The Solo Model was not created contemporaneously. It was prepared in or around 2016 by, a former Assistant Trader employed by SCP. It is a not wholly accurate description of the Future and/or Forward Trade. Nor does it include any information about the Platform. Paragraph 56 above is repeated.

57.8.2  The Solo Model does not show "circular" trades or trades between "connected" parties. Each transaction was conducted between parties at arm's-length and on full commercial terms on the Platform. The narratives (both in the Solo Model and as pleaded by SKAT), insofar as they refer to "brokers" acting as agents as opposed to being principals are inaccurate. The parties described as "forward counterpart", "Equity broker" and "stock loan intermediary" each dealt as principals in the transactions to which they were parties.

57.8.3  Any and all references by SKAT to "the same shares" is misconceived and in any event denied. Danish exchange traded equities issue shares to VP Securities only, who in turn provide custodian services for credit institutions. Clients of the credit institutions are entitled to and do hold claims against the credit institutions for shares and net dividend payments. The decision by the WHT Applicants and/or other principals who were participants in the Future and/or Forward Trades to hedge their position as opposed to engage in directional trading was a wholly discretionary but unsurprising decision in circumstances where the trading strategies were focused on generating a profit from the arbitragal differences outlined at paragraph 57.7 above, as opposed to a directional speculation on changes to the share price at the public exchange in the future.

57.8.4  Any and all references by SKAT to "a closed loop of circular transactions" is similarly misconceived and in any event denied. The trades were not fictitious but were legitimate transactions carried out in accordance with EU legislation and national regulations.

57.8.5  Upon entering into the transaction (by way of a binding contract having provided good consideration) described as "the first leg" in paragraph 24(e1)(i)(A)(1), the WHT Applicants were entitled to make the WHT Applications.

57.8.6  Any and all remaining "legs" were transactions concerned solely with a legitimate decision to hedge the WHT Applicants' exposure to future

27

movements in equity prices listed at the exchange and to raise financing for the first leg.

57.8.7   The Solo Model does not make specific reference to the dividend compensation payments which were credited to the "buyer" in "the first leg". It was not drafted as a fully comprehensive description of the trade.

57.8.8   As to paragraph 24(e1)(iii) (the role of SCP):

57.8.8.1   SCP's operational activities, including securities clearing, settlement, custody and safekeeping were legitimate and in accordance with the legislative framework within which SCP operated.

57.8.8.2   SCP was an authorised custodian or sub-custodian of clients' assets which it held pursuant to custody agreements entered into with each client. It acted as a clearing broker and as such was liable to its clients in a case of settlement fail.

57.8.8.3   SCP did not carry out any false accounting and only provided Credit Advice Notes when it was properly entitled to do so.

57.8.8.4   The final sentence is misconceived and in any event denied. Danish tax law recognises fiscal ownership based on contractual arrangements. Shares were traded on SCP's platforms and dividends were distributed to the WHT Applicants.

57.8.9   Paragraph 24(e1)(iv) is embarrassing for the use of imprecise emotive language and for want of particularity, and in any event denied. There was no common ownership or control between the parties as alleged or at all. The brokers were not coordinated, each carried out business at arms' length from each other, and in the Solo Model acted as execution only brokers (i.e. as principals) not intermediaries.

57.9   Paragraph 24(e1)(v) (Schedule 6B) is outside the knowledge of the Sanjay Shah Defendants and accordingly not admitted. Accurate trade examples are provided in Appendix 2 to this Defence.

57.10   Paragraph 24(f) is not admitted. Further or alternatively, the first two sentences do not relate to the Sanjay Shah Defendants but to the Competitors.

57.11   Paragraph 24(g) is not admitted. In any event, for the reasons aforesaid the existence of multiple Credit Advice Notes (for different pension plans on the same day) is irrelevant to Danish fiscal ownership rules.

57.12   Paragraph 24(h) is noted.

57.13   Paragraph 24(i) (summary of inferences by SKAT) is denied:

57.13.1   The WHT Applications were based on actual and legitimate transactions. The WHT Applicants received dividends as stated in the Credit Advice Notes.

57.13.2   To the extent that the phrase "circular transactions that cancelled each other out" is used to suggest that beneficial ownership of the Equities was transferred through the stock lending agreements, this is denied.

57.13.3   The WHT Applicants were entitled to and did choose to hedge their exposure to directional movements in publicly traded equities. Such decisions and/or agreements did not affect their entitlement to make the WHT Applications.

57.13.4   The WHT Applications were made honestly.

57.13.5   If and to the extent that any WHT Applications were made dishonestly (which is denied) the Sanjay Shah Defendants had no knowledge of the same but instead reasonably believed that any and all WHT Applications made following trades carried out pursuant to the Future and/or Forward Trade were in accordance with SCP's compliance processes and the external advice it procured and received from time to time.

57.13.6 Paragraph 24(i)(iv)(A) is misconceived and not accepted. Shares are not identifiable in the manner alleged or at all.

57.13.7 Paragraph 24(i)(iv)(B) is denied. The source of funding/collateral does not effect the beneficial ownership of the Equities nor does it create any obligation to pass on the dividend received by a WHT Applicant. It is denied that the WHT Applicant acted as a mere nominee. To the best of the Sanjay Shah Defendant's knowledge, each WHT Applicant entered into the relevant transactions as a principal, by way of a binding contract and provided good consideration for the same.

## H.   PROCEEDS OF THE WHT APPLICATIONS

### H.1. Payments by SKAT

58    As to paragraph 25 (summary of payments to Agents), it is admitted that SKAT made payments to Goal, Syntax and Acupay, and makes no admissions in respect of payments made to Koi, Global and Globe Tax Services Inc. No admissions are made as to the amount of sums paid. The remainder of paragraph 25 is not admitted.

59    As to paragraph 26 (allegation that Agents held monies from SKAT as constructive trustees), it is denied that the representations were false and/or were fraudulently made. It is denied that SKAT was operating under a mistake of fact. The existence of a constructive trust is denied. If and to the extent that any WHT Applications were made dishonestly (which is denied) the Sanjay Shah Defendants had no knowledge of the same but instead reasonably believed the same to have been honestly made.

### H.2. Transfers to SCP

60    As to paragraph 27 (payments by Agents to SCP), it is not admitted that Syntax, Goal and Acupay made payments to SCP. Payments were made to the custody account held by the relevant WHT Applicant with SCP. No admissions are made as to the amount of the sums paid.

61    Save that the reference to Global in paragraph 28 is not understood, paragraph 28 (payments in paragraph 27 are traceable) is denied.

62   Paragraph 29 (ultimate destination of payments to Koi) is not a matter which the Sanjay Shah Defendants can plead to.

63   Paragraph 30 (SCP and Indigo fraudulent participants in misrepresentations) is denied insofar as it relates to SCP. The Sanjay Shah Defendants have no knowledge as to the dealings of Indigo. It is denied that there was any misrepresentation, and denied that any alleged misrepresentation induced SKAT to make the payments described at paragraph 27. It is in any event denied that the Sanjay Shah Defendants were dishonest, as alleged or at all. Paragraphs 56 and 57 above are repeated.

64   It is accordingly also denied that any sums received by the Sanjay Shah Defendants were received as constructive trustee for SKAT, as alleged or at all.

### H.3.   Transfers to the Alleged Fraud Defendants

65   Paragraph 31 (payments by SCP to accounts to accounts at Varengold) is denied insofar it is addressed to the Sanjay Shah Defendants save where expressly admitted in the relevant schedule for each of the Sanjay Shah Defendants appended to this Defence. Where paragraph 31 deals with matters not within the knowledge of the Sanjay Shah Defendants they are accordingly unable to admit or deny the same.

66   Paragraph 32 (payments by SCP to accounts not held at Varengold) is denied insofar it is addressed to the Sanjay Shah Defendants save where expressly admitted in the relevant schedule for each of the Sanjay Shah Defendants appended to this Defence. Where paragraph 32 deals with matters not within the knowledge of the Sanjay Shah Defendants they are accordingly unable to admit or deny the same.

67   As to paragraph 33 (payments between Alleged Fraud Defendants) is denied insofar it is addressed to the Sanjay Shah Defendants save where expressly admitted in the relevant schedule for each of the Sanjay Shah Defendants appended to this Defence. Where paragraph 33 deals with matters not within the knowledge of the Sanjay Shah Defendants they are accordingly unable to admit or deny the same.

### H.4.   Purchase of controlling shareholding in Varengold Bank AG

68   As to paragraphs 34 (transactions for purchase of 40.89% in Varengold):

68.1    As to sub-paragraph (a) it is denied that SCP funded the acquisition of shares acquired by Agrius Capital Ltd/Rivera One Ltd as alleged or at all. Paragraphs 25.5 and 26.3 of the Defence to Schedule 5B is repeated.

68.2    As to sub-paragraph (b) it is denied that SCP funded the acquisition of shares acquired by Ampersand Capital Ltd/PCM Capital Ltd as alleged or at all. Paragraphs 25.9 and 26.8 of the Defence to Schedule 5B is repeated.

68.3    As to sub-paragraph (c) it is denied that SCP funded the acquisition of shares acquired by Ace City Holding Ltd/Astella Ltd as alleged or at all. Paragraphs 25.8 and 26.7 of the Defence to Schedule 5B is repeated.

68.4    As to sub-paragraph (d) it is denied that SCP funded the acquisition of shares acquired by Oberix International Corporation/Eris Investments Ltd as alleged or at all. Paragraphs 25.11 and 26.9 of the Defence to Schedule 5B is repeated.

68.5    As to sub-paragraph (e) it is denied that SCP funded the acquisition of shares acquired by Silverfox Holding Ltd/Silvercouk Ltd as alleged or at all. Paragraphs 25.7 and 26.5 of the Defence to Schedule 5B is repeated.

68.6    As to sub-paragraph (f) it is denied that SCP funded the acquisition of shares acquired by Skyfall Financial Ltd/Bellview Financial Ltd as alleged or at all. Paragraphs 25.12 and 26.10 of the Defence to Schedule 5B is repeated.

68.7    As to sub-paragraph (g) it is denied that SCP funded the acquisition of shares acquired by T&S Capital as alleged or at all. Paragraphs 25.6 and 26.4 of the Defence to Schedule 5B is repeated.

68.8    As to sub-paragraph (h) it is denied that SCP funded the acquisition of shares acquired by Colbrook Ltd as alleged or at all. Paragraphs 25.10 and 26.6 of the Defence to Schedule 5B is repeated.

69    As to paragraph 35 (acquisition of 5.47% and 33.32% shareholdings in Varengold) it is admitted that AESA acquired 160,000 shares in Varengold Bank on or about 12 June 2014. The remainder of this paragraph (in so far as it relates to AESA) is not admitted. It is admitted that Elysium Dubai acquired 974,184 shares on or about 23 February 2016. The remainder of this paragraph (in so far as it relates to Elysium Dubai) is not admitted.

70    Paragraph 36 (acquisitions financed by SCP using proceeds traceable to SKAT) is
      denied. The Sanjay Shah Defendants received and made payments wholly lawfully using
      monies to which they were legally and beneficially entitled.

71    Paragraph 37 (coordination of share purchases in Varengold) is denied. Whilst the
      acquisition of Varengold shares was co-ordinated by Mr Sanjay Shah, the commercial
      benefit derived from the same related only to his own investments in Varengold. The
      investments made by other persons and/or companies controlled by them was for the
      commercial benefit of those third parties only. It is denied that any of the acquisitions
      were financed by proceeds traceable to SKAT:

      71.1    Sub-paragraph (a) is not admitted as the Sanjay Shah Defendants are unable to
              state when each of the relevant third parties opened accounts with Varengold
              Bank.

      71.2    Sub-paragraph (b) is insufficiently particularised and in any event denied. The
              Sanjay Shah Defendants held bank accounts (cash), foreign exchange accounts,
              securities accounts, collateral accounts, clearing accounts and custody accounts
              with Varengold Bank.

      71.3    Sub-paragraph (c) is not admitted.

      71.4    Sub-paragraph (d) is denied.

      71.5    Sub-paragraph (e) is insufficiently particularised and is in any event not
              admitted.

72    As to paragraph 38 (acquisition of a further 21.06% in Varengold) it is admitted that
      Elysium Dubai is the sole shareholder of PCM Capital Ltd, T&S Capital Ltd, Colbrook
      Ltd, Ampersand Capital Ltd, Skyfall Holdings Ltd/Skyfall Financial Ltd (who in turn
      hold shares in Varengold Bank) pursuant to the process set out at paragraphs 25 to 26 of
      the Defence to Schedule 5B. It is not admitted that Elysium Dubai acquired indirect
      control of a further 21.06% of the shares in Varengold Bank.

73    Paragraph 39 (alleged sham transactions between Elysium Global and third parties) is
      denied:

73.1     As to sub-paragraph (a) it is admitted that Elysium Dubai entered into loan and security agreements with Skyfall Holdings Ltd, Agrius Capital Partners LLP and Luna Capital Partners LLP for commercial purposes. The remainder of the paragraph is denied. Paragraph 27 of the Defence to Schedule 5B are repeated.

73.2     Sub-paragraph (b) is denied.

73.3     Sub-paragraph (c) is admitted. The physically-settled Share Option was executed between Elysium Dubai and Ace City Holding Ltd to provide security. Paragraph 25.8 of the Defence to Schedule 5B is repeated.

74     Paragraphs 40 and 41 are denied. The share acquisitions described at paragraphs 34 to 39 were undertaken for commercial purposes. It is denied (as is alleged at paragraph 41) that the acquisition was to launder, conceal or distribute proceeds of the WHT Applications.

## H.5.  Purchase of 100% of the shares in Dero Bank AG

74     As to paragraph 42 it is admitted that the total sum of €28.57 million of funds held by clients of SCP (in their respective custody accounts) was used for the acquisition of 100% of the shares in Dero Bank. Paragraphs 30 of the Defence to Schedule 5B are repeated.

74.1     Sub-paragraph (a) is admitted save that the monies were transferred from the custody account held by Trillium Capital Sarl with SCP. As to the use of those funds it is admitted that €28.573 million was used to acquire shareholdings in Dero bank. It is denied that the balance was used for that purpose. Paragraphs 30 of the Defence to Schedule 5B are repeated.

74.2     Sub-paragraph (b) is admitted.

74.3     As to sub-paragraph (c) it is admitted that Trillium Capital Sarl purchased 100% of the shares in Dero Bank for €28.573 million but denied that Trillium Capital Sarl used funds that are the traceable proceeds of sums paid by SKAT.

75     Paragraph 43(a) (ownership of Trillium by Mr Sanjay Shah) is admitted. The remainder of paragraph 43 is outside the knowledge of the Sanjay Shah Defendants.

76     As to paragraph 44 it is denied that the shares in Woodfields Holdings Capital Ltd (which held the shares of Woodfields Holdings Ltd) and the shares in Polaris Capital (One) Ltd (which held the shares in Polaris Capital Ltd) were acquired by Elysium Dubai. Elysium Global acquired those shares on 20 February 2018 and 27 November respectively.

77     Paragraph 45 (alleged sham transactions between Elysium Global/Dubai and third parties) is denied:

    77.1     Sub-paragraph (a) is denied. Elysium Global entered into loan and security agreements with Kenna Capital Ltd, Serafina Capital LLP and Luna Capital Partners LLP for commercial purposes. Paragraph 30 of the Defence to Schedule 5B is repeated.

    77.2     Sub-paragraph (b) is denied. It is denied that Mr Sanjay Shah caused SCP to fund the acquisition of the shares in Dero Bank. The acquisition of the shares in Dero Bank (which was previously known as VEM Bank) were funded as set out at paragraph 30 of the Defence to Schedule 5B.

78     Paragraphs 46 and 47 are denied: the share acquisitions described at paragraphs 42 to 45 were undertaken for commercial purposes. It is denied (as is alleged at paragraph 47) that the acquisition was to launder, conceal or distribute proceeds of the WHT Applications.

## I.     THE WHT SCHEME

79     It is denied that the WHT Applications were made as part of a fraudulent scheme (or schemes), as alleged at paragraph 49 or at all.

80     Paragraph 50 (coordination of WHT Scheme) is denied.

    80.1     Sub-paragraph (a) is not admitted.

    80.2     Sub-paragraph (b) is not admitted.

    80.3     Sub-paragraph (c)(i) is admitted.

    80.4     As to sub-paragraph (c)(ii) it is admitted that the funds were remitted from the custody account held by Ganymede with SCP.

80.5    Sub-paragraph (c)(iii) is admitted save that the beneficial ownership of First
        Alton Inc is not within the knowledge of the Sanjay Shah Defendants and use
        of the word "purported" is denied.

80.6    Sub-paragraph (c)(iiiA) is admitted save that the beneficial ownership of SSM
        United LLC is not within the knowledge of the Sanjay Shah Defendants and use
        of the word "purported" is denied.

80.7    Sub-paragraph (c)(iv) is admitted save that the beneficial ownership of India
        Atlantic Inc is not within the knowledge of the Sanjay Shah Defendants and use
        of the word "purported" is denied.

80.8    Sub-paragraph (c)(v) is admitted save that the beneficial ownership of Icon
        Beach Inc is not within the knowledge of the Sanjay Shah Defendants and use
        of the word "purported" is denied.

80.9    Sub-paragraph 50(c1) is insufficiently particularised so as to enable the Sanjay
        Shah Defendants to plead to the same. Sub-paragraphs (i) to (iv) are admitted.

80.10   As to paragraph 50(c2) (payments made by Parla):

        80.10.1 The details of the invoices and payments in sub-paragraph (i) are
                admitted. The remainder of the paragraph is not admitted.

        80.10.2 The details of the invoices and payments are identified at (A), (B) and
                (C) in sub-paragraphs (ii) are admitted. The transaction/invoice at (D)
                is a duplicate of (B) and is denied. The remainder of the paragraph is
                not admitted.

        80.10.3 The details of the invoices identified in sub-paragraph (iii) are
                admitted. The details of the payments are not admitted as the
                information is not currently available to the Sanjay Shah Defendants.
                The remainder of the paragraph is not admitted.

80.11   As to paragraph 50(c3) (payments made by Acai):

80.11.1 The details of the invoices and payments in sub-paragraphs (i) to (iii) are admitted. The remainder of the paragraphs are not admitted.

80.12 As to paragraph 50(c4) (payments made by Philo):

80.12.1 The details of the invoices and payments in sub-paragraphs (i) to (iii) are admitted. The remainder of the paragraphs are not admitted.

80.13 As to paragraph 50(c5) (payments made by Fire):

80.13.1 The details of the invoices and payments in sub-paragraphs (i) to (iii) are admitted. The remainder of the paragraphs are not admitted.

80.14 Paragraph 50(c6) is not admitted.

80.15 As to paragraph 50(c7) it is admitted that Parla, Acai, Philo and Fire were incorporated on the dates identified in paragraph 50(c1) of the Amended Particulars of Claim. The ownership and/or control of the receiving companies is not within the knowledge of the Sanjay Shah Defendants. The remainder of the paragraph is denied.

80.16 Paragraphs 50(c8)(a) and (b) are not within the knowledge of the Sanjay Shah Defendants. As to sub-paragraph (c) it is denied there is anything unlawful in the use of four independent companies.

80.17 To the extent that paragraph 50(c9) is within the knowledge of the Sanjay Shah Defendants it is denied. The payments were wholly legitimate. No efforts were made to conceal the same or their true nature.

80.18 Paragraph 50(d) is not within the knowledge of the Sanjay Shah Defendants. To the best of the Sanjay Shah Defendant's knowledge (from information provided by SKAT in these proceedings), Mr Donaldson/DWM Pension Plan traded with North Channel Bank.

80.18.1 As to sub-paragraph (i) (Mr La Rosa) it is admitted that Raubritter LLC Pension Plan was a client of SCP (and may or may not have been a

client of its Competitors). No admissions are made as to the amount of the sums paid.

80.18.2 As to sub-paragraph (ii) (Mr Lehman) it is admitted that The Valerious LLC Solo 401K Plan was a client of SCP (and may or may not have been a client of its Competitors). No admissions are made as to the amount of the sums paid.

80.18.3 As to sub-paragraph (iii) (Mr Bradley) it is admitted that Blackrain Pegasus LLC Solo 401k Plan and The Bradley London Pension Plan were clients of SCP (and may or may not have been a client of its Competitors). No admissions are made as to the amount of the sums paid.

80.19 As to paragraph 50(d1) it is admitted that Roxy Ventures LLC Solo 401K Plan was a client of SCP (and may or may not have been a client of its Competitors). No admissions are made as to the amount of the sums paid.

80.20 Paragraph 50(d2) is insufficiently particularised. To the extent that the Sanjay Shah Defendants are able to plead to this paragraph pending disclosure and evidence, it is not admitted. As to the storage of the documents with the BlackBox storage facility which the Sanjay Shah Defendants infers SKAT is referring to, it is not admitted that all of those documents were obtained or stored contemporaneously. The material (in part) found in the BlackBox storage facility in so far as it related to the USPF (and related entities) was collated from 2016 onwards. Paragraph 57.8.1 is repeated.

80.21 As to paragraph 50(e):

80.21.1 Sub-paragraph (i)(A) (Bastion Capital) is not admitted. The full custody statements for SCP clients are not within the possession of the Sanjay Shah Defendants.

80.21.2 Sub-paragraph (i)(B) is admitted.

80.21.3 Sub-paragraph (ii)(A) and (C) (Novus Capital Markets Ltd) are not admitted. The full custody statements for SCP clients are not within the possession of the Sanjay Shah Defendants.

80.21.4 Sub-paragraph (ii)(B) is admitted.

80.21.5 Sub-paragraph (iii)(A) (TJM Partners) is not admitted. The full custody statements for SCP clients are not within the possession of the Sanjay Shah Defendants.

80.21.6 Sub-paragraph (iii)(B) is admitted.

80.21.7 Sub-paragraph (iii)(C) is admitted.

80.22   As to paragraph 50(f) (Novus Capital Markets Ltd) it is admitted that Solo Group Holdings Ltd acquired the shareholdings in Novus Capital Markets Ltd on or around 20 May 2015 (date of payment) following the execution of a share purchase agreement on 5 December 2014. This acquisition post dated all and any trading undertaken by Novus on the GSS platform which ceased on 8 May 2014. The remainder of this paragraph in so far as it relates to Novus Capital Markets Ltd is denied.

80.23   As to paragraph 50(f) (FGC Securities LLC) it is denied that FGC Elysium LLC (or any other entities associated with the Sanjay Shah Defendant) acquired the shareholdings in FGC Elysium LLC. This was an intended acquisition which did not in fact proceed. The remainder of this paragraph in so far as it relates to FGC Securities LLC is denied.

80.24   The use of the expression "*associates of Mr Sanjay Shah*" in paragraph 50(g) is insufficiently particularised. It is denied that there was any such fraud perpetrated on SKAT via SCP as alleged or at all. The remainder of the paragraph is not admitted.

80.25   As to paragraph 50(h) it is admitted that Mr Grant-Klar formerly held a managerial position with SCP. The remainder of the paragraph is not within the knowledge of the Sanjay Shah Defendants and is not admitted.

80.26    As to paragraph 50(i)(i):

    80.26.1 It is admitted that the Solo Group Custodian produced Credit Advice Notes.

    80.26.2 No admissions are made in respect of the value of the sums stated.

    80.26.3 It is admitted that the ultimate owner of the Solo Group Custodians is Mr Sanjay Shah. It is not admitted that they were controlled by him and paragraphs 56.14 and 56.15 are repeated.

    80.26.4 The remainder of the paragraph is insufficiently particularised including the meaning of "the same software/IT system" and accordingly the Sanjay Shah Defendants are unable to plead to the same.

80.27    As to paragraph 50(i)(ii) the Credit Advice Notes produced by Indigo are not within the knowledge of the Sanjay Shah Defendants. It is admitted that sums totalling £21.5 million (£10,374,000 on 6 June 2014 and £11,163,441 on 4 July 2014) were paid to Mr Horn from Ganymede's custody account held with SCP which represented the profit share due to Mr Horn from his prior employment with SCP and the Elysium Group.

80.28    As to paragraph 50(j):

    80.28.1 As to sub-paragraph (i) it is admitted that Treefrog was the majority shareholder of Syntax from 19 September 2014. It is denied that Syntax was "controlled" by Treefrog and/or Mr Sanjay Shah. At all material times Syntax was controlled by Mr Vargas.

    80.28.2 Sub-paragraph (ii) is denied.

80.29    Paragraph 50(k) is not admitted.

80.30    Paragraph 50(l) is denied.

80.31    Paragraphs 50(m) and 50(n) are not admitted.

80.32    As to paragraph 50(o) it is admitted that the acquisition of shares in Varengold and Dero Bank was co-ordinated on the instructions of Mr Sanjay Shah. There were no arrangements with regards to the exercise of voting rights. The remainder of the paragraph is denied.

80.33    Paragraph 50(p) is denied.

81    It is denied that there was any such conspiracy as alleged in paragraph 50A or at all. Paragraph 39 above is repeated.

81.1    Sub-paragraphs (a) to (f) are not within the knowledge of the Sanjay Shah Defendants.

81.2    Sub-paragraph (g) is admitted (and SKAT's reservation is noted).

81.2.1    As to sub-paragraph (i), paragraph 80.27 is repeated.

81.2.2    The Sanjay Shah Defendants do not plead to any matters set out in schedules which are not expressed to be against the Sanjay Shah Defendants. If appropriate, they will respond to such matters in evidence.

81.2.3    Sub-paragraph (iii) is admitted to the extent that, to the best of the Sanjay Shah Defendants knowledge and belief, Mr LaRosa acted under POA's provided by USPF that traded with SCP and Competitor companies.

81.3    Sub-paragraphs (h)(i) to (ii) are admitted.

81.4    As to sub-paragraph (h)(iii):

81.4.1    Mr Dhorajiwala held controlled functions at SCP between 13 August 2012 and 24 September 2014.

81.4.2    Mr Price held controlled functions at SCP between 12 July 2012 and 31 October 2013.

81.4.3    Mr Graham Horn was a member of SCP in the period 31 March 2012 to 22 February 2013.

81.4.4    Save as aforesaid sub-paragraph (h)(iii) is not admitted.

81.5   Sub-paragraph (h)(iv) is not within the knowledge of the Sanjay Shah Defendants and accordingly not admitted.

81.6   Sub-paragraphs (i) to (k) are not within the knowledge of the Sanjay Shah Defendants and accordingly not admitted.

82   Paragraph 51 is noted but does not require a response.

83   As to paragraph 52, it is denied that there was any misrepresentation, and denied that any alleged misrepresentation induced SKAT to make the payments described at paragraph 52.

84   It is accordingly also denied that SKAT was entitled to rescind the said transactions, as alleged at paragraphs 53 and 54, or at all.

## J.   APPLICABLE LAW

85   SKAT's allegations at paragraphs 55 and 56 regarding the applicable law are dealt with at paragraphs 17 to 21 above of this Defence.

## K.   ENGLISH LAW CLAIMS AGAINST THE ALLEGED FRAUD DEFENDANTS

### K.1.  Tort claims

### (a)  Deceit

86   Paragraph 57 ("Syntax", "true principals" and "ultimate instructions") is denied. Specifically:

86.1    It is denied that Mr Sanjay Shah and/or AESA Sarl made the Agent Representations, as alleged or at all.

86.2    It is denied that Mr Sanjay Shah and/or AESA Sarl were the "true principals" of the Agents and Global, as alleged or at all. Paragraph 38 above is repeated.

86.3    It is denied that the Agents and Global were acting on the "ultimate instructions" of Mr Sanjay Shah and AESA Sarl, as alleged or at all. Paragraph 38 above is repeated.

86.4    As regards the allegations contained in Schedule 5, the Sanjay Shah Defendants respond more particularly to those allegations at Schedules 5B, 5D, 5K, 5L, 5M and 5N to this Defence.

87    Paragraphs 57(c) (Agent Representations made jointly by Alleged Fraud Defendants) and 58(b) (Custodian Representations made jointly by Alleged Fraud Defendants) are denied. Specifically:

87.1    It is denied that there was any deceit, as alleged or at all. The WHT Representations (insofar as they were made) were true to the best of the Sanjay Shah Defendants' knowledge and belief. Paragraphs 38 and 55 to 57 above are repeated.

87.2    It is denied that there was any 'common design,' as alleged or at all. Paragraph 57.8 above is repeated.

87.3    As regards the allegations contained in Section G, paragraphs 51 to 57 above above are repeated.

87.4    As regards the allegations contained in Schedule 5, the Sanjay Shah Defendants respond more particularly to those allegations at Schedule 5B, 5D, 5K, 5L, 5M and 5N to this Defence.

87.5    In the premises, it is denied that the Sanjay Shah Defendants made the Agent Representations and/or the Custodian Representations, as alleged or at all.

88    As to paragraph 58(a), it is admitted that the Credit Advice Notes were produced by the parties identified. It is not admitted that the Credit Advice Notes contained the Custodian Representations.

89    Paragraph 59(b) (Mr Sanjay Shah induced the Custodian Representations) is denied. Paragraph 38 above is repeated.

90    Paragraph 60 ("Individuals' Custodian Representation") is not admitted. SKAT is put to
      strict proof that the Credit Advice Notes contained the Custodian Representations. SKAT
      is also put to proof that signature of the Credit Advice Note amounted to an implied
      representation by Mr Sanjay Shah that the contents of the Credit Advice Note were true.
      Mr Sanjay Shah admits that some of the Credit Advice Notes were signed by him in wet
      ink and thereafter a system generated electronic signature was used by SCP. In any event,
      to the extent that the Custodian Representations were made by SCP, Mr Sanjay Shah did
      honestly believe that SCP's representations were true, for the reasons set out at
      paragraphs 38 and 55 to 57 above.

91    Paragraph 61 (falsity of the WHT Representations) is denied, for the reasons set out at
      paragraphs 55 to 57 above.

92    As to paragraph 62 (knowledge and inducement):

      92.1    If the WHT Representations were false (which is denied), the Sanjay Shah
              Defendants neither knew nor were reckless as to their falsity, for the reasons set
              out at paragraphs 38 and 55 to 57 above.

      92.2    It is denied that the Sanjay Shah Defendants made the WHT Representations.
              The intent of those making the WHT Representations is outside the knowledge
              of the Sanjay Shah Defendants, and SKAT is put to proof of the same.

93    Paragraph 63 (inducement and payment) is not admitted, save that it is admitted that
      payments were made to the Agents. No admission is made as the amount of such
      payments. Whether the alleged misrepresentations were material, likely to induce such
      payments and did induce such payments are not matters within the knowledge of the
      Sanjay Shah Defendants, and SKAT is put to proof of the same.

94    As to paragraph 64 (knowledge and inducement relating to the Individuals' Custodian
      Representations), in respect of Mr Sanjay Shah:

      94.1    Paragraph 64(a) is denied. Mr Sanjay Shah believed that the Credit Advice
              Notes signed by him in wet ink contained Custodian Representations that were
              true. Paragraph 56 above is repeated.

44

94.2    Paragraph 64(b) is denied. Mr Sanjay Shah signed the Credit Advice Note on behalf of SCP and when he did so he believed that what SCP was saying was true.

94.3    Paragraph 64(c) is denied.

**(b)   Unlawful means conspiracy**

95    Paragraph 65 (conspiracy in pursuit of common design) is denied. It is in particular denied that there was any common design as alleged. Alternatively, it is denied that the Sanjay Shah Defendants were party to any such conspiracy and/or common design. Paragraphs 38 and 55 to 57 above are repeated. As regards the allegations contained in Schedule 5, the Sanjay Shah Defendants respond more particularly to those allegations at Schedule 5B, 5D, 5K, 5L, 5M and 5N to this Defence.

96    Paragraph 66 (intention to injure SKAT) is denied. In particular, it is denied that there was any such combination or conspiracy, as alleged or at all. Alternatively, it is denied that the Sanjay Shah Defendants were part of any such combination or conspiracy. In the premises, it is denied that the Sanjay Shah Defendants intended to cause financial loss to SKAT by unlawful means, as alleged or at all. Paragraphs 38 and 55 to 57 above are repeated.

97    Paragraph 67(a) (unlawful means: deceit) is denied. Paragraphs 86 to 94 above are repeated.

98    Paragraphs 67(b), (c) and (d) (unlawful means: constructive trust claims) are denied. It is denied that there was any constructive trust, as alleged or at all. Further and alternatively, if there was such a trust, it is denied that any of the Sanjay Shah Defendants were parties to a conspiracy to commit any breach thereof. It is also denied that the Sanjay Shah Defendants knew of any breach of such trust, and accordingly denied that they knowingly received the proceeds of the alleged breach. Paragraphs 38 and 55 to 57 above are repeated.

**(c)   Loss**

99    Paragraph 68 (SKAT suffered loss) is not admitted, and SKAT is put to proof in respect of all loss and damage allegedly suffered.

45

100  As to paragraph 69 (quantification of alleged losses):

    100.1    It is admitted that SKAT made payments to the Agents.

    100.2    No admission is made as to the amount of such payments, and SKAT is put to proof of the same.

    100.3    The involvement of the Sanjay Shah Defendants is described in detail at paragraphs 38 and 55 to 57 above. Insofar as the allegation that the Sanjay Shah Defendants were "party to the WHT Scheme" is inconsistent with that description, it is denied.

    100.4    The remainder of paragraph 69 is denied.

101  Paragraph 70 (each Defendant liable from when they "became a party") is denied. In respect of each WHT Application that forms part of SKAT's claim, SKAT is required to make out a complete cause of action against each Defendant. SKAT has failed to particularise what is meant by an allegation that an Alleged Fraud Defendant *"became party to the WHT Scheme."* As such, the Sanjay Shah Defendants cannot respond to this allegation, save to deny that they are liable, as alleged or at all.

102  Paragraph 71 (recovery of payments allegedly induced by WHT Representations and Individuals' Custodian Representations) is denied. Paragraphs 86 to 94 above are repeated.

**K.2.  Equitable claims**

103  Paragraph 72 is denied. It is denied that there was any such constructive trust, as alleged or at all. Alternatively, it is denied that the Sanjay Shah Defendants were accessories to any breach thereto. Paragraphs 59 and 98 above are repeated.

**(a)  Dishonest assistance**

104  Paragraph 73 (Alleged Fraud Defendants induced, procured or assisted breach of trust) is denied. It is denied that there was any such constructive trust, as alleged or at all. Alternatively, it is denied that the Sanjay Shah Defendants induced, procured or assisted in any breach thereof. The Sanjay Shah Defendants respond more particularly to those

allegations at Schedule 5B, 5D, 5K, 5L, 5M and 5N to this Defence. Paragraphs 59 and 98 above are repeated.

105   Paragraph 74 (knowledge of Alleged Fraud Defendants) is denied. There was no scheme to defraud SKAT, nor to conceal and/or launder and/or distribute the proceeds of the WHT Applications, as alleged or at all. Further and alternatively, if there was, the Sanjay Shah Defendants did not have either actual or blind eye knowledge of such scheme. The Sanjay Shah Defendants respond more particularly to those allegations at Schedule 5B, 5D, 5K, 5L, 5M and 5N to this Defence. Paragraphs 38 and 55 to 57 above are repeated.

106   Paragraphs 75 and 76 (dishonesty) are denied. The Sanjay Shah Defendants did no more than engage in lawful dividend arbitrage trading. Paragraphs 38 and 55 to 57 above are repeated.

## (b)   Knowing receipt

107   Paragraph 77 (Alleged Fraud Defendants knowingly received traceable proceeds) is denied. In particular, it is denied that any and all sums received by the Sanjay Shah Defendants are the traceable proceeds of SKAT's money, as alleged or at all. The Sanjay Shah Defendants respond more particularly to those allegations at Schedule 5B, 5D, 5K, 5L, 5M and 5N to this Defence. Paragraphs 38 and 55 to 57 above are repeated. It is denied that any sums received by the Sanjay Shah Defendants were received in breach of constructive trust, as alleged or at all.

108   Paragraph 78 (knowledge) is denied. In particular, is denied that the Sanjay Shah Defendants had any knowledge such that it would be unconscionable for them to retain any sums they received, as alleged or at all.

   37.1   Sub-paragraph (a) (actual or blind eye knowledge of fraud) is denied. Paragraph 104 above is repeated.

   37.2   Sub-paragraph (b) (reasonable professional would have made enquiries) is also denied. Paragraphs 38 and 55 to 57 above are repeated.

## (c)   Equitable compensation or an account of profits

109 In the premises, it is denied that SKAT is entitled to an account or any of the relief sought at paragraph 79, or any further or other relief. Paragraph 79 contains repetitions of the

47

factual allegations made at paragraphs 57 to 78 of the Particulars Claim, and the Sanjay Shah Defendants repeat paragraphs 86 to 108 above.

### K.3. Unjust enrichment/restitution

110   As to paragraph 80 (payments by SKAT to the Agents), it is admitted that SKAT made payments to the Agents, but the amount of such payments is not admitted and SKAT is put to strict proof of the same. The remainder of paragraph 80 is denied.

111   Paragraph 81 and 82 (enrichment of the Alleged Fraud Defendants) is denied. As regards the allegations contained in Schedule 5, the Sanjay Shah Defendants respond more particularly to those allegations at Schedule 5B, 5D, 5K, 5L, 5M and 5N to this Defence.

112   Paragraph 83 (Alleged Fraud Defendants are liable to make restitution) is denied.

### K.4. Proprietary claims

113   Paragraph 84 (traceable proceeds are held on constructive trust) is denied. Paragraphs 38 and 55 to 57 above are repeated. In the premises, it is denied that any sums received by the Sanjay Shah Defendants are subject to any constructive trust, as alleged or at all.

114   It is denied that SKAT is entitled to the declaration and order sought at paragraph 85, or any declaration or order to similar effect.

115   The Sanjay Shah Defendants repeat their denial at paragraph 109 above that SKAT is entitled to an account or any other relief as sought at paragraph 79 of the Particulars of Claim. In the premises, it is denied that SKAT is entitled to claim any equitable charge and/or lien, as alleged at paragraph 85A or at all. It is further denied that any sums received by the Sanjay Shah Defendants were the traceable proceeds or product of the payments made by SKAT, as alleged or at all. Paragraph 113 above is repeated.

### L.   ENGLISH LAW CLAIMS AGAINST THE NON-FRAUD DEFENDANTS

116   Paragraphs 86 to 98 do not contain any allegations against the Sanjay Shah Defendants, and the Sanjay Shah Defendants do not plead to those paragraphs individually. No admission is made in respect of any of the facts and matters set out in those paragraphs.

### M.   ALTERNATIVE DANISH LAW CLAIMS

## M.1. Danish law

117  The Sanjay Shah Defendants have no knowledge of Danish law, and SKAT is put to proof of all matters set out at paragraph 99. The following paragraphs address the law as pleaded by SKAT, but should not be taken as an admission or averment that SKAT's pleading is correct.

## M.2. Damages claims against the Alleged Fraud Defendants

118  Paragraph 100 (foreseeable loss as a result of alleged misconduct) is denied. In particular:

118.1  Paragraph 100(a) is denied. It is denied that the conduct of the Sanjay Shah Defendants violated the *bonus pater* standard. The Sanjay Shah Defendants engaged in lawful dividend arbitrage trading. Such trading strategies are well-known and cannot be said to "violate well-established standards of behaviour in the area of the conduct in question." Paragraphs 38 and 55 to 57 above are repeated.

118.2  It is denied that the Sanjay Shah Defendants acted in a way that was grossly negligent, as alleged at paragraph 100(b) or at all. Paragraphs 38 and 55 to 57 above are repeated.

118.3  Paragraph 100(c) is denied.

118.4  As to paragraph 100(d), it is admitted that SKAT made payments to the Agents. No admission is made as to the amount of such payments, and SKAT is put to proof in this regard. The remainder of paragraph 100(d) is denied.

118.5  It is denied that the Sanjay Shah Defendants have committed 'misconduct,' as alleged at paragraph 100(e) or at all. Paragraphs 38 and 55 to 57 above are repeated.

118.6  Further and in any event, it is not admitted that the alleged losses suffered by SKAT were a foreseeable consequence of any action on the part of the Sanjay Shah Defendants, as is alleged at paragraph 100(e). SKAT is put to strict proof of the same.

### M.3. Damages claims against other Defendants

119 Paragraphs 101 and 102 do not contain any allegations against the Sanjay Shah Defendants, and are noted.

### M.4. Unjust enrichment/restitution claims

120 Paragraph 103 is denied. It is denied that the Sanjay Shah Defendants have been unjustly enriched, as alleged or at all. It is accordingly denied that SKAT is entitled to bring a claim for unjust enrichment against the Sanjay Shah Defendants, as alleged or at all.

121 The Sanjay Shah Defendants repeat paragraphs 110 to 112 above in response to the allegations made at section I3 of the Particulars of Claim. As regards the allegations contained in Schedule 5, the Sanjay Shah Defendants respond more particularly to those allegations at Schedule 5B, 5D, 5K, 5L, 5M and 5N to this Defence.

### M.5. Proprietary claim

122 Paragraph 104 is denied. It is denied that any sums received by the Sanjay Shah Defendants are the traceable proceeds of money originally paid by SKAT to the Agents. It is denied that any of the Sanjay Shah Defendants have acted in bad faith, as alleged or at all, and further denied that any wrong was committed against SKAT. Further and alternatively, if any wrong was committed, it is denied that the Sanjay Shah Defendants knew or ought to have known of such wrong and/or that funds received by the Sanjay Shah Defendants were received as a result of that wrong. Paragraphs 38 and 55 to 57 above are repeated.

123 The Sanjay Shah Defendants repeat paragraphs 113 to 115 above in response to the allegations made at section I4 of the Particulars of Claim. As regards the allegations contained in Schedule 5, the Sanjay Shah Defendants respond more particularly to those allegations at Schedule 5B, 5D, 5K, 5L, 5M and 5N to this Defence.

### N.   INTEREST

124 It being denied that SKAT is entitled to any of the sums claimed, it is accordingly denied that SKAT is entitled to interest, as claimed at paragraphs 105 (English law) and 106 (Danish law) or at all.

125  As regards paragraph 105, it is denied that SKAT is entitled to claim interest on a compound basis.

126  As to paragraph 106 SKAT is put to proof of this paragraph.

## O.  CURRENCY OF CLAIMS

127  Paragraph 107 and 108 are noted.

## P.  PRAYER FOR RELIEF

128  For the reasons set out in this Defence, it is denied that SKAT are entitled to the relief claimed, or any further or other relief against the Sanjay Shah Defendants.

## Q.  CONCLUSION

129  The claim is denied. Relief is denied. Save where express admissions are made above, each and every allegation in the Amended Particulars of Claim is denied as if set out and specifically traversed in this paragraph.

**NIGEL JONES QC**
*Hardwicke Chambers*

**LISA FREEMAN**
*Furnival Chambers*

**LAURENCE PAGE**
*Hardwicke Chambers*

---

**STATEMENT OF TRUTH OF THE 34th DEFENDANT SERVED ON SKAT ON 17 MAY 2019 (SANJAY SHAH PERSONALLY)**

I believe that the facts stated in this Defence are true.

*Signed:*

*Name:*  **Sanjay Mansukhlal Shah**

---

## STATEMENT OF TRUTH FOR THE DEFENCE OF THE SANJAY SHAH DEFENDANTS SERVED ON SKAT ON 17 MAY 2019 (SANJAY SHAH AS DIRECTOR)

The 6th, 9th, 30th, 32nd, 35th and 53rd Defendants to the First Claim, the 4th, 18th, and 21st Defendants to the Second Claim, and the 8th Defendant to the Third Claim believe that the facts stated in this Defence are true.

I am duly authorised to sign this statement of truth.

*Signed:*

*Name:*       **Sanjay Mansukhlal Shah**
Position:     Director, the 6th, 9th, 30th, 32nd, 35th and 53rd Defendants to the First Claim, the 4th, 18th and 21st Defendants to the Second Claim, and the 8th Defendant to the Third Claim

## STATEMENT OF TRUTH FOR THE DEFENCE OF THE SANJAY SHAH DEFENDANTS SERVED ON SKAT ON 17 MAY 2019 (IP UNIVERSAL)

The 44th, 45th, 46th, 47th, 48th, 49th, 50th, 51st, 54th, 55th, 56th, and 57th Defendants to the First Claim, and the 4th Defendant to the Second Claim believe that the facts stated in this Defence are true.

I am duly authorised to sign this statement of truth.

*Signed:*

*Name:*       **Sanjay Mansukhlal Shah**
Position:     Director, IP Universal

## STATEMENT OF TRUTH FOR THE 19th DEFENDANT TO THE SECOND CLAIM SERVED ON SKAT ON 17 MAY 2019 (TREEFROG CAPITAL LIMITED)

The 19th Defendant to the Second Claim believes that the facts stated in this Defence are true.

I am duly authorised to sign this statement of truth.

*Signed:*

*Name:*       **Sanjay Mansukhlal Shah**

Position:     Grantee of Power of Attorney dated 10 April 2018

**APPENDIX 1 TO DEFENCE OF THE SANJAY SHAH DEFENDANTS: EXTERNAL LEGAL ADVISORS PRIOR TO SCP ENTERING SPECIAL ADMINISTRATION**

| No. | Law firm/chambers | Key individuals |
|---|---|---|
| 1 | Thomas More Chambers (London) | Rt. Hon. Geoffrey Cox QC (now Attorney General) |
| 2 | Blackstone Chambers (London) | Kieron Beal QC |
| 3 | Furnival Chambers (London) | Lisa Freeman<br>Craig Harris (assisted 2016) |
| 4 | Addleshaw Goddard (Middle East) LLP (Dubai) | Louise Vun<br>Paul Hughes<br>Charlotte Bhania<br>Darren Harris<br>Ahlam Souccarieh |
| 5 | Al Safar Partners (Dubai) | |
| 6 | Allen & Overy LLP (Frankfurt) | Kai Schaffelhuber<br>Frank Herring<br>Laura Druckenbrodt<br>Michael Huerths |
| 7 | Allen & Overy LLP (London) | Vimal Tilakapala<br>Georgina Thomson<br>Sam Brooks<br>Nitish Upadhyaya<br>Michelle de Kluyver<br>Russell Williams |
| 9 | Baker McKenzie (Vienna) | Dr Wendelin Ettmayer |
| 10 | CGS Legal (London) | Gurm Sanger<br>Nicky Doran |
| 11 | Charles Russell Speechlys (London) | |

| 12 | Collas Crill (Jersey) | Mark Rawlins<br>Kellyann Ozouf |
|---|---|---|
| 13 | Ernst & Young (Austria) | |
| 14 | Hannes Snellman (Denmark) | Nikolaj Bjørnholm<br>Anne Becker-Christensen |
| 15 | Herbert Smith Freehill LLP (London) | Chris Bushell (partner)<br>Tom Brown (associate)<br>Daniel May (Snr associate) |
| 16 | Jakob Lund Poulsen, (Denmark) | |
| 17 | Kai Hart-Hoening (Frankfurt) | |
| 18 | KPMG Lower Gulf Limited (Dubai) | |
| 19 | Loyens & Loeff (Luxembourg) | |
| 20 | Mills Oakley Lawyers (Melbourne) | |
| 21 | Mishcon de Reya (London) | Les Allen<br>Tim Thompson<br>Jo Rickards<br>David Leibowitz<br>Matthew Ewens<br>Sam Rubuck<br>Ciju Puthuppally<br>Alex Jenkins<br>Tabassum Khan |
| 22 | Norton Rose Fulbright LLP (Munich) | Frank Henkel<br>Alexander Reiner<br>Christoph Richter<br>Achim Döser<br>Claas Suermann |
| 23 | Ogier (Guernsey) | Alex Horsburgh-Porter |
| 24 | Pinsent Masons (various offices) | Carl Allen<br>Olivia Archer-Jones<br>James Armshaw<br>Amar Ahmad<br>Anne-Marie Friel<br>Martin Bishop |

| | | |
|---|---|---|
| | Pinsent Masons (various offices)<br>(cont'd) | Kevin Boa<br>Hannah Brader<br>Conor Brindley<br>Audrey Cook<br>Simon Cooper<br>Philip Corfield-Smith<br>Isobel Coulter<br>Carole Court<br>Simon Cooper<br>Tammy Dobbie<br>Susannah Donaldson<br>Linda Doyle<br>Daniel Greenaway<br>Anne-Marie Friel<br>Sarah Gennoe<br>Jon Harris<br>Daniel Hoborough<br>Janet Hoskin<br>Shailee Howard<br>John Salmon<br>Jonathan Kirkwood<br>Nicola King<br>Michael Lewis<br>Tracey McCoy<br>Darren Mellor-Clark<br>Ray McCann<br>Monica Gogna<br>Stuart Neilson<br>Nick Pike<br>Vin Sehdev<br>Christine Simpson<br>Jonathan Snade<br>John Salmon<br>Calum Thom<br>Chris Thomas<br>Terri Campbell<br>Eden Walsh<br>Louise Wolfson |
| 25 | Plesner Advokatpartnerselskab<br>(Denmark) | |
| 26 | PWC (Zurich) | |

| 27 | Reed Smith (London) | |
|----|---------------------|---|
| 28 | Schiebe ünd Collegen (Germany) | Dr. Claas de Boer |
| 29 | Seddons (London) | |
| 30 | Thomas Eggar LLP (London) | Mark Pearce<br>Richard Jordan<br>Rich Risino<br>Emma Tyrrell<br>Ravi Francis<br>Matthew O'Brien<br>Jeannette Meyer |
| 31 | United Advocates (Dubai) | |
| 32 | Walkers (Dubai) LLP (Dubai) | Tom Cochrane<br>Brian O'Donnell<br>Sophie Kassam<br>Claran Bohnacker |
| 33 | W. Wong & Associates (Hong Kong) | |

## APPENDIX 2 TO DEFENCE OF THE SANJAY SHAH DEFENDANTS

## APP2.A EXAMPLE OF FUTURE TRADE (STERLING ALPHA IN DKK FOR TDC A/S)

### APP2.A.1 Share Trade

1    Sterling Alpha traded in shares of TDC A/S Copenhagen. On 8 August 2012 the fund placed an order to purchase 6,150,000 shares at a price of DKK 41.6 for value date 14 August 2012 (DKK 255,840,000).

2    On 5 March 2013 the fund sold the same number of shares at DKK 45.3188 for value date 8 March 2013. The shares were recorded in the custody statement as a shareholding and the position was liquidated (7 months later) at a net profit of DKK 3.7188 per share (aggregate profit of DKK 22,870,620). This open position was kept over year end.

### APP2.A.2 Future Trade

3    On 8 August 2012 the fund placed an order to sell a total of 61,500 "B"-clear futures contracts (1 futures contract representing 100 shares) for TDC shares on the UK future market LIFFE at a price of DKK 39.9264 for settlement on 21 September 2012 for cash settlement.

4    This open position was rolled on 17 September 2012 into future contracts with maturity on 15 March 2013 at a cost of DKK 1.56 per contract.

5    On 5 March 2013 the fund placed an order to purchase back the future thereby closing its open position at a market price of DKK 45.32 for settlement on the same day in cash. The fund incurred a total loss out of this futures position of DKK 5.3936 per contract for a loss of DKK 33,170,640.

6    The net difference between the shares and futures trades amounted to a notional loss of DKK 1.6748 or a loss of DKK 10,300,020.

### APP2.A.3 Compensation Payment

7       The gross dividend paid by TDC was DKK 2.3 per share (with the WHT per share being DKK 0.621).

8       Alpha Sterling received a dividend compensation payment of DKK 1.6790 per share or a notional DKK 10,325,550.

9       This resulted in a net profit to the USPF (after deduction of losses itemised at paragraph 6 above) of DKK 25,830.

### APP2.A.4 Stock Lending Transaction

10      On 14 August 2012 the fund placed an order to lend 6,150,000 shares of TDC A/S at a market price of DKK 41.60 for settlement on 14 August 2012 in return for a cash payment of DKK 255,840,000.

11      On 8 March 2013 the loan was recalled for value date 8 March 2013 at a price of DKK 45.3188 and a notional profit of DKK 278,710.62.

### APP2.A.5 Claim for tax refund

12      The USPF filed a claim for tax refund in the amount of DKK 0.6210 per share and a notional of DKK 3,819,150, which was approved and paid out by SKAT.

13      The result across all positions was a net profit of DKK 3,844,980.

| Data for this table: trade information from Sterling Alpha LLC 401(k) Profit Sharing Plan | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| TDC A/S - Shares: 39360.0 | | | | | | | | | |
| **1.) Facts** | | | | | **2.) Performance** | | | | |
| **Share-Purchase** | | | | | | | | | |
| Buy "Cum" | | Sell "Ex" | | | 08.08.12 | Buy price per share ("Cum") | | - 41.6000 | |
| **Buy Date** | 08.08.12 | **Sell Date** | 05.03.13 | | 05.05.13 | Sell price per share ("Ex") | | 45.3188 | 3.7188 |
| | | | | | | Dividend: | | | 2.3000 |
| Price | 41.6000 | **Sell Price** | 45.3188 | | | | Net-Dividend | 1.6790 | |
| Amount of shares | 6,150,000 | **Amount of shares** | 6,150,000 | | | | Tax on Dividend | 0.6210 | |
| Delivery date | 14.08.12 | | | | | Future sell price | | 39.9264 | |
| | | | | | | Future buy price | | 45.3200 | -5.3936 |
| **Future for hedge ("Ex")** | | | | | | Earning per share | | | 0.6252 |
| **Sell Date** | 08.08.12 | **Buy Date** | 05.03.13 | | | Earning on 6150000.0 shares | | | 3,844,980.00 DKK |
| Amount | 61,500 | Amount | 61,500 | | | | | | |
| Price | 39.9264 | Price | 45.3200 | | | | | | |
| | | | | | | **Total earning after tax refund** | | | 3,844,980.00 DKK |
| **Dividend:** | | | | | | Amount of tax refund | | | 3,819,150.00 DKK |
| Gross-Dividend | 2.30 DKK | | | | | Earnings bevor tax refund | | | 25,830.00 DKK |
| Pay Date | 14.08.12 | | | | | | | | |
| | | | | | | Nominal value of shares bought | | | 255,840,000.00 DKK |
| | | | | | | Reutrn on nominal value | | | 1.50% |
| **3.) Arbitrage** | | | | | **4.) Cash-Flow** | | | | |
| 08.08.12 | Buy price per share ("Cum") | | | -41.6000 | | Buy price per share ("Cum") | | | -255,840,000.00 DKK |
| 08.08.12 | Future sell price | | | 39.9264 | | Future sell price | | | 245,547,360.00 DKK |
| | | | | -1.6736 | | Cash-Flow "Cum" | | | -10,292,640.00 DKK |
| 14.08.12 | Dividend: | | | 2.3000 | | | | | |
| | Net-Dividend | | 1.6790 | | | Net-Dividend | | | 10,325,850.00 DKK |
| | Tax | | 0.6210 | | | Sell price per share ("Ex") | | | 278,710,620.00 DKK |
| | Earning per share ("Cum") | | | 0.6264 | | Future buy price | | | -278,718,000.00 DKK |
| | | | | | | Cash-Flow "Ex" | | | 10,318,470.00 DKK |
| 05.03.13 | Sell price per share ("Ex") | | | 45.3188 | | | | | |
| 05.03.13 | Future buy price | | | -45.3200 | | | | | |
| | Earning per share ("Ex") | | | -0.0012 | | Cash-Flow "Cum" | | | -10,292,640.00 DKK |
| | | | | | | Cash-Flow "Ex" | | | 10,318,470.00 DKK |
| | Earning per share ("Cum") | | | 0.6264 | | Sum | | | 25,830.00 DKK |
| | Earning per share ("Ex") | | | -0.0012 | | Tax refund | | | 3,819,150.00 DKK |
| | Earning per share | | | 0.6252 | | Earning | | | 3,844,980.00 DKK |

## APP2.B EXAMPLE OF FORWARD TRADE (BLACKRAIN PEGASUS LLC SOLO 401K PLAN IN DKK FOR COLOPLAST B)

### APP2.B.1 Share Trade

14    Blackrain Pegasus LLC Solo 401K Plan traded in shares of Coloplast B. On 4 December 2014 the fund placed an order to purchase 998,992 shares at a price of DKK 527 for value date 9 December 2014 (DKK 526,468,784).

15    On 17 December 2014 the fund sold the same number of shares at DKK 501.50 for value date 19 December 2014. The position was liquidated at a net loss of DKK 25.5000 per share (aggregate loss of DKK 25,474,296).

### APP2.B.2 Forward Trade

16    On 4 December 2014 the fund placed an order to sell a forward on 998,992 shares for Coloplast shares at a price of DKK 522.04 for settlement on 20 March 2014.

17    On 17 December 2014 the fund placed an order to purchase the forwards back thereby closing its open position at a price of DKK 501.91. The Fund incurred a total profit out

of its forward position of DKK 20.13 per contract for a notional profit of DKK 20,109,708.96.

18    The net difference between the shares and forward trades amounted to a notional loss of DKK 5.3700 or in aggregate DKK 5,364,587.04.

### APP2.B.3 Compensation Payment

19    The gross dividend paid by Colopast was DKK 7.5 per share (with the WHT per share being DKK 2.0250).

20    Blackrain Pegasus LLC Solo 401K Plan received a dividend compensation payment of DKK 5.4750 per share or a notional DKK 5,469,481.20.

21    This resulted in a net profit to the USPF (after deduction of losses itemised at paragraph 5 above) of DKK 104,894,16.

### APP2.B.4 Stock Lending Transaction

22    On 8 December 2014 the fund placed an order to lend 998,992 shares of Coloplast at a market price of DKK 527 for settlement on 9 December 2014 in return for a cash payment of DKK 526,468,784.

23    On 17 December 2014 the loan was recalled for value date 19 December 2014 at a price of DKK 501.5 and a notional of DKK 500,994,488.

### APP2.B.5 Claim for tax refund

24    The USPF filed a claim for tax refund in the amount of DKK 2.0250 per share and a notional of DKK 2,022,958.80, which was approved and paid out by SKAT.

25    The result across all positions was a net profit of DKK 2,127,852.96.

**Data for this table: trade information from Blackrain Pegasus LLC Solo 401K Plan**
COLOPLAST-B - Shares: 998992.0

| 1.) Facts | | | | | 2.) Performance | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Share-Purchase** | | | | | | | | | |
| Buy "Cum" | | Sell "Ex" | | | 04.12.14 | Buy price per share ("Cum") | - | 527.0000 | |
| Buy Date | 04.12.14 | Sell Date | 17.12.14 | | 17.12.14 | Sell price per share ("Ex") | | 501.5000 | -25.5000 |
| | | | | | | Dividend: | | | 7.5000 |
| Price | 527.0000 | Sell Price | 501.5000 | | | | | | |
| Amount of shares | 998,992 | Amount of shares | 998,992 | | | Net-Dividend | | 5.4750 | |
| Delivery date | 09.12.14 | | | | | Tax on Dividend | | 2.0250 | |
| | | | | | | Forward sell price | | 522.0400 | |
| **Forward for hedge via forwards ("Ex")** | | | | | | Forward buy price | | 501.9100 | 20.1300 |
| Sell Date | 04.12.14 | Buy Date | 17.12.14 | | | Earning per share | | | 2.1300 |
| Amount | 998,992 | Amount | 998,992 | | | Earning on 998992.0 shares | | | 2,127,852.96 DKK |
| Price | 522.0400 | Price | 501.9100 | | | | | | |
| **Dividend:** | | | | | | Total earning after tax refund | | | 2,127,852.96 DKK |
| Gross-Dividend | 7.50 DKK | | | | | Amount of tax refund | | | 2,022,958.80 DKK |
| Pay Date | 09.12.14 | | | | | Earnings bevor tax refund | | | 104,894.16 DKK |
| | | | | | | Nominal value of shares bought | | | 526,468,784.00 DKK |
| | | | | | | Reutrn on nominal value | | | 0.40% |

| 3.) Arbitrage | | | | | 4.) Cash-Flow | | |
|---|---|---|---|---|---|---|---|
| 04.12.14 | Buy price per share ("Cum") | | -527.0000 | | | Buy price per share ("Cum") | -526,468,784.00 DKK |
| 04.12.14 | Forward sell price | | 522.0400 | | | Forward sell price | 521,513,783.68 DKK |
| | | | -4.9600 | | | Cash-Flow "Cum" | -4,955,000.32 DKK |
| 09.12.14 | Dividend: | | 7.5000 | | | | |
| | Net-Dividend | 5.4750 | | | | Net-Dividend | 5,469,481.20 DKK |
| | Tax | 2.0250 | | | | Sell price per share ("Ex") | 500,994,488.00 DKK |
| | Earning per share ("Cum") | | 2.5400 | | | Forward buy price | -501,404,074.72 DKK |
| | | | | | | Cash-Flow "Ex" | 5,059,894.48 DKK |
| 17.12.14 | Sell price per share ("Ex") | | 501.5000 | | | | |
| 17.12.14 | Forward buy price | | -501.9100 | | | | |
| | Earning per share ("Ex") | | -0.4100 | | | Cash-Flow "Cum" | -4,955,000.32 DKK |
| | | | | | | Cash-Flow "Ex" | 5,059,894.48 DKK |
| | Earning per share ("Cum") | | 2.5400 | | | Sum | 104,894.16 DKK |
| | Earning per share ("Ex") | | -0.4100 | | | Tax refund | 2,022,958.80 DKK |
| | Earning per share | | 2.1300 | | | Earning | 2,127,852.96 DKK |