# Exhibit 108

CONFIDENTIAL
Anne Munksgaard - June 9, 2021

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
MASTER DOCKET 18-MD-2865(LAK)
CASE NO. 18-CV-09797

------------------------------------
                                    )
IN RE:                              )
                                    )
CUSTOMS AND TAX ADMINISTRATION OF   )
THE KINGDOM OF DENMARK              )
(SKATTEFORVALTNINGEN) TAX REFUND    )
SCHEME LITIGATION                   )
                                    )
------------------------------------)


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*                                   \*
\*           CONFIDENTIAL            \*
\*                                   \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


VIDEO DEPOSITION OF
ANNE MUNKSGAARD
Copenhagen, Denmark
Wednesday, June 9, 2021
12:02 p.m. (CEST)


Reported by: CHRISTINE MYERLY

Page 10

1   academic career?
2       A    No.
3       Q    What did you do before you joined
4   SKAT professionally?
5       A    I used my law degree working for
6   the City of Copenhagen for the Tax and Register
7   Division.  I have also -- I have also worked in
8   tax-related services for an agricultural advisory
9   organization.
10      Q    And immediately before you joined
11  SKAT, were you working for the city?
12      A    No.  First the City of Copenhagen,
13  then the agricultural advisory center, then SKAT.
14      Q    You have been employed by SKAT for
15  more than 25 years, right?
16      A    Yes.
17      Q    You still are employed by SKAT
18  today, right?
19      A    Yes.
20      Q    Over the course of your 25 years
21  at SKAT, you have held a number of different
22  positions?
23      A    Yes.
24      Q    Do you mind telling us about them
25  over time?

Page 11

1       A    I can give it a go.
2       Q    Please do.
3       A    I started in the tax region of
4   Horsens as a clerk.  Then I became interested in
5   going into management, and I was at a pre-management
6   level in 2001 -- in 2000, sorry.  Then over a period
7   of two years, I had various managerial roles in
8   Horsens.  Then I came to Aarhus and became the
9   manager of a secretary for the management.
10      Q    Was that in 2013?
11      A    No, 2002.
12           From 2003 to 2005, I was acting head of
13  section -- head of section for a company group.
14           Do you need me to add any more details
15  about that?
16      Q    No.  But after you were the head
17  of the company group in that early 2000s period,
18  what did you do next?
19      A    So, then I -- in 2005 I became
20  head of a section in Horsens, dealing with property
21  and cars, as well as collection, bookkeeping and
22  administration.
23      Q    Then what?
24      A    So from 2009 to 2012 I was a
25  deputy tax director for a unit called case center

Page 12

1   for individuals, where decisions were made in cases
2   regarding individuals.
3       Q    And just to clarify, when you say
4   individuals, you mean individual taxpayers, correct?
5       A    Yes.  A tax-paying citizen.
6       Q    A tax-paying citizen of Denmark,
7   correct?
8       A    Yes.
9       Q    Did you deal with foreign
10  taxpayers during that time?
11      A    So, not specifically.  It was more
12  relating to estates after people who were deceased,
13  and also within -- within estates from people who
14  were deceased, or within sections -- within a
15  section where we would administer a sanction or
16  punishment in certain cases, as well as other cases
17  involving individuals.
18      Q    Okay.  Is it fair to say that by
19  that point you had been promoted within SKAT many
20  times?
21      A    I had gone up two levels as
22  regards salary.
23      Q    And the role that you were
24  describing as deputy director of tax between 2009
25  and 2012, when did that end?

Page 13

1       A    Around -- I am not quite sure, but
2   around early 2012, perhaps.  And then for a year I
3   became the deputy tax director for the entire area
4   of southern Denmark.  When I say that, I mean for
5   the management secretariat.
6            And by '13, I had gone up another level,
7   and that made me go up one level so that --
8            THE INTERPRETER:  I don't know -- I don't
9   know how to translate this because it is all vice or
10  deputy director, and so from one kind of deputy
11  director to the next level of deputy director, which
12  is one level up from --
13      A    It has to do what the way that the
14  Danish government pays the officials.  So it has to
15  do with the level that you are at.
16      Q    What was your title in 2013?
17      A    I was deputy director for
18  something called business.
19      Q    At some point did you become
20  deputy -- strike that.  At some point did you become
21  director of an antifraud unit?
22      A    That was -- I became head of that
23  section on July 1st, 2013.
24      Q    And was that another level up?
25      A    Same level.

CONFIDENTIAL
Anne Munksgaard - June 9, 2021

5 (Pages 14 to 17)

Page 14

1  Q   Okay. What were your
2  responsibilities as director of the antifraud unit?
3  A   So, from July 1st to October 10th,
4  it was dealing with financial crime. My job was to
5  split this into two units. So, financial crime had
6  grown too big in SKAT, and we had to -- we had had
7  some bad cases, so we needed to have better focus on
8  ensuring that the legislation was -- that
9  legislation was upheld.
10 Q   So before July 2013, there had
11 been multiple instances of tax fraud, is that what
12 you are saying?
13 A   No.
14 Q   What did you mean when you said
15 financial crime had grown too big?
16 A   I am speaking from an
17 organizational point of view.
18 Q   The -- there were too many
19 employees working on financial crime?
20 A   Yes. They wanted to spread it out
21 into standard control units.
22 Q   Are you familiar with something
23 called special control?
24 A   Yes. That was what I was part of
25 building.

Page 15

1  Q   And as director of the antifraud
2  unit, were you a part of special control?
3  A   Yes.
4  Q   Did you create what is known as
5  special control?
6  A   Yes.
7  Q   What was the point of creating the
8  special control group?
9  A   It was switching -- specifically
10 switching the name from financial crime to special
11 control.
12 Q   In addition to changing the name,
13 did you change anything else?
14 A   So, I can't remember exactly how
15 things happened, but we specifically focused on
16 legislation and making sure that legislation was not
17 violated. If I am to give an example, we prepared
18 new control manuals. And we would then teach others
19 so that we were certain that they were familiar with
20 the tax control legislation; for example, what you
21 have as regards right of access, when you go out to
22 visit businesses.
23 Q   How long did you serve as director
24 of the antifraud unit at SKAT?
25 A   It changed along the way up until

Page 16

1  2019. On August 1st, 2019, I became vice president
2  of -- or vice director -- deputy director, sorry, I
3  became deputy director of small and medium-sized
4  companies. And that is what I am -- what I am doing
5  until this day.
6  Q   Okay. As the director of the
7  antifraud department, did you oversee the work of
8  other employees?
9  A   At a general level. Because at
10 that time I had five managers below me.
11 Q   And how many people were reporting
12 to those five managers?
13 A   Around 20. We were 100 people in
14 this unit by then.
15 Q   And you were in charge of the
16 unit, right?
17 A   Yes, of that -- of those 100
18 employees.
19 Q   To whom did you report?
20 A   So, at that time I would report to
21 a specific efforts director.
22 Q   What was his or her name?
23 A   First I had Erling Andersen, and
24 then he went to another unit and then for a period
25 of time it was Per Jacobsen. Then it became Jim

Page 17

1  Sørensen, and then by '18, if I remember correctly,
2  it was Steen Bechmann -- Steen Bechmann Jansen --
3  Jacobsen -- it is embarrassing.
4  Q   Did those people serve as head of
5  SKAT?
6  A   No. They were part of management.
7  So, above them there was another head who also
8  changed over time.
9  Q   Okay. Why did your role change in
10 August 2019?
11 A   I applied for a job, it had to do
12 with geography, and I also wanted new challenges. I
13 live in Vejle, and preferably I had to go to work in
14 Fredensborg or Hoeje Taastrup. Then I was given the
15 opportunity to apply for a position where the deputy
16 director had -- was located in Horsens.
17       And other than that, I was interested in
18 general case administration and control, and they do
19 much more of those activities.
20       MR. WEINSTEIN: Can I just make one
21 suggestion, when we're discussing cities or towns
22 with Danish names, maybe we can have those spelled
23 at the time, because it is going to be difficult to
24 go back and figure out.
25       THE INTERPRETER: I will spell from now on

Page 26

```
 1   question, as I myself have no auditor training or
 2   background.
 3        Q    Would you answer the question if I
 4   asked it about the people who worked for SIR?
 5        A    Sorry.  I thought that you were
 6   asking about SIR.
 7        Q    No, I was asking about the
 8   national audit office.
 9        A    Well, as an official authority,
10   you can always have an opinion -- as an official
11   authority you may also have -- you can always have
12   an opinion about whether the evaluations, the
13   assessments that they make, whether it is correct or
14   not.  And we are also entitled to respond and add
15   our input to those evaluations.
16        Q    Okay.  And regardless of your
17   opinion on the recommendations they make, if the
18   auditors make a recommendation, somebody should
19   respond to that, correct?
20        MR. OXFORD:  Objection to the form.
21        A    Well, yes, that is correct.  Yes,
22   that is correct, and this is generally handled at a
23   central level because it often has to do with IT or
24   general guidelines.
25
```

Page 27

```
 1   BY MR. DULBERG:
 2        Q    Understood.  And do you think the
 3   auditors are good at their jobs?
 4        MR. OXFORD:  Objection to the form.
 5        A    Well, that is a bit of -- that
 6   question is maybe too general.  I think that you
 7   will find good and bad people everywhere you go.
 8   BY MR. DULBERG:
 9        Q    You couldn't say in general that
10   you have a high opinion of Rigs or SIR?
11        MR. OXFORD:  Objection to form.
12        A    I am a loyal civil servant.  So I
13   am sure it is fine, the work that they do.
14   BY MR. DULBERG:
15        Q    I want to ask you about June 16,
16   2015.
17        THE INTERPRETER:  I said it wrong,
18   June 16, 2015.
19   BY MR. DULBERG:
20        Q    Yes.  Do you remember that day?
21        A    Well, I assume that that's because
22   there was a telephone call, whether it was the 16th
23   or the 17th, I assume -- it must have been the 16th.
24        Q    You got a phone call from somebody
25   named Michael Amstrup, correct?
```

Page 28

```
 1        A    M-I-C-H-A-E-L, last name
 2   A-M-S-T-R-U-P.
 3        Q    Did you know Mr. Amstrup before he
 4   called you?
 5        A    No.
 6        Q    Do you know how he got your phone
 7   number?
 8        A    As far as I remember he got it
 9   from a man called Torben Hjelmstrand, first name
10   T-O-R-B-E-N, last name H-J-E-L-M-S-T-R-A-N-D.
11        Q    Who is Mr. Amstrup?
12        A    He introduced himself as a lawyer.
13        Q    He's a partner at a law firm
14   called Lundgrens, correct?
15        A    Yes, that sounds about right.
16        Q    Had you heard of Lundgrens at the
17   time?
18        A    I don't remember.
19        Q    What did Mr. Amstrup tell you?
20        A    So, I don't remember the details,
21   but he wanted to report an offense against SKAT.
22        Q    He warned you about a fraud,
23   correct?
24        A    Yes.
25        Q    The fraud related to dividend
```

Page 29

```
 1   withholding tax, correct?
 2        A    Yes.
 3        Q    At that point in time, June 2015,
 4   were you familiar with SKAT's administration of
 5   withholding tax?
 6        MR. OXFORD:  Objection to form.
 7        A    I was probably aware that there
 8   was something called refund of dividend tax, but I
 9   was not involved in this.
10   BY MR. DULBERG:
11        Q    You weren't familiar with the
12   details of that process at that time, right?
13        A    That is correct.
14        Q    And you were the head of the
15   antifraud division at that time, true?
16        A    Yes.
17        Q    You had served in that role for
18   more than two years, right?
19        A    Almost two years.
20        Q    And nobody had previously
21   identified for you the possibility of fraud with
22   respect to dividend withholding tax reclaims, is
23   that right?
24        A    That is correct.  We had no cases
25   involving refunds of dividend tax.  We only got
```

Page 30

1  cases that were -- that came to us from the outside.
2  Or if it specifically entailed continuous fraud or
3  the VAT carousel fraud.
4       Q       What was Mr. Amstrup's tone on the
5  phone call you described?
6       A       So, this is almost six years ago,
7  but he would like for us to act upon this. So, of
8  course he was insisting that I took this seriously.
9       Q       Did you take it seriously?
10      A       I take everything seriously when I
11 am contacted.
12      Q       What did you tell him in response?
13      A       He asked us whether we were able
14 to involve the Danish police handling financial
15 crime. I said to him that it was not enough for him
16 just to tell me or write to me about this. I think
17 that in all cases people are satisfied that we
18 investigate things properly. We get many reports,
19 and many cases involve spouses or ex-spouses out to
20 create problems for the other, or neighbors who have
21 had some sort of conflict, or one company that is
22 angry at another company.
23              So, we have to look into the matter
24 ourselves. And that is the way that it has always
25 been and there have been special focus on upholding

Page 31

1  the law in these areas more.
2       Q       Okay. This case did not involve
3  spouses, correct?
4       MR. OXFORD: Object to form.
5       A       I know nothing about that.
6       Q       This case did not involve
7  neighbors, correct?
8       MR. OXFORD: Objection to form.
9       A       I do not assume so.
10 BY MR. DULBERG:
11      Q       Okay. What did you do after you
12 got off the phone with Mr. Amstrup?
13      A       So, I don't remember the exact
14 sequence of events, but I had to find people who
15 knew about this area. So, I don't remember whether
16 it was the same day or a few days later, but at some
17 point I called Rene Frahm Joergensen, first name
18 Rene, R-E-N-E at the end, last name Frahm,
19 F-R-A-H-M, and then second last name Joergensen,
20 J-O-E-R-G-E-N-S-E-N.
21      Q       Did you take notes during that
22 phone call?
23      MR. OXFORD: Object to the form.
24      A       No.
25

Page 32

1  BY MR. DULBERG:
2       Q       You mentioned earlier SOIK?
3       A       Yes.
4       Q       Mr. Amstrup wanted you to report
5  to SOIK, right?
6       A       So, I don't remember the details,
7  but he wanted us -- he wanted for them to become
8  involved.
9       Q       Did you ask if he reached out to
10 them directly?
11      A       I don't remember any longer,
12 unfortunately.
13      Q       Were you surprised by what you
14 heard from Mr. Amstrup?
15      A       So, I have a long history in this
16 business and I have heard many things. At the time
17 we had other big cases, so my world did not collapse
18 in any way just because I had one conversation with
19 a lawyer.
20      Q       You were not surprised, right?
21      A       It wasn't that it sort of got my
22 full and utter attention.
23      Q       After the phone call, Mr. Amstrup
24 sent you an e-mail, correct?
25      A       Yes.

Page 33

1       Q       Had you given him your e-mail
2  address?
3       A       I must have, but I don't remember.
4  But I must have, otherwise how could he send me
5  anything.
6       Q       Had you asked him to send you an
7  e-mail?
8       A       I would have told him that if we
9  are to move forward with this, we need more
10 information.
11      Q       And he provided more information
12 by e-mail, right?
13      A       Yes.
14      Q       Please turn in your binder to
15 Exhibit 3062. Do you recognize this document?
16      A       Yes.
17      Q       Is this at the bottom of the first
18 page an e-mail that you received from Mr. Amstrup on
19 the 16th of June 2015?
20      A       Yes, that is what it says.
21      Q       That is the first e-mail you
22 received from him, correct?
23      A       I hope so. I can't say otherwise
24 at this point, but I would say so.
25      Q       And in the first sentence he

CONFIDENTIAL
Anne Munksgaard - June 9, 2021

10 (Pages 34 to 37)

Page 34

1  referred to a suspected fraud involving up to
2  500 million krone, correct?
3      A    Yes, that is what it says.
4      Q    That is a big number, correct?
5      A    Yes.  But as I said, we had other
6  big cases or we always have big cases.
7      Q    The e-mail told you that the main
8  character was Sanjay Shah, do you see that?
9          MR. OXFORD:  Objection to form.  You can
10 answer.
11     A    Yes.
12 BY MR. DULBERG:
13     Q    The e-mail identified the names of
14 reclaim agents who submitted forms to SKAT
15 requesting dividend withholding tax, correct?
16         MR. OXFORD:  Objection to the form.
17     A    Yes.
18 BY MR. DULBERG:
19     Q    What was your reaction to seeing
20 this e-mail?
21     A    So, as always in my role as a
22 manager, my job when I get any e-mails like this is
23 to make sure that it goes to the right people who
24 are going to handle this.
25     Q    You forwarded this message to

Page 35

1  Christian Ekstrand, Lill Drost and Vagn Larsen, do
2  you see that?
3          THE INTERPRETER:  Sorry.
4  BY MR. DULBERG:
5      Q    And Line Haslev.
6          MR. OXFORD:  Can you spell those names?
7          THE INTERPRETER:  Christian Ekstrand is
8  C-H-R-I-S-T-I-A-N, last name E-K-S-T-R-A-N-D.  Also
9  sent to Lill Helene Drost, first name L-I-L-L,
10 middle name Helene, H-E-L-E-N-E, last name,
11 D-R-O-S-T.  And Line Haslev, first name L-I-N-E,
12 last name H-A-S-L-E-V.  The last one is then Vagn
13 Larsen, first name V-A-G-N, last name L-A-R-S-E-N.
14 BY MR. DULBERG:
15     Q    Were those -- sorry, withdrawn.
16 Why did you forward this message to those specific
17 people?
18     A    Because they were the people
19 handling -- looking through cases that were sent to
20 our unit.
21     Q    Okay.  You wrote, "We are going to
22 follow up on this tomorrow."  Do you see that?
23     A    Yes.
24     Q    Did you follow up on it the next
25 day?

Page 36

1      A    As far as I remember, we received
2  additional material from Mr. Amstrup.
3      Q    Did you do anything the next day
4  other than receive information from Mr. Amstrup?
5      A    So, without making this sound too
6  strange, my main function is that of a mailbox in
7  these situations.
8      Q    So -- okay.  And so you received
9  additional mail from Mr. Amstrup, right?
10     A    Yes.  To my recollection, yes.
11     Q    If you could turn to the next
12 exhibit, which has been marked as 3063.  Do you find
13 another e-mail from Mr. Amstrup?
14     A    Yes.
15     Q    And this is the second e-mail in
16 two days that you received from Mr. Amstrup, right?
17     A    Yes.
18     Q    And if you turn to the second
19 page, in response to his first e-mail, you had
20 informed him, "We are looking into it," do you see
21 that?
22     A    Yes.
23     Q    At that point had you taken any
24 steps to look into the alleged fraud that
25 Mr. Amstrup had reported?

Page 37

1          MR. OXFORD:  Object to the form.  You mean
2  at the specific moment she wrote that e-mail?
3  BY MR. DULBERG:
4      Q    You can answer the question.
5          THE INTERPRETER:  I am unsure whether to
6  translate what you said as well.
7          MR. OXFORD:  You can just translate the
8  question.
9  BY MR. DULBERG:
10     Q    The question was, at that point in
11 time, had you taken any steps to look into the
12 alleged fraud that Mr. Amstrup had reported?
13     A    So my role was that of a deputy
14 director in charge of a substantial area in various
15 cities.  So I send it to people who have access to
16 our systems.  I never process cases myself.
17     Q    Understood.  At that point in
18 time, did you think that other people were working
19 to investigate the alleged fraud that had been
20 identified by Mr. Amstrup?
21         MR. OXFORD:  Objection to form.
22     A    So are you asking me whether
23 others within my unit were investigating?
24 BY MR. DULBERG:
25     Q    Yes.

CONFIDENTIAL
Anne Munksgaard - June 9, 2021

11 (Pages 38 to 41)

Page 38

1   A     Well, they need to have something
2   first.  I mean, these are e-mails, then obviously
3   they start looking if we have anything.
4       Q     Okay.  You received the second
5   e-mail from Mr. Amstrup on the 17th of June 2015,
6   correct?
7       THE WITNESS:  Yes, it says --
8       A     Yes, that is what it says here.
9       Q     He provided more information about
10  Sanjay Shah, correct?
11      A     Yes, that is what I can read from
12  this.
13      Q     He called it a very special case?
14      MR. OXFORD:  Objection to form.
15  BY MR. DULBERG:
16      Q     The last paragraph, first
17  sentence.
18      A     Well, yes, I am reading that now.
19  I didn't give that much thought.
20      Q     He told you he had a handwritten
21  list of companies that allegedly acted as fictitious
22  owners of shares, do you see that?
23      A     Yes.
24      Q     What was your reaction to
25  receiving that information?

Page 39

1   A     To be honest, I do not read things
2   like this in great detail.
3       Q     You didn't ask for the list of
4   companies, correct?
5       A     Well, my role is to distribute
6   work to where it needs to go.  So a text like this,
7   I would typically just skim through.  And then I
8   will forward this to the person -- the manager in
9   charge of this, or maybe certain employees.
10      Q     Would you have expected one of
11  your employees to ask you to ask Mr. Amstrup for his
12  handwritten list of fictitious companies?
13      MR. OXFORD:  Objection to form.
14      A     Well, all I expect is that they do
15  what they are supposed to do.  I don't know what
16  they can find or not find.
17  BY MR. DULBERG:
18      Q     Okay.  You forwarded this message
19  to Mr. Ekstrand, Ms. Drost, Ms. Haslev and Ms. Vagn
20  Larsen -- a male or female?
21      THE INTERPRETER:  Male.
22  BY MR. DULBERG:
23      Q     Mr. Larsen, correct?
24      A     Yes.
25      Q     Did you ask them to do anything

Page 40

1   about it?
2       A     Well, of course.  When I forward
3   something like this I expect people to handle it,
4   generally speaking.
5       Q     Did you reply to Mr. Amstrup?
6       A     I don't remember.  I usually reply
7   when people write to me, but I don't remember.
8       Q     All right.  Let's go to the next
9   exhibit, which is 3064.
10      MR. OXFORD:  Before we get there, we have
11  been going for a little over an hour.  Should we
12  take a short break?
13      MR. DULBERG:  Why don't we get through
14  this one and then we will take a short break, if
15  that works for you?
16      MR. OXFORD:  If that is okay for the
17  witness, yeah, let's do one more.
18  BY MR. DULBERG:
19      Q     3064, yes.  Do you recognize this
20  document?
21      A     Was that not the one we were
22  discussing just a minute ago?
23      Q     No.  This is now the third e-mail
24  from Mr. Amstrup.  This one is dated the 18th of
25  June 2015.

Page 41

1   A     This is 67 --
2       Q     I'm at 64.
3       THE INTERPRETER:  Yeah, but 64 was the one
4   that we just discussed.  This one from the 18th
5   is -- sorry.  Yes.  Right.  Sorry.
6       MR. DULBERG:  That is okay.
7   BY MR. DULBERG:
8       Q     For the record, Exhibit 3064
9   ending in Bates number 411550 contains an e-mail
10  from Mr. Amstrup dated the 18th of June 2015, right?
11      A     Yes.
12      Q     In this e-mail he provided the
13  names of the companies he had written down by hand,
14  correct?
15      MR. OXFORD:  Objection to form.
16      A     Yes.
17  BY MR. DULBERG:
18      Q     Did you have any understanding of
19  why he kept providing more information each day?
20      A     I didn't give it any thought.
21      Q     Directly beneath the list of
22  companies on the first page of this exhibit, he told
23  you that he had even more information about the
24  sellers of the shares, correct?
25      A     Yes, that is what it says.

CONFIDENTIAL
Anne Munksgaard - June 9, 2021

15 (Pages 54 to 57)

## Page 54

1  It is an e-mail exchange between you and
2  Mr. Sørensen, correct?
3      A    Yes.
4      Q    And in the middle of the first
5  page, do you see an e-mail from Mr. Sørensen to you
6  from the 10th of August 2015?
7      A    Yes.
8      Q    He asked if you should give the
9  department a briefing, correct?
10     A    Yes.
11     Q    Do you know what he meant by "the
12 department"?
13     A    That is the department of the
14 Danish Ministry of Tax.
15     Q    The entire Ministry of Tax?
16     MR. OXFORD:  Object to form.
17     A    Yes.  There may be around 200
18 employees in the department.
19     Q    You responded to suggest that yes,
20 the department should be briefed, correct?
21     A    My answer is yes, we probably
22 should.
23     Q    What had changed -- strike that.
24 To that point, the department had not been briefed
25 about this possible fraud, correct?

## Page 55

1      A    So, I need to be careful --
2  mindful not to speak on behalf about this.  I had
3  informed Jim about the report that I had received.
4  So, I don't know.
5      Q    Okay.  Had anything changed
6  between June and August that warranted briefing the
7  entire department?
8      MR. OXFORD:  Objection to the form.
9      A    Again, I don't know whether to
10 inform the entire department or not, but we had
11 received a report late July, I can't remember from
12 what authority it was, but from the UK.
13 BY MR. DULBERG:
14     Q    Another report of potential fraud
15 with respect to dividend withholding tax reclaims,
16 right?
17     A    Yes, correct.  But this time we
18 got it from an official authority called a national
19 something or other, I can't remember the name.
20     Q    Is it fair to say you took the
21 report from the UK more seriously than the previous
22 report?
23     MR. OXFORD:  Object to the form.
24     A    Again, I was on holiday when we
25 received the second report, but as I said initially,

## Page 56

1  whenever there is a case we need to be -- we need to
2  substantiate the case that we have made regardless
3  of who made the reports to us, whether it is from a
4  national authority or not, but of course the more
5  reports that we get from external sources, the more
6  we are able to look within our own systems as well
7  as look for information elsewhere.
8      Q    Had you substantiated the case at
9  the time when SKAT stopped paying reclaims?
10     MR. OXFORD:  Objection to form.
11     A    We hadn't substantiated anything
12 at that time.
13 BY MR. DULBERG:
14     Q    If you can turn to Exhibit 3303,
15 do you find an e-mail you, in the middle of the
16 page, sent Jim Sørensen on August 12, 2015?
17     A    Yes.
18     Q    And in the last paragraph, you
19 noted there were two independent sources of
20 evidence, so there was probably something about the
21 talk, right?
22     A    Correct.
23     Q    You wrote, "We are going to work,"
24 correct?
25     A    So, not we are going to work, but

## Page 57

1  more that we will keep working on this.  Just to
2  make sure that it is clear, we have -- when we have
3  a control case, we need to be able to substantiate
4  this.  We cannot just willy nilly send out claims to
5  businesses, we need to be able to document the basis
6  of our claim.  And we didn't have that at the time.
7      Q    Okay.  Despite not having
8  documentation to support to your claim in
9  August 2015, SKAT still stopped paying reclaim
10 applications at that time, right?
11     MR. OXFORD:  Objection to form.
12     A    Correct.
13 BY MR. DULBERG:
14     Q    Okay.  And after -- withdrawn.
15 After SKAT stopped paying dividend withholding tax
16 reclaims, there was pressure on SKAT to resume
17 making those payments, right?
18     MR. OXFORD:  Objection to form.
19     A    So, I don't remember specifically,
20 because I was in special control and we did not
21 handle payments of dividend tax refund.  So there
22 might have been discussions whether or not to
23 maintain the stop or not, but that was not something
24 that I was directly involved in.
25