# Exhibit 8_I

24

spect to the stock lending transactions that were referred to, the answer to that is no.

Senator LEVIN. In terms of the swaps?

Mr. POTAPCHUK. In terms of stock loan transactions, no.

Senator LEVIN. What about swaps? Did you engage——

Mr. POTAPCHUK. Swaps, yes. We engaged, have engaged, and continue to engage in transactions that involve taking exposure to securities in the form of total return swaps.

Senator LEVIN. All right. And the principal purpose there was——

Mr. POTAPCHUK. Well, the principal purpose——

Senator LEVIN. The principal reason, I think your testimony is, although not necessarily the only reason, of these total return swaps was to reduce the tax burden on the non-U.S. investors. Is that your testimony I am reading from?

Mr. POTAPCHUK. Yes. There are other economic reasons for entering into a swap, but quite frankly, the most compelling one by far is the tax savings. And without that tax savings, a lot of those swaps, I would say, at Highbridge would not have occurred.

Senator LEVIN. Thank you.

Mr. POTAPCHUK. Some would and some would not.

Senator LEVIN. But many of them would not have occurred?

Mr. POTAPCHUK. That is true.

Senator LEVIN. Mr. Manogue, you said that in 2007 a number of financial institutions suspended offering dividend enhancement services.

Mr. MANOGUE. That is correct.

Senator LEVIN. And how many stopped, and who were they?

Mr. MANOGUE. To the best of my knowledge, all of them stopped.

Senator LEVIN. Let me ask each of you, how did your firm learn about these types of transactions in the first place? Did this come from a financial institution of some kind?

Mr. MANOGUE. Yes, financial institutions would market us for this product.

Senator LEVIN. "Mark" you? What does that mean?

Mr. MANOGUE. Market.

Senator LEVIN. Oh, market.

Mr. MANOGUE. They would come up and try to convince us to buy their product.

Senator LEVIN. Who are some of those institutions; do you remember?

Mr. MANOGUE. Over the years they have ranged from every major financial institutions, but, in particular, for us it was UBS, Merrill Lynch, Morgan Stanley, Lehman Brothers, Nomura, and ING.

Senator LEVIN. OK, so they initiated it, came to your company to try to persuade you to use the type of transaction?

Mr. MANOGUE. Yes, they did.

Senator LEVIN. Mr. Potapchuk, did you initiate this or was this a financial institution which marketed this to you?

Mr. POTAPCHUK. Well, as I explained, what we do at Highbridge is enter into total return swap transactions and not the other stock lending type transactions. We enter into total return swaps for, again, many other reasons in many other markets. We are very

25

aware that under current tax law, payments under total return swaps are not subject to dividend withholding, so——

Senator LEVIN. There was not a financial institution which came to you to market it?

Mr. POTAPCHUK. They all come to us to market it in the sense that we may be doing it with someone, with a UBS company, and they would like us to do it with them instead just to gain some market share of our business. But once approached by any of these firms, we have a practice whereby internally we vet any of the issues that they bring up. We confer with our own in-house counsel, our own in-house tax advisers. We go outside to the extent we need to with our tax professionals. And we basically came to the same conclusion as they did with respect to the appropriate tax treatment of these payments under the swap contracts.

Senator LEVIN. But these total swaps are marketed to you?

Mr. POTAPCHUK. They are marketed to us, just like a normal prime brokerage is marketed to us, yes.

Senator LEVIN. And when they are marketed to you as the principal—I will leave it there.

Mr. Wolf, how did your company get involved in the swaps? Was this something internal, or was this marketed to you by financial institutions?

Mr. WOLF. It was marketed to us by a number of major financial institutions.

Senator LEVIN. And who are they?

Mr. WOLF. Several on this list that are—Lehman Brothers, Deutsche Bank, Morgan Stanley, Goldman Sachs, Merrill Lynch, and others.

Senator LEVIN. OK. Mr. Manogue, is Maverick LDC a U.S. company?

Mr. MANOGUE. No. It is a Cayman Island entity.

Senator LEVIN. And how many people does Maverick have in the Caymans?

Mr. MANOGUE. We do not have any.

Senator LEVIN. So this is a company that you own that is in the Caymans or listed in the Caymans, but you do not have any people there?

Mr. MANOGUE. Correct. It is registered in the Caymans.[1]

Senator LEVIN. Registered. Thanks. So you do not have an office there?

Mr. MANOGUE. Correct.

Senator LEVIN. And how many people do you have in the United States?

Mr. MANOGUE. Close to 200 people.

Senator LEVIN. And where are the investment specialists who make all the investment decisions, perform all the investment decisions, and perform all the research located?

Mr. MANOGUE. We have several offices here in the United States. The primary office would be Dallas as well as New York City.

Senator LEVIN. But all the 200 or so are in the United States?

[1] See Exhibit No. 35 which appears in the Appendix on page 300 for clarification of these remarks.

26

Mr. MANOGUE. Almost all of them. We do have some folks in London, Taipei, and Shanghai.

Senator LEVIN. All right. Now, when you performed the stock loan transactions with UBS, the record indicates that the transactions were with UBS' Cayman Island facility. If you would take a look at Exhibit 10,[2] and this is the way UBS described its Cayman Island facility. It said, "UBSCL is not licensed, registered, or regulated, e.g., by reason of capital adequacy requirements, as a broker-dealer or similar entity in any jurisdiction, cannot access the capital markets except through a broker-dealer, and does not hold itself out as a broker-dealer. UBSCL"—that is their Cayman operation—"is not and does not hold itself out as being capable of servicing customers, e.g., it does not possess adequate systems or personnel. UBSCL's counterparties do not view themselves as UBSCL's customer. And UBSCL does not have any fiduciary duties to its counterparties. UBSCL does not make markets, possess inventory, or have an established place of business. UBS does not hold itself out as a merchant or as willing to enter into either side of securities or derivative trades."

I cannot think of a better definition of a shell than that one.

Now, your operation in the Caymans, as you just indicated, was a shell operation, and over the years the stock loan transactions between the two Cayman Islands shells cost the U.S. Government about $90 million in dividends that were not withheld. And that loss came because the transactions supposedly took place between the two Cayman entities. So far are you with me?

Mr. MANOGUE. I am with you, Senator.

Senator LEVIN. OK. Do you disagree with anything I have said so far on this question?

Mr. MANOGUE. Well, I am not sure what the question is, but——

Senator LEVIN. Well, what I have said so far, that there were two entities—there was a loan transaction between—one of them was your entity, which you have described as not having any people there and being registered there; the other one, UBS described just the way I have just read it.

Mr. MANOGUE. Yes.

Senator LEVIN. Were you aware that UBS Cayman——

Mr. MANOGUE. We knew of the entity, yes.

Senator LEVIN. All right. Now, do the financial institutions that Maverick has dealt with more recently also run these trades through these kind of registered offices in offshore jurisdictions?

Mr. MANOGUE. Yes.

Senator LEVIN. And, again, I think you have been clear that the trades are structured through these jurisdictions as a way of enhancing your dividend, as you put it. So I think you have been clear on that.

Now, Mr. Wolf, does Angelo, Gordon & Co. have a Cayman Island hedge fund?

Mr. WOLF. We have—yes.

Senator LEVIN. And how many people do you have in the Caymans?

Mr. WOLF. We do not have any employees in the Caymans.

---

[2] See Exhibit No. 10 which appears in the Appendix on page 216.

27

Senator LEVIN. Do you have an office in the Caymans?

Mr. WOLF. No. We have an administrator.

Senator LEVIN. No employees?

Mr. WOLF. That is correct.

Senator LEVIN. And about how many people work for Angelo, Gordon & Co.?

Mr. WOLF. About 250.

Senator LEVIN. And none of them are in the Caymans. Where are they?

Mr. WOLF. They are in New York, offices in London, Amsterdam, several in Asia, Chicago, and Los Angeles.

Senator LEVIN. OK. Thank you.

Mr. Potapchuk, what about Highbridge? Does Highbridge have a Cayman hedge fund?

Mr. POTAPCHUK. The funds that Highbridge manages are generally registered in the Cayman Islands, yes.

Senator LEVIN. And how many folks do you have in the Caymans?

Mr. POTAPCHUK. We have none. We have an administrator, some legal experts, etc.

Senator LEVIN. But no employees there?

Mr. POTAPCHUK. No employees.

Senator LEVIN. And do you have an office there?

Mr. POTAPCHUK. We do not have an office there.

Senator LEVIN. Mr. Manogue, would you take a look at Exhibit 7, please?[1] Leading up to my question, Mr. Manogue, about Exhibit 7, let me see if you would agree with this. According to the materials that you have provided to the Subcommittee—and, again, we appreciate that cooperation—your firm received about $63 million in dividend enhancements. Now, those are portions of dividends that would normally be withheld but are not under the transactions that you engaged in, and the financial institutions that you were trading with received about $31 million, the portion of Maverick's enhancement that was paid to them. That would be money, obviously, which would have otherwise been withheld and turned over to the U.S. Government.

Now, I want to ask you about Exhibit 7. What I have said so far is based on your documents, and so I will proceed from there unless you disagree with those figures that I just gave.

Mr. MANOGUE. I do not disagree.

Senator LEVIN. All right. Thanks.

Now, Exhibit 7, this is a communication between Mr. Chisholm of Maverick and a representative from Ernst & Young. In the memo, Mr. Chisholm raises the question of whether money from dividend enhancement transactions should be reserved or paid to the government as part of Maverick's tax return. And this is what he says: "Now that June 15th is approaching, we are considering"—again, I am reading from Exhibit 7—"whether we need to go ahead and remit the 2006 income tax withholding that we accrued for FIN 48 purposes in connection with the stock loan fee income earned during 2006. We determined in December that we should probably accrue these taxes even though nothing is actually

---

[1] See Exhibit No. 7 which appears in the Appendix on page 203.

28

withheld by our other brokers. We will need to address whether or not to pay these taxes for pre-2006 years whenever we file protective returns for those years."

Has Maverick paid any money to the government as part of a tax payment related to these dividend enhancement transactions?

Mr. MANOGUE. I am not aware of that. I would have to talk to our tax advisers and service folks.

Senator LEVIN. All right. Let us know then. Would you do that for the record?[2]

Mr. MANOGUE. We will.

I believe this memo also is driven by a discussion on compliance with FIN 48. There is a reserve that has been determined that we should take related to fees that we earn for lending our stocks out. So I believe there are two issues being discussed in this memo.

Senator LEVIN. All right. Now, that same exhibit, I think it is page 5, but at the bottom it is MAV0001119. Do you see that page? It is in the lower right-hand corner.

Mr. MANOGUE. Yes.

Senator LEVIN. OK. Now, if you look at the top paragraph there, this is addressed to Joe Bianco, who is a Maverick employee. Is that correct?

Mr. MANOGUE. No. He works for Ernst & Young, I believe.

Senator LEVIN. Matt Blum at the bottom. Do you see he works for Ernst & Young?

Mr. MANOGUE. As well, yes.

Senator LEVIN. So they both work for Ernst & Young?

Mr. MANOGUE. I believe so, yes.

Senator LEVIN. All right. As you read the first paragraph, if the prime broker does not withhold and the IRS catches the prime broker, then perhaps the prime broker can go after Maverick for contribution or indemnification, complex point if the contract is silent, but if the IRS figures out what is going on, the IRS can bypass the prime broker and go straight after Maverick for failure to pay tax imposed under Section 881. The only limit is that the IRS may not collect the tax twice.

So if the IRS figures out what is going on, the IRS can go straight after Maverick. Were you aware that was the Ernst & Young opinion?

Mr. MANOGUE. I was not until preparing for this testimony.

Senator LEVIN. OK. Mr. Wolf, how much withholding did Angelo, Gordon & Co. get back from these dividend enhancement transactions over the years? Do you have that figure for us?

Mr. WOLF. For the years 2000 to 2007, the total amount of U.S. dividends that Angelo, Gordon & Co. received in offshore funds was $137 million. So we would have gotten contract payments of $137 million.

Senator LEVIN. All right.

Mr. WOLF. Therefore, what you were calling dividend—30 percent of that number is the number.

Senator LEVIN. Thirty percent of that $137 million.

Mr. WOLF. Correct.

---

[2] See Exhibit No. 35 which appears in the Appendix on page 300.

29

Senator LEVIN. And, Mr. Potapchuk, how much withholding did Highbridge get back from the dividend enhancement transactions over the years?

Mr. POTAPCHUK. The analysis that we have done and submitted to the staff previously covered the 6-year period from 2002 through 2007, where it is indicated that if during that time there was a 30-percent withholding requirement on payments received on swap transactions, the likely amount of withholding amounts that would have occurred at Highbridge would have been approximately $100 million. And I can walk you through that number a bit. It works like this.

We received during that period about $425 million in payments under total return swap contracts. These were received by our master fund. Our master fund has a combination of U.S. and non-U.S. investors. The U.S. portion ranges from 10 to 20 percent. So let's say that 15 percent of that number, or about $60 million, would not be subject to withholding because they would be directly received by—they would be indirectly effectively received by U.S. persons. That would bring us down to about $360 million.

Additionally, there are several amounts included in those payments received that would otherwise not be taxable. For instance, in many cases, in particular with respect to large dividends that are paid, many of the dividends are treated as returns of capital for U.S. tax purposes. They are not paid out of current earnings and profits of the corporations.

Conservatively, we estimate that about $20 million of that total would have been made up of something classified as return of capital by the corporations, which would bring us to $340 million, and about 30 percent of that number gets me to the $100 million over the 6-year period ending in 2007.

Senator LEVIN. I have got it. And I can ask both of you, Mr. Wolf first, was any of that $137 million ever paid back to the government as part of a tax payment?

Mr. WOLF. Well, again, it was not the $137 million. That was the——

Senator LEVIN. The 30 percent of that, was any of that ever paid to the government?

Mr. WOLF. Not to my knowledge.

Senator LEVIN. All right. And do you know, Mr. Potapchuk, if any of that approximately $100 million you talked about was ever paid to the government?

Mr. POTAPCHUK. No, it was not paid to the government at all.

Senator LEVIN. Thank you.

Mr. MANOGUE. Senator, if I may, I would like to clarify one other point.

Senator LEVIN. Sure.

Mr. MANOGUE. We discussed Exhibit—I believe it is Exhibit 7, page MAV0001119.

Senator LEVIN. Yes.

Mr. MANOGUE. The memo from Matt Blum to Joe Bianco of Ernst & Young. I believe after having a chance to look at this, the first two paragraphs refer to a discussion about the reserve for stock loan fees that have been paid in our tax return. The last paragraph in that email exchange refers to dividend enhancement,

30

where they conclude that there is a need to come up with a better than 50-percent chance of succeeding under FIN 48 analysis. So I believe the top two paragraphs are referring to something different, not dividend enhancement.

Senator LEVIN. The one I read you do not think referred to——

Mr. MANOGUE. I do not.

Senator LEVIN. But you are confident that this memo was an internal memo at Ernst & Young?

Mr. MANOGUE. Yes.

Senator LEVIN. And that the "Joe" referred to is an Ernst & Young employee?

Mr. MANOGUE. Joe Bianco, yes.

Senator LEVIN. And that these points in this memo were not shared with you?

Mr. MANOGUE. They were not shared with me, no.

Senator LEVIN. I mean with your company.

Mr. MANOGUE. I believe they were shared and through the email chain would have gotten to our tax department.

Senator LEVIN. Who in your tax department? Who in that email chain——

Mr. MANOGUE. Keith Hennington and Chad Chisholm.

Senator LEVIN. So your tax department was aware of this document, then?

Mr. MANOGUE. Yes.

Senator LEVIN. OK. Let me again thank our witnesses, and I would note that these hedge funds are not the only hedge funds that engage in these activities. These are representative of these actions and activities that go on, and we selected three because we needed to have representative witnesses here, and you have been helpful. We appreciate it and you are excused.

Mr. MANOGUE. Thank you.

Mr. POTAPCHUK. Thank you.

Mr. WOLF. Thank you.

Senator LEVIN. Let me now welcome our third panel of witnesses: John DeRosa, the Managing Director and Global Tax Director of Lehman Brothers, New York; Matthew Berke, the Managing Director and Global Head of Equity Risk Management of Morgan Stanley of New York; and Andrea Leung, the Global Head of Synthetic Equity Finance of Deutsche Bank of New York.

Let me thank each of you again for being here today, and pursuant to Rule VI, all witnesses who testify before the Subcommittee are required to be sworn. So I would ask that you please stand and raise your right hand. Do you solemnly swear that the testimony that you will give to this Subcommittee today will be the truth, the whole truth, and nothing but the truth, so help you, God?

Mr. DEROSA. I do.

Mr. BERKE. I do.

Ms. LEUNG. I do.

Senator LEVIN. Thank you.

I think you were all here when we described the timing system, so I will not repeat that. Mr. DeRosa, we will have you go first, followed by Mr. Berke, and then Ms. Leung. And then we will turn to questions.

So, Mr. DeRosa, you may proceed.

31

## TESTIMONY OF JOHN DeROSA,[1] MANAGING DIRECTOR AND GLOBAL TAX DIRECTOR, LEHMAN BROTHERS INC., NEW YORK, NEW YORK

Mr. DeRosa. I am John DeRosa, Managing Director and Global Tax Director at Lehman Brothers. I appreciate the opportunity to appear before the Subcommittee today on behalf of Lehman Brothers.

Lehman Brothers, an innovator of global finance, serves the financial needs of corporations, governments, municipalities, and high-net-worth individuals worldwide. Founded in 1850, Lehman Brothers maintains leadership positions in equity and fixed-income sales, trading and research, investment banking, private investment management, asset management, and private equity. The firm is headquartered in New York, with regional headquarters in London and Tokyo, and operates offices worldwide.

As global tax director, I can state with confidence—and I want to emphasize—that Lehman Brothers takes its obligations under the U.S. tax code very seriously. Lehman Brothers has worked diligently to follow the letter and spirit of the law governing both equity swaps and stock loan agreements. The rules governing the applicability of U.S. withholding tax for payments made to non-U.S. counterparties on swap and stock loan transactions referencing U.S. equities are clear.

Under Treasury Regulation Sec. 1–863–7(b)(1), the source of notional principal contract income—i.e., swap payments—is determined by reference to the residence of the taxpayer receiving the payment, not the residence of the payor on the underlying referenced asset. Thus, when Lehman Brothers makes a payment on an equity swap referencing a U.S. asset to a non-U.S. counterparty, the payment is sourced to the residence of the swap counterparty and does not attract U.S. withholding tax.

With respect to stock loans, IRS administrative Notice 97–66 exempts from U.S. withholding tax in-lieu payments made to a foreign counterparty when the criteria articulated in that notice are met. Thus, under these rules, the transactions that the Subcommittee is reviewing do not attract U.S. withholding tax. When Lehman Brothers makes payments, whether pursuant to an equity swap or a stock loan, to foreign counterparties referencing U.S. equities, Lehman Brothers complies with these rules. We understand that Treasury and the IRS may now be considering whether these rules should be changed going forward, including possibly advancing a new rule that would recharacterize some, but not all, of these transactions. I can assure you that, to the extent that Treasury or the IRS now changes these rules, Lehman Brothers will comply with those new rules.

Equity swaps and stock loan agreements are basic financial instruments that have been in existence for decades and are critical to the proper functioning of today's global capital markets. There are many reasons—totally unrelated to withholding tax—why clients use these instruments. Fundamentally, clients employ these instruments to gain economic exposure to underlying assets with-

---

[1] The prepared statement of Mr. DeRosa with an attachment appears in the Appendix on page 80.

32

out beneficially owning those assets. These instruments can provide clients with leverage, operational and administrative efficiency, and other balance sheet and regulatory capital benefits. In return, Lehman Brothers receives financing spreads and commissions as appropriate. These financial instruments, like many others such as municipal bonds, offer tax efficiency in certain circumstances—a result fully recognized by Treasury and the IRS.

In fact, however, most of Lehman Brothers' equity swaps and stock loans have nothing to do with U.S withholding tax efficiency. The overwhelming majority of Lehman Brothers' equity swaps and stock loans simply do not implicate U.S. withholding taxes at all because they have one or more of the following characteristics: One, the counterparty takes a short, rather than a long, position; two, there is no distribution payment on the underlying referenced security; three, the swap or stock loan is not held by the counterparty over a dividend record date; four, the underlying referenced security makes a payment characterized for tax purposes as interest, which is generally not subject to U.S. withholding tax; five, the underlying security is foreign, rather than United States; or, six, the counterparty is a resident in the United States.

It has been well understood for years that even when these basic financial instruments do reference underlying U.S. dividend-paying securities and are entered into as long positions by non-U.S. counterparties over a dividend record date—a relatively small universe of the transactions at Lehman Brothers—they do not attract withholding tax under U.S. tax laws. As I stated earlier, the basic rule for equity swaps, established by Treasury in 1991, is that payments made to non-U.S. counterparties pursuant to these basic financial instruments must be sourced based on the residence of the counterparty and, therefore, do not implicate U.S. withholding taxes. In addition, an IRS administrative notice specifically exempts from U.S. withholding taxes in-lieu payments on stock loan transactions like the ones in which Lehman Brothers participated. These fundamental rules—and the resulting tax treatment for certain counterparties—have long been understood by market participants and, notably, the Department of Treasury and the IRS.

Indeed, most, if not all, of the major Wall Street investment banks and commercial banks engage in equity swap and stock loan transactions referencing U.S. underlying equities with non-U.S. counterparties. Over the last 15 years, numerous commentators in widely respected taxation journals have addressed the withholding tax consequences of equity swaps similar to those offered throughout Wall Street, including articles by the current chief of staff for the Joint Committee on Taxation and his former law firm. In 1998, a Notice of Proposed Rulemaking was published in the *Federal Register* that expressly addressed the same issue. It said, "Treasury and the IRS are aware that in order to avoid the tax imposed on U.S. source dividends . . . some foreign investors use notional principal contract transactions based on U.S. equities. . . . Accordingly, Treasury and the IRS are considering whether rules should be developed to preserve the withholding tax with respect to such transactions."

In May 2007, the Practicing Law Institute hosted a panel focused specifically on the U.S. withholding tax aspects of equity swaps and

33

stock loan transactions. The panel included well-recognized practitioners in the tax field including, most notably, a representative from the IRS. Lehman Brothers has provided the Subcommittee with a copy of that panel's presentation.

Despite the IRS' clear recognition for at least a decade that these financial instruments, in certain circumstances, may have U.S. withholding tax implications, to date, no new rules governing equity swaps or stock loan arrangements have been promulgated. This is not surprising when one considers what a fundamental change any such new rules would present, particularly if those new rules were to articulate circumstances warranting recharacterization of certain transactions.

I should note, however, that even under existing law, Lehman Brothers exercised appropriate care when entering into financial instruments. Lehman Brothers consulted extensively with tax experts both internally and at major Wall Street law firms, receiving both oral and written advice. Based on the advice of its legal counsel, Lehman Brothers put in place guidelines and parameters governing the use of these instruments. For example, Lehman Brothers instituted a minimum duration requirement and established requirements governing the size of underlying baskets. Under the prevailing rules applicable to equity swaps and stock loans, transactions meeting these guidelines should not be recharacterized for tax purposes. In other words, according to the U.S. tax laws as currently written, the payments made to non-U.S. counterparties pursuant to equity swaps must be sourced to the residence of the counterparty and, therefore, do not trigger U.S. withholding taxes. Likewise, the type of in-lieu payments made by Lehman Brothers on stock loans are specifically exempt from withholding tax pursuant to the IRS administrative notice mentioned earlier.

Lehman Brothers made every effort to ensure that its equity swaps and stock loans complied with these guidelines. Indeed, we know that in some situations clients approached Lehman Brothers in an effort to transact in instruments in a way that did not align with our product parameters—for example, by seeking to hold a position for a very short period of time around a dividend record date—and that Lehman Brothers refused to engage in those transactions.

But Lehman Brothers did even more than that. In October 2007, when David Shapiro, Senior Counsel in the Treasury Department's Office of Tax Policy, stated publicly that Treasury would "welcome input" from the industry on the proper tax treatment, Lehman Brothers responded. First, Lehman Brothers participated with the Securities Industry and Financial Markets Association to help develop a framework on behalf of the industry. This analytical framework was shared with Treasury and the IRS. Second, Lehman Brothers proactively and independently engaged the Treasury Department in constructive discussions explaining the equity swap business and a possible new framework. These discussions culminated with Lehman Brothers' submission earlier this year of a request to the IRS, pursuant to the Industry Issue Resolution Program, for official guidance. I have attached a copy of that submission to my written testimony.

34

As I said at the outset, if new rules governing the tax treatment of equity swaps and stock lending transactions are promulgated, Lehman Brothers will comply with those new rules. In the meantime, Lehman Brothers has made a concerted and good-faith effort to comply with current tax law. We will continue to do so.

Thank you again for the opportunity to appear here today. I would be happy to answer any questions you may have.

Senator LEVIN. Thank you, Mr. DeRosa. Mr. Berke.

**TESTIMONY OF MATTHEW BERKE,[1] MANAGING DIRECTOR AND GLOBAL HEAD OF EQUITY RISK MANAGEMENT, MORGAN STANLEY & CO., NEW YORK, NEW YORK**

Mr. BERKE. Thank you, Senator. My name is Matt Berke, and I am a Managing Director and Global Head of Equity Risk Management for Morgan Stanley. Thank you for inviting Morgan Stanley to participate in today's hearings. We have been pleased to assist the Subcommittee's staff as it examined these issues, and I hope that I have been a useful resource and will continue to be today.

I understand that the Subcommittee is focused on two issues: Whether industry participants are complying with applicable laws regarding dividend withholding obligations, and whether new laws and policies may be appropriate. I cannot speak for others, but Morgan Stanley believes that its practices in these areas are in compliance with relevant tax laws and regulations, and on the conservative end of the spectrum. We have submitted a longer written statement for the record, but I want to summarize a few key points now about our equity derivatives and stock lending businesses.

Swap trading is widespread and commonly accepted in today's financial markets, and Morgan Stanley is a leader in the equity swap market. I understand that the Subcommittee is particularly interested in a subset of the equity swap business, namely, total return swaps with non-U.S. counterparties obtaining long exposure to dividend-paying U.S. stocks. I will refer generally to these as "swaps" or "total return swaps" in my comments and in response to your questions. But I should be clear that the swaps I am referring to constitute a small subset of Morgan Stanley's overall global swaps business.

There are a variety of reasons why an investor may choose to transact via swap, including leverage, operational efficiency, and in some instances, tax benefits. I know from talking with the Subcommittee staff members and from reading the staff report that there is a great deal of focus on business purpose and client motivation for these trades. Let me start by saying our clients are, first and foremost, investors. Their business purpose, their motivation when they transact, is to put capital at risk in hopes of obtaining a positive investment return. Only after making their threshold investment decision of what to buy and what to sell do they begin to confront the issue of the best means by which to put their capital at risk, and tax can be an important part of that decision.

Non-U.S. counterparties can choose to transact in swap in part to reduce their tax obligations. This is a legitimate choice and permissible under applicable tax laws, provided the swaps are exe-

---

[1] The prepared statement of Mr. Berke appears in the Appendix on page 88.

35

cuted properly. We believe our swaps are properly executed in compliance with relevant tax laws and regulations.

The relevant laws, as I understand them, provide that payments made under swap contracts are treated differently than dividends paid to owners of physical shares. That is the law, and it reflects a decision made by policymakers. At Morgan Stanley, our focus is on ensuring that what we offer to clients as swaps are, in fact, swaps. And we do not enter into swaps that could be recharacterized as repurchase agreements or agency arrangements, which are subject to different U.S. tax treatment.

To take a conservative position, Morgan Stanley has always prohibited two-sided crosses to reestablish a physical long position and currently prohibits swaps with crosses on either end. We also do not allow our swap counterparties to direct our hedge or tell us how or whether to vote any shares that we may choose to purchase as part of a hedge.

I understand the Subcommittee is also interested in the tax treatment of certain stock lending transactions. As one of the world's leaders in equity financing services, Morgan Stanley is active in borrowing and lending stocks both inside and outside the United States.

One aspect of our stock loan business is an intermediation business with Morgan Stanley standing between custodial lenders and borrowers of U.S. dividend-paying stocks and earning a spread between the cost of borrowing and the fees generated by our on-lending activities. At Morgan Stanley, the stock loan activity you have focused on is conducted by a desk in our London office, focused largely on non-U.S. stocks but involving some U.S. stocks as well. We believe we conduct this business in compliance with IRS Notice 97–66, as we understand it, and that our practices are on the conservative end of the spectrum.

Finally, I would like to say a word about tax policy in general. The tax treatment of dividends generally differs from the tax treatment of derivatives. Some have suggested a comprehensive rethinking of how we tax capital investment returns, regardless of whether the return is classified as a dividend or not, and regardless of whether the investor is U.S. or non-U.S. In light of today's hearings, additional guidance on which investment structures the IRS would critique or respect would be helpful, particularly for organizations like Morgan Stanley, where we try to conduct our business on the conservative end of the spectrum.

Thank you for the opportunity to testify, and I look forward to your questions.

Senator LEVIN. Thank you, Mr. Berke. Ms. Leung.

## TESTIMONY OF ANDREA LEUNG, GLOBAL HEAD OF SYNTHETIC EQUITY FINANCE, DEUTSCHE BANK AG, NEW YORK, NEW YORK

Ms. LEUNG. Good morning, Chairman Levin and Members of the Subcommittee. My name is Andrea Leung. I am the Global Head of Synthetic Equity Finance for Deutsche Bank AG. I am based in New York and have worked at Deutsche Bank since 2002.

Among my responsibilities is the management of the synthetic equity desk in Deutsche Bank's New York office. Our clients can

36

use synthetic equity to replicate the economics of a long or a short position in any particular equity security or in a basket of securities. Specifically, we enter into derivative or swap transactions with clients who want the economics of purchasing or selling a single stock, a basket of stocks, or an index of stocks without actually acquiring the underlying securities.

Synthetic equity is a well-recognized, well-developed financial product that has business purposes unrelated to taxation in general or withholding taxes on dividends in particular. Indeed, many of our clients manage ongoing portfolios and execute trading strategies without owning any of the underlying securities. All of their investments are held in synthetic equity. Furthermore, we do transactions every day with domestic U.S.-based entities. We use synthetic equity to replicate short positions and to replicate positions in stocks that do not pay dividends. This product was not devised and is not held out by Deutsche Bank as a vehicle to avoid dividend withholding taxes.

As my title Global Head of Synthetic Equity Finance suggests, this New York business is a financing business. As with any bank engaged in a financing business, we hope to profit from spreads— here the difference between our own cost of funds and that which we charge to the client. All clients, whether they are large or small, long or short, onshore or offshore, trading in dividend-paying securities or not, are charged a fee based on Deutsche Bank's cost of funds plus our cost of balance sheet usage, stock execution, and any risks associated with the transaction, including the credit risk of the counterparty.

We enter into swaps on all types of securities, including convertible bonds. Our swaps business based on U.S. stocks covers both dividend and non-paying dividend stocks. Approximately 60 percent of our clients have long positions with us, while the remaining 40 percent have short positions. About one-third of our clients are based onshore, while the remainder are based offshore. Our swap product allows clients to execute trading strategies and take positions on U.S. equities and equity markets without holding the underlying physical securities.

Clients establish synthetic versus actual equity positions for many reasons. Synthetic equity exposure, whether long or short, is advantageous to clients as a financing technique. Swaps provide clients with leverage, allowing them to gain the economic benefit of purchasing and selling securities without expending their own capital or having to pay the full cost of trading such securities. Clients are relieved of having to pay settlement costs and other back-office expenses. Also, because swaps involve synthetic and not actual trading positions, swaps shift from clients to the broker-dealers the obligation of certain market trading rules, such as locates for short sales.

Synthetic position also allow clients to protect their proprietary trading strategies from market competitors. Because our synthetic equity product is intended to replicate the economics of a position in the underlying security, we make or receive payments under our swap agreements to give our clients the financial equivalent of dividend payments. The same economics could be replicated through a futures or option transaction. I and my colleagues across Wall

37

Street always have understood that, as a matter of tax law, swap payments are not subject to withholding tax, and the institution that makes them is not a withholding agent. That remains my understanding.

Further, I have always understood that Deutsche Bank could not be deemed a withholding agent unless its transactions with customers were susceptible of being recharacterized as repo transactions or stock loans.

We have taken a series of steps to eliminate any possibility that our transactions could be recharacterized in a manner that would violate tax laws or turn Deutsche Bank into a withholding agent. We have done this in part by establishing policies designed to prevent clients from entering swap transactions close to a dividend event. Thus, our policies are designed to encourage clients to hold for a minimum of 30 and preferably 45 days.

In addition, we do not hedge our synthetic positions by both buying and selling the underlying stock with our client. We expect leverage to be a primary driver for entering into synthetic positions, so we do not permit clients fully to collateralize their positions. We also employ volume limits and pricing policies to ensure that our hedging involves market activity.

We believe our policy has worked and that our synthetic equity business is not a tax dodge. The information we have provided to the Subcommittee demonstrates that two-thirds of all of our New York swap clients hold their swap positions at least 60 days before dividend record dates, and two-thirds of them hold their positions at least 60 days after dividend record dates. Typically, our clients unwind their swap positions not because dividends have just been paid, but because their trading strategy dictates a change in investment position. Further, we successfully market our synthetic equity product to customers who want short positions and to customers who want to enter into swaps on non-dividend-paying stocks.

The entirety of the business clearly supports our understanding that our clients are entering into swaps for sound business reasons and our transactions are entirely legal under existing law.

Thank you for your time. I will do my best to answer any questions that you may have. In the interest of time, I have left out portions of my prepared statement, including those addressed to the business conducted by my colleagues in London and Jersey. With your permission, I will submit those portions together with my written remarks for the record.

Senator LEVIN. Ms. Leung, you are reading a statement. You have asked that the parts that you did not read be submitted to the record. We asked you to provide a copy of that written statement in advance, and you failed to do so. Why?

Ms. LEUNG. We were certainly trying to comply with everything that you had requested and just as a matter of time, did not have the chance to get that to you.

Senator LEVIN. You could not have gotten it to us this morning? You could not have given it to us last night? Everyone else gave us a copy of the written statements that they read from.

Ms. LEUNG. I am sorry we did not do that.

38

Senator LEVIN. Mr. Berke, did Morgan Stanley market or engage in swap or stock loan transactions principally for the purpose of avoiding U.S. dividend withholding tax?

Mr. BERKE. Senator, as I said in my opening remarks, we believe the primary purpose of clients engaging in equity swaps is to gain exposure to the underlying equity. Choosing swaps as a means of gaining that exposure or choosing entering into a stock loan is a secondary decision on their part on how to potentially deal with issues, including taxes.

Senator LEVIN. Did you ever market your swap transactions or stock loan transactions so your client could avoid U.S. dividend withholding taxes?

Mr. BERKE. We market the products generally and include disclosure about all the relevant aspects of it, including any tax implications or considerations that clients should have when considering those investment opportunities.

Senator LEVIN. But did you ever market it focusing on enhancing the dividend payout by not having to pay withholding?

Mr. BERKE. Our marketing materials include a discussion about taxes.

Senator LEVIN. Did this discussion ever tell your recipient of your proposals that they would enhance the dividend payout?

Mr. BERKE. Specific marketing materials may have, but generally we do include——

Senator LEVIN. Take a look at Exhibit 26,[1] would you?

Mr. BERKE. I am familiar with this from preparation for today's testimony.

Senator LEVIN. All right. This says, "Here are the main points regarding total return equity swaps on Microsoft why offshore funds are subject to withholding tax of up to 30 percent on cash dividends from U.S. stocks. Morgan Stanley can enhance the dividend payout from 70 percent to 100 percent through a total return equity swap. This is a great opportunity to highlight an application that is relevant to all dividend-paying securities, not just Microsoft."

Is that a Morgan Stanley document?

Mr. BERKE. It is an internal distribution Morgan Stanley document, so it is marketing to our internal sales people and traders.

Senator LEVIN. And did those folks that were marketing this particular type of a product use this argument?

Mr. BERKE. They may very well have discussed these issues as opposed to using this piece as a marketing piece, yes.

Senator LEVIN. But whether or not this particular piece was used in marketing, is it fair to say that they would have used this argument, this point in marketing for Morgan Stanley?

Mr. BERKE. Yes, it is fair to say that.

Senator LEVIN. And so, therefore, is it not fair to say that Morgan Stanley, when it was offering and suggesting total return equity swaps to potential customers, used as an argument that Morgan Stanley can enhance the dividend payout from 70 percent to 100 percent through a total return equity swap?

---

[1] See Exhibit No. 26 which appears in the Appendix on page 256.

39

Mr. BERKE. It is certainly the case in respect to the Microsoft dividend, yes.

Senator LEVIN. Well, doesn't it say here "not just Microsoft"?

Mr. BERKE. Yes, it does.

Senator LEVIN. Mr. DeRosa, did Lehman Brothers market or engage in swap or stock loan transactions with the presentation of the argument that your customer could avoid U.S. dividend withholding tax?

Mr. DEROSA. Similar to Mr. Berke's answer——

Senator LEVIN. Give me your answer, if you would.

Mr. DEROSA. Fine. We included among the benefits from entering into equity swaps the tax features.

Senator LEVIN. The tax features being?

Mr. DEROSA. Meaning the reduction of taxes payable.

Senator LEVIN. OK. Now, if you will look at Exhibit 22?[1] This is a letter from you to Maverick Capital. Do you see on page 2 it says, "We have a variety of solutions using swap and securities lending vehicles for achieving yield enhancement"?

Mr. DEROSA. I see that.

Senator LEVIN. Was that not clearly marketing to Maverick a vehicle for increasing dividend yield, enhancing a dividend yield? Is that not clearly what you were marketing there?

Mr. DEROSA. Among the other items listed in this letter, yes, that was featured.

Senator LEVIN. And where are those other items?

Mr. DEROSA. In just looking down the list of starting at the first page, it goes through several different aspects of synthetic financing, I believe.

Senator LEVIN. Were any of those applying to your swap product or your securities lending product?

Mr. DEROSA. I have not seen this document before this morning, so I am just skimming it now. But I presume it is with respect to all of the products that we offer.

Senator LEVIN. Well, why don't you read it now and tell me whether any of those items on page 1 refer to your swap and securities lending vehicle and whether you say anything about your swaps and security lending vehicle except that it will achieve yield enhancement. And then you propose that Maverick provide Lehman Brothers with an interest list on a weekly basis for possible enhancement trades. If that is not marketing a vehicle to increase your dividend yield, I do not know what is.

Mr. DEROSA. Again, just looking at it for the first time, at the bottom of the first page it is discussing our prime-plus product; prime-plus provides U.S.-based hedge fund risk-based margin lending.

Senator LEVIN. Right.

Mr. DEROSA. With all the benefits of traditional prime brokerage, including insurance wrapper.

Senator LEVIN. Is that your swap lending to achieve yield enhancement?

Mr. DEROSA. I am not sure exactly which product that is. I apologize. But, again, what I am suggesting is that the letter deals

---

[1] See Exhibit No. 22 which appears in the Appendix on page 242.

40

with other aspects that are advantageous to the client in addition to the dividend enhancement.

Senator LEVIN. Well, you are selling a lot of things in this letter. You are promoting a lot of things. One of the things you are promoting is a swap and security lending vehicle for achieving yield enhancement. Are you promoting it for anything else other than achieving yield enhancement? Just take a look at the paragraph. It says "Dividend Enhancement Solutions. We have a variety of solutions using swap and securities lending vehicles for achieving yield enhancement." Do you list anything else there that you are using swap and securities lending vehicles other than for that?

Mr. DEROSA. That paragraph does not. It references the dividend enhancement feature associated with swaps and security lending transactions.

Senator LEVIN. All right. Ms. Leung, did Deutsche Bank engage in swap or stock loans transactions for the principal purpose of avoiding U.S. dividend withholding tax?

Ms. LEUNG. We did not.

Senator LEVIN. All right. Now, take a look at Exhibit 31.[1] On Exhibit 31, where it says, "We are in the process of determining hedge fund demand for 'All In' enhancement to clients for our proprietary trades," does that relate to dividend enhancement?

Ms. LEUNG. This would relate to dividend enhancement. However, I will note that we did not actually, to the best of my knowledge, engage in any activity that came off of this memo.

Senator LEVIN. So you determined there was no demand?

Ms. LEUNG. We determined that this was not something that we wanted to market to our clients and actually discouraged any marketing documents with regards to the Microsoft dividend.

Senator LEVIN. Did you hear Mr. Wolf on the prior panel testify that Deutsche Bank marketed dividend enhancement swaps to them? Did you hear him say that?

Ms. LEUNG. Yes, I did hear that.

Senator LEVIN. He was under oath.

Ms. LEUNG. Yes.

Senator LEVIN. You are under oath.

Ms. LEUNG. I understand.

Senator LEVIN. Do you disagree with him?

Ms. LEUNG. We market swaps to clients for a variety of reasons——

Senator LEVIN. No. I am saying for dividend enhancement.

Ms. LEUNG. Dividend——

Senator LEVIN. That is what he testified to. Did you market dividend enhancement swaps to them?

Ms. LEUNG. Sure, well, to——

Senator LEVIN. Pardon? The answer is "sure," or your answer is——

Ms. LEUNG. No. To address both of your questions separately, first regarding this document, this is regarding Microsoft, and in the case of Microsoft, we did not market the Microsoft transaction. In fact, under our New York swaps desk, we did a total of 500,000 shares worth of swaps during the time of Microsoft, which is a very

---

[1] See Exhibit No. 31 which appears in the Appendix on page 265.

41

de minimis amount in the context of our business, as well as had trading parameters around making sure that there was investment intent with those trades.

With regards to selling our product and Mr. Wolf's comments before, our swaps are marketed for a variety of reasons, for counterparties who want long exposure and who want short exposure, for those who have onshore and offshore entities, and a variety of reasons including and most primarily leverage, as well as protecting clients' market strategies and global market access.

Senator LEVIN. Now, did Deutsche Bank market dividend enhancement swaps——

Ms. LEUNG. We marketed——

Senator LEVIN [continuing]. For—all those other purposes you just listed. But did you ever market swaps for dividend enhancement?

Ms. LEUNG. We did market swaps with dividend enhancement as part of one of the many other factors for doing swaps.

Senator LEVIN. Did you ever market swaps primarily for dividend enhancement?

Ms. LEUNG. No, we did not.

Senator LEVIN. And so when Mr. Wolf said that Deutsche Bank marketed dividend enhancement swaps to them, you are saying that that was never the primary purpose that you marketed them for?

Ms. LEUNG. To the best of my knowledge, yes.

Senator LEVIN. Would you have knowledge if you had done that, if your firm had done that, if the bank had done that? Would you be aware of it if Deutsche Bank did that?

Ms. LEUNG. Yes, I would be, and to the best of my knowledge, we market swaps for many reasons, and——

Senator LEVIN. But never primarily for dividend enhancement. Is that what you are telling us, under oath, that your bank never marketed swaps primarily for dividend enhancement. Is that what your testimony is?

Ms. LEUNG. We do not market swaps primarily for dividend enhancement.

Senator LEVIN. And never have?

Ms. LEUNG. I can't speak to the lifetime of my firm.

Senator LEVIN. While you were there?

Ms. LEUNG. While I was there, correct.

Senator LEVIN. You never did that?

Ms. LEUNG. We did not—we did not market swaps primarily for dividend enhancement.

Senator LEVIN. OK, good. And how long have you been there?

Ms. LEUNG. Since 2002.

Senator LEVIN. Thank you.

Mr. DeRosa, could you take a look at Exhibit 19? [1]

[Pause.]

Senator LEVIN. Are you familiar with this document?

Mr. DEROSA. Yes, I am.

Senator LEVIN. OK. Now, this is an internal review document, as I understand it, a briefing paper that was devoted to dividend en-

---

[1] See Exhibit No. 19 which appears in the Appendix on page 229.

42

hancement and what the exposure would be of that enhancement. Is that fair?

Mr. DeRosa. That is fair.

Senator Levin. And it lists Lehman Brothers' yield enhancement product and has a chart estimating the amount of dividends affected by each product, the amount of "withholding tax risk" that the company thinks it might face if the IRS rules against these products. It even has a description and diagram of a stock loan transaction used for yield enhancement.

Now, is it fair to say that the reason that Lehman Brothers prepared this document is in order to market yield enhancement products and to look at what the potential risks would be of that use in that market? Is that correct?

Mr. DeRosa. No. This document did not have to do with marketing. This, as you indicated initially, was an internally prepared document, shared internally, designed to assess the different potential risks on the transactions.

Senator Levin. Of engaging in those transactions?

Mr. DeRosa. Correct.

Senator Levin. OK. So you were looking in some detail at the exposure to you of these transactions. Is that correct?

Mr. DeRosa. The person who prepared this document, who was not familiar in detail with all these businesses, was—with all these products, rather, was trying to craft a high-level assessment.

Senator Levin. Do you know who prepared this document?

Mr. DeRosa. Yes.

Senator Levin. Who was that?

Mr. DeRosa. Ian Maynard.

Senator Levin. OK. Why would you do this kind of an analysis if you were not marketing these products?

Mr. DeRosa. What I think he was trying to give information on was around Lehman Brothers' risk profile. Maybe I am missing your use of the word "marketing," but——

Senator Levin. You were engaged in these products, you were involved in these products.

Mr. DeRosa. Correct.

Senator Levin. And your involvement was in products which enhanced the yield of dividends. Is that correct?

Mr. DeRosa. Correct.

Senator Levin. Through the use of swaps.

Mr. DeRosa. And stock loans?

Senator Levin. And loans.

Mr. DeRosa. Correct.

Senator Levin. And so this was looking at what the risks were of doing that?

Mr. DeRosa. Correct.

Senator Levin. But you were doing that despite these risks?

Mr. DeRosa. The risk was created due to the vacuum in which we were operating as far as guidance is concerned, so at Lehman Brothers, we measure the risk across all of our transactions, and these are no exception. So what this document was appreciative of is the fact that the IRS had indicated that they might have a concern with the characterization of these transactions, and, therefore,

43

what we were trying to do here was to create an indication of what the total maximum possible could be, much like——

Senator LEVIN. What was that total maximum possible?

Mr. DEROSA. I am not sure what the total maximum was because this document is fundamentally incorrect in assessing the risk. What I can tell you is that the examination in which we are involved by the IRS has generated a much smaller number.

Senator LEVIN. What is that number?

Mr. DEROSA. Roughly ten and a half million across the 2004–05 period.

Senator LEVIN. What period?

Mr. DEROSA. For 2004 and 2005.

Senator LEVIN. And before that?

Mr. DEROSA. We did not measure that pursuant to the IRS exam. The audit is restricted to those 2 years.

Senator LEVIN. And did you do any subsequent to that?

Mr. DEROSA. Subsequent to 2005, we have not taken the detailed review, but we have done a fair amount of work around 2006 and 2007, and transactions that remotely, I think, replicate the transaction as described in the Subcommittee report probably generate several hundred thousand dollars of dividends.

Senator LEVIN. OK. Take a look, if you would, Mr. DeRosa, at Exhibit No. 12.[1] This is an email from Mr. Demonte to Elizabeth Black. They are both Lehman Brothers employees, as we understand it. And here is what it says, that "the spread sheet contains long positions for Highbridge which we currently buy into a swap to enhance their yield for dividends." Is that accurate?

Mr. DEROSA. That is what it says.

Senator LEVIN. Are you familiar with this?

Mr. DEROSA. I have seen this document in my preparation.

Senator LEVIN. All right. So this spread sheet, then, looks at Highbridge stocks which Lehman Brothers currently buys into a swap to enhance their yield for dividends. That is the stated purpose. Is that correct? There is no other purpose stated for that swap except to enhance their yield for dividends. Is that correct?

Mr. DEROSA. There is no other purpose stated in this email. That is correct.

Senator LEVIN. And do you have any other document which shows there was any other purpose for that particular swap?

Mr. DEROSA. I do not.

Senator LEVIN. OK. Could you take a look, if you would, Mr. DeRosa, down at the page number at the bottom 33324.

Mr. DEROSA. Which tab?

Senator LEVIN. This is Exhibit 18.[2] Now, if you take a look at this exhibit, in the second paragraph—do you have it in front of you now?

Mr. DEROSA. I do.

Senator LEVIN. It says that the CFD—and that is a swap product—is usually used for yield enhancement purposes. And that is a Lehman Brothers swap product, right?

Mr. DEROSA. CFD, yes.

---

[1] See Exhibit No. 12 which appears in the Appendix on page 218.
[2] See Exhibit No. 18 which appears in the Appendix on page 228.

44

Senator LEVIN. Is that Lehman Brothers?

Mr. DEROSA. CFD is a general term, not specifically Lehman Brothers. But, yes, it is a Lehman Brothers product.

Senator LEVIN. But you are referring here to the Lehman Brothers CFD, right?

Mr. DEROSA. I believe that is what he was referring to.

Senator LEVIN. Well, take a look at the previous paragraph. It says the Lehman Brothers CFD, right?

Mr. DEROSA. Correct.

Senator LEVIN. OK. So we are talking about a Lehman Brothers CFD and it is usually used for yield enhancement purposes. Is that an accurate reading of your document?

Mr. DEROSA. That is an accurate reading.

Senator LEVIN. So you have this product, which is usually used for yield enhancement. None of those other reasons are specified. Is that correct?

Mr. DEROSA. You have got a salesperson drafting a document here to one of his clients, and that is the purpose that he is indicating in this document.

Senator LEVIN. Is he using any other purpose beside yield enhancement in this document?

Mr. DEROSA. No, not in this document.

Senator LEVIN. So is that anything other than marketing this particular product for yield enhancement purposes? What is this other than marketing for yield enhancement purposes in this situation?

Mr. DEROSA. I am not trying to debate the——

Senator LEVIN. Well, I am not trying to debate. I am trying to get a straight answer from you. What other reason is given in this document, and is this not a marketing document?

Mr. DEROSA. He gives no other reason in this document to the person with whom he is communicating for doing the transaction other than yield enhancement.

Senator LEVIN. And is it a marketing document, would you not say?

Mr. DEROSA. I wouldn't necessarily call it a marketing document, but that is fine. I don't object to that.

Senator LEVIN. Mr. Berke, take a look at Exhibit 27,[1] if you would.

This is an August 9, 2004, email from Daniel Brennan to Alan Thomas, both Morgan Stanley employees. It says, "Spoke again"—are you with me.

Mr. BERKE. Yes.

Senator LEVIN. Do you see where I am reading from?

Mr. BERKE. Yes.

Senator LEVIN. "Spoke again with Bill Scazzero who works on Moore's," which is a hedge fund, "trading desk, to ascertain usefulness of the Microsoft total equity swap for Moore Capital. Bill informed me that Morgan Stanley and Moore Capital frequently transact such swaps to maximize returns given offshore status and dividend withholding issues."

Now, that is a Morgan Stanley document, right?

---

[1] See Exhibit No. 27 which appears in the Appendix on page 259.

45

Mr. BERKE. Yes.

Senator LEVIN. It is a contemporaneous document. Do you have any reason to say that it is inaccurate, that there were not frequent transactions using such swaps to maximize returns given offshore status and dividend withholding issues? Do you have any reason to say that is an inaccurate statement in August 2004?

Mr. BERKE. No.

Senator LEVIN. These are Morgan Stanley employees emailing each other. Is that accurate? Daniel Brennan to Alan Thomas.

Mr. BERKE. Yes, these are Morgan Stanley employees.

Senator LEVIN. All right. Mr. Berke, let me ask you about your Cayman Islands operation. Do you employ folks in the Caymans?

Mr. BERKE. Not to my knowledge, no.

Senator LEVIN. If you will take a look at Exhibit 29.[1]

Mr. BERKE. Yes, Senator.

Senator LEVIN. All right. Before I ask you specifically about that document, in your opening statement, Mr. Berke, you testified that between 2000 and 2007, Morgan Stanley Cayman and Morgan Stanley International U.K. paid about $2.4 billion in substitute dividends as a result of stock loans involving U.S. dividend-paying securities. The Subcommittee understands that about 49 percent, or $1.6 billion of that, was from your Cayman Islands entity.

If U.S. withholding taxes on those dividends had been collected at the 30-percent rate, the amount would total approximately $300 million. However, no withholdings were collected because Morgan Stanley took advantage of an IRS notice and inserted a Cayman Islands shell company into this transaction, and as a result, Morgan Stanley did not withhold any of the dividend payments.

So far am I accurate?

Mr. BERKE. Yes, by complying with IRS Notice 97–66——

Senator LEVIN. No, but is my statement, what I just read, totally accurate in its total? Do you have any disagreement with what I just read to you about your opening statement?

Mr. BERKE. No.

Senator LEVIN. OK. Now, you said that you have no folks in the Caymans, and now you are looking at Exhibit 29, which says that Cayco—and Cayco is your company in the Caymans. Is that correct?

Mr. BERKE. Yes. It has a longer name, but we refer to it as "Cayco."

Senator LEVIN. OK. It is a thinly capitalized company, cannot absorb losses, and it should never hold long stock positions. Is that correct?

Mr. BERKE. Yes, it is.

Senator LEVIN. It also says that it must not enter into stock lending arrangements directly with MSIL. Who is that?

Mr. BERKE. That is the former name of our U.K.-registered broker-dealer.

Senator LEVIN. OK. Surplus cash in Cayco must not be lent to any affiliate or entity in the United States without the approval of the tax department. If it enters into derivative transactions, dispensation should always be obtained from the law and compliance

---

[1] See Exhibit No. 29 which appears in the Appendix on page 262.

46

department. It may not sell stock positions to U.S. institutional investors. It may not enter into stock lending transactions with any U.S. counterparties. It may not purchase securities from any person in the United States. It may not enter into derivative transactions with any U.S. person. It may not carry out repo transactions with any U.S. person. It may not source collateral from MS & Company. It may not lend U.S. equities against cash collateral unless the cash is equal to 200 percent. It may not carry out advisory business. It may not invest in futures.

What can it do?

Mr. BERKE. With respect to the United States, it primarily engages in stock lending activity of U.S. stocks.

Senator LEVIN. All right. That was its purpose?

Mr. BERKE. That is the primary purpose that I am aware of that the vehicle is used for.

Senator LEVIN. Now, is it fair to say that is a shell corporation, in common parlance?

Mr. BERKE. That is a fair estimate, yes.

Senator LEVIN. Mr. DeRosa, Lehman Brothers has a Cayman facility that it has used to run two stock loan transactions. Does Lehman Brothers have people working in the Cayman Islands?

Mr. DEROSA. No, we do not. Just to clarify, the Cayman Islands operation is a branch of our Hong Kong entity.

Senator LEVIN. That is Lehman Brothers' Hong Kong entity?

Mr. DEROSA. Correct.

Senator LEVIN. Can I call it Lehman Brothers without any misunderstanding?

Mr. DEROSA. Sure.

Senator LEVIN. OK. Is that location in the Caymans still used to transact stock loans involving U.S. dividend-paying securities?

Mr. DEROSA. I believe it is.

Senator LEVIN. Ms. Leung, in 2004, Deutsche Bank Limited began to use a facility in the Isle of Jersey to transact stock loans using U.S. securities. According to an internal Deutsche Bank application seeking approval for those transactions, the reason for the proposed transaction and its location was so Deutsche Bank could insert a "non-U.S. treaty entity" in its stock loan transactions to avoid dividend withholding and lower its stock loan pricing to match its competitors.

Is that the case, that Deutsche Bank set up this program in the offshore jurisdiction of Jersey to exploit the IRS rule on substitute payments and avoid the withholding tax on dividends, thereby generating a bigger return on the transactions?

Ms. LEUNG. It is true that we started trading through our Jersey entity. We did not feel that it was to exploit, but we felt it was legal, perfectly legal under Notice 97–66.

Senator LEVIN. All right. To utilize that rule.

Ms. LEUNG. Yes.

Senator LEVIN. Except for that word—and I will say "utilize" instead of "exploit"—was what I read to you accurate?

Ms. LEUNG. Yes, it is accurate.

Senator LEVIN. Part of the desire to be more competitive, to match its competitors, as I said, in order to match the substitute dividend payments for stock loans and avoiding the withholding

47

tax on those substitute dividends to the extent that your competitors were doing it. Is that correct? You wanted to be competitive with your competitors in that area.

Ms. LEUNG. What we were trying to be competitive with was on the ability to bid on pools of stocks available for lending. We did not enter into any of these transactions with hedge funds. The primary purpose of this in order to be competitive with pricing was to tap into the pools of stock loan available through institutions where, when bidding on those securities and paying a fee to those institutions, a portion of those securities would be U.S. securities. And under Notice 97–66, we felt we could be more competitive in our pricing in order to win those pools of securities.

Senator LEVIN. In order to be more competitive on your pricing, you would, like your competitors, need to avoid the withholding on those dividends. Is that correct?

Ms. LEUNG. We would need to not be subject to the 15-percent withholding that we would have been subject to.

Senator LEVIN. And you used Notice 97–66 to avoid the taxes. Is that correct?

Ms. LEUNG. We used Notice 97–66 because we felt that was within the letter of the law.

Senator LEVIN. Right, and that would help you avoid those taxes?

Ms. LEUNG. Notice 97–66 would keep us from being withheld on those dividends.

Senator LEVIN. Ms. Leung, Deutsche Bank told the Subcommittee staff that approximately 98 percent of the loans transacted through the Deutsche Bank Jersey entity involve U.S. dividend-paying securities. Are you aware of that?

Ms. LEUNG. I am not intimately familiar with it, but, please, I will try to answer your question.

Senator LEVIN. Do you disagree with that?

Ms. LEUNG. No, I don't disagree.

Senator LEVIN. It also reported that in 2007 alone, DBIL engaged in stock lending transactions involving U.S. dividend-paying securities with a notional value of over $30 billion. We have asked Deutsche Bank to supply us the amount of dividends paid as a result of those $30 billion worth of loans, and when are we going to get this information from you?

Ms. LEUNG. I have that information for you now. Again, if these transactions were subject to withholding from the periods 2004 to 2007, that amount would be $27 million.

Senator LEVIN. OK. Would you submit to the Subcommittee the way in which you reached that result? Not now, but would you for the record submit to us your computations which led you to the $27 million figure?[1]

---

[1] Counsel to Deutsche Bank provided the Subcommittee with a letter dated September 29, 2008, explaining that the $27 million figure "was derived from an analysis of data reflecting stock lending transactions and forward contract transactions involving the DBIL entity . . . in which securities were held 'for 21 days or less, where such a time period covered a dividend record date of the securities[.]'"

The Subcommittee advised Deutsche Bank that the request for the approximate amount of total withholding taxes avoided through dividend enhancement, yield enhancement, or other transactions that had the reduction of withholding tax as a primary purpose was not limited to transactions with a duration of 21 days or less. The Subcommittee asked Deutsche Bank to

Continued

48

Ms. LEUNG. Yes, we can do that.

Senator LEVIN. Ms. Leung, why did Deutsche Bank conduct its stock loan business on U.S. securities with entities in 15-percent tax jurisdictions from the Isle of Jersey?

Ms. LEUNG. I am not intimately familiar with that business, but for these pools of—for these securities lending pools, these were bids for international securities, and that was run out of our London office.

Senator LEVIN. Was that to take advantage of Notice 97–66?

Ms. LEUNG. I do not believe——

Senator LEVIN. Was that utilizing that regulation?

Ms. LEUNG. It utilized the regulation, yes.

Senator LEVIN. All right. Let me ask you, Mr. DeRosa. Lehman Brothers established tax risk limits for all of the swap and stock loan transactions that you used for dividend enhancement purposes, the Cayman stock loan transactions had a $25 million annual limit, which was later raised to $50 million. Why did you set a tax risk limit?

Mr. DEROSA. It goes back to not having clear guidance around the products.

Senator LEVIN. All right. Was that tax guidance from the IRS, you mean?

Mr. DEROSA. Yes.

Senator LEVIN. And, Mr. Berke, did Morgan Stanley set any tax risk limits on any dividend enhancement transactions involving U.S. dividend-paying securities?

Mr. BERKE. Yes, there is a risk limit on a type of equity swap done out of London.

Senator LEVIN. That is it?

Mr. BERKE. That is the only tax limit that I am aware of.

Senator LEVIN. And did Deutsche Bank have any tax risk limits, Ms. Leung?

Ms. LEUNG. We did not have any risk limits.

Senator LEVIN. All right. And what about indemnity agreements? First of all, Lehman Brothers, Mr. DeRosa, did you have indemnity agreements?

Mr. DEROSA. My understanding is that there are standard indemnity agreements found both in the ISDA contract governing swaps and the OSLA contract governing securities lending. In addition to that, when specifically asked by several clients with respect to our stock lending activities, we did provide further documentation, which basically provided more specificity around the indemnification that is found in the OSLA.

_____

provide the total amount of withholding taxes avoided through transactions conducted through DBIL.

On October 30, 2008, counsel for Deutsche Bank responded with the following information encompassing transactions from October 2004, when DBIL commenced operations, through the end of 2007:

"[T]he total hypothetical estimated withholding figure for all DBIL transactions of any tenor [is] $97,349,757.24. . . . $27,819,148.73 of this total is due to transaction where a position was held for 21 days or less. Another $8,479,821.51 is from transactions of more than 21 days and fewer than 30 days. And the bulk of this total, $61,050,787, is due to transactions where a position was held for 30 days or more. Deutsche Bank does not believe that a transaction where a counterparty holds a position for a month or longer over a dividend record date is one that necessarily 'has as a primary purpose the reduction, minimization, or elimination of withholding tax liability.'"

49

Senator LEVIN. Further documentation that had greater specificity. Would that say that the customer wanted to be clearer in terms of indemnity?

Mr. DEROSA. I think it does mean that the client wants more guidance than the standard language that is found in the OSLA. That is relatively broad. I think the wording is all encompassing, but I think in certain instances clients would like a more granular documentation.

Senator LEVIN. And would that granularity, speaking with greater clarity, mean specific indemnity for substitute payments?

Mr. DEROSA. The indemnity provides that the counterparty would be not held liable if there were a withholding tax imposed at a later date.

Senator LEVIN. On those substitute dividends?

Mr. DEROSA. Correct.

Senator LEVIN. Let's see. Did I ask you, Mr. Berke about the indemnity?

Mr. BERKE. Not yet. [Laughter.]

Senator LEVIN. I would not want to leave you out. Did you issue indemnity agreements?

Mr. BERKE. In connection with our Notice 97–66 business, we have issued a handful of indemnities to order placers acting in a fiduciary capacity on behalf of investment clients.

Senator LEVIN. Ms. Leung, did your bank issue indemnity agreements?

Ms. LEUNG. We did not.

Senator LEVIN. OK. Finally, let me ask the three of you: UBS has halted and Merrill Lynch has suspended stock loan programs that use entities in offshore tax havens for the purpose of utilizing that IRS notice. Do any of your companies plan to take any similar type of action? Mr. DeRosa, do you know of any plans by your company?

Mr. DEROSA. Not to the best of my knowledge.

Senator LEVIN. Mr. Berke.

Mr. BERKE. Not to the best of my knowledge.

Senator LEVIN. Ms. Leung.

Ms. LEUNG. Not to the best of my knowledge.

Senator LEVIN. OK. Thank you for your appearance here today, and I appreciate your testimony.

We are going to take a 5-minute break.

[Recess.]

Senator LEVIN. We will come back to order.

Let me welcome our final witness, Hon. Doug Shulman, Commissioner of the IRS.

Commissioner Shulman, I want to thank you for being here. I want to welcome you back to the Subcommittee. You have testified before this Subcommittee before on tax haven banks and U.S. tax compliance, and we very much appreciate your being with us today. I know you are familiar with our rule that we have to swear in all of our witnesses, and so I would ask you to stand and please take the following oath: Do you solemnly swear that all the testimony you will give before this Subcommittee will be the truth, the whole truth, and nothing but the truth, so help you, God?

Mr. SHULMAN. Yes.

50

Senator LEVIN. Thank you so much, and I think you know our rule in terms of timing, and so we will just turn it right over to you directly for your testimony.

### TESTIMONY OF HON. DOUGLAS SHULMAN,[1] COMMISSIONER, INTERNAL REVENUE SERVICE, WASHINGTON, DC

Mr. SHULMAN. Thank you, Chairman Levin, and good morning. I want to thank you for the opportunity to appear before you today to discuss an issue of great interest both to the Internal Revenue Service and this Subcommittee: The practice of using certain financial instruments to reduce or eliminate the U.S. withholding tax that applies to payments of dividends on U.S. stocks to foreign persons.

Let me reiterate what I told you previously: That I have made international issues a top priority for the IRS during my 5-year term as Commissioner. I am only 5 months into that term, but I am committed to aggressively pursue enforcement actions where taxpayers use the complexities of international commerce to circumvent their duties under the law.

I also want to tell you that I am personally focused on these issues and am in the process of shifting more resources to the financial markets in international arenas.

Let me also just reiterate the appreciation that I and everyone at the IRS have for the support of the Members of this Subcommittee and, commend you and your staff for your excellent work. You really do great work, and it helps us out quite a bit in doing our job.

In my limited time this morning, I would like to make a few points about securities lending and equity swaps, and the extent to which such transactions are being used as a means of avoiding the withholding tax on dividends paid to foreign persons.

Before going into my testimony, I must start by saying that, as you know, taxpayer confidentiality laws preclude me from disclosing information relating to specific taxpayers or specific audits. Accordingly, I will not be able to comment or respond to questions on any specific facts that have been reported by the Subcommittee or other witnesses.

Our statutory and regulatory framework in this area, which includes both legislation and administrative guidance, would objectively be called "a patchwork." Dividends in the cash market are taxed at 30 percent, with a 30-percent withholding tax. By contrast, capital gains earned by foreign persons on these same stocks are generally exempt from U.S. tax by statute. In addition, most forms of interest paid to foreign persons are not subject to U.S. tax. And at the same time, income earned by foreign residents with respect to total return swaps are generally considered to be exempt from U.S. tax. With that as a background and recognizing this patchwork, let me connect the dots for the Subcommittee on the IRS's approach and strategy in this area.

First, the IRS has numerous active investigations of the types of transactions that we are discussing today. In these types of large complex audits, our investigations lag behind the tax years. For in-

---

[1] The prepared statement of Mr. Shulman appears in the Appendix on page 94.

51

stance, the current examinations that we have open generally focus on years 2004 to 2006, but we also have investigations open in years before that. As you know, we do not receive 2007 corporate tax returns until later this month. However, if some of the type of information in your report plays out as we look at current or later years, we would have serious concerns and investigate the issues thoroughly.

Examinations in this area are extremely complex, often involving multiple taxpayers, some of whom are foreign citizens located outside the United States. As we discussed when I was here before, when we have foreign citizens and entities outside the United States, it can be harder for us to get there on our investigative resources, and we talked about some potential solutions like extending the statute of limitations.

In the course of our examinations, we have issued numerous information document requests, requesting information related to suspicious transactions. Depending on the nature of the request, we look for emails, other documentation, and we also take testimony. As I noted before, these are extremely complex investigations, and they are still ongoing.

And while we are seeing some financial institutions whose swaps and securities lending business is structured for bona fide business purposes, we are also seeing some fact patterns that are troubling. I cannot comment on the specifics of the ongoing investigations, but I can tell you that where we see transactions that we believe are abusive, under my tenure at the IRS we will challenge them.

As I said before, the Subcommittee staff has done excellent work in producing this report. There is one aspect of the report, however, that is troubling to me. The report may leave the reader with the impression that the IRS is reluctant to challenge financial institutions on tax matters. The report references the so-called Wall Street rule.

Let me state very plainly and unequivocally that where the facts are favorable for the government, we will challenge sham transactions that have no economic purpose other than tax avoidance.

On the policy front, we are aware that some companies believe there is a loophole in Notice 97–66 which allows them to structure securities lending deals that avoid all withholding on the payment of dividends. As you know, Notice 97–66 is 10 years old. I agree that Notice 97–66 should be reviewed to determine if it can be modified in such a way as to retain the original intent. I have asked the IRS staff to work with the Treasury Department on this analysis.

As the Nation's tax administrator, I always welcome dialogue on better ways to run our system of taxation. As we look at this notice, however, we also have to recognize that it opens broader economic policy issues, and we will need to consider how it fits into our patchwork of taxation for the capital markets.

Regardless, you should rest assured, Mr. Chairman, that on my watch, the IRS will aggressively pursue financial institutions who are using the complexity of the global capital markets to avoid paying the taxes that they owe.

52

Thank you for the opportunity to appear today. I appreciate the support that your Subcommittee has given the IRS over the years, and I am happy to respond to questions.

Senator LEVIN. Thank you very much, Commissioner.

This has been going on for 10 years. You have only been there, I guess, half a year—how many months have you been there?

Mr. SHULMAN. Five months.

Senator LEVIN. Five months. We basically have heard for 10 years, not from you but from other folks at the IRS, that this is troubling; they are reviewing particularly Notice 97–66.

Now, if you are sitting out there and you are a taxpayer in this country and you are paying your taxes, including taxes on dividends that you are receiving from companies, and then folks overseas who are receiving dividends who are supposed to be paying taxes on those dividends are using these gimmicks to avoid paying taxes, and it was clearly not intended that they be able to avoid paying taxes on dividends because we have a withholding requirement—which has got teeth in it, but they have avoided it through these gimmicks which you know about and have heard about again this morning, why not just end it? I know the policy arguments. Those policy arguments will rage until someone resolves those policy arguments. And I take it you have participated in policy discussions about this issue. Is that a fair statement?

Mr. SHULMAN. Only very recently.

Senator LEVIN. Only very recently.

Mr. SHULMAN. Yes.

Senator LEVIN. But there are policy discussions which are raging around this issue, I assume, within the IRS and in the Treasury. Is that a fair statement?

Mr. SHULMAN. I think everyone is aware there are policy issues.

Senator LEVIN. This hearing is not into the policy issues. We will let the Finance Committee and others have that debate. This is a question of enforcing our tax laws. They are not being enforced. It is very simple. It is very clear. They are not being enforced. We heard it here very clearly this morning. They are clearly not being enforced on the stock loans, where everyone acknowledges that that regulation was not intended to allow for the avoidance of taxes when it comes to the stock loans which we heard described. But then you have got these phony stock sales that then are used as part of a swap transaction to avoid the tax on dividends where swaps are used.

Now, why can't we just simply modify Notice 97–66? You have acknowledged this morning its purpose is being obviated. I know there are policy issues involved, but why not change the regulation? It is acknowledged that its purpose is being circumvented, so why not change it?

Mr. SHULMAN. You brought up a few things there. Let me first say, if I were a financial institution testifying before you, I would sit up here and be assertive and claim my view of the tax law. I think the IRS may have a view that is different from some of the things you have heard.

Senator LEVIN. Not on Notice 97–66.

Mr. SHULMAN. Well, second is we have a number of ongoing investigations. On the spectrum of rules that are easy to enforce or

53

not, I would say Notice 97–66 happens to be one of the more difficult ones, and that is why I acknowledge and agree with you, and have asked the staff to start looking to see if there is a way to modify it with the current Treasury. And clearly, we are also going to have to have this discussion with the next Administration.

But I do not think companies should take comfort, and I do take issue with the notion that we are not being aggressive and actively looking at these situations. As I said, we have open investigations, some of which are in the years you have looked at. All the things in this report are not things that are going to go unnoticed. We are going to push on this very hard.

As you noted, I am 5 months into my term, and I think our staff clearly understands that I think we should be aggressive about this and make sure people are not circumventing the law.

Senator LEVIN. Well, you heard Professor Avi-Yonah say that he heard a tax professional call these dividend enhancement transactions an "approved loophole." What is your reaction to that?

Mr. SHULMAN. My reaction is for the current transactions that are under investigation in the future, which are the ones that I can influence on my watch. If I were a taxpayer, I certainly would not take comfort that the IRS is not going to challenge them.

Senator LEVIN. And you say that the so-called "Wall Street Rule" that says if financial firms do certain transactions for years, claim they are tax free, and the IRS does not object, that the IRS loses the authority to challenge that transaction. You challenge that rule?

Mr. SHULMAN. I do challenge that rule. I think there has been no private letter rulings on this, which gets you a little further down the road. Also, as we have talked about in other hearings, I think you would agree that over the last 6 months the IRS record of aggressively targeting international transactions, taking a hard run at the QI program, and using our John Doe summons authority, has shown improvement. These are all things that had not been done before, and I think the IRS is at least showing, since I have been here, an aggressive stance. If I were a prudent taxpayer, I would not take comfort in the notion of the Wall Street rule—that if we have not looked at something before, we therefore think it is not within the law, and will not look at it now or in the future. A prudent taxpayer should not take comfort with that.

Senator LEVIN. Here is the testimony of Mr. DeRosa, which I think you heard this morning: "Most, if not all, of the major Wall Street investment banks and commercial banks engage in equity swap and stock loan transactions referencing U.S. underlying equities with non-U.S. counterparties. Over the last 15 years, numerous commentators in widely respected taxation journals have addressed the withholding tax consequences of equity swaps similar to those offered throughout Wall Street, including articles by the current chief of staff for the Joint Committee on Taxation and his former law firm. In 1998, a Notice of Proposed Rulemaking was published in the *Federal Register* that expressly addressed the same issue. It said, 'Treasury and the IRS are aware that in order to avoid the tax imposed on U.S. source dividends . . . some foreign investors use notional principal contract transactions based on U.S. equities . . . Accordingly, Treasury and the IRS are considering whether

54

rules should be developed to preserve the withholding tax with respect to such transactions.'"

Now, according to this testimony, that is 1998—so, in other words, 10 years ago. So now the Treasury and the IRS have been aware for 10 years because they said they were aware back in 1998.

If you are aware of something for 10 years and do nothing about it, why would you expect any other reaction on the part of this business other than to just pile on, keep on using it, keep on costing the Treasury and the IRS billions of dollars over these 10 years? Why would you expect any other reaction except that this is, in the words of the tax professional, an "approved loophole"? Isn't that a kind of normal reaction after 10 years?

Mr. SHULMAN. Well, I cannot speak to people's reactions. What I can tell you is clearly, as I said before, some of the testimony you heard today was people justifying transactions. As you know, the tax code is four times as long as "War and Peace," and they picked out a nice sentence to give them comfort, which might be false comfort.

We have a number of investigations underway. Some of the stock lending under Notice 97–66 presents to us real questions about the substance of the underlying corporation. In swaps, we have investigations underway in the broadest terms on some of the kinds of things you have looked at, crossing in, crossing out only for tax avoidance purposes.

And so the notion that a lot of experts have opined on this in the past, again, I would not, if I were a firm, take false comfort in that. The IRS is looking at these issues and is going to be aggressive.

Senator LEVIN. I am not talking about the number of experts. I am talking about the Notice of Proposed Rulemaking of the IRS. That is your own statement. This is an expert's—not yours, the previous IRS Commissioner. "Treasury and IRS are aware that in order to avoid the tax imposed on U.S. source dividends . . . some foreign investors use notional principal contract transactions based on U.S. equities . . . Treasury and the IRS are considering whether rules should be developed to preserve the withholding tax with respect to such transactions." Are you still considering it?

Mr. SHULMAN. Well, I think this is the swap——

Senator LEVIN. Yes. Are you consider it?

Mr. SHULMAN [continuing]. Issue that you are looking at?

Senator LEVIN. Right. Are you considering whether rules should be developed to preserve the withholding tax with respect to swap transactions that are used in the way we have defined very specifically to avoid withholding? Is that under consideration?

Mr. SHULMAN. I would tell you what you said earlier, that certainly tax policy is not solely in the purview of the IRS Commissioner. We are, however, actively investigating people who use swaps potentially in ways that are only meant to avoid the tax law, and do not really transfer benefits and burdens. I just would not comment on broader swaps policy.

Senator LEVIN. And what is your policy about dividend enhancement transactions?

Mr. SHULMAN. As you would agree, we do not have broad policies. I think I, like you, find some of these marketing materials dis-

55

tasteful. For us, though, as the administrator of the law, we need to be fair and look at the rules and enforce them.

So our concern is that when we see people exploiting the tax law, not meeting the spirit and the letter of the law, not meeting their tax obligations, we will go after them aggressively.

Senator LEVIN. Are you able to put in writing what the IRS position is about dividend enhancement transactions? Could you issue just a statement as to what your position is?

Mr. SHULMAN. I am not——

Senator LEVIN. I think it will have a very salutary effect if you could do that. First, on swaps, if you could do that, as to when, from the IRS's perspective, is it appropriate that a swap be used which involves a sale which is not a sale, which then shifts the source. I think that it is reasonable for us to know where you stand on that practice. And so I am going to ask whether you would provide that for the country.

Mr. SHULMAN. Yes, I am not going to agree to write a specific policy on dividend enhancements. I think we are pretty clear that there is a current swap rule that has been in place since 1991. With people who try to circumvent that rule, we are going to be aggressive. We actually have ongoing investigations that are complex and fact specific that I am not going to jeopardize by going further and changing policy or discussing that here, which is not clearly purely under my purview. I think I owe it to the current and future Treasury Secretary to have this discussion with them.

Senator LEVIN. I am not talking about whether the policy should be changed. I am talking about what the current policy is.

Mr. SHULMAN. Yes, I think the current policy on swaps is this——

Senator LEVIN. Swaps when used in connection with these phony sales in order to avoid taxes on dividends from non-Americans. That is the issue.

Mr. SHULMAN. Oh, I think we have been pretty clear on that, and I am happy to make sure we continue to be clear.

Senator LEVIN. If you could give us the clear statement for the record, that would be very helpful.

Mr. SHULMAN. Here is what I am going to do. My biggest concern is to make sure that we administer the law effectively, and so I need to talk to the people who have ongoing investigations and make sure anything we give you is not going to endanger the government's position in the ongoing investigation so that I can meet my promise of being aggressive in this area to you.

Senator LEVIN. I accept that. We do not want to jeopardize an investigation. But you said that the position of the IRS is clear on that, and I would just like a copy of that clear statement. OK? Is that fair enough?

Mr. SHULMAN. That is fair. I will give you as clear a statement as I can get.[1]

Senator LEVIN. Good. And then, second, on the Notice 97–66 regulation, since it is clear, I think everyone would agree, that the Notice 97–66 regulation has been used in a way that it was not intended, can you say that? And can you be that clear?

---

[1] See Exhibit No. 36 which appears in the Appendix on page 304.

56

Mr. SHULMAN. I can tell you that certain financial institutions have interpreted Notice 97–66 to mean that they do not need to pay dividends if they structure a transaction a certain way. I will also tell you what I said before about the Wall Street rule, that people should not take comfort in the notion that if we have not challenged transactions in the past, we will never challenge them in the future. I can also commit to you what I said before, that I, as IRS Commissioner who does not have the sole authority to make broad policy changes, have instructed our staff to start working with Treasury to review this notice very closely.

Senator LEVIN. And can you state clearly what the intent was of Notice 97–66 and what the intent was not?

Mr. SHULMAN. Well, first of all, I was not there when it happened. But I will tell you what my understanding is. My understanding is that it was intended to prevent cascading of dividends, where there was a lot of confusion in the market that multiple people were going to be paying tax on the substitute dividends payments.

There was a notion that when the lending happened, it would stay at the bank and the bank would pay the dividend, so that a taxpayer would pay the tax on the dividend. I think the market has gotten much more complex and much more sophisticated in derivatives since then, and we potentially have unintended consequences. But the original intent was to take care of the cascading problem.

Senator LEVIN. And so it was intended that taxes be paid on dividends.

Mr. SHULMAN. I cannot tell you that. What I can tell you is that the original intent—the reason this notice was issued—was to take care of the cascading problem.

Senator LEVIN. To avoid multiple tax.

Mr. SHULMAN. Yes. And, again, that was 10 years ago. I am sitting here today, and you have my commitment to take a hard look at this.

Senator LEVIN. And, finally, should we not under current law treat dividend equivalent payments the same way we treat dividends, as Professor Avi-Yonah recommends, under current law?

Mr. SHULMAN. I think there are a whole bunch of ways to structure synthetic transactions to avoid paying dividends on economic structures that look pretty similar to a dividend being paid. We have talked about swaps. We have talked about securities lending. Equity-linked notes under statute, which have nothing to do with IRS regulation, can be structured in such a way that you can get money for dividends and a payment for dividend and not pay the taxes on that same economics. So what I would tell you is that this country does not have a consistent approach to cash markets versus derivatives markets and how to take them. That is a subject worthy of a broader policy debate, and I think it would be relatively irresponsible of me to lay down a stake on it now, since it involves a whole bunch of other agencies and, clearly, the Congress.

Senator LEVIN. Thank you, Commissioner. I will just conclude with this statement, that we are dealing here with major financial players. They presumably do not want to be on the wrong side of the law. If the IRS tells them to stop, they would stop. So far, the IRS will not say "Stop." It won't say "Go." So the financial commu-

57

nity does not really know if it is on the wrong side of the law or not. Many of them claim everyone is waiting for the IRS to make up its mind. After 10 years of mixed signals, the IRS' failure to say where it stands, I think it makes a mockery of your mission. And we need to have your resolution promptly. And if you cannot do it this year, I hope you can do it by the spring of next year.

Is that a fair request?

Mr. SHULMAN. Yes.

Senator LEVIN. Thank you. We stand adjourned.

[Whereupon, at 12:23 p.m., the Subcommittee was adjourned.]

# A P P E N D I X

------------

**AVI-YONAH TESTIMONY FOR HEARING ON DIVIDEND TAX ABUSE**
**US SENATE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS**
**September 11, 2008**

My name is Reuven S. Avi-Yonah. I am the Irwin I. Cohn Professor of Law and Director of the International Tax Master of Law Program at the University of Michigan Law School. I hold a JD (magna cum laude) from Harvard Law School and a PhD in History from Harvard University. I have 19 years of full and part time experience in the tax area, and have been associated with or consultant to leading law firms like Wachtell, Lipton, Rosen & Katz, Cravath, Swaine & Moore and Cadwalader, Wickersham & Taft. I have also served as consultant to the US Treasury Office of Tax Policy and as member of the executive committee of the NY State Bar Tax Section. I am currently Chair of the ABA Tax Section Committee on VAT, a member of the Steering Group of the OECD International Network for Tax Research, and a Nonresident Fellow of the Oxford University Center on Business Taxation. I have published eleven books and over 80 articles on various aspects of US domestic and international taxation, and have fourteen years of teaching experience in the tax area (including basic tax, corporate tax, international tax and tax treaties) at Harvard, Michigan, NYU and Penn Law Schools.

I would like to thank Senators Levin and Coleman and the Committee staff for inviting me to testify today on dividend tax abuse.

### 1. Introduction.

The United States levies a 30% withholding tax on "fixed or determinable annual or periodic" (FDAP) income paid from US sources to non-resident taxpayers.[1] This withholding tax has been in place since the beginning of the income tax as a way of ensuring that non-resident taxpayers fulfill their tax obligation when earning US source income. Since the 1930s, the withholding tax on the gross amount of FDAP has been the final tax on such income, collected in lieu of the graduated income tax on net income that is levied on US residents (and on non-residents earning income that is effectively connected with a US trade or business).

A number of exemptions and treaty-based reductions apply to most forms of FDAP. For example, portfolio interest (interest paid to non-residents who do not own 10% or more of the stock of a corporate payor) is typically exempt from withholding tax under the "portfolio interest exemption."[2] Royalties are likewise typically exempt from withholding tax because most of them are paid to countries with whom we have treaties that follow the US and OECD Models and reduce withholding on royalties to zero.[3]

------------

[1] IRC 871(a)(1), 881(a)(1).
[2] IRC 871(h), 881(c).
[3] See Reuven Avi-Yonah and Martin B. Tittle, The Integrated 2006 United States Model Income Tax Treaty (Vandeplas, 2008), Art. 12.

60

Thus, the main source of revenue from withholding tax on FDAP is dividends. Dividends are subject to the full 30% withholding if not paid to a resident of a treaty jurisdiction, but even in the case of treaty partners, our treaties only reduce dividend withholding to 15% for portfolio dividends and 5% for direct dividends.[4]  This represents a judgment of the Treasury Department and the Congress that it is appropriate for non-resident taxpayers to pay a withholding tax on dividends, even though the underlying corporate income has already been taxed once.[5] If Congress were to decide that this judgment is erroneous, it could change the policy; but as long as dividend withholding is the law, it is not appropriate for Treasury, the IRS or taxpayers to abolish it.

Do dividends actually bear a withholding tax of 30% or 15%? In 2003, the latest year with reliable data, about $42 billion in US source dividends were paid to non-resident corporations, but only about $1.9 billion (or 4.5%) were withheld.[6] This suggests that the only dividends actually subject to withholding are direct dividends, i.e., dividends paid to affiliated corporations within multinational enterprises, which are typically subject to the reduced treaty tax rate of 5%. What happened to all the portfolio dividends?

## 2. Equity Swaps.

Beginning in the 1980s, derivative financial instruments have been developed that potentially undermine the integrity of the income tax by, for example, converting equity into debt.[7] For present purposes, the relevant derivative is the total return equity swap (TRES).

In a TRES transaction, a foreign investor (who may or may not hold stock in a US corporation) enters into an agreement with a US financial institution. Under the TRES agreement, the investor pays an amount equal to the value of some amount of stock of a US corporation (the "underlying stock") to the financial institution. In return, the

---

[4] Avi-Yonah and Tittle, Art. 10. Many of our recent treaties (e.g., with the UK) reduce the dividend rate to zero for certain direct dividends, but never for portfolio dividends.
[5] While it may seem strange that dividends, which are not deductible, are subject to withholding tax while interest and royalties are not, this reflects the reality that (a) royalties are tax-free by treaty because the US gains more from reducing foreign taxes on royalties than it loses by reducing its own, (b) interest is tax free because it can easily be earned anywhere in the world and an attempt to impose withholding taxes on it would lead investors to go elsewhere and/or increase costs to US borrowers. Dividends, on the other hand, arguably represent an investment in unique US companies earning particular forms of rent, so the investment cannot easily be replicated elsewhere. For a proposal to impose withholding taxes on interest and royalties in coordination with other OECD members see Reuven Avi-Yonah, A Coordinated Withholding Tax On Deductible Payments, Tax Notes (June 2, 2008).
[6] Tax Compliance: Qualified Intermediary Program Provides Some Assurance that Taxes on Foreign Investors are Withheld and Reported, but Can Be Improved, Government Accountability Office, Report No. GAO-08-99 (December 2007) (the GAO Report), Table 3.
[7] Alvin C. Warren, Jr., Financial Contract Innovation and Income Tax Policy, 107 Harv. L. Rev. 460 (1993); for an argument that the threat posed by derivatives to the income tax has been exaggerated see David M. Hasen, A Realization-Based Approach to the Taxation of Financial Instruments, 57 Tax L. Rev. 397 (2004).

61

investor receives (a) the right to a dividend equivalent (DE) whenever the underlying stock pays an actual dividend, and (b) the right to any appreciation in the stock when the TRES expires, and undertakes to pay the financial institution for any decline in the stock's value when the TRES expires. Thus, for the period of the TRES, the holder of the TRES is in the same economic position as if it held the underlying stock, although it is not a stockowner for corporate governance purposes (e.g., voting).

The financial institution then uses the funds received from the investor to purchase the underlying stock. During the period of the TRES, the financial institution pays a DE whenever the underlying stock pays a dividend. Upon expiration of the TRES, the financial institution sells the underlying stock, and the parties settle the TRES transaction by making a payment equal to the appreciation or depreciation of the stock.

What are the tax consequences of this transaction? For the financial institution, the actual dividends received on the underlying stock represent income, but that is offset by a deduction for the DE payment to the investor. The capital gain or loss on the underlying stock at the end of the TRES is likewise offset by the payment to settle the TRES. Thus, the US financial institution is perfectly hedged and indifferent to the tax treatment of the DE (it pays tax on the fees received for undertaking the TRES).

For the foreign investor, the capital gain or loss at the end of the TRES are foreign source income and thus not subject to US taxation.[8] Before 1991, there was uncertainty as to the tax treatment of the DE. It could be argued that the DE was equivalent to a dividend and therefore subject to US withholding tax. However, in January of 1991 the Treasury issued a regulation stating that "the source of notional principal contract income" (which includes income from derivatives such as the TRES) "shall be determined by reference to the residence of the taxpayer."[9] Thus, because the recipient of the TRES is a foreign resident, the DE is foreign source income and not subject to US tax.

Why did the Treasury adopt this rule? At the time, there was widespread concern that imposing withholding taxes on derivatives would kill a new and flourishing market in securities, which arguably benefited both Wall Street and US issuers by harnessing billions of dollars of funds. There was extensive lobbying by the Securities Industry Association and expressions of concern that the uncertainty regarding the source of income on derivatives was harming the market.[10]

It was immediately understood that the effect of the new rule would be to exempt DEs from withholding tax even if economically they are indistinguishable from

---

[8] IRC 865(a)(2).

[9] Treas. Reg. 1.863-7(b), adopted by T.D. 8330, 1-11-91.

[10] See generally H. David Rosenbloom et al., General Report, Tax Aspects of Derivative Financial Instruments, 80b Cahiers de droit fiscal international (1995); Reuven S. Avi-Yonah and Linda Z. Swartz, U.S. International Treatment of Financial Derivatives, 74 Tax Notes 1703 (1997).

62

dividends. Commentators expressed concern that the source rule for derivatives would result in widespread avoidance of the withholding tax on dividends, because a TRES gives the foreign holder the same economic returns as an investment in the underlying stock, but enables it to avoid the withholding tax because of the source rule for DEs.[11]

The Treasury and the IRS were aware of these concerns. In January of 1992, in the context of issuing the new rule for securities lending (discussed below), the Treasury and IRS expressed concern that the derivative source rule could lead to avoidance of the dividend withholding tax by using TRES, and suggested that a single stock TRES may be abusive.[12] However, no action was taken. In 1998, in the context of issuing new regulations governing the treatment of derivatives under IRC section 446, the Treasury and IRS repeated their concern that TRES could be used to avoid dividend withholding.[13] In response, the New York Bar Association Tax Section issued a report urging the Treasury not to treat DEs as equivalent to actual dividends for withholding tax purposes.[14] Again, Treasury and the IRS took no action.

The market understood the inaction by Treasury and the IRS as a sign that using TRES (even on a single stock, and even when the investor held the actual stock before and after entering into a TRES over the ex-dividend date) is an "approved loophole." As a result, by 2008, only the hopelessly unsophisticated foreign portfolio investor would invest directly in the stock of US corporations and incur the withholding tax on actual dividends.[15] Instead, everyone invests using TRES and receives tax-free DEs. Thus, it is unsurprising that the GAO Report numbers suggest that no withholding tax is collected from foreign corporate investors in US portfolio stock. The numbers indicate that the entire amount collected as withholding tax on dividends stems from direct (over 10%) holders, who care about voting the stock and therefore will not enter into a TRES.[16]

---

[11] See, e.g., Oren Penn, Withholding Tax in Cross-Border Equity Swaps: The Dividend Problem, 93 TNI 196-14 (1993); Gregory May, Flying on Instruments: Synthetic Investments and the Avoidance of Withholding Tax, 96 TNT 239-32 (1996); Avi-Yonah and Swartz, supra; Yaron Reich, Taxing Foreign Investors' Portfolio Investments: Developments and Discontinuities, 16 TNI 1975 (1998); David P. Hariton, Equity Derivatives, Inbound Capital and Outbound Withholding Tax, 60 Tax Lawyer 313 (2007).
[12] Preamble to Prop. Reg. 1.861-3(a)(6), 57 F.R. 860 (January 9, 1992).
[13] Preamble to Treas. Reg. 1.446-3, 1998-1 C.B. 1322 (June 29, 1998).
[14] NYSBA Report, Report on the Imposition of U.S. Withholding Tax on Substitute and Derivative Dividend Payments Received by Foreign Persons, 79 Tax Notes 1749 (1998) (the NYSBA Report). The NYSBA Report made two arguments: First, that an investor in a TRES is not the same as an investor in the underlying stock or as an investor in a securities lending transaction because it may never hold the underlying stock; and second, that if the Treasury attacked single stock TRES, the same result can be achieved using baskets. These arguments are addressed below.
[15] An important question is whether these investors are truly foreign or whether they are US persons investing through tax havens and avoiding their tax liability on dividends. Joe Guttentag and I have estimated that the US loses $50 billion each year because of tax haven abuses by US resident taxpayers. See Joseph Guttentag and Reuven Avi-Yonah, Closing the International Tax Gap, in Max B. Sawicky (ed.), Bridging the Tax Gap: Addressing the Crisis in Federal Tax Administration, 99 (2005).
[16] Note, however, that it may be possible for a foreign parent to create two classes of stock in its subsidiary, one carrying the vote and the other the dividend, and engage in a TRES with respect to the dividend paying stock while retaining the voting stock.

63

### 3. Securities Loans.

In 1992, a year after issuing the new rule for sourcing DEs, the Treasury and IRS issued proposed regulations governing securities lending transactions.[17] These regulations take a different approach to taxing dividend substitutes (DS) made pursuant to a securities lending transaction. The regulations were finalized in 1997.[18]

In a typical cross-border securities loan, a foreign holder of US stock enters into an agreement with a US borrower. Under the agreement, the US borrower borrows the stock for a certain period of time, and returns it thereafter. The US borrower is treated as the holder of the stock for the period of the loan, and therefore is entitled to receive any dividends on it during that period.

Because the foreign lender forgoes the right to receive dividends for the term of the loan, the US borrower agrees to make a DS payment ay time the underlying stock pays a dividend. Thus, the US borrower receives the dividend, and immediately turns around and makes a DS payment to the foreign lender. Since the DS payment is deductible, the US borrower has no net income.

What are the tax consequences to the foreign borrower? Under the regulations, "[a] substitute dividend payment shall be sourced in the same manner as the distributions with respect to the transferred security."[19] Thus, a DS is treated as a dividend for all US tax purposes (including for tax treaty purposes), and therefore it is subject to US withholding tax when made from a US borrower to a foreign lender.

The contrast between the DS rule (for securities loans) from 1992 and the DE rule (for TRES) from 1991 is impressive, since economically both transactions are identical: in both, as well as in a direct investment in the underlying stock, the foreign investor receives the full amount of the dividend.[20] Why, then, is the DS treated as a dividend for withholding tax purposes, while the DE is not?

In its 1998 report on the issue, the New York State Bar Association Tax Section argued that the DS rule should not be applied to DEs because in a TRES the foreign holder may never have held the underlying stock, while in a DS and a direct investment the foreign holder held the stock.[21] This may or may not be true (in many TRES transactions the foreign investor holds the stock before and after the TRES, which is entered into to cover the ex-dividend date). But even if true, it is unclear why

---

[17] 57 Fed. Reg. 860 (January 9, 1992).
[18] T.D. 8735 (October 6, 1997).
[19] Treas. Reg. 1.861-3(a)(6).
[20] Minus any fee levied on the DS or DE, which represent a payment to the US financial institution for "enhancing the dividend yield", i.e., enabling the investor to avoid the withholding tax.
[21] NYSBA Report, supra. The NYSBA also argues that any change to the DE rule involving single stocks can be avoided by using baskets. Because of this issue, I would recommend a rule relying on the well-established "substantially similar or related property" (SSRP) standard of IRC 246(c). See recommendations below.

64

it is relevant. Economically, the foreign investor in a TRES is in exactly the same position as a foreign investor in the underlying stock or as a foreign lender in a securities loan: All three are entitled to the dividend, and all three have the upside and downside risk of holding the stock.[22]

I believe that Treasury and the IRS had second thoughts about the 1991 DE rule by the time they issued the DS rule a year later, as indicated by the concerns expressed in the preamble to the DS rule. This explains whey they took a different approach in the DS rule. However, no action was taken to curb abusive exploitation of the DE rule in the period from 1992 to the present.

**4. Combining Equity Swaps with Securities Loans.**

Treasury and the IRS finalized the DS rule in October, 1997. Taxpayers immediately expressed concerns that the DS rule could result in a "cascading" withholding tax on multiple securities lending transactions.

The cascading issue arises because the DS rule applies to any securities loan involving stock of a US corporation, including a securities loan between foreign persons. Suppose that foreign person 1 lends stock in a US corporation to foreign person 2. Under the DS rule, if the US issuer pays a dividend to foreign person 2 (the holder for the period of the loan), and if foreign person 2 then makes a DS payment to foreign person 1, both payments (the actual dividend and the DS) would be subject to withholding, resulting in a cascading tax of over 30%.

How likely is this scenario? Generally unlikely, because the obvious solution is to make the securities loan to a US person, not to another foreign person, thereby avoiding the cascading by avoiding the withholding tax on the actual dividend. However, taxpayers argued that in some cases, regulatory limits prevented foreign lenders from engaging in securities loans with borrowers outside their own country.[23]

Because of these concerns, Treasury and the IRS issued Notice 97-66 in November, 1997 (i.e., a month after the DS rule became effective). Under Notice 97-66, the US withholding tax on a DS foreign to foreign payment "will be the amount of the underlying dividend multiplied by a rate equal to the excess of the rate of U.S. withholding tax that would be applicable to U.S. source dividends paid by a U.S. person directly to the recipient of the substitute payment over the rate of U.S. withholding tax that would be applicable to U.S. source dividends paid by a U.S. person directly to the payor of the substitute payment."[24]

---

[22] In some TRES and securities loan transactions, the foreign holder gets less than the full amount of the dividend; the difference is simply a fee paid to the US financial institution that arranges the transaction. For TRES transactions, this fee may also incorporate a splitting of the risk that the IRS would seek to impose a withholding tax on the TRES.
[23] I have seen no evidence that this is in fact a serious concern.
[24] Notice 97-66, 1997-2 C.B. 328.

65

What this means is that if foreign persons 1 and 2 are in the same country or in two countries subject to the same dividend withholding tax rate (e.g., 30% and 30% or 15% and 15%), and *if a US withholding tax is imposed on an actual dividend to foreign person 2*, then a DS payment from foreign person 2 to foreign person 1 would not be subject to US withholding tax, because a direct payment from the US to either foreign person would be subject to the same withholding tax rate.[25]

The clear intent of the Notice, as stated in both the text and in the examples, is to condition this rule on an actual US withholding tax being paid on an actual dividend or a DS somewhere in the chain. If no US withholding tax is ever paid, no cascading issue arises.

However, because the Notice (issued in haste a month after the DS rule was finalized) did not explicitly include this condition, taxpayers soon found a way to avoid the DS rule by combining it with the DE rule.[26] In such transactions, instead of foreign person 2 holding the actual stock of the US corporation (and thereby subjecting itself to withholding tax), foreign person 2 would enter into a TRES with respect to the stock. Foreign person 2 would then receive the DE free of withholding tax under the DE rule, and would make the DS payment to foreign person 1 free of withholding tax under Notice 97-66.

I believe this treatment of the transaction is wrong under the terms of Notice 97-66. Because the rationale for the Notice hinges on an actual withholding tax being due somewhere in the chain, it is inappropriate to interpret it as exempting the DS payment from withholding tax when there is no withholding tax due anywhere. Even if the taxpayer does not know whether a withholding tax is due (e.g., because foreign person 2 sells the borrowed stock into the market and does not know who the buyer is), I would argue that the Notice does not apply because foreign person 2 has the burden of proof to show that a withholding tax applies somewhere before it can exempt its DS payment to foreign person 1 from withholding under the Notice. Given that taxpayers are in a better position to establish that a withholding tax was actually imposed on the transaction, there should be a presumption that the Notice does not apply unless the taxpayer meets this burden.

## 5. Recommendations

In my opinion, there is no good policy reason to treat actual dividends, DEs and DSs differently for withholding tax purposes. I would therefore recommend that Congress, Treasury and the IRS take the following actions to prevent the widespread avoidance of the dividend withholding tax:

---

[25] Ironically, this means that a DS payment from one tax haven person to another is subject to better treatment than a payment from a non-tax haven person to a tax haven person (because the 15% to 30% payment would be subject to tax at 15%, while the 30% to 30% payment is exempt).
[26] Treasury and the IRS may have realized this by the time they expressed concern on abusing the DE rule in the preamble to the IRC 446 regulations (June, 1998).

7

66

1.  The DE rule (Treas. Reg. 1.863-7(b)) should be revised. For DEs on single stock
    TRES, the rule should be the same as the DS rule (Treas. Reg. 1.861-3(a)(6)), i.e.,
    the DE should be treated as an actual dividend for all U.S. tax purposes.
    Moreover, DEs on a basket of stock should likewise be treated as equivalent to a
    dividend if the basket represents "substantially similar or related property" (as
    defined under IRC 246(c) and the Regulations thereunder) to a single stock.

2.  Notice 97-66 should be amended to explicitly condition its application on the
    taxpayer showing that a U.S. withholding tax was levied on a dividend or a DS
    payment in the same chain of transactions to which the Notice is being applied.

3.  The IRS should challenge existing interpretations of the DE rule and of Notice
    97-66 that it deems abusive. For example, it should challenge the applicability of
    the DE rule to situations where the foreign investor holds the actual stock and
    enters into a TRES to cover the ex-dividend date. Likewise, it should challenge
    any application of Notice 97-66 to situations where the taxpayer cannot show that
    a U.S. withholding tax was levied on a dividend or a DS payment in the same
    chain of transactions to which the Notice is being applied.

4.  The IRS should challenge existing transactions involving DE and DS that lack
    economic substance. In particular, the IRS should examine whether transactions
    using Notice 97-66 satisfy the objective business purpose prong of the economic
    substance test.

## 6. Conclusion.

Congress has determined that foreign taxpayers who invest in US portfolio equities
should be subject to a 30% or 15% withholding tax. Many commentators have argued
that this result is inappropriate when interest and royalties are usually not subject to
withholding tax. However, the distinction between royalties, interest and dividends
can be defended.[27] Moreover, even if a "portfolio dividend exemption" is appropriate
as a policy matter, as long as Congress does not enact one, and as long as the Senate
does not ratify treaties with a zero rate for portfolio dividends, it is up to Congress,
the Treasury and the IRS to defend the US revenue base by preventing taxpayers from
abusing the DE and DS rules in the ways explained above.

In order to maintain any kind of tax system, the US public needs to be confident that
current law can be enforced. Thus, I hope that bipartisan support can be found for
taking the steps identified above to prevent dividend tax abuse. These steps offer the
potential of raising additional revenue without raising taxes, and of leveling the
playing field between ordinary Americans who pay their fair share of taxes and others
who do not.

---

[27] See footnote 5 above.

67

Maverick Capital
300 Crescent Court
18th Floor
Dallas, TX 75201
(214) 880-4000 Phone
(214) 880-4020 Fax

# Maverick

September 10, 2008

## STATEMENT OF MAVERICK CAPITAL LTD. TO THE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

Honorable Members of the Permanent Subcommittee:

My name is Joseph Manogue and I am the Treasurer of Maverick Capital, Ltd.

I submit this statement as Maverick's representative in response to the invitation that we received late last week from the Subcommittee in order to assist the Subcommittee in its review of certain industry practices that have commonly been referred to as dividend enhancement transactions.

Maverick is an investment advisor that manages client capital primarily through hedging strategies based on long and short positions in U.S. and foreign equity securities. To that end, Maverick undertakes typical industry transactions, including the purchase and sale of stocks, shorting stocks, and borrowing and lending stocks.

Investors in Maverick managed funds include both U.S. and foreign institutions and individuals, and our funds include both domestic and foreign entities in structures that are typical for our industry. I would like to note in particular that our structures and policies provide for investment by U.S. taxpayers in domestic partnerships that are subject to full Internal Revenue Service return and information reporting requirements that typically apply in a domestic context.

In 1994, Maverick made the decision to register as an investment adviser under the Investment Advisers Act of 1940, and thereby voluntarily submitted to periodic review and inspection by the Securities and Exchange Commission. Our company prizes above all its reputation for client service and the highest ethical standards.

In the course of its operations, Maverick utilizes the services of a variety of prime brokerage firms that support implementation of its trading strategy on behalf of Maverick's client funds. These firms are among the most well-established institutions on Wall Street. Beginning in the late 1990s and through the subsequent years, the services offered by these firms included dividend enhancement programs.

68

The proposal was as follows: U.S. tax laws subjected dividends paid by U.S. companies to foreign stockholders to a 30% withholding tax. Under the relevant tax regulations, however, foreign investors who received equivalent payments under total return swaps and foreign stockholders of U.S. companies who received substitute dividend payments from many foreign stock borrowers were not subject to the 30% withholding tax.

Maverick's financial institution service providers offered to help Maverick enter into total return swap transactions that involved Maverick's Cayman funds selling the U.S. company stock eligible for an expected dividend to the financial institution for a price and negotiated fees that would be substantially equivalent to getting the value of the dividend. Alternatively they suggested that Maverick's Cayman Island funds should consider lending the U.S. company stock to a Cayman affiliate of the service provider. In consideration for the loan, the financial institution's Cayman affiliate would pay to the Maverick Cayman fund an amount that was somewhat less than the dividend but exceeded the amount that it would have received had it received the dividend net of the tax.

Maverick's tax personnel considered these proposals and examined the tax regulations that applied to these transactions. Taking into account their compliance with the rules, the number of different blue chip firms offering the services, and their assurances that the transactions had been thoroughly vetted, there seemed to be little cause for concern that they were legitimate.

Of the alternatives presented, however, those requiring that the Maverick Cayman funds enter into swaps directly presented greater complexity relating to variable transaction terms and operational considerations than those providing for simple stock loans. Moreover, IRS Notice 97-66 appeared to provide express confirmation that "substitute dividend payments" received with respect to stock loans to a borrower located in the same jurisdiction as the lender would not be subject to the withholding tax.

Thus, in 1999, Maverick began engaging in dividend enhancement stock loans in reliance on Notice 97-66. On a case by case basis, a Maverick employee would ask one of the financial institutions that had offered to provide dividend enhancement services whether it wished to borrow a particular security. If the financial institution did wish to borrow that security, Maverick would negotiate terms with that institution. We did not engage in swaps or other cross border transactions for purposes of dividend enhancement, and we did not participate in any subsequent transactions involving the borrowed shares that may have been undertaken by the borrowers.

We engaged in these transactions through various financial institutions until 2007. In 2007, however, the business press published a number of reports about these programs and suggested that the IRS was taking a close look at their legitimacy. Understandably, the financial institutions involved suspended the services until any questions about the industry practices could be resolved. Maverick estimates that its Cayman funds received approximately $63,000,000 in substitute dividend payments beyond the amount that they would otherwise have received as a result of participation in dividend enhancement stock loan transactions since 2000.

When the Staff of this Subcommittee issued a request for information earlier this year, our counsel promptly complied by producing thousands of pages of documents. We have made our

69

personnel available to assist the staff in understanding industry practices in this area, and, on the basis of numerous discussions over the past several months, believe that we have developed a candid and cooperative relationship.  I am hopeful that they have conveyed consistent impressions of Maverick to you.

The regulation and taxation of financial transactions such as those under discussion today are complex and evolving subjects.  As I have indicated, we believe that we have acted in accordance with the governing legal precedents and existing guidance, but understand that those precedents may be subject to further interpretation or revocation on the basis of further policy review such as the one you are conducting here.  Maverick will conform to any new laws and regulations that result from this review.

Thank you.

70

<u>U.S. Senate Permanent Subcommittee on Investigations</u>

Testimony of Richard Potapchuk
<u>Highbridge Capital Management, LLC</u>

September 11, 2008

Chairman Levin, members of the Subcommittee, I am pleased to have the opportunity to testify today on the subject of the tax treatment of certain payments to non-U.S. investors under contracts known as total return swaps.

Highbridge is an investment advisor that manages investment vehicles commonly known as hedge funds. It has client assets of approximately $27 billion currently under management. Highbridge invests its clients' assets throughout the world in a wide range of financial instruments, including stocks, bonds, currencies, futures, and swaps, using a number of different investment strategies. Its objective, like that of all asset managers, is to achieve favorable risk-adjusted investment returns for its investor clients.

I served as the Chief Financial Officer of Highbridge from 1994 until 2007. My current title is Director of Treasury and Finance. I am familiar with Highbridge's use of total return swaps in different investment contexts.

A total return swap is a private financial contract between two parties that allows an investor to gain market exposure to the performance of a security without making a direct investment in an operating company. Under a typical total return swap contract, the "seller" of the contract, usually a large financial institution, agrees to pay the "buyer," usually an investor such as a fund managed by Highbridge, the total returns achieved by a reference security, typically a publicly-traded equity security, for a specified period of time. These returns include any increases in the security's value and any dividends or other distributions that would have been paid to an owner of the security during the specified period. In return, the total return swap buyer pays the seller (1) an amount determined by reference to a standard interest rate such as LIBOR applied to the notional amount of the contract and (2) an amount equal to any decrease in the value of the reference security. The swap buyer does not own the reference security: it merely has a contractual right to receive payments from the seller, and a contractual obligation to make payments to the seller, in both cases measured by the performance of the reference security. The swap seller need not own the reference security either, although it often does to hedge its obligations under the swap contract. Throughout the life of the total return swap, the swap buyer is exposed to the credit risk of the swap seller, the party to which it looks for all payments due.

Total return swaps serve a number of different purposes in different markets. In some foreign markets, it is difficult or impossible for investors to purchase securities outright in their own name, and total return swaps may be the only way, or the most efficient way, for an investor to gain exposure to those markets. In some circumstances, there may be financing or operational advantages to gaining exposure to a security or group of securities through a total return swap

71

instead of direct ownership. Because the total return swap buyer does not own the reference security, its regulatory and reporting obligations may be different than they would be if it owned the security directly; at the same time, the swap seller does not have the rights of ownership, including the right to vote the reference shares on corporate matters requiring a shareholder vote. The application of taxes and fees to securities transactions are different in many jurisdictions if exposure to positions is maintained in the form of total return swaps rather than direct ownership.

In the United States in particular -- and this, of course, is the subject of today's hearing -- U.S. source dividend distributions to non-U.S. investors located in non-tax treaty jurisdictions are subject to a 30% withholding tax. Payments from a total return swap seller with respect to dividends paid by the reference security, however, are neither "dividends" nor U.S. source income for U.S. tax purposes, and they are not subject to withholding tax. For this reason, it is often economically preferable for a non-U.S. investor to invest in a dividend-paying security in the form of a total return swap rather than to own the security directly.

This difference in tax treatment has been well known in the securities industry for many years, certainly since at least the mid-1990s, and many investors, including funds managed by Highbridge, have used total return swaps to minimize the tax burden on their non-U.S. investors arising out of transactions in U.S. dividend-paying securities.

At the Subcommittee staff's request, Highbridge has compiled data on investments by its funds in U.S. dividend-paying securities maintained in the form of total return swaps from the beginning of 2002 through the end of 2007. We have not attempted to collect data for the years prior to 2002 in which we engaged in similar investment transactions, and, at the staff's request, we have limited our inquiry to transactions involving, at some point, the conversion of an investment position from physical ownership to total return swap exposure or vice versa, i.e., we have excluded investment positions maintained continuously in the form of total return swaps. Our data, previously supplied to the staff, show that for the six-year period from 2002 through 2007 Highbridge funds received payments of about $425 million pursuant to total return swap contracts that reflected dividends paid by the securities referenced in those contracts.

It is fair to say that, for the most part, the principal reason, although not necessarily the only reason, Highbridge funds maintained exposure to these securities positions in the form of total return swaps, rather than through outright ownership, was to reduce the tax burden on their non-U.S. investors. At the same time, tax savings were not the primary reason for the investments themselves, which were based on an analysis of the likely performance of the underlying securities.

You have asked us to address the question of "[t]he approximate total amount of withholding taxes avoided through the use of these transactions." In one sense, of course, the answer is none: under the law as it existed then (and exists now), no U.S. tax was due on these transactions. Moreover, a significant portion of the $425 million in dividend-related swap payments would not have been subject to withholding tax even if paid directly as dividends to the Highbridge funds. First of all, no withholding tax would be applicable on the share of dividend income allocable to U.S. investors, 10% or more of the payments discussed above. In addition, some portion of the dividend distributions paid by the reference securities would likely

72

have been treated as a return of capital and would not have been subject to dividend withholding tax.

The real issue, it seems to us, however, is what the resulting tax revenue would have been if total return swaps did not exist, or if a 30% withholding tax were required on total return swap payments arising out of dividend distributions by the reference securities. This is a very difficult question to answer. Like most prudent investors, Highbridge considers tax implications in evaluating alternative investment strategies. Of the investment positions described above, some would have continued to make economic sense even if the relatively small dividend component of the overall return had been subjected to a 30% withholding tax with respect to non-U.S. investors. Others would not have made sense and would have been abandoned in favor of alternative investments. Still others would have continued to make sense but would have been less attractive and would have received a reduced dollar allocation. It is almost impossible to reconstruct, even within broad ranges, what the total effect would have been.

You have also asked us to comment on "[t]he role of the financial institutions that facilitated these transactions for Highbridge and the representations that they made to Highbridge regarding the tax implications of the transactions." Many different financial institutions, primarily large commercial or investment banks, have offered total return swaps going back to the 1990s, and Highbridge funds have entered into total return swap transactions with ten or more of them. These counterparty institutions generally represented that they had vetted their total return swaps with counsel and other experts and were comfortable that they were not required to withhold tax from payments to investors like the funds managed by Highbridge with respect to payments that were based on dividends paid on the reference securities. Although Highbridge did less independent investigation, it reached the same conclusion, and large numbers of other participants in the securities markets appear to have done so as well.

I do not recall that financial institutions offering total return swaps gave primary emphasis to the tax advantages of this form of investing. In part, this is because there are a variety of other reasons why total return swaps are an attractive way to gain economic exposure to a wide range of securities -- although these other reasons are not typically decisive for Highbridge, at least with respect to its investments in U.S. dividend-paying securities -- and in part because the tax advantages of total return swaps have been widely understood for many years. Institutions offering total return swaps thus tended, in their marketing efforts, to emphasize why their platform was preferable to a competitor's platform, while summarizing the various reasons, including tax benefits, why it might be advantageous to the investor.

Although it is clear that, under existing law, payments with respect to dividend distributions under properly-structured total return swap agreements are not subject to withholding tax -- because they are not payments of dividends or otherwise U.S. sourced -- the securities industry has also been sensitive for many years to the possibility that parties could engage in sham transactions that have the appearance of being total return swap transactions but in which the swap buyer retains the rights and obligations of direct ownership. Highbridge funds recognize that, in electing to maintain exposure to investment positions in the form of total return swaps, they give up the rights of direct ownership, including voting rights, and that in other respects their investment positions must have the substance, not merely the form, of total return

- 3 -

73

swap transactions rather than direct ownership. We believe that our total return swap transactions have been swap transactions in substance, and, for this reason, we believe our use of total return swaps has been entirely legal under existing law. We continue to use total return swaps where it is lawful and advantageous to our investors to use them.

Because we believe that existing law is clear, at least as it applies to transactions in which we engaged, we believe that the most important question for the Subcommittee is whether changes in existing law are appropriate or desirable. Highbridge has no institutional position on this question, and we would, of course, abide by any changes in the law. Our familiarity with investment transactions involving total return swaps, however, allows us to make some observations about this difficult policy issue that may be of assistance to the Subcommittee.

First, the issue of whether a withholding tax in some amount should be imposed on the portion of total return swap payments attributable to dividends on the reference securities does not affect U.S. taxpayers. U.S. taxpayers are not presently subject to dividend withholding tax, and the total return swaps that are the subject of today's hearing are not a mechanism that allows U.S. taxpayers to reduce their tax burden.

Second, some significant portion of the investors who would be affected by the imposition of a withholding regime on swap payments attributable to dividends -- about 20%, in Highbridge's case -- are U.S. tax-exempt entities such as universities, foundations, and pension funds. These entities typically would not be subject to tax on dividend income, unless the underlying investment positions were acquired with borrowed money, and it might be thought inappropriate to tax them on a portion of the investment returns they receive from total return swap contracts, when they otherwise would not be subject to such a tax.

Third, the 30% withholding that applies presently to dividend payments to non-U.S. taxpayers is already quite high by both U.S. and international standards. For both U.S. taxpayers and taxpayers in most industrialized countries who are entitled to the benefits of a tax treaty with the United States, portfolio dividend income is subject to a maximum tax rate of 15%, and effective tax rates are often lower. Extending a 30% withholding to total return swap payments would have at least some deterrent effect on foreign investment in U.S. securities markets.

Fourth, because, as discussed above, investors take tax effects into consideration in making investment decisions, any change in the tax status of total return swap payments would alter investor behavior, making the actual tax revenue impact of any contemplated change in law difficult to predict. For example, there are already alternative ways of investing in U.S. dividend-paying securities without being subject to dividend tax withholding, such as through investing in single-stock futures contracts. Any change in the tax status of total return swap payments would likely lead to more extensive use of other forms of indirect investment that were not subject to tax. Similarly, relatively simple changes in the structure of the off-shore funds Highbridge manages would allow many off-shore investors to take advantage of tax treaties between the United States and their home jurisdictions, generally reducing a 30% withholding tax to 15%. These developments would significantly reduce the likely revenue effect of extending the 30% dividend withholding tax to the dividend-related portion of swap payments.

74

For these and other reasons, most non-U.S. jurisdictions presently treat payments under total return swap agreements the same way that the United States presently treats them, namely, they are <u>not</u> subject to dividend withholding tax.  Any changes in U.S. law in this regard would make the United States an exception by international standards, at least in the short run.

Thank you for this opportunity to address these interesting and complicated issues.

75

**STATEMENT OF GARY I. WOLF**

**MANAGING DIRECTOR - ANGELO, GORDON & CO., L.P.**

**BEFORE THE SENATE COMMITTEE ON HOMELAND
SECURITY AND GOVERNMENTAL AFFAIRS,
PERMANENT SUBCOMMITTEE ON INVESTIGATIONS**

Thank you, Mr. Chairman. My name is Gary Wolf. I am a managing director at Angelo, Gordon & Co., L.P., a Delaware limited partnership and an SEC-registered investment advisor.

Angelo, Gordon was founded in 1988 and currently manages, with its affiliates, in excess of $19 billion. We seek to achieve attractive risk adjusted returns, while preserving capital, primarily through investments in non-traditional/alternative strategies. Angelo, Gordon manages capital across four principal lines: (a) distressed debt and par loans, (b) real estate, (c) private equity, and (d) hedged strategies. Our client base is global and is comprised of institutions, including corporations, public funds, endowments and foundations, and high net worth individuals. We have associated offices in London, Amsterdam, Hong Kong, Seoul, Tokyo, Singapore and Mumbai.

I joined the firm in 1993 and have been a convertible securities research analyst and portfolio manager during the past 15 years. Since 1995, I have been the head of the firm's convertible securities department.

The Subcommittee's hearing today concerns issues relating to one investment product which has been offered by investment banks for many years. The use of this product, often

I

76

referred to as a "swap" or a CFD (contract for differences), has been a common practice in the financial world and was marketed to Angelo, Gordon by many of the largest, most sophisticated investment banks in the world. The investment banks offering these investment products represented to Angelo, Gordon that the structure of these transactions, including the tax implications, had been cleared by their legal advisors, a position which was confirmed by our own legal advisors. Angelo, Gordon did not construct or market these swap products, but rather these products were created and marketed by the investment banks.

While the specific products offered by different investment banks varied in particular aspects, this investment product, in general, is one in which the investor is not the actual owner of the security but rather enters into a contract with the investment bank to receive, or to make, payments which mirror the performance of the referenced security. The investment bank, which is the counterparty to the contract, may or may not actually hold or own the security. If the price of the security rises, the investment bank is obligated under the contract to pay an amount equal to that increase; if the price of the security falls, the investor must pay the investment bank an amount equal to the decline. Under the contract an amount equal to some or all of the value of any dividend paid to stockholders during the contract period is paid to the investor by the investment bank.

Depending on the specific circumstances of a given transaction, sometimes the best way to maximize returns for our investors was to engage in a swap transaction. While I am not a tax expert, it is my understanding that while the person or entity actually owning the security and receiving the actual dividend payment may be subject to the federal tax on dividends, the tax treatment of a payment received under a contract is determined by other provisions of the tax code. At times this tax treatment of swaps would provide a tax benefit resulting in a higher total

77

yield on the investment for a foreign investor. This benefit was a central aspect of the marketing pitches that were made to us by the investment banks.

While the tax consequences were a significant factor considered in deciding whether to enter into a swap transaction, this was far from the only consideration. In fact, there were other significant economic realities that factored into the decision to enter into a swap transaction, including increased leverage and competitive transparency benefits. While swap transactions do have a significant number of positive benefits, including those related to leverage, transparency, and tax, there are a number of potential negative consequences or risks associated with such transactions. There was the economic reality that, since we would not be the actual owner of the security, we would not have the normal stockholders' role in the control of the company. Also, there were often significant transaction costs associated with swap transactions, including the fees for leverage. Sometimes such transaction costs could outweigh any benefits of engaging in a proposed swap transaction, causing Angelo, Gordon not to enter into the transaction. In addition, unlike those situations where we held the actual security, under a swap contract we were exposed to the risk that our counterparty would not make the payments called for by the contract. Recent events have demonstrated that counterparty risk is a significant factor.

We were told by the investment banks, as well as by our own legal advisors, that this form of investment offered a legal way for us to enhance or maximize our total return since we would be receiving contract payments and not actual dividend payments. The investment strategies we pursue are not designed around dividends but rather focus on movement in the price of the equity. While the value of any dividends paid during the time we held a position in a company would be, we hoped, minor compared to what we would realize from the movement of the price of the security, we were attracted to a form of investment that resulted in lower rather

78

than higher taxes for our investors. Just as an individual deciding between renting and homeownership is well advised to consider the tax consequences of each approach, it is incumbent on financial firms and institutions to also consider the tax consequences, among many other factors, inherent in a given transaction.

The tax advantage of these products was certainly one of the primary considerations that made them attractive when they were marketed to us by the investment banks, but the tax advantage was not the only substantive aspect of these contracts. During the time period when Angelo, Gordon was active in swap transactions, leverage was also a considerable factor driving such decisions. In fact, often one of the most important negotiation points when entering into a swap transaction was the amount of leverage that could be obtained. Leverage was deemed to be so critical to investment decisions that the prime brokerage arms of investment banks would compete for business on the basis of the amount of leverage that could be offered.

Another significant benefit associated with swap transactions relates to competitive transparency. When Angelo, Gordon holds a security in swap, it prevents other competing investors from tracking and either mirroring or undermining our positions.

Given the myriad of benefits and positive economic results that can be realized through swap transactions, Angelo, Gordon engaged in such transactions on a global level, and this activity was not simply limited to U.S. securities. Similarly, this activity was not limited to U.S. dividend paying securities. In fact, Angelo, Gordon has entered into swap transactions for securities ranging from U.S. convertible bonds to bank debt to foreign securities, none of which would be subject to the U.S. withholding tax even if owned directly, and this has been the case with both our domestic and foreign funds.

79

My understanding is that some of the recent media discussion regarding swap transactions has centered on the practice of acquiring a position in a security shortly before a dividend date and then exiting that position shortly after the dividend date, often referred to as "bracketing" a dividend. Not only did Angelo, Gordon not engage in either the strategy or the practice of "bracketing" dividends, but such a practice runs counter to Angelo, Gordon's core investment philosophy of focusing on well-researched, longer term investments. Almost always, Angelo, Gordon would hold a security in swap for at least nine months, and sometimes as long as two years. In only a handful of instances did Angelo, Gordon hold a security in swap for less than 30 days.

Due to economic and business realities in the marketplace and at Angelo, Gordon, the firm currently engages in very few swap transactions, and the number of swap transactions engaged in has decreased significantly over time. Given a decrease in opportunities in the marketplace, Angelo, Gordon's dedicated convertible securities funds, which used to engage in such swap transactions, closed in late 2006; similarly, Angelo, Gordon's real estate securities funds, which also used to engage in such swap transactions, closed in late 2007. Notably, the significant decrease in swap transactions has had no relationship to any change in the tax treatment of dividend-based payments, but rather is based on other economic and business realities.

I hope that my testimony has aided the Subcommittee in understanding these issues, and I will do my best to answer any questions you may have.

80

September 11, 2008

**TESTIMONY OF JOHN DEROSA,**
**GLOBAL TAX DIRECTOR, LEHMAN BROTHERS INC., BEFORE THE**
**U.S. SENATE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS**

Chairman Levin, Ranking Member Coleman, and Members of the Subcommittee:

I am John DeRosa, Managing Director and Global Tax Director at Lehman Brothers Inc. I appreciate the opportunity to appear before the Subcommittee today on behalf of Lehman Brothers Inc. ("Lehman"). Lehman, an innovator of global finance, serves the financial needs of corporations, governments and municipalities, institutional clients, and high net worth individuals worldwide. Founded in 1850, Lehman maintains leadership positions in equity and fixed income sales, trading and research, investment banking, private investment management, asset management and private equity. The Firm is headquartered in New York, with regional headquarters in London and Tokyo, and operates in a network of offices around the world.

As Global Tax Director, I can state with confidence—and I want to emphasize—that Lehman takes its obligations under the U.S. tax code very seriously. Lehman has worked diligently to follow the letter and spirit of the law governing both equity swaps and stock loan agreements.

The rules governing the applicability of U.S. withholding tax for payments made to non-U.S. counterparties on swap and stock loan transactions referencing U.S. equities are clear. Under Treasury Regulation § 1.863-7(b)(1), the source of notional principal contract income (*i.e.*, swap payments) is determined by reference to the residence of the taxpayer receiving the payment, not the residence of the payor on the underlying referenced asset. Thus, when Lehman makes a payment on an equity swap referencing a U.S. asset to a non-U.S. counterparty, the

81

payment is sourced to the residence of the swap counterparty and does not attract U.S. withholding tax. With respect to stock loans, IRS administrative Notice 97-66 exempts from U.S. withholding tax in lieu payments made to a foreign counterparty when the criteria articulated in that notice are met. Thus, under these rules, the transactions the Subcommittee is reviewing do not attract U.S. withholding tax.

When Lehman makes payments, whether pursuant to an equity swap or a stock loan, to foreign counterparties referencing U.S. equities, Lehman complies with these rules. We understand that Treasury and the IRS may now be considering whether these rules should be changed going forward, including possibly advancing a new rule that would recharacterize some, but not all, of these transactions. I can assure you that, to the extent that Treasury or the IRS now changes these rules, Lehman will comply with those new rules.

Equity swaps and stock loan agreements are basic financial instruments that have been in existence for decades and are critical to the proper functioning of today's global capital markets. There are many reasons—totally unrelated to withholding tax—why clients use these instruments. Fundamentally, clients employ these instruments to gain economic exposure to underlying assets without beneficially owning those assets. These instruments can provide clients with leverage, operational and administrative efficiency, and other balance sheet and regulatory capital benefits. In return, Lehman receives financing spreads and commissions as appropriate. These financial instruments, like many others such as municipal bonds, offer tax efficiency in certain circumstances – a result fully recognized by Treasury and the IRS.

In fact, however, most of Lehman's equity swaps and stock loans have nothing to do with U.S withholding tax efficiency. The overwhelming majority of Lehman's equity swaps and stock loans simply do not implicate U.S. withholding taxes at all because they have one or more

82

of the following characteristics: (1) the counterparty takes a short, rather than a long, position; (2) there is no distribution payment on the underlying referenced security; (3) the swap or stock loan is not held by the counterparty over a dividend record date; (4) the underlying referenced security makes a payment characterized for tax purposes as interest, which is generally not subject to U.S. withholding tax; (5) the underlying referenced equity is a foreign, rather than a U.S., equity; or (6) the counterparty is resident in the United States.

It has been well understood for years that even when these basic financial instruments *do* reference underlying U.S. dividend-paying securities and are entered into as long positions by non-U.S. counterparties over a dividend record date—a relatively small universe of transactions at Lehman—they do not attract U.S. withholding tax under U.S. tax laws. As I stated earlier, the basic rule for equity swaps, established by Treasury in 1991, is that payments made to non-U.S. counterparties pursuant to these basic financial instruments must be sourced based on the residence of the counterparty and, therefore, do not implicate U.S. withholding taxes. In addition, an IRS administrative notice specifically exempts from U.S. withholding taxes in lieu payments on stock loan transactions like the ones in which Lehman participated. These fundamental rules – and the resulting tax treatment for certain counterparties – have long been understood by market participants and, notably, the Department of Treasury and the Internal Revenue Service.

Indeed, most, if not all, of the major Wall Street investment banks and commercial banks engage in equity swap and stock loan transactions referencing U.S. underlying equities with non-U.S. counterparties. Over the last 15 years, numerous commentators in widely-respected taxation journals have addressed the withholding tax consequences of equity swaps similar to those offered throughout Wall Street, including articles by the current Chief of Staff for the Joint

3

83

Committee on Taxation and his former law firm. In 1998, a Notice of Proposed Rulemaking was published in the Federal Register that expressly addressed the same issue. It said (and I quote), "Treasury and the IRS are aware that in order to avoid the tax imposed on U.S. source dividends…some foreign investors use notional principal contract transactions based on U.S. equities…Accordingly, Treasury and the IRS are considering whether rules should be developed to preserve the withholding tax with respect to such transactions." In May 2007, the Practicing Law Institute hosted a panel focused specifically on the U.S. withholding tax aspects of equity swaps and stock loan transactions. The presentation expressly set forth and extensively discussed precisely the mechanics of the transactions the Subcommittee is now reviewing. That panel included well recognized practitioners in the tax field including, most notably, a representative from the IRS. Lehman has provided the Subcommittee with a copy of that panel's presentation.

Despite the IRS' clear recognition for at least a decade that these financial instruments, in certain circumstances, may have U.S. withholding tax implications, to date, no new rules governing equity swaps or stock loan arrangements have been promulgated. This is not surprising when one considers what a fundamental change any such new rules would present, particularly if those new rules were to articulate circumstances warranting recharacterization of certain transactions. Equity swaps and stock loans are, in fact, substantively different from beneficial ownership of the underlying securities and have been so treated – in regulation and in practice – for years. The challenge of recharacterizing an equity swap or stock loan transaction is highlighted by the fact that in many instances Lehman Brothers did not hold the underlying referenced assets in the equity swaps and stock loans at issue here. It is difficult to rationalize, for example, a new rule that would impose a dividend withholding tax on an equity swap or

84

stock loan payment in which neither party to the transaction actually held the underlying referenced security or ever received a dividend.

I should note, however, that even under existing law, Lehman exercised appropriate care when entering into these financial instruments. Lehman consulted extensively with tax experts both internally and at major Wall Street law firms, receiving both oral and written advice. Based on the advice of its legal counsel, Lehman put in place guidelines and parameters governing the use of these instruments. For example, Lehman instituted a minimum duration requirement and established requirements governing the size of underlying baskets. Under the prevailing rules applicable to equity swaps and stock loans, transactions meeting these guidelines should not be recharacterized for tax purposes. In other words, according to the U.S. tax laws as currently written, the payments made to non-U.S. counterparties pursuant to equity swaps must be sourced based on the residence of the counterparty and, therefore, do not trigger U.S. withholding taxes. Likewise, the type of in lieu payments made by Lehman on stock loans are specifically exempt from withholding tax pursuant to the IRS administrative notice mentioned earlier.

Lehman made every effort to ensure that its equity swaps and stock loans complied with these guidelines. Indeed, we know that in some situations clients approached Lehman in an effort to transact in these instruments in a way that did not align with our product parameters – for example, by seeking to hold a position for a very short period of time around a dividend record date – and that Lehman refused to engage in those transactions.

But Lehman did even more than that. In October 2007, when David Shapiro, Senior Counsel in the Treasury Department's Office of Tax Policy, stated publicly that Treasury would "welcome input" from the industry on the proper tax treatment for these instruments going forward, Lehman responded. First, Lehman actively participated with the Securities Industry

85

and Financial Markets Association ("SIFMA") to help develop a framework on behalf of the industry to analyze the appropriate tax treatment going forward for equity swap transactions. This analytical framework was then shared with Treasury and the IRS. Second, Lehman proactively and independently engaged the Treasury Department in constructive discussions explaining the equity swap business and a possible new framework. Those discussions culminated with Lehman's submission earlier this year of a request to the IRS (pursuant to the Industry Issue Resolution Program) for official guidance. I have attached a copy of that submission with my written testimony.

As I said at the outset, if new rules governing the tax treatment of equity swaps and stock lending transactions are promulgated, Lehman will comply with those new rules. In the meantime, Lehman has made a concerted and good faith effort to comply with current tax law. We will continue to do so in the days and months to come.

Thank you again for the opportunity to appear here today. I would be happy to answer any questions you might have.

86

# LEHMAN BROTHERS

June 12, 2008

Internal Revenue Service
Office of Prefiling and Technical Services
Large and Mid-Size Business Division LM:PFT
Mint Building 3 Floor M3-420
1111 Constitution Avenue NW
Washington, DC 20224

**Re: News Release 2008-31 (Industry Issue Resolution Program)**

Dear Sir or Madam:

In News Release 2008-31 (March 3, 2008), the Internal Revenue Service solicited the submission of tax issues to be considered as part of the Industry Issue Resolution ("IIR") Program. We are writing to request that, under the IIR Program, you consider publishing guidance with respect to the withholding tax treatment of equity swap transactions referencing U.S. equities and executed with foreign counterparties. In particular, we request that Treasury and the IRS publish guidance describing the circumstances, if any, under which the IRS would recharacterize an equity swap transaction and impose U.S. withholding tax on payments made to a foreign counterparty with respect to such equity swap.

This is a significant issue that affects a wide range of financial institutions and non-U.S. investors who regularly execute equity swap transactions over U.S. equities. We understand that the IRS is conducting audits of financial institutions' equity swap transactions with foreign counterparties that reference U.S. equities to determine whether there might be a U.S. withholding tax liability with respect to those transactions. Published guidance would significantly reduce the burden created by these audits on both the IRS and the relevant financial institutions.

Since 1991, Treasury regulations have provided that payments received under notional principal contracts are sourced by reference to the residence of the taxpayer receiving the payments. This sourcing rule reflects the Treasury's and the IRS' long-held view that notional principal contracts in general and equity swaps in particular are single indivisible financial instruments rather than a collection of individual financial instruments. The IRS and Treasury accordingly have not disaggregated for U.S. tax purposes the constituent elements of payments made under equity swaps. The residence-based sourcing rule applicable to equity swaps embodies these principles, and reflects Treasury's and the IRS' considered decision not to impose a withholding tax on equity swap payments because, in many cases, a foreign counterparty has relatively little capital

87

invested in the transaction and primarily earns net income as a result of changes in the market values of the relevant equities. Although on at least two occasions Treasury and the IRS stated they were considering prospective rules that would depart from the residence-based sourcing rule for dividend equivalent amounts embedded in equity swap payments, no action has been taken to alter this rule.

We recognize that there may be fact patterns for equity swap transactions that could warrant recharacterization and the imposition of U.S. withholding tax on payments made under such equity swaps. There are no articulated standards, however, to guide taxpayers in ensuring that their equity swap transactions are subject to the default sourcing rule and not subject to recharacterization. Again, providing guidance would eliminate this uncertainty and reduce the burden on the IRS and taxpayers by focusing current and future audits on a far more limited universe of transactions. Without guidance, taxpayers can expect time-consuming, expensive and wide-ranging audits on transactions where the line between appropriate and inappropriate has never been drawn.

Given the longstanding use of equity swaps in the financial markets, we believe that guidance addressing the facts and circumstances in which it would be appropriate to impose withholding tax on equity swaps is long overdue. In light of the factual uncertainties underlying any potential recast of an equity swap, we encourage Treasury and the IRS to designate this issue as a high-priority industry issue and to develop guidance to fill the interstices between so-called "good" and "bad" equity swaps.

In light of the above, we respectfully request inclusion of this issue in the IIR Program. Consistent with our prior meeting, Lehman Brothers would be delighted to provide you with our cooperation, our assistance and any additional information that you might require to better approach this issue. In addition, we have crafted a few specific proposals that we think might assist in your efforts in this area, and we would be happy to share them with you. You can reach me at 212-320-7081 if you have any questions or would like to discuss this further.

Yours sincerely,

John DeRosa
Global Tax Director

cc:    Stephen R. Larson              David H. Shapiro
       Associate Chief Counsel        Senior Counsel, Financial Products
       Internal Revenue Service       Department of the Treasury

88

**Testimony of Matt Berke**
**Managing Director and Global Head of Equity Risk Management**
**Morgan Stanley**
**September 11, 2008**

My name is Matt Berke. I am a Managing Director and Global Head of Equity Risk Management for Morgan Stanley. Thank you for inviting Morgan Stanley to participate in today's hearing about dividend withholding tax policy and market practices. We have been pleased to cooperate with the Subcommittee's staff as it examined these issues over the last several months, and I hope that I can be a useful resource to you today.

I understand that the Subcommittee is focused on two issues: (1) whether industry participants are complying with existing laws regarding dividend withholding obligations, and (2) whether new laws and policies may be appropriate. Our understanding is that you are principally focused on these issues with respect to two products: equity derivatives such as total returns swaps and equity-linked certificates, and certain stock loan transactions.

I can only speak to my firm's practices. Morgan Stanley believes that its practices in these areas are in compliance with applicable tax laws and regulations. Compliance with the law is the beginning of the analysis for our firm, though, not the end. Morgan Stanley is also committed to doing business in a way that is consistent with our own corporate values. To that end, we often review how we conduct these businesses, and of our own volition have changed certain practices over time to become more conservative. We are always looking for ways to improve and refine what we do and appreciate the opportunity to discuss our practices with you today.

I would like to begin by providing some background on the relevant tax laws and regulations, then move to certain equity derivative products Morgan Stanley offers, then discuss our stock-lending business, and finally touch on a few policy issues.

_Tax Treatment of Equity Derivatives and Stock Loans_

There are several well-accepted tax principles involved in the issues being discussed today. When a non-U.S. investor owns a U.S. stock and receives a dividend payment on that stock, withholding tax on the gross amount of dividends is imposed without allowing any deduction for related investment expenses or for the corresponding reduction in value that typically accompanies the payment of a dividend. The statutory rate is 30%, although the rate can be reduced by tax treaty. For U.S. investors, by contrast, there is no withholding tax imposed on dividend income.

Equity derivatives often track the performance of a U.S. stock, but do not generate U.S. taxation on the dividend-related performance under current law. Based on our discussions with the Subcommittee staff, we understand that you are principally interested in two types of derivatives, namely "total return swaps" and a form of equity-linked note known as "certificates." Under a total return swap, two parties agree to exchange total return performance

89

(including dividend and other corporate actions) of the underlying stock, index or basket (the "underlier") in exchange for a stream of payments based on interest rates. The party that benefits from positive stock performance is referred to as the "long side," and the party that benefits from negative stock performance is referred to as the "short side." A certificate is a security under which the investor receives a payment from a non-U.S. issuer equal to the value of a "linked" underlying stock, index, or basket, and a percentage of any dividends paid on the underlier.

In the case of a total return swap, one of the elements that determines how swap payments are calculated and netted is the dividend, if any, paid on the underlier. However, it is well-established that the inclusion of an underlying dividend as part of the calculation that determines swap settlement amounts does not give rise to U.S. taxation for a non-U.S. investor on the long side of the swap. Similarly, gain from the sale or redemption of a certificate is not subject to U.S. taxation for a non-U.S. investor.

The Subcommittee staff has also expressed an interest in stock lending transactions. In a stock loan, the lender agrees to lend the security in return for collateral and a fee. The borrower on-lends or uses the security to make delivery on a short sale or to cover a broker's deficit. If the stock pays a dividend, the borrower is obligated to pay the lender what is called a "substitute dividend" equal to the amount of any dividend paid on the borrowed stock while the stock loan is outstanding (in some cases subject to fees and tax-related adjustments). Substitute dividends paid by U.S.-borrowers to non-U.S. lenders are subject to the dividend withholding tax when paid by a U.S. borrower to a non-U.S. lender. Under IRS guidance, that tax can be reduced or eliminated when the substitute dividend payment is made between a non-U.S. stock borrower and a non-U.S. stock lender, depending on the U.S. tax treaty status of the two parties. That guidance is found in IRS Notice 97-66, which was issued shortly after the IRS published regulations treating substitute dividends paid to stock lenders as U.S.-source dividend income when the underlying stock is U.S. stock.

*Equity Derivatives*

In recent years equity derivatives have become an increasingly important method of trading worldwide. Equity investors can choose between owning physical stocks or investing in financial instruments tied to the performance of those physical stocks, including total return swaps and certificates. Critically, the key decision an investor makes is whether to risk capital in the hope of obtaining an investment return from the price movement of the underlier. Only after making this threshold investment decision does the investor confront the issue of the best means by which to put such capital at risk.

Morgan Stanley's involvement in swaps dates back at least into the 1990s. Our overall global swaps business involves onshore and offshore counterparties. Those counterparties take both long and short positions on U.S. and non-U.S. stocks, baskets or indices. Some of the underliers pay dividends and others do not. I will refer to the subset of swaps the Subcommittee has focused on – long swaps by non-U.S. clients on single-name U.S. dividend-paying underliers – as "swaps" in my comments today and in response to your questions, but, so there is no misunderstanding, the swaps I am referring to are a small subset of our overall global swaps business.

90

There are a variety of reasons why many equity investors now choose to transact via swap. One potential motivating factor is margin: leveraged purchases of physical securities in U.S. markets are governed by formal margin rules that generally limit margin borrowing to a specific percentage of the value of the securities held in the investor's margin account, while credit exposure in swaps is the subject of private agreement between counterparties. Swaps may also offer an efficient way to invest in baskets or indices, or to invest in certain emerging foreign markets. There are operational efficiencies associated with transacting in swaps. For some investors there are tax benefits to investing through a swap.

Morgan Stanley's swaps desk regularly enters into swap contracts with equity investors who are motivated by one or more of these reasons. Under these contracts, where the counterparty takes a long position, Morgan Stanley will be short. However, unlike the counterparty that puts capital at risk in hope of obtaining an investment return, Morgan Stanley typically has no interest in putting capital at risk. As a result, Morgan Stanley typically hedges its exposure.

Morgan Stanley's central focus in conducting our swaps business is to ensure that a long investor in a swap actually has a swap position – not a physical ownership position in the stock underlier. We are confident that we satisfy, and historically have satisfied, tax requirements because of our policies on hedging and stock transactions with swap counterparties. With regard to hedging:

- Morgan Stanley makes no commitment to a swap counterparty as to how, or even whether, Morgan Stanley will hedge its swap position. We make no commitment to acquire or retain physical shares. We may hedge by acquiring physical shares, we may hedge through netting of swap positions that we hold with different counterparties, or we may hedge through financial instruments with third parties. We may change the form of our hedge at any time without the knowledge or consent of our counterparty.

- Morgan Stanley does not take voting instructions from any counterparty.

- The swap counterparty has no security interest in any asset Morgan Stanley may use to hedge.

- Morgan Stanley documentation clarifies that there is no principal-agent relationship between us and our swap counterparties.

With regard to stock transactions, Morgan Stanley's swaps desk will not purchase physical shares from a swap counterparty – known as "crossing in" – and will not sell physical shares to the swap counterparty at the end of a swap – known as "crossing out." Morgan Stanley's policy prohibiting crossing physical shares to or from our swaps desk when a swap is entered or terminated further ensures that a swap investor actually has a swap position that could not be recharacterized as a repurchase agreement or agency relationship (which would be taxed differently). Our policy has never permitted investors to cross in physical shares upon entering a swap and then cross shares back out to re-establish a long position when terminating the swap.

91

Until 2005, we did permit either a cross in or a cross out.[1]  We believe this policy ensured that what we considered swaps could not be recharacterized as repurchase agreements or agency relationships.  However, as part of our desire to operate our business in a conservative manner, and consistent with our business values, we moved in 2005 to eliminate crosses.  We refused to enter crossing transactions with investors with whom we had not crossed previously, and over time also reduced down to zero the existing investors whom we allowed to cross. In light of these policies, we believe that investors who wish to change from physical to swap form and then back to physical on a temporary basis over dividend dates generally prefer to transact this business with other financial institutions who, unlike Morgan Stanley, will undertake crossing trades.

The Subcommittee staff has asked us to estimate the amount of withholding taxes avoided by counterparties transacting in swap form.  We cannot do this because we have no way to know how our counterparties would have acted if swaps were not afforded the tax treatment that they are.  For example, if an offshore holder of a U.S. dividend-paying stock could not invest through a swap, it might choose to sell its stock before the dividend date and then, if it wanted to continue its exposure to the stock, repurchase it after the dividend date.  Alternatively, some offshore investors might choose to focus largely on non-dividend-paying stocks, or on non-U.S. stocks.

The Subcommittee staff did ask us to identify a subset of swaps lasting 21 days or fewer that included a cross at either the initiation or termination of the swap.  The Subcommittee staff indicated that it believed this subset of transactions could be tax-related.  We can offer some rough estimates based on those transactions.  From 2002 through 2007, Morgan Stanley paid about $46 million in substitute dividends on those swaps.  However, we know that many swaps within this subset were entered into for a range of reasons other than tax considerations.

*Certificates*

As mentioned above, certificates are another commonly-traded financial instrument.  Since at least 2000, Morgan Stanley's U.K. broker-dealer has made a market in certificates issued by non-U.S. Morgan Stanley affiliates, under which the payment at maturity is tied to the total return on an underlying stock, index or basket.  The single name stock underliers have almost exclusively been non-U.S. stocks.

Because a number of European clients wish to trade in certificate form, they approached us in 2004 and asked if we were willing to offer a certificate tied to the return of a U.S. underlier, as certain other financial institutions were doing at that time.  We agreed, establishing a conservative structure under which we hedged with derivative instruments rather than by purchasing physical shares from the certificate purchasers (or from anyone else).  Under this approach, there was no ownership by Morgan Stanley of shares that might be imputed to a certificate holder under a repurchase agreement or agency theory.  We used this structure again for a certificate issue in 2007.

---

[1]     We also allowed investors who had crossed in to cross out to cover an existing short position.  Such an investor would not be re-establishing a long position via physical ownership

4

92

The Subcommittee staff also asked about the volume of these transactions. Morgan Stanley sold about 12.9 million certificates in the 2004 issuance, and 1.1 million certificates in the 2007 issuance. In order to estimate the amount of dividend tax related to these purchases, one must assume that the purchasers would otherwise have held physical shares over the dividend date. There is no reason to believe this assumption is valid. Nonetheless, if each of the certificate purchasers had instead chosen to hold that number of physical shares, in the 2004 issuance the total dividends would have been about $40 million. Similarly, with respect to the 2007 certificates, the total dividends would have been about $11.2 million.

*Stock Lending*

I understand that the Subcommittee is also interested in the tax treatment of certain stock lending transactions. As in all of these businesses, Morgan Stanley believes it complies with the relevant laws and regulations.

As one of the world's leaders in equity financing services, Morgan Stanley is active in borrowing and lending stocks inside and outside the United States. To satisfy our clients' needs, it is critical for Morgan Stanley to have access to stock borrows in order to facilitate clients' short sale settlements and associated delivery obligations. To source such stock, we frequently make arrangements with custodians to gain exclusive access to borrow stocks from portfolios or groups of portfolios. This is a highly competitive market in which multiple brokers bid for exclusive access to these portfolios. In order to be competitive, our bids must reflect the value of all lawful uses of the stocks in the portfolios.

One such lawful use involves Morgan Stanley borrowing dividend-paying stocks and then lending them to other financial institutions over dividend dates to earn a fee. This is an intermediation business, with Morgan Stanley standing between custodial lenders and borrowers and earning a spread between the cost of borrowing and the fees generated by our on-lending.[2] At Morgan Stanley this trading is conducted by a desk in London, focused largely on non-U.S. stocks but involving some U.S. stocks as well.

Morgan Stanley believes the borrowing and on-lending it does in this regard is compliant with the applicable tax laws and regulations. Following the guidance provided by the IRS in Notice 97-66, a Morgan Stanley affiliate organized under the laws of the Cayman Islands borrows securities from custodians of asset owners organized in non-treaty countries and on-lends to other counterparties organized in non-treaty countries. Transactions with counterparties in 15% treaty jurisdictions are implemented through a Morgan Stanley affiliate organized under U.K. law and eligible for U.S.-U.K. tax treaty benefits.

The Subcommittee staff asked about the volume of stock lending transactions including payment of substitute dividends. From 2000 through 2007, the Morgan Stanley Cayman and U.K. affiliates discussed above paid about $2.4 billion in substitute dividends on U.S. stocks to lenders in trades conducted in accordance with IRS Notice 97-66. We do not have access to information concerning the taxation of actual dividends paid on this stock. Because we do not

---

[2]    Morgan Stanley currently sources stock for this transaction from third-party custodians. Until 2006, Morgan Stanley also sourced stock from a limited number of asset owners for whom Morgan Stanley itself acted as custodian.

5

93

have that information, we cannot make any estimate of the amount of withholding tax potentially avoided in connection with these transactions, or indeed whether any withholding tax has been avoided at all.

*Tax Policy Issues*

As I stated at the outset, and as I believe my testimony reflects, Morgan Stanley believes that its practices in these areas are in compliance with applicable tax laws and regulations. Morgan Stanley takes no position on what those laws and regulations should be, and we have not been involved in any discussions regarding these issues with the IRS. Nonetheless, it bears mention that many of the issues the Subcommittee is confronting arise from the fact that the tax treatment of dividends often differs from the tax treatment of alternative payments that are determined with reference to dividends. Some have suggested a comprehensive rethinking of taxation of capital investment returns to reduce the tax significance, to any investor, of whether a return is or is not a dividend. Even in the absence of fundamental change, additional guidance on structures that the IRS would either challenge or respect would be helpful, particularly for organizations like Morgan Stanley who strive to conduct our business at the conservative end of the spectrum.

This concludes my prepared remarks. I hope my testimony has been of assistance, and I will be pleased to answer any questions.

94

**WRITTEN TESTIMONY OF
DOUGLAS SHULMAN
COMMISSIONER OF INTERNAL REVENUE
BEFORE THE
SENATE COMMITTEE ON HOMELAND SECURITY AND
GOVERNMENTAL AFFAIRS'
PERMANENT SUBCOMMITTEE ON INVESTIGATIONS
HEARING ON
EQUITY SWAPS AND SECURITY LENDING**

**SEPTEMBER 11, 2008**

Good morning Chairman Levin, Ranking Member Coleman, and Members of the Subcommittee. Thank you for the opportunity to appear before you today to discuss an issue of great interest both to the Internal Revenue Service (IRS) and to this Subcommittee – the practice of using certain financial instruments to reduce or eliminate the U.S. withholding tax that applies to payments of dividends on U.S. stocks to foreign persons.

Let me reiterate what I have told this Subcommittee previously. I have made international issues a top priority for the IRS for my five-year tenure as Commissioner. Previously, I discussed broad themes and specific examples of the IRS' investigations of offshore activities.

For the past several years, the IRS has also been investigating the issues that are the subject of this hearing. I am pleased to report on the current status of our efforts. Let me also reiterate our appreciation for the support of the Members of this Subcommittee.

The transactions that the IRS and this Subcommittee are examining are extremely complex, often involving multiple taxpayers, some of whom are foreign citizens located outside the United States. Some of these transactions are conducted offshore between counterparties that are both foreign entities, raising difficult jurisdictional questions.

With the growing complexity and sophistication of our financial markets, the tax treatment of derivatives has become an increasing area of focus for the IRS, and we appreciate this Subcommittee's work on these issues.

This morning, I would like to describe some of the transactions we are now seeing. I will then describe what we are doing to respond, and finally, I will discuss some of the obstacles we are seeing as we move forward on these issues.

95

**Background**

Unlike U.S. persons, who are subject to U.S. tax on their worldwide income, foreign persons are generally subject to U.S. tax only on their U.S. source income. Income of a foreign person that is effectively connected with the conduct of a trade or business in the United States is taxed generally in the same manner as income of a U.S. person. For example, if a foreign citizen directly operates an auto repair business in this country, he or she is responsible for paying Federal income tax on the income earned in the United States from that business, just like a U.S. citizen.

Special tax rules apply to passive investment income received by a foreign person. A foreign person's U.S. source income that is not effectively connected with a U.S. trade or business generally is subject to a 30-percent withholding tax on the gross amount of the payment, although there are significant exceptions to that general rule. The determination of whether a particular payment to a foreign person is subject to U.S. tax – and at what rate – is highly fact specific, due to the various statutory exemptions, regulatory rules, and exemptions or lower rates provided by tax treaties.

For example, dividends from passive investments in stocks of U.S. corporations paid to foreign persons are subject to U.S. taxation at a rate of 30 percent (unless reduced by a tax treaty) on the gross amount of the dividend. By contrast, capital gains earned by foreign persons with respect to passive investments in stocks of U.S. corporations are generally exempt from U.S. tax by statute. Furthermore, income earned by foreign residents with respect to "notional principal contracts" (such as a total return equity swap, described below) is generally considered to be from foreign sources under applicable regulations (and therefore exempt from U.S. tax), to the extent the foreign person is not engaged in a U.S. trade or business. In addition, most forms of interest paid to foreign persons are not subject to the 30-percent tax on the gross amount of the payment. This is primarily due to statutory exemptions, such as the exemptions for "portfolio interest" and for interest from U.S. bank deposits. U.S. tax treaties also often further reduce or even eliminate the withholding tax on passive investment income.

Some foreign taxpayers have attempted to structure their investments to reduce or eliminate the 30- percent withholding tax. By using certain structured financial transactions, foreign taxpayers can, under certain circumstances, earn income that is economically attributable to a U.S. source dividend payment (which would be subject to withholding tax if paid by a U.S. corporation directly to the foreign taxpayer) as some other form of income that is exempt from U.S. withholding tax. Often, various types of sophisticated financial transactions, including total return equity swaps, and securities lending transactions are used.

The following are examples of these financial transactions.

- Total Return Equity Swaps – A total return equity swap is an executory contract between two parties to exchange a series of cash flows, which derive their value from a hypothetical (or "notional") quantity of underlying stock. These contracts

96

allow one party (typically referred to as the "long" party) to achieve the same pre-tax economic effect it would have had if it had borrowed money from the counterparty (typically a financial institution) to purchase a specified block of stock.

For example, suppose a taxpayer wants to simulate the monetary benefits and burdens of owning 100 shares of X Corporation stock for a year, and suppose the X Corporation stock today is selling for $50 per share. The taxpayer could enter into a one-year contract as the "long" party with a counter-party, usually a financial institution, providing for periodic payments to be made by one party to the other, calculated in the following manner:

(1) if the X Corporation stock appreciates in value during a given quarter, then the institution will pay to the taxpayer an amount equal to that appreciation, so if X Corporation stock appreciates to $55 during the first quarter, then, at the end of that quarter, the institution will pay to the taxpayer $5 x 100 shares, which equals $500;

(2) if the X Corporation stock instead depreciates during a given quarter, then the taxpayer will pay to the institution an amount equal to that depreciation, so if X Corporation stock depreciates to $44 during the first quarter, then, at the end of that quarter, the taxpayer will pay to the institution $6 x 100 shares, which equals $600;

(3) if X Corporation pays a dividend during a given quarter, then the institution will pay to the taxpayer an amount equal to that dividend, so that if X Corporation pays a dividend of $1.50 per share during the first quarter, then, at the end of that quarter, the institution will pay to the taxpayer $1.50 x 100 shares, which equals $150; and

(4) the taxpayer will pay to the institution an amount equal to some rate, such as LIBOR, times the value of 100 shares of X Corporation stock at the beginning of the quarter. LIBOR is the London Interbank Offered Rate which is the interest rate that banks charge each other for fixed term loans. So if LIBOR is 4 percent annually, at the end of the first quarter, the taxpayer will pay to the institution 1 percent x $50 per share x 100 shares, which equals $50.

Importantly, under the total return swap contract, these periodic payments are netted. Consequently, these gross amounts do not represent the parties' actual entitlements or obligations (for example, in a bankruptcy court context), but rather they are computational inputs that calculate the net/actual commercial arrangement.

Furthermore, because of the uncertainty in the values underlying the computation (e.g., the value of the underlying stock), at the inception of the contract, the parties do not know who will make a net payment to whom.

97

Because the taxpayer does not own X Corporation stock, the taxpayer has no right to vote on corporate matters. Nevertheless, the taxpayer has synthesized the monetary benefits and burdens of leveraged ownership; that is, without investing any cash up-front, the taxpayer will gain if the value of X Corporation stock increases, will lose if the value decreases, and will benefit if X Corporation pays a dividend on its stock – just like an owner who borrows money to buy the stock outright.

There are a number of legitimate uses of swaps. However, when a taxpayer enters into a swap with the financial institution, receives a substitute dividend pursuant to the swap, and then terminates the swap and buys the stock back from the financial institution ("cross in, cross out"), taxpayers can expect the IRS to look closely at whether the holder of the swap effectively owns the security on the dividend record date and so is taxable on the dividend. This transitory divestiture of the stock is an area of particular IRS scrutiny, as will be discussed in this testimony.

- Securities Lending – Securities lending transactions are common commercial transactions of long standing in which the owner of a security "lends" the security to another person, who typically sells the security to a third person in a "short sale." The borrower must thereafter return the borrowed securities (or their equivalent) to the lender. During the time that the transaction remains open, the borrower must also pay the lender amounts equivalent to distributions (e.g., dividends), which the owner of the security is entitled to receive during the same period. In the case of stock loans, these are commonly called "substitute dividend payments."

As an economic matter, the lender still earns the same economic return as the actual owner of the shares (i.e., it receives all of the price appreciation/depreciation of the underlying security as well as the amount of any distributions). From a tax perspective, by statute, the lender typically does not recognize gain or loss upon execution of the loan. Furthermore, the lender is not entitled to treat substitute dividend payments as actual dividends (e.g., recipients of substitute dividend payments are not entitled to claim a dividends received deduction or to treat them as qualified dividend income currently subject to capital gains rates).

These transactions can involve a foreign person "loaning" dividend-paying U.S. stocks to financial institutions that can result in such foreign persons avoiding ownership of the stock on the dividend record date.

In general, the IRS considers "substitute dividend payments" made to lenders on loans of U.S. equities to be U.S. source income that is subject to withholding tax. However, recognizing that a single security can be lent multiple times (and thereby generate multiple substitute dividend payments), Notice 97-66 was issued to prevent the multiple (or "cascading") imposition of tax on an amount that is economically attributable to a single dividend distribution. The IRS is aware that

98

some taxpayers are interpreting Notice 97-66 in a manner that permits the payment of substitute dividends without the imposition of U.S. tax where such exemption is not necessary to prevent the cascading tax that the Notice was designed to prevent. The appropriateness of these positions and whether withholding tax applies in international securities lending transactions is an extremely fact-intensive determination, and does not lend itself to generalizations. IRS audits in this area are complex, and labor-intensive. We have ongoing investigations in this area and will continue to focus on ensuring that financial institutions are following the applicable rules.

**IRS Examinations**

In 2007, the IRS initiated a number of focused examinations of financial institutions with regard to the financial instruments and transactions that I described above (i.e., total return swaps and securities lending). The immediate goal of these examinations is to determine whether such financial institutions have failed in their responsibilities to withhold tax on payments made to their foreign clients who may be liable for U.S. taxes with respect to such payments.

In the course of these examinations, we have issued numerous information document requests (IDRs) requesting information related to suspicious transactions. Depending on the nature of the examination, these IDRs requested e-mails, power point presentations, promotional materials, and other documents on selected financial transactions or categories of transactions.

Under such IDRs, financial institutions are requested to review their swap and security lending transactions to produce information and correspondence about certain transactions that meet criteria that the IRS believes may reveal or may otherwise suggest the incidence of potentially suspicious transactions.

In addition to the IDRs, the IRS has taken testimony from senior executives of the financial institutions and plans to conduct further interviews during these examinations. As noted above, these are extremely complex investigations that are still ongoing.

**Analysis of Transactions**

In administering the applicable tax laws in this area, the IRS must undertake a multi-faceted analysis.

First, we are required to analyze and characterize a transaction under general tax principles (e.g., tax ownership principles). Next, we must consider whether a transaction, so characterized, is being treated by the taxpayer in a manner that comports with the technical requirements of the statute and regulations. In this context, we are evaluating how taxpayers and financial institutions structure stock sales and purchases that occur around the same time as the execution and termination of certain swap contracts. This is a complex and time-consuming process.

99

**Detection**

One of the challenges we face in dealing with international issues and specifically as we examine the transactions I described above, is that these transactions generally involve foreign persons. Because these foreign persons are not always required to file U.S. tax returns, it is often difficult to detect potential wrongdoing, but there have been some recent developments that may improve our capabilities in this area.

The IRS is benefiting greatly from information from informants that are intimately familiar with the activities of the taxpayers and the nature of the transactions. Overall, the number of informants coming forward on all issues has increased dramatically since the significant changes adopted by Congress in the Tax Relief and Health Care Act of 2006.

Finally, when we identify foreign persons who may be inappropriately avoiding U.S. tax, we are often able to gather information on those foreign individuals through our tax treaty and Taxpayer Information Exchange Agreement (TIEA) network, which I discussed at this Subcommittee's hearing on July 17, 2008.

**Challenges in Moving Forward**

The most significant challenges the IRS faces in reviewing cases such as those involving total return swaps and securities lending are the complexity of the transactions, the need to evaluate factors on a case-by-case basis, and the difficulty in examining transactions occurring outside the United States by parties located offshore.

In assessing potential liability, we must look at the fact pattern of each individual transaction and in most circumstances the analysis is fact-intensive.

Finally, the issues presented by the existing regulations and Notice 97-66 are under review by the IRS and the Treasury Department. It is disturbing whenever taxpayers manipulate the tax code in a way that is contrary to the intent of the law. Our review of the Notice will seek to determine whether it can be modified to retain the original intent – the prevention of the cascading of U.S. withholding tax on substitute dividend payments – while preventing structures created to eliminate U.S. withholding tax on substitute dividend payments.

Whether to adopt further published guidance necessitates a careful consideration of the possible ancillary effects of that guidance. We must be careful as we look at potential changes in the regulations to ensure that we are driving the proper type of behavior while not impeding legitimate business transactions. This may mean that we have to make difficult choices because changing regulations to address one problem may raise critical issues in another area.

More broadly, we must make sure that any changes do not have unintended consequences.

100

**Summary**

Mr. Chairman, let me reiterate that the IRS is carefully examining a number of cases involving the transactions that this Subcommittee has raised. We have received thousands of documents from our information document requests, which we are reviewing carefully. We have interviewed employees, outside counsel, and others to determine what they can add regarding specific financial transactions.

I cannot predict where these examinations will lead, but I hope this Subcommittee understands that despite the challenges I have discussed, we have multiple examinations ongoing.

We appreciate the interest of this Subcommittee and I thank you for the opportunity to appear before you today. I would be happy to respond to any questions that you or any Member of the Subcommittee may have.

101

*United States Senate*
*PERMANENT SUBCOMMITTEE ON INVESTIGATIONS*
*Committee on Homeland Security and Governmental Affairs*

*Carl Levin, Chairman*
*Norm Coleman, Ranking Minority Member*

# DIVIDEND TAX ABUSE: HOW OFFSHORE ENTITIES DODGE TAXES ON U.S. STOCK DIVIDENDS

## STAFF REPORT

## PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

## UNITED STATES SENATE



RELEASED IN CONJUNCTION WITH THE
PERMANENT SUBCOMMITTEE ON INVESTIGATIONS
SEPTEMBER 11, 2008 HEARING

102

**SENATOR CARL LEVIN**
Chairman
**SENATOR NORM COLEMAN**
Ranking Minority Member

## PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

**ELISE J. BEAN**
Staff Director and Chief Counsel

**ROBERT L. ROACH**
Counsel and Chief Investigator

**ROSS K. KIRSCHNER**
Counsel

**MARK L. GREENBLATT**
Staff Director and Chief Counsel to the Minority

**TIMOTHY R. TERRY**
Counsel to the Minority

**ADAM C. PULLANO**
Staff Assistant to the Minority

**MARY D. ROBERTSON**
Chief Clerk

1.26.09

*Permanent Subcommittee on Investigations*
199 Russell Senate Office Building – Washington, D.C.  20510
Telephone: 202/224-9505 or 202/224-3721
Web Address: www.hsgac.senate.gov  [Follow Link to "*Subcommittees*," to "*Investigations*"]

103

**PERMANENT SUBCOMMITTEE ON INVESTIGATIONS**
**STAFF REPORT**
**DIVIDEND TAX ABUSE:**
**HOW OFFSHORE ENTITIES DODGE TAXES**
**ON U.S. STOCK DIVIDENDS**

**TABLE OF CONTENTS**

| | | |
|---|---|---:|
| **I.** | **EXECUTIVE SUMMARY** ......................... | 2 |
| | A. Subcommittee Investigation ....................... | 2 |
| | B. Abusive Dividend Tax Transactions ................. | 3 |
| | C. Report Findings and Recommendations ............... | 10 |
| |    1. Findings ...................................... | 10 |
| |    2. Recommendations ............................. | 11 |
| | | |
| **II.** | **BACKGROUND** .................................... | 12 |
| | A. Taxation of Dividends ........................... | 12 |
| |    1. Dividends Generally ........................... | 12 |
| |    2. Dividends Paid to Non-U.S. Persons .............. | 12 |
| | B. Hedge Funds ................................... | 14 |
| | C. Equity Swaps .................................. | 16 |
| | D. Stock Loans ................................... | 19 |
| | | |
| **III.** | **SIX CASE HISTORIES OF DIVIDEND TAX ABUSE** .... | 24 |
| | A. Lehman Brothers Case History ...................... | 25 |
| |    1. Background .................................. | 25 |
| |    2. Dividend Tax Abusive Transactions ............... | 25 |
| | B. Morgan Stanley Case History ...................... | 40 |
| |    1. Background .................................. | 40 |
| |    2. Dividend Tax Abusive Transactions ............... | 40 |
| | C. Deutsche Bank Case History ....................... | 50 |
| |    1. Background .................................. | 50 |
| |    2. Dividend Tax Abusive Transactions ............... | 51 |
| | D. UBS Case History .............................. | 56 |
| |    1. Background .................................. | 56 |
| |    2. Dividend Tax Abusive Transactions ............... | 57 |
| | E. Merrill Lynch Case History ....................... | 63 |
| |    1. Background .................................. | 63 |
| |    2. Dividend Tax Abusive Transactions ............... | 64 |
| | F. Citigroup Case History .......................... | 76 |
| |    1. Background .................................. | 76 |
| |    2. Dividend Tax Abusive Transactions ............... | 77 |
| | | |
| **IV.** | **U.S. GOVERNMENT RESPONSE TO ABUSIVE** | |
| | **DIVIDEND TAX TRANSACTIONS** .................... | 83 |
| | | |
| **V.** | **ADDITIONAL MINORITY STAFF VIEWS ON THE** | |
| | **REPORT** ........................................ | 85 |

104

## U.S. SENATE
## PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

### STAFF REPORT ON

### DIVIDEND TAX ABUSE:
### HOW OFFSHORE ENTITIES DODGE TAXES ON U.S. STOCK DIVIDENDS

September 11, 2008

Each year, the United States loses an estimated $100 billion in tax revenues due to offshore tax abuses.[1]  The U.S. Senate Permanent Subcommittee on Investigations has examined various aspects of this problem, including how U.S. taxpayers have used offshore tax havens to escape payment of U.S. taxes.  This Report focuses on a different subset of abusive practices that benefit only non-U.S. persons, have been developed and facilitated by leading U.S. financial institutions, and have been utilized by offshore hedge funds and others to dodge payment of billions of dollars in U.S. taxes owed on U.S. stock dividends.

---

[1] This $100 billion estimate is derived from studies conducted by a variety of tax experts.  See, e.g., Joseph Guttentag and Reuven Avi-Yonah, "Closing the International Tax Gap," in Max B. Sawicky, ed., Bridging the Tax Gap: Addressing the Crisis in Federal Tax Administration (2006) (estimating offshore tax evasion by individuals at $40-$70 billion annually in lost U.S. tax revenues); Kimberly A. Clausing, "Multinational Firm Tax Avoidance and U.S. Government Revenue" (August 2007) (estimating corporate offshore transfer pricing abuses resulted in $60 billion in lost U.S. tax revenues in 2004); John Zdanowics, "Who's watching our back door?" Business Accents magazine, Volume 1, No. 1, Florida International University (Fall 2004) (estimating offshore corporate transfer pricing abuses resulted in $53 billion in lost U.S. tax revenues in 2001); "The Price of Offshore," Tax Justice Network briefing paper (March 2005) (estimating that, worldwide, individuals have offshore assets totaling $11.5 trillion, resulting in $255 billion in annual lost tax revenues worldwide); "Governments and Multinational Corporations in the Race to the Bottom," Tax Notes (Feb. 27, 2006); "Data Show Dramatic Shift of Profits to Tax Havens," Tax Notes (Sept. 13, 2004).  See also series of 2007 articles authored by Martin Sullivan in Tax Notes (estimating over $1.5 trillion in hidden assets in four tax havens, Guernsey, Jersey, Isle of Man, and Switzerland, beneficially owned by nonresident individuals likely avoiding tax in their home jurisdictions): "Tax Analysts Offshore Project:  Offshore Explorations: Guernsey," Tax Notes (Oct. 8, 2007) at 93 (estimating Guernsey has $293 billion in assets beneficially owned by nonresident individuals who were likely avoiding tax in their home jurisdictions); "Tax Analysts Offshore Project:  Offshore Explorations: Jersey," Tax Notes (Oct. 22, 2007) at 294 (estimating Jersey has $491 billion in assets beneficially owned by nonresident individuals who were likely avoiding tax in their home jurisdictions); "Tax Analysts Offshore Project:  Offshore Explorations: Isle of Man," Tax Notes (Nov. 5, 2007) at 560 (estimating Isle of Man has $150 billion in assets beneficially owned by nonresident individuals who were likely avoiding tax in their home jurisdictions); "Tax Analysts Offshore Project: Offshore Explorations: Switzerland," Tax Notes (Dec. 10, 2007) (estimating Switzerland has $607 billion in assets beneficially owned by nonresident individuals who were likely avoiding tax in their home jurisdictions).

105

2

Using phrases like "dividend enhancement," "yield enhancement," and "dividend uplift" to describe their products, U.S. financial institutions have developed, marketed, and profited from an array of transactions involving multi-million-dollar equity swaps and stock loans whose major purpose is to enable non-U.S. persons to dodge payment of U.S. taxes on U.S. stock dividends. In addition, many of the offshore hedge funds that have benefited from these abusive transactions appear to function as shell operations controlled by U.S. professionals who are helping them dodge U.S. dividend taxes. Six case histories illustrate the scope and nature of the offshore dividend tax abuse problem.

## I.    EXECUTIVE SUMMARY

### A. Subcommittee Investigation

The Permanent Subcommittee on Investigations has a long history of examining offshore tax abuses. Twenty-five years ago, for example, in 1983, under Chairman William Roth, the Subcommittee held landmark hearings exposing how U.S. taxpayers were using offshore banks and corporations to escape U.S. taxes.[2] More recently, in March 2001, the Subcommittee took testimony from a U.S. owner of a Cayman Island offshore bank who estimated that 100% of his clients were engaged in tax evasion, and 95% were U.S. citizens.[3] In July 2001, the Subcommittee examined the historic lack of cooperation by some offshore tax havens with international tax enforcement efforts and their resistance to divulging information needed to detect, stop, and punish U.S. tax evasion.[4]

In 2003, the Subcommittee held hearings showing how some respected accounting firms, banks, investment advisors, and lawyers had become tax shelter promoters pushing the sale of abusive tax transactions, including some with offshore elements.[5] In 2006, the Subcommittee examined six case studies illustrating how U.S. taxpayers were utilizing U.S. and offshore tax and financial professionals, corporate service providers, and trust administrators to hide assets

---

[2] See "Crime and Secrecy: The Use of Offshore Banks and Companies," hearing before the U.S. Senate Permanent Subcommittee on Investigations, S.Hrg. 98-151 (Mar. 15, 16 and May 24, 1983).

[3] See "Role of U.S. Correspondent Banking in International Money Laundering," hearing before the U.S. Senate Permanent Subcommittee on Investigations, S.Hrg. 107-84 (Mar. 1, 2 and 6, 2001), testimony of John M. Mathewson, at 12-13.

[4] See "What is the U.S. Position on Offshore Tax Havens?" hearing before the U.S. Senate Permanent Subcommittee on Investigations, S.Hrg. 107-152 (July 18, 2001).

[5] See "U.S. Tax Shelter Industry: The Role of Accountants, Lawyers, and Financial Professionals," hearing before the U.S. Senate Permanent Subcommittee on Investigations, S.Hrg. 108-473 (Nov. 18 and 20, 2003).

106

3

offshore.[6] Earlier this year, the Subcommittee held hearings showing how some tax haven banks have employed banking practices that facilitate tax evasion by U.S. clients.[7]

The Subcommittee began its investigation into offshore dividend tax abuse in September 2007. Since then, the Subcommittee has issued more than a dozen subpoenas and conducted numerous interviews of financial institution executives, tax attorneys, hedge fund managers, and others. The Subcommittee has also consulted with experts in the areas of tax, securities, and international law. During the investigation, the Subcommittee reviewed hundreds of thousands of pages of documents, including trading data, financial records, presentations, correspondence, and electronic communications. Using this information, the Subcommittee developed six case histories to illustrate the scope and nature of the problem.

### B. Abusive Dividend Tax Transactions

Offshore hedge funds and other sophisticated non-U.S. institutions and companies are active players in the U.S. stock market, often hold large volumes of U.S. stock, and are frequent recipients of U.S. stock dividends. Because many are located in tax haven jurisdictions, they are typically subject to a 30% rate of taxation on their U.S. stock dividends. It is not surprising, then, that these non-U.S. persons have sought ways to eliminate or reduce the 30% dividend tax, since to do so would provide them with significant tax savings and greater yield on their investments.

After reviewing practices at nearly a dozen financial institutions and hedge funds,[8] the Subcommittee uncovered substantial evidence that U.S. financial institutions knowingly developed, marketed, and implemented a wide range of transactions aimed at enabling their non-U.S. clients to dodge U.S. dividend taxes.[9] Using a variety of complex

---

[6] See "Tax Haven Abuses: The Enablers, the Tools and Secrecy," hearing before the U.S. Senate Permanent Subcommittee on Investigations, S.Hrg. 109-797 (Aug. 1, 2006).

[7] See "Tax Haven Banks and U.S. Tax Compliance," hearing before the U.S. Senate Permanent Subcommittee on Investigations (July 17, 2008).

[8] The financial institutions examined by the Subcommittee included Citigroup, Deutsche Bank, Goldman Sachs, Lehman Brothers, Merrill Lynch, Morgan Stanley, and UBS. The hedge funds included Angelo Gordon, Highbridge (a JPMorgan Chase affiliate), Maverick, Moore Capital, and funds managed by the financial institutions listed above. The documents produced by those entities and the interviews conducted by the Subcommittee show that the industry practices described in this Report extend beyond the specific institutions reviewed. In particular, the documents produced by the financial institutions include references to a large number of hedge fund clients.

[9] "U.S. financial institution" includes both financial institutions that are organized in the United States and U.S. branches of foreign financial institutions.

107

4

financial instruments, primarily involving equity swaps and stock loans, these U.S. financial institutions structured transactions to enable their non-U.S. clients to enjoy all of the economic benefits of owning shares of U.S. stock, including receiving dividends, without paying the tax applicable to those dividends. These structured transactions increased the amount of dividend returns obtained by some of their non-U.S. clients by 30% or more.[10]

The evidence also showed that use of abusive dividend tax transactions is widespread throughout the offshore hedge fund industry. Offshore hedge funds actively sought these abusive transactions, negotiated the terms of the arrangements with the financial institutions, and at times played one financial institution against another to elicit the largest possible tax reduction. In addition, many of the offshore hedge funds benefiting from these tax dodges did not maintain physical offices or investment professionals in their offshore locations, and instead operated primarily under the control of U.S. persons serving as the fund's general partner or investment manager. In these cases, U.S. hedge fund managers and their employees often played key roles in facilitating the offshore dividend tax abuse.

The purpose of this Report is not to condemn the use of complex financial transactions that utilize stock swaps, stock loans, or other forms of structured finance, which can be used for legitimate business purposes such as facilitating capital flows, reducing capital needs, and spreading risk. Instead, this Report attempts to identify abusive financial transactions that have no business purpose other than tax avoidance and to recommend measures to stop the misuse of structured finance to undermine the U.S. tax code.

Abusive dividend tax practices took hold in the 1990s, and have multiplied since, due to a variety of factors. These factors include the lowering of the dividend tax rate in 2003, which resulted in more companies paying dividends; the implementation of other tax code changes, such as more favorable treatment of swaps, which encouraged tax practitioners to think of ways to disguise dividend payments as swap payments to avoid the 30% dividend tax rate; the proliferation of hedge funds willing to engage in complex financial transactions; the proliferation of "dividend enhancement" products offered by financial institutions to attract and retain clients; the failure of regulators to keep track of and regulate these new products to prevent abusive practices; the general loosening of regulation and oversight of the financial industry, including with respect to offshore activities; and the

---

[10] If one is entitled, for example, to a $70 dividend and receives $100 instead, the increase is approximately 43%.

108

5

willingness on the part financial institutions, hedge funds, and their legal advisors to adopt more aggressive and abusive tax practices.

**Abusive Stock Swap and Loan Transactions.** The abusive tax products examined by the Subcommittee were primarily associated with stock swaps and stock lending transactions.[11] These transactions varied in form, complexity, and the degree to which they transgressed, distorted, or undermined current tax law.

Abusive stock swap transactions essentially involve an effort to recast a dividend payment as a swap payment in order to take advantage of the favored tax treatment currently given to swap agreements involving non-U.S. persons. Right now, under the U.S. tax code, while U.S. stock dividends paid to non-U.S. persons are generally subject to a 30% tax rate, "dividend equivalents" paid to non-U.S. persons as part of a swap agreement are not subject to any U.S. tax at all.[12]

Abusive stock swap tax transactions seek to take advantage of this disparity in tax treatment. For example, in one of the most blatant forms of this type of transaction, a few days before a stock is scheduled to issue a dividend, an offshore hedge fund sells its stock to a U.S. financial institution and simultaneously enters into a swap agreement with the financial institution, temporarily replacing its stock holdings with a swap agreement tied to the economic performance of the same stock. After the dividend is issued, the offshore hedge fund receives from the financial institution a "dividend equivalent" payment under the swap agreement equal to the full dividend amount less a fee. The fee, charged by the financial institution, is usually tied to the tax savings, and generally equals 3% to 8% of the dividend amount. The end result is that the offshore hedge fund receives 92% to 97% of the dividend amount instead of the 70% that it would have received if the 30% in taxes had been withheld. A few days after the dividend date, the offshore hedge fund terminates the swap agreement and repurchases the stock, leaving the offshore hedge fund with the same status it had before the transaction was undertaken.

This type of transaction is intended to enable the offshore client to maintain the same economic benefits (including the receipt of dividend payments) and market risks as owning the real stock, while dodging payment of tax on the dividend equivalent payments. That the offshore

---

[11] The Subcommittee also identified other financial transactions, such as equity linked certificates and certain stock option transactions using puts and calls, that were used by a few financial institutions to enable their clients to dodge U.S. dividend taxes. These transactions are discussed in brief in the case histories.

[12] Treas. Reg. § 1.863-7(b)(1).

109

6

client enters into the swap agreement for only a short period of time around the dividend period, and owns shares of the underlying stock both before and after the swap, demonstrates that this type of transaction has no purpose other than to avoid the dividend tax.

More complex variants of this transaction include a multitude of parties, longer time frames, multiple stock sales, and coordinated pricing to give the appearance of market risk and arms length dealing. These elements have been added, as offshore hedge funds and U.S. financial institutions have tried to disguise the true nature of the transactions and avoid their recharacterization by the Internal Revenue Service (IRS) as ones that are subject to dividend taxes.

Another effort to dodge payment of U.S. dividend taxes utilizes stock lending transactions. In a typical transaction, a U.S. financial institution uses an offshore corporation it owns and controls to borrow U.S. stock from an offshore hedge fund. The offshore corporation borrows the stock a few days before a dividend is issued, sells the stock, and simultaneously enters into a swap agreement with its affiliated financial institution. After receiving a tax-free "dividend equivalent" payment under the swap agreement, the offshore corporation passes the payment (now called a "substitute dividend") back to the offshore hedge fund from which it had borrowed the stock. Relying upon a misinterpretation of an IRS notice on substitute dividends, the parties then claim that no withholding of the substitute dividend payment is required and the payment can be made tax-free. A few days after the dividend payment, the offshore corporation returns the borrowed stock to the offshore hedge fund which then regains the same status as before the stock loan took place.

When this type of stock loan first began appearing, a vigorous debate erupted among legal counsel and their clients about its legitimacy. JPMorgan Chase told Morgan Stanley that the substitute dividend payment was tax-free only if someone earlier in the stock loan lending chain had paid the initial withholding. A potential client told Merrill Lynch that its legal counsel had said the stock loan works "once, maybe twice" but "repeated use, coincidentally around dividend payment time, would provide a strong case for the IRS to assert tax evasion." He observed that, "it is the repeated 'overuse', e.g. pigs trying to be hogs, that proves problematic."

**Red Flags.** The Subcommittee reviewed a wide variety of stock swap and loan transactions used to dodge payment of U.S. dividend taxes. These transactions typically contained a number of red flags signaling their abusive nature, including one or more of the following features:

110

7

- **Short-Term Transaction.** The transaction took place over a short period of time during which U.S. stockholders received a dividend distribution.

- **Dividend Payments Over 70%.** The financial institution and client reached agreement on an explicit dividend payment rate above the 70% rate normally available after application of the 30% dividend withholding tax.

- **Fees Tied to Tax Savings.** The swap or stock loan pricing and fees were tied to the amount of tax savings, measured by the dividend taxes that were not withheld.

- **Stock Replacement.** Physical shares were sold before and then reacquired after a dividend distribution, suggesting that the stock "sale" was a sham.

- **Sham Market Sales.** The financial institution and client reached a prior agreement on the sale or repurchase of U.S. stock through third parties to give the appearance of a "market sale."

- **Prevention of Risk.** The financial institution and client coordinated their stock sales and repurchase transactions to minimize or eliminate the risk of financial loss.

- **Offshore Shell Company.** In stock loan transactions, the financial institution and client inserted an offshore shell corporation into the middle of the transaction for no apparent purpose other than to create an offshore structure aimed at eliminating dividend withholding.

- **Tax Risk Limits.** The financial institution treated nonpayment of dividend taxes as a "tax risk" and set a "risk limit" on the aggregate amount of tax withholding avoidance that could be incurred by the institution.

As a result of these abusive dividend tax transactions, non-U.S. persons, including offshore hedge funds and offshore financial institutions, have dodged U.S. taxes and secured benefits that were never intended or contemplated under the U.S. tax code or the regulations and notices issued by the IRS.

**Limiting Tax Risk.** Casting further doubt on legitimacy of these transactions is the fact that a number of financial institutions and their clients took steps to protect themselves financially against the possibility that the IRS would challenge their transactions and require payment of dividend taxes that were never withheld.

111

8

One such protective measure taken by some financial institutions was to establish a limit on the amount of financial exposure that could be incurred by the institution from stock-related swaps and loan transactions in which dividend amounts were paid but no tax was withheld. To calculate their "withholding tax risk," the financial institution determined the amount of dividend tax that was not withheld as a result of the transactions it arranged, and therefore the amount that the institution might have to pay the IRS if the transactions were invalidated or recharacterized. The institution then established the level of withholding tax risk that it was willing to incur, and did not allow the amount of withholding tax avoidance to exceed that limit. For example, Lehman established an annual withholding tax risk limit of $25 million on its stock loans, later raised to $50 million; it also set a $10 million risk limit on one of its three types of swap transactions. UBS set a limit of $72 million on its stock loans, while Merrill Lynch set a limit on its stock loans equal to the first to be reached of "$50 million annual gross withholding tax elimination" or "$25 million net withholding tax (=gross withholding tax less [its] fees)." These risk limits show that each of these financial institutions was enabling clients to dodge payment of tens of millions of dollars in dividend taxes each year.

An additional protective measure against tax risk was undertaken in connection with some stock loan transactions. The Subcommittee uncovered evidence of several financial institutions that agreed to indemnify their clients against any tax liability arising out of a stock loan transaction that the institution claimed had eliminated the need to withhold dividend taxes. Lehman Brothers and Morgan Stanley, for example, each provided some clients with an indemnity agreement to cover any tax liability, penalty, or interest that the IRS might subsequently assess on substitute dividend payments under stock loan where no dividend taxes were withheld. Some of these agreements also gave the financial institution the right to take over the defense against any IRS claim, and prohibited the indemnified parties from agreeing to any tax settlement without the financial institution's written consent. In another instance, an offshore hedge fund associated with Goldman Sachs apparently insisted that Merrill Lynch provide an indemnity agreement to protect it against tax liability, and when the two parties were unable to agree on its wording, that and other factors led to collapse of a proposed stock loan transaction.

**Fees and Profits.** U.S. financial institutions offered abusive dividend tax transactions to their offshore hedge fund clients, not only to attract and retain their business, but also to profit from the fees. In one instance, for example, a Lehman Brothers employee hailed the 2004 announcement of a special dividend to be paid on Microsoft stock and

112

9

declared, "the cash register is opening!!!!" A senior Lehman official responded: "Outstanding. … Let's drain every last penny out of this [market] opportunity." The fees charged by the financial institutions for swap, stock loan, and other transactions that enabled clients to dodge U.S. dividend taxes typically included a portion of the dividend tax "savings." Morgan Stanley estimated that its 2004 revenues from its dividend-related transactions totaled $25 million. Lehman calculated that its Cayman stock lending operations produced a 2003 profit of $12 million, and projected doubling those profits the next year to $25 million. UBS estimated its 2005 profits at $5 million and predicted double that amount in 2006. Deutsche Bank stated that, in 2007, its stock loans alone had produced profits of $4 million. The direct fees earned from these transactions are, however, only one reason why financial institutions enter into them. In recent years, providing dividend enhancement has become seen as increasingly necessary to attract and retain clients.

**Lost Tax Revenues.** The IRS does not currently track abusive dividend tax transactions, so the total volume of dividend payments involved and the total amount of lost tax revenues each year are unclear. Nevertheless, the information collected by the Subcommittee indicates that the figures are substantial. For example, Morgan Stanley data indicates that, over a seven-year period from 2000-2007, its dividend tax transactions enabled clients to escape payment of U.S. dividend taxes totaling more than $300 million. An internal Lehman Brothers presentation estimates that, in 2004 alone, its transactions enabled clients to dodge payment of dividend taxes of as much as $115 million. UBS data on its stock loan transactions over a four-year period, from 2004 to 2007, indicate that its clients escaped payment of U.S. dividend taxes totaling about $62 million. Providing a different perspective, the investment manager of a group of related offshore hedge funds, Maverick Capital Management, calculated that over an eight-year period, from 2000 to 2007, it had entered into "U.S. Dividend Enhancements" with a variety of firms that enabled it to escape paying U.S. dividend taxes totaling nearly $95 million. In another example, Citigroup told the IRS that it had failed to withhold dividend taxes on a limited set of transactions from 2003 to 2005, and voluntarily paid those taxes which totaled $24 million. This figure does not take into account tens of millions of dollars in additional dividends associated with its other suspect "dividend uplift" swaps. Finally, as mentioned earlier, several of the financial institutions established dividend withholding tax risk limits that permitted each of them to conduct transactions that led to unpaid dividend taxes totaling tens of millions of dollars per type of transaction per year.

113

10

These data points encompass different periods of time, different types of transactions, and only a few of the financial institutions and offshore clients engaged in dividend enhancement transactions. So while this limited data is insufficient to extrapolate across the entire industry, it is sufficient to establish that, over the ten-year period that these abusive practices have been taking place, lost U.S. tax revenues likely reach into the billions of dollars.

**Inadequate Response.** The Department of Treasury and the IRS have failed to take effective action to stop dividend tax abuse. They have failed to publish for ten years final regulations to address abusive stock loans, failed to clarify existing regulations related to abusive equity swaps, and failed to take enforcement actions against participating financial institutions or their clients. The silence and inaction of the Treasury Department and the IRS in the face of a growing problem have encouraged the spread of offshore dividend tax abuse. Much more is needed if U.S. dividend taxes are finally to be collected from offshore stockholders.

### C. Report Findings and Recommendations

Based upon its investigation, the Subcommittee staff makes the following findings of fact and recommendations.

#### 1. Findings

(1) **Offshore Dividend Tax Abuse.** For over ten years, some U.S. financial institutions have been structuring abusive transactions aimed at enabling their non-U.S. clients to dodge U.S. taxes on stock dividends. U.S. financial institutions have developed, marketed, implemented, and profited from these abusive "dividend enhancement" transactions.

(2) **Offshore Hedge Funds.** Offshore hedge funds are frequent participants in abusive dividend tax transactions, which have become widespread in the hedge fund industry, and in too many instances, their U.S. general partners or investment managers facilitated their participation in such transactions for the express purpose of dodging U.S. dividend taxes.

(3) **Substantial Revenue Loss.** Over the last ten years, offshore dividend tax abuses have resulted in billions of dollars in lost tax revenues for the U.S. Treasury.

(4) **Inadequate Response.** The Department of Treasury and IRS have failed to take effective action to stop offshore dividend tax abuses, having failed to publish for ten years final regulations to

114

11

address abusive stock loans, failed to clarify existing regulations related to abusive equity swaps, and failed to take enforcement actions against participating financial institutions and their clients. The silence and inaction of the Treasury Department and the IRS continues to encourage the spread of offshore dividend tax abuse.

### 2. Recommendations

(1) **End Offshore Dividend Tax Abuse.**  Congress should end offshore dividend tax abuse by enacting legislation to make it clear that non-U.S. persons cannot avoid U.S. dividend taxes by using a swap or stock loan to disguise dividend payments.  This legislation should end the abuse by eliminating the different tax rules for U.S. stock dividends, dividend equivalent payments, and substitute dividend payments, and making them all equally taxable as dividends.

(2) **Take Enforcement Action.**  The IRS should complete its review of dividend-related transactions and take civil enforcement action against taxpayers and U.S. financial institutions that knowingly participated in abusive transactions aimed at dodging U.S. taxes on stock dividends.

(3) **Strengthen Regulation on Equity Swaps.**  To stop misuse of equity swap transactions to dodge U.S. dividend taxes, the IRS should issue a new regulation to make dividend equivalent payments under equity swap transactions taxable to the same extent as U.S. stock dividends.

(4) **Strengthen Stock Loan Regulation.**  To stop misuse of stock loan transactions to dodge U.S. dividend taxes, the IRS should immediately meet its 1997 commitment to issue a new regulation on the tax treatment of substitute dividend payments between foreign parties to make clear that inserting an offshore entity into a stock loan transaction does not eliminate U.S. tax withholding obligations.

115

12

## II.   BACKGROUND

### A. Taxation of Dividends

#### 1. Dividends Generally

A dividend is a distribution by a corporation of a portion of its earnings to its stockholders, with the amount to be distributed based upon the number of shares held by each stockholder. When a corporation's board of directors declares a dividend, it sets a date in the future on which persons must be listed on its books as a stockholder in order to receive the dividend. Called the "record date," it determines who is eligible to receive the dividend payment.[13] In order to be recognized as owning stock on the record date, a stockholder must have purchased the shares earlier, generally two business days before the record date. This earlier date is the "ex-dividend date."[14]

Dividends are paid by corporations in a variety of ways, most often by sending a check to a stockholder's specified address, crediting the stockholder's account at a financial institution, or reinvesting the dividend amount in the purchase of additional shares of stock. If the dividend recipient is a U.S. person, at the end of the calendar year, the payor of the dividend must send a 1099 form to the stockholder and to the IRS reporting the total amount of dividends paid to the stockholder during the year. Stockholders must report all dividends received on their tax return as part of their taxable income.[15]

U.S. stock dividends are included in the gross income of an individual or corporate taxpayer and taxed at the appropriate individual or corporate income tax rate, each of which, in 2003, reached a maximum of 35%. In 2003, Congress enacted legislation that lowered the individual tax rate on U.S. stock dividends to 15% when paid to most U.S. taxpayers.

#### 2. Dividends Paid to Non-U.S. Persons

Different rules apply to stock dividends paid by U.S. corporations to nonresident alien individuals or non-U.S. corporations, partnerships, or other entities (hereinafter referred to as "non-U.S. persons"). First, dividends paid to non-U.S. persons that are not connected with a U.S. business are subject to a tax rate of 30%, absent a tax treaty between the

---

[13] See U.S. Securities and Exchange Commission, "Ex-Dividend Dates: When Are You Entitled to Stock and Cash Dividends," at http://www.sec.gov/answers/dividen.htm.

[14] Id.

[15] See I.R.C 861(a)(2)(A).

116

13

United States and the stockholder's country of residence setting a lower rate.[16]

Second, U.S. tax law requires the 30% tax to be "deducted and withheld at the source" of the dividend payment being made to the non-U.S. person.[17] The purpose of this requirement is to ensure that the tax owed on the dividend payment is withheld and remitted to the IRS, before the dividend payment leaves the United States, since the United States is generally without authority to compel collection of U.S. taxes outside of its borders.[18] This tax withholding regime for U.S. stock dividends has been in place for decades.[19]

To ensure taxes on stock dividends are withheld in the United States and remitted to the IRS before the dividend payment leaves the country, U.S. tax law deems any person that has "control, receipt, custody, disposal, or payment of any item of income of a foreign person that is subject to withholding" to be a "withholding agent."[20] The law also deems the withholding agent "personally liable for any tax required to be withheld," and makes the withholding agent jointly and severally liable for the tax along with the non-U.S. person to whom the payment was made, if the withholding agent fails to withhold and the non-U.S. person fails to satisfy the tax liability.[21]

The law requires the U.S. withholding agent to withhold the appropriate amount of tax from the dividend payment, remit the withheld amount to the IRS, and file a 1099 form with the IRS and the dividend recipient identifying the amount withheld and the amount paid to the non-U.S. person.[22] If the withholding agent mistakenly withholds too much tax, the dividend recipient may obtain a refund from the IRS.[23]

---

[16] See I.R.C 871(a)(1)(A) and 881(a)(1); see also "United States Income Tax Treaties - A to Z," Internal Revenue Service (hereinafter "IRS"), at
http://www.irs.gov/businesses/international/article/0,,id=96739,00.html.

[17] I.R.C. 1441(a) and (b), and 1442(a).

[18] Id.

[19] The first Federal withholding statute was enacted in 1913; the first comprehensive set of IRS withholding regulations for nonresident aliens was issued in 1956. See "Tax Compliance: Qualified Intermediary Program Provides Some Assurance That Taxes on Foreign Investors are Withheld and Reported, But Can Be Improved," Government Accountability Office, Report No. GAO-08-99 (December 2007) (hereinafter "2007 GAO report"), at 6.

[20] See Department of the Treasury, IRS, "Withholding Agent," at
http://www.irs.gov/businesses/small/international/ article/0,,id=105005,00.html.

[21] See Department of the Treasury, IRS, Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities (Rev. April 2007).

[22] If the withholding agent is a non-U.S. financial institution operating outside of the United States, other rules apply, including in some cases Qualified Intermediary agreements which may

117

14

The withholding agent is generally obligated to withhold 30% of any U.S. stock dividend paid to a non-U.S. person. This 30% tax rate applies to many countries of residence, including most tax haven jurisdictions, and also applies when a non-U.S. person's country of residence is unclear.[24] Certain countries, however, have negotiated a lower tax rate with the United States, including for example, the United Kingdom, which has a 15% tax rate imposed on stock dividends received by its residents.

In 2003, the latest year with available data, about $42 billion in U.S. stock dividends were paid to non-U.S. corporations, from which only about 4.5% or $1.9 billion was withheld.[25] The U.S. Government Accountability Office has raised a number of issues related to the apparent failure to withhold sufficient U.S. taxes related to dividend and other payments sent abroad.[26]

In the transactions reviewed by the Subcommittee, U.S. financial institutions engaged in dividend-related swap and loan transactions with a variety of sophisticated non-U.S. investors, including offshore hedge funds, foreign financial institutions, certain Luxembourg mutual funds, and large institutional investors such as pension funds, insurance companies, and private equity funds. In addition, the U.S. financial institutions sometimes engaged in abusive transactions on their own behalf involving stock owned by their non-U.S. affiliates, working with other financial institutions to carry them out.

### B. Hedge Funds

Many of the abusive dividend tax transactions reviewed by the Subcommittee involved a U.S. financial institution and an offshore hedge fund. In the United States, hedge funds are lightly regulated, private investment funds that pool investor contributions to trade in U.S.

---

specify different disclosure obligations. This investigation, however, is focused on U.S. financial institutions acting as withholding agents.

[23] See IRS, Publication 515, supra note 21.

[24] Id.

[25] See 2007 GAO report, at 23-24. GAO reports that, altogether in 2003, about $293 billion in U.S. source income was paid to non-U.S. persons residing abroad. Id. at 1. Of that amount, about $200 billion was paid to non-U.S. corporations. Id. at 23. Of that $200 billion, about $42 billion consisted of U.S. stock dividends. Id. at 24. GAO does not specify what portion of the remaining $93 billion paid to non-U.S. persons other than corporations consisted of dividend payments.

[26] Id. at 4-5, 14-15, 19-24.

118

15

securities or make other investments.[27]  Most U.S. hedge funds are structured as limited partnerships, in which the general partner manages the fund for a fixed fee and a percentage of the fund's gross profits, and the limited partners function as passive investors.[28]  Some U.S. hedge funds are structured as U.S. corporations that contract with an investment manager to manage their investments.  Most U.S. hedge funds employ persons living in the United States to manage the fund's investments.

Many U.S. hedge funds are also associated with one or more offshore hedge funds, often sharing the same general partner or investment manager.  These offshore hedge funds are typically organized in a tax haven jurisdiction like the Cayman Islands which now claims to host over 10,000 hedge funds, more than any other jurisdiction in the world.[29]  Offshore hedge funds, when associated with a U.S. hedge fund, often do not maintain a physical office or employ investment professionals in their tax haven jurisdiction, but instead make use of the same U.S. investment professionals used by their U.S. counterparts.

In addition, since U.S. securities are denominated and traded in U.S. dollars, offshore hedge funds often use one or more U.S. financial institutions to act as their "prime brokers" and carry out their U.S. securities transactions.  It is these U.S. financial institutions that typically act as the hedge funds' withholding agents and arrange the abusive stock swap and loan transactions reviewed in this Report.

Most offshore hedge funds use the services of a law firm, financial firm, or corporate services provider located in their tax haven jurisdiction to keep their client lists, subscription agreements, and other

---

[27] For more information about hedge funds, please see "Tax Haven Abuses: The Enablers, the Tools and Secrecy," S. Hrg. 109-797 (Aug. 1, 2006), at 456.

[28] See Goldstein v. SEC, 451 F.3d 873, 875 (D.C. Cir. 2006); Report to Congress by Treasury, Federal Reserve, and the SEC pursuant to Section 356(c) of the Patriot Act (Dec. 31, 2002 ) (hereinafter "Report to Congress"), at 19-24 (discussing hedge funds).  Investors generally sign a "subscription agreement" specifying the investor's ownership interest in the fund, which may be in the form of shares, limited partnership interests, or ownership units.  See, e.g., Report to Congress, at 20 in footnote 67, and at 22.

[29] The Cayman Island states that approximately 10,000 hedge funds are organized within its borders, making the Cayman Islands the jurisdiction with the largest number of hedge funds in the world.  See Cayman Islands Monetary Authority, "The Navigator" Vol. 33, July 2008, License Statistics as of 30 June 2008, available at http://www.cimoney.com.ky/section/default.aspx?section=PUB&id=2082#July08_lic_stats (listing 10,037 mutual funds); Cayman Islands Monetary Authority, "Year in Review, 1 July 2006 – 30 June 2007" at 55 (stating that "Although Cayman Islands legislation refers to 'mutual funds,' the vast majority of the funds registered in this jurisdiction fall within the loose definition of a 'hedge fund.'").

119

16

records offshore, and perform administrative functions. But it is not uncommon for a hedge fund organized in a tax haven to have little more than a post office box or a one-person office in that jurisdiction, and operate on a day-to-day basis as a shell entity under the control of U.S. persons acting as its general partner or investment manager.

With respect to U.S. taxes, U.S. hedge funds organized as partnerships file 1065 informational tax returns with the IRS, and provide information about gains and losses to their partners for inclusion in the partners' individual tax returns. U.S. hedge funds organized as corporations generally file 1099 forms with the IRS reporting any payments made to their clients.[30] U.S. hedge fund clients are responsible for including any realized hedge fund gains in their taxable income.

Offshore hedge funds, on the other hand, are typically organized as foreign partnerships or corporations, operate outside of U.S. tax law, and do not file U.S. tax returns. Moreover, since most offshore hedge funds are formed in tax haven jurisdictions, they typically pay little or no tax in their home country. In 1999, the President's Working Group on Financial Markets noted that a significant number of hedge funds operated in tax havens and may be associated with illegal tax avoidance.[31]

One of the few U.S. taxes that offshore hedge funds are subject to are taxes on dividend payments related to their U.S. stock holdings. These dividend taxes are supposed to be withheld by the U.S. withholding agent before any part of the dividend payment leaves the United States. But as shown in this Report, many offshore hedge funds, with the assistance of U.S. financial institutions, participate in abusive transactions aimed at enabling them to escape payment of most or all U.S. dividend taxes.

### C. Equity Swaps

One key type of transaction used by U.S. financial institutions to help offshore clients, including offshore hedge funds, dodge payment of dividend taxes involves swaps, which are a common type of derivative. A derivative is a "bilateral executory contract with a limited term, the value of which is determined by reference to the price of one or more

---

[30] See I.R.C. § 6042(a) (on reporting dividends), § 6045 (on reporting securities transactions), and § 6049(a) (on reporting interest).

[31] Report of the President's Working Group on Financial Markets, "Hedge Funds, Leverage, and the Lessons of Long-Term Capital Management," (1999), at 41, cited in Report to Congress, at 24.

120

17

fungible securities, commodities, rates, or currencies."[32]  Essentially, it
is a "wager with respect to the change in the price or yield of an
underlier."[33]

Equity swaps are derivatives whose values are tied to the published
price of a specified stock or group of stocks.  One of the most common
forms of equity swaps, and the type most often used in abusive dividend
transactions, is a total return swap.  They are called total return swaps
because they are "agreement[s] in which one party (total return payer)
transfers the total economic performance of a reference obligation to the
other party (total return receiver)."[34]  In other words, in a total return
swap that involves an equity swap, one party (called the "long" party)
agrees to pay an amount equal to any appreciation in the stock price plus
the amount of any stock dividends paid during the term of the swap,
while the other party (called the "short" party) agrees to pay any
depreciation in the stock price plus certain fees, which usually include
an interest component.  The end result is that the swap provides the long
party with virtually all of the economic benefits and burdens of holding
stock without taking physical possession of the shares.[35]

---

[32] Staff of the Joint Committee on Taxation, Present Law and Analysis Relating to the Tax
Treatment of Derivatives (JCX-21-08) 2 (2008).

[33] Id.

[34] International Swaps and Derivatives Association, Inc., "Product Descriptions and Frequently
Asked Questions," at http://www.isda.org/educat/faqs.html (last visited Sept. 1, 2008).

[35] Recently, total return equity swaps have received heightened judicial scrutiny on the issue of
how they can be used to hide stock ownership.  The U.S. District Court for the Southern District
of New York made the following observation in a 2008 case involving a dispute over whether
certain hedge funds should have disclosed their ownership interests in CSX Corporation, a
publicly traded U.S. company, "Some people deliberately go close to the line dividing legal from
illegal if they see a sufficient opportunity for profit in doing so.  A few cross that line and, if
caught, seek to justify their actions on the basis of formalistic arguments even when it is apparent
that they have defeated the purpose of the law.  This is such a case."  CSX Corp. v. The
Children's Inv. Fund Management (UK) LLP, No. 08 Civ. 2764 (LAK), 2008 WL 2372693, at *1
(S.D.N.Y. June 11, 2008).  In the case, two hedge funds "amassed a large economic position" in
CSX "without making the public disclosure required of 5 percent shareholder and groups by the
Williams Act."  Id.  The funds had built their positions in the company using total return swaps
and argued that their swap holdings were not equivalent to stock holdings and did not require
them to disclose their ownership interests in the company.  The Court disagreed.  It examined the
swap agreements between one of the hedge funds and its counterparties which included eight
large financial institutions, Deutsche Bank AG, Citigroup Global Markets Limited, Credit Suisse
Securities (Europe) Limited, Goldman Sachs International, JPMorgan Chase Bank, Merrill
Lynch International, Morgan Stanley & Co. International plc, and UBS AG.  The Court found
that "the evidence is overwhelming that these counterparties in fact hedged the short positions
created by the [total return swaps] with [the hedge fund] by purchasing shares of CSX common
stock . . . on virtually a share-for-share basis and in each case on the day or the day following the
commencement of each swap."  Id. at *4 FN 15 and *21.  The Court stated that "[t]here are
persuasive arguments for concluding, on the facts of this case . . . that defendants beneficially
owned at least some and quite possibly all of the referenced CSX shares held by their [swap]
counterparties."  Id. at *1.  However, the Court determined it was "unnecessary to reach such a
conclusion to decide this case," holding instead that securities law "provides, in substance that

121

18

As explained earlier, a dividend paid on the stock of a U.S. company is treated as a U.S. source payment subject to taxation, since the source of the dividend is the U.S. corporation that paid it. If the dividend is to be paid to a non-U.S. person, the tax code requires the dividend tax to be withheld by the payor – the withholding agent – and remitted to the IRS.

In contrast, a swap is considered a "notional principal contract," and a 1991 regulation provides that the "source" of any payment made under that contract is to be determined according to the country of residence of the person receiving the payment, the potential taxpayer.[36] This approach is the exact opposite of the one for stock dividends, and turns the usual meaning of the word, "source," on its head – since instead of looking to the origin of the payment to determine its "source," the regulation looks to the payment's recipient. For example, if a U.S. financial institution makes a dividend equivalent payment under a swap agreement to a Cayman Island hedge fund, the tax code would normally treat that payment as a Cayman source payment not subject to U.S. withholding taxes. The result is that dividend payments made to an offshore recipient are taxed, while dividend equivalent payments made to the same recipient under a swap agreement are not.

Many offshore hedge funds and some U.S. financial institutions have sought to take advantage of the different source rules for dividend versus dividend equivalent payments, in order to eliminate U.S. withholding taxes on U.S. stock dividends. The most blatant type of transaction is as follows. Before the record date on a stock dividend payment, the offshore hedge fund sells its stock to a U.S. financial

---

one who creates an arrangement that prevents the vesting of beneficial ownership [of stock] as part of a plan or scheme to avoid the disclosure that would have been required if the actor bought the stock outright is deemed to be a beneficial owner of those shares. That is exactly what the defendants did here in amassing their swap positions. In consequence, defendants are deemed to be the beneficial owners of the referenced shares." Id. at *1-2.

[36] Treas. Reg. § 1.863-7(b)(1). Treasury defines a notional principal contract as "a financial instrument that provides for the payment of amounts by one party to another at specified intervals calculated by reference to a specified index upon a notional principal amount in exchange for specified consideration or a promise to pay similar amounts." Treas. Reg. § 1.446-3(c)(1)(i). The "specified index" refers to "(i) A fixed rate, price, or amount; (ii) a fixed rate, price, or amount applicable in one or more specified periods followed by one or more different fixed rates, prices, or amounts applicable in other periods; (iii) an index that is based on objective financial information; and (iv) an interest rate index that is regularly used in normal lending transactions between a party to the contract and unrelated persons." Id. at § 1.446-3(c)(2). A "notional principal amount" "is any specified amount of money or property that, when multiplied by a specified index, measures a party's rights and obligations under the contract, but is not borrowed or loaned between the parties as part of the contract." Id. at § 1.446-3(c)(3). Swaps tied to stock prices and dividend payments – called "equity swaps" or "equity index swaps" – are explicitly included in Treasury's definition of notional principal contracts. Id. at § 1.446-3(c)(1)(i).

122

19

institution.  The offshore hedge fund also enters into a swap agreement with the U.S. financial institution tied to the value of the stock just sold and which is timed to end soon after the dividend is paid.  The financial institution agrees to pay the hedge fund an amount equal to any price appreciation in the value of the stock plus any dividend payments during the term of the swap, while the hedge fund agrees to pay the financial institution an amount equal to any price depreciation in the value of the stock plus a fee.

The parties treat the payments to the offshore hedge fund as payments on a notional principle contract.  Because the amounts are paid to an offshore entity, the parties claim the payments are from a non-U.S. source and, therefore, tax-free.  After the dividend is paid and the financial institution makes a dividend equivalent payment to the offshore hedge fund, the swap is concluded.  In some cases, the U.S. financial institution then sells to the hedge fund an equivalent number of shares of the stock that was the subject of the swap.  Alternatively, the hedge fund may be required to reacquire the shares of stock from another institution, but arrangements may be made to ensure that it is able to pay the same, or virtually same, price as the swap's termination price.  The end result is that, soon after the swap is concluded, the offshore hedge fund regains its physical shares of stock and is in the same position as before the swap, but having pocketed a dividend equivalent without paying any tax on it.

While the financial institution and hedge fund contend that this transaction meets all of the requirements of a tax-free payment on a derivative, the transaction could also be viewed as a sham in which the financial institution simply passed through a stock dividend payment to its client under the guise of a swap payment, for the sole purpose of dodging the dividend tax.

**D. Stock Loans**

The second type of transaction used by U.S. financial institutions to enable offshore clients to dodge payment of U.S. stock dividend taxes involves stock loans.  Securities lending or stock loans are standard transactions within the securities industry, in which one party ("the lender") loans securities to another ("the borrower").[37]  In a stock lending transaction, the parties typically negotiate a fee to be paid by the borrower to the lender for the loan of the shares.  In addition, the borrower typically supplies the lender with collateral for the loan of the

---

[37] The stock loans reviewed by the Subcommittee were often governed by a standard lending agreement used for most trades in the industry, called an Overseas Securities Lending Agreement or Global Master Securities Lending Agreement.

123

20

shares. The amount of collateral provided by the borrower is typically equal to or greater than the value of the loaned securities, and may be provided in a variety of forms, such as cash, securities, or a letter of credit. If the collateral is provided in the form of cash, the lender typically agrees to make a payment to the borrower at the end of the loan reflecting not only the interest earned by the collateral over the term of the loan, but also the loan fee.

While the stock loan is in effect, title to the stock is typically transferred to the borrower. The borrower may use the stock for whatever purpose it wishes, including selling the securities, and the borrower typically controls the voting rights of the stock, and receives any dividends that are paid during the term of the loan. In the abusive transactions reviewed by the Subcommittee, as part of the loan agreement, the borrower typically agrees to pass any dividends back to the lender. The dividend payments made to the lender by the borrower are called "substitute dividend payments." [38] Under current tax law, substitute dividend payments are taxed in the same way as dividends, with the source determined by looking to the origin of the dividend.[39]

If a substitute dividend payment is made to a non-U.S. person as part of a stock loan transaction, however, U.S. tax law currently provides that the substitute dividend payment "shall be sourced in the same manner as the distributions with respect to the transferred security."[40] In other words, substitute dividend payments are treated like standard dividend payments and are sourced based upon the underlying equity. That means, if a substitute dividend payment is made with respect to a U.S. stock, that payment is considered U.S. based and is taxable, even if paid to a non-U.S. person.

The regulation creating this rule for substitute dividend payments was issued in October 1997. It was substantially similar to the rule that had been proposed by the IRS and Treasury Department five years earlier in 1992.[41] Upon its publication, tax practitioners immediately expressed concern with the wording, warning that the provisions could lead to over withholding in cases where the same shares of stock were

---

[38] A substitute dividend "is a payment, made to the transferor of a security in a securities lending transaction . . . of an amount equivalent to a dividend distribution which the owner of the transferred security is entitled to receive during the term of the transaction." Treas. Reg. § 1.861-3(a)(6).

[39] Id.

[40] Id. See also "Dividends," Department of Treasury, IRS, at http://www.irs.gov/businesses/small/international/ article/0,,id=106181,00.html.

[41] See Certain Payments Made Pursuant to a Securities Lending Transaction, 62 Fed. Reg. 53502 (Oct. 14, 1997).

124

21

lent to multiple non-U.S. parties in concurrent transactions, a common practice in stock loans. For example, if an offshore hedge fund loaned shares of a U.S. stock to another offshore entity, 30% of any dividend payment made to the offshore entity would have to be withheld by the withholding agent making the dividend payment. Some tax practitioners claimed that the 1997 regulation then required the offshore entity to withhold an additional 30% on the substitute dividend payment passed back to the initial lender, the offshore hedge fund. The result, they claimed, was that the aggregate withholding amount would be greater than the statutory tax rate of 30%. These tax practitioners expressed the concern that there would be a "cascading effect" as substitute dividend payments were made between a number of offshore entities in a lending chain, and each withheld 30% of the substitute dividend amount passed on to the next party. [42]

To resolve the concern with potential over taxation from a cascading withholding problem as described above, one month after having issued the regulation, the IRS issued Notice 97-66, in November 1997, to "clarif[y] how the amount of the tax imposed [on substitute dividend payments made by one foreign person to another foreign person] will be determined with respect to foreign-to-foreign payments."[43] In the Notice's "Summary," the IRS stated that it and Treasury "intend to propose new regulations to provide specific guidance" on this topic and this Notice was intended to fill the gap until such new regulations are promulgated.[44]

The IRS began the section on "Substitute Dividend Payments" by stating that "[t]he final regulations were adopted to eliminate unjustifiable differences between the taxation of similar economic investments."[45] The Notice then provided a formula for calculating the rate of taxation to be applied when a substitute dividend payment related to U.S. stock is made between foreign parties:

"[T]the amount of U.S. withholding tax to be imposed . . . with respect to a foreign-to-foreign payment will be the amount of the underlying dividend multiplied by a rate equal

---

[42] Specifically, if a lender in the Cayman Islands ($CI^1$) lent its securities to another Cayman Islands entity ($CI^2$), who then lent it to a third Cayman Islands entity ($CI^3$) who lent it to a U.S. financial institution. Upon receipt of the dividend, the U.S. financial institution would withhold $30 and give $CI^3$ a $70 substitute dividend payment. $CI^3$ would then be required to withhold 30%, and only pass back $49 to $CI^2$ who likewise would only pass back $34.30 to $CI^1$.

[43] IRS Notice 97-66, 1997-48 I.R.B. at 8 (Nov. 12, 1997).

[44] Id.

[45] Id.

125

22

to the excess of the rate of U.S. withholding tax that would
be applicable to U.S. source dividends paid by a U.S. person
directly to the recipient of the substitute payment over the
rate of U.S. withholding tax that would be applicable to U.S.
source dividends paid by a U.S. person directly to the payor
of the substitute payment.  This amount may be reduced or
eliminated to the extent that the total U.S. tax actually
withheld on the underlying dividend and any previous
substitute payments is greater than the amount of U.S.
withholding tax that would be imposed on U.S. source
dividends paid by a U.S. person directly to the payor of the
substitute payment."[46]

The Notice also stated: "The recipient of a substitute payment may
not, however, disregard the form of its transaction in order to reduce the
U.S. withholding tax."[47]  The Notice also stated that, based on this
formula, "substitute payments with respect to foreign-to-foreign
securities loans . . . that do not reduce the overall U.S. withholding tax
generally will not be subject to withholding tax.  For example, no
withholding tax is required in situations where transactions are entered
into between residents of the same country."[48]

This Notice and its complex formula created confusion
among financial institutions and gave rise to a variety of
interpretations.  Moreover, soon after it was issued, some U.S.
financial institutions and offshore entities began to take advantage
of the wording of the Notice to structure stock loan transactions
that they claimed eliminated all withholding tax on substitute
payments.  These financial institutions took the position that a
literal reading of the IRS notice meant that a substitute dividend
payment made between two foreign parties located in jurisdictions
subject to the same withholding rate (generally either 30% or 15%)
was not subject to any withholding tax.

With the support of some law firms that issued opinions supporting
this interpretation of the IRS notice, these financial institutions designed
stock loan structures aimed at enabling offshore hedge funds to dodge
payment of U.S. stock dividend taxes.  The first step in the structure was
that a U.S. financial institution used an offshore corporation that it
owned and controlled to borrow U.S. stock from an offshore client
anticipating a dividend.  Then the offshore corporation borrowed the

---

[46] Id.

[47] Id.

[48] Id.

126

23

stock prior to the dividend, sold the stock so that it would not have to pay the dividend itself, and simultaneously entered into a swap agreement with its affiliated financial institution. After the dividend was issued, the financial institution paid a tax-free "dividend equivalent" payment under the swap agreement to the offshore corporation which, in turn, paid the same amount (called a "substitute dividend") back to the offshore client from which it had borrowed the stock. According to the theory the financial institutions adopted, no withholding of the substitute dividend payment was required because the substitute dividend payment was between two foreign parties located in jurisdictions subject to the same withholding rate. In short, the claim was that the substitute dividend payment, like the dividend equivalent payment under the swap agreement, was tax-free.

As this interpretation of the IRS notice became more widespread, the use of such stock loan structures to dodge U.S. dividend taxes mushroomed. Financial institutions such as Morgan Stanley and UBS established offshore corporations in Jersey and the Cayman Islands specifically for the purpose of transacting stock loans to achieve "dividend enhancement."

The problem, however, is that this interpretation of the 1997 Notice stands the Notice on its head. The IRS issued the notice to eliminate the possibility that withholding on substitute dividend payments by foreign parties would exceed the statutory withholding rate of 30%. Now the same Notice is being used to establish a zero withholding rate. This interpretation was never intended by the IRS.[49]

In addition, this interpretation of the notice was rejected by some major law firms and financial institutions. When Morgan Stanley offered a Cayman Island loan transaction to JPMorgan Chase, for example, JPMorgan Chase replied in an electronic communication that, "JPMorgan Chase's interpretation of the US securities lending regulations and Notice 97-66 (intended to solve the 'cascading withholding tax' issue) is that some form of proof of withholding is required."[50] It stated further that "the ability to rely on the notice requires some showing of actual withholding." Before agreeing to enter into a stock loan agreement, JPMorgan Chase asked Morgan Stanley for a representation that "appropriate U.S. taxes have been withheld" and an agreement to indemnify JPMorgan Chase for any dividend withholding taxes that may be assessed by the IRS.[51] Morgan Stanley "has no reason

---

[49] Subcommittee staff interview with IRS (Aug. 18, 2008).

[50] Email from JPMorgan Chase to Morgan Stanley, Re: MSIL Lending (Jan. 9, 2002), MS-PSI* 020806-07.

[51] Id.

127

24

to believe it did not enter into an indemnification agreement with JPMorgan Chase on the terms of the draft," however they "have not been able to locate the signed agreement."[52]

Despite differing interpretations of Notice 97-66, increased use of abusive stock loan transactions based on the Notice, and the IRS' 1997 commitment to provide clarification on the tax treatment of substitute dividend payments between foreign parties, no clarifying guidance has been issued over the course of the following ten years. In the absence of this guidance, the conflicting interpretations of the Notice have not been resolved, and abusive dividend transactions using stock loans between foreign parties have become widespread.

The fact that the IRS has failed to take decisive action to stop these abusive stock loan transactions over this long period of time has led some financial institutions to claim that the IRS has lost the authority to challenge them. Sometimes referred to as the "Wall Street Rule," some within the financial industry assert that the "IRS cannot attack the tax treatment of any security or transaction if there is a long-standing and generally accepted understanding of its expected tax treatment."[53] Neither the IRS nor the courts have ever accepted this doctrine, however, in part because there are established ways to obtain the IRS' analysis of a transaction, such as by requesting an IRS ruling. To the Subcommittee's knowledge, the first financial institution to make such a request is Lehman Brothers, which sent a letter to the IRS making the request in the summer of 2008.

## III. SIX CASE HISTORIES OF DIVIDEND TAX ABUSE

To illustrate the abusive practices used to dodge U.S. stock dividend taxes, the Subcommittee conducted an in-depth examination of six case histories involving a variety of participants and a variety of transactions over the last ten years. They focus on transactions devised and carried out by Lehman Brothers, Morgan Stanley, Deutsche Bank, UBS, Merrill Lynch and Citigroup. The case studies are intended to provide an illustrative, rather than comprehensive, overview of the dividend tax abuse problem, providing evidence of the many methods employed to undermine dividend tax collection, the key role played by U.S. financial institutions in enabling non-U.S. persons to dodge U.S. dividend taxes, the competitive pressures to offer these transactions and

---

[52] Email from Morgan Stanley's legal counsel (Sept. 10, 2008).

[53] Emily A. Parker, Acting Chief Counsel, IRS, Remarks at the TEI/LMSB Financial Services Industry Conference (Sept. 22, 2003), available at http://www.irs.gov/pub/irs-utl/tei-92203.pdf.

128

25

their widespread use among non-U.S. clients, the volume of dividend payments and unpaid taxes involved, and the steps that must be taken to put an end to this entrenched offshore tax abuse.

### A. Lehman Brothers Case History

#### 1. Background

Lehman Brothers Holding Inc. (Lehman Brothers or Lehman) is an international investment bank that is headquartered in New York City, has 36 foreign offices,[54] and employs over 28,000 people worldwide.[55] At the end of its 2007 fiscal year, Lehman reported $691 billion in assets and net income of $4.2 billion.[56] Lehman is organized into three major segments: Capital Markets, Investment Banking, and Investment Management.[57] Its subsidiaries include Lehman Brothers Inc., Neuberger Berman LLC, and Neuberger Berman Management Inc.,[58] which are registered as broker dealers with the SEC.[59] Lehman provides prime brokerage services for many offshore hedge funds through its Capital Markets Prime Services group.[60] Richard S. Fuld, Jr. serves as Lehman Brothers' Chairman and Chief Executive Officer.[61]

#### 2. Dividend Tax Abusive Transactions

From at least 2000 until the present, Lehman Brothers has developed, marketed, and implemented a variety of transactions, using both swaps and stock loans, aimed at enabling offshore clients to dodge U.S. dividend taxes. Lehman once estimated that, in 2004 alone, its transactions enabled its clients to dodge payment of dividend taxes of as much as $115 million.

**Product Offerings.** Lehman Brothers has employed a variety of products to enable its offshore hedge fund clients to dodge U.S. dividend taxes. These products include three swap transactions called the Single Equity Swap (terminated in 2004 and a revised version, called the "Single Stock Swap," was introduced in 2005); Contract for Differences

---

[54] http://www.lehman.com/who/offices/Americas.htm.

[55] Lehman Brothers Holding Inc., Annual Report on Form 10-K for the Fiscal Year Ended Nov. 30, 2007 at 14 (2008).

[56] Id.

[57] Id. at 3.

[58] Id. at 8.

[59] Id. at 10.

[60] Id. at 6.

[61] Id. at 142.

129

26

("CFD" terminated with respect to U.S. stocks in 2004);[62] and the Lehman Performance Swap ("LPS" or Lehman Portfolio Swap); and two stock lending transactions called the Cayman Islands Trades or "Cayco" trades.[63]

With respect to the swaps, the single stock swap operates as a total return swap. The LPS is a swap which references a basket of equities and allows for the addition and subtraction of equities into the basket without termination of the swap agreement. The CFD is a long-term swap that operates under an annex to the standard swap agreement. It references individual securities, but offers reporting, valuation, and other operational features that aggregate each holding with other holdings across a client's account and provides reports in a fashion similar to the way ownership of a security would be displayed.[64] Lehman managed some of these transactions through its "Yield Enhancement Desk," which is part of its Equity Finance Group. It appears that Lehman formalized its swap "enhancement" program in May 2000, when it issued guidelines for equity swaps performed with offshore clients. At the time of issuance, an official in the Equity Finance Group wrote: "To the extent that we are to offer pricing to enhance a client' US [dividends], Richard or I should be involved in the process. This should be viewed as a service that we expect to be paid for, and receive incremental business for."[65]

The Lehman stock lending transactions were designed to exploit the wording of IRS Notice 97-66, which a number of financial institutions interpreted to mean that substitute dividend payments between two foreign parties subject to the same withholding rate were not subject to any withholding taxes at all. Lehman Brothers used a Cayman Island corporation, called Lehman Brothers Equity Finance (Cayman) Ltd., as the borrower in the trades. This corporation, however, was a shell that had no physical office in the Caymans, no Cayman employees, and little more than an address at the infamous Ugland House. Instead, the trade operations were conducted through a

---

[62] While Contract for Differences is a generic name for a derivative product in many markets throughout the world, including the United Kingdom, the CFD discussed here is a specific Lehman Brothers swap product that referenced a U.S. stock.

[63] See Lehman Brothers, The Power of Synthetics (undated), Bates No. LBHIPSI00012296-320. The Subcommittee's review indicates that these products were used often, but not exclusively, for dividend tax abuse purposes.

[64] Id.

[65] Email from Jeffrey S. Dorman, Lehman Brothers, to Bruce Giedra, Richard G. Story, and David Crowe, copying Howard Blechman, all Lehman Brothers, RE: Equity Swaps, Bates No. LBHIPSI00039837-40 (fourth email from top).