# Exhibit 45

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
MASTER DOCKET 18-MD-2865(LAK)

_____
                                    )
IN RE:                              )
                                    )
CUSTOMS AND TAX ADMINISTRATION OF   )
THE KINGDOM OF DENMARK              )
(SKATTEFORVALTNINGEN) TAX REFUND    )
SCHEME LITIGATION                   )
                                    )
_____)


C O N F I D E N T I A L


VIDEO DEPOSITION OF
DORTHE PANNERUP MADSEN
Copenhagen, Denmark
Thursday, September 30, 2021


Reported by: CHRISTINE MYERLY

CONFIDENTIAL
Dorthe Pannerup Madsen - September 30, 2021

7 (Pages 22 to 25)

Page 22

1  March 2014, right?
2          MR. OXFORD:  Objection to form.
3          A      Yes, the few members of staff that
4  were left.
5  BY MR. DULBERG:
6          Q      When you took over, did you become
7  aware of a number of problems related to SKAT's
8  administration of dividend withholding tax?
9          MR. OXFORD:  Objection to form.
10         A      What are you referring to
11 specifically?
12 BY MR. DULBERG:
13         Q      We can circle back to that in a
14 bit. At any point prior to her retirement, did
15 Ms. R☐mer talk to you about any problems or
16 challenges related to dividend withholding tax?
17         MR. OXFORD:  Objection to form.
18         A      As I said earlier, I got no --
19              (Danish clarification.)
20         THE INTERPRETER:  Hang on one moment,
21 please.
22              (Danish clarification.)
23         THE INTERPRETER:  I was just asking about
24 a word I said just -- I translated this with
25 "information" earlier, and it is maybe better to use

Page 23

1  information of substance. What the witness did say
2  was, "I did mention earlier that I was given no
3  information of substance on this issue."
4  BY MR. DULBERG:
5          Q      This issue meaning dividend
6  withholding tax?
7          MR. OXFORD:  Objection to form.
8          A      Correct.
9  BY MR. DULBERG:
10         Q      From anyone?
11         A      Not from a single person.
12         Q      Did that surprise you?
13         MR. OXFORD:  Objection to form.
14         A      Yes. But Lisbeth R☐mer had
15 already retired.
16 BY MR. DULBERG:
17         Q      How do you explain the fact that
18 you received no substance or information about
19 dividend withholding tax before you were asked to
20 lead that group?
21         MR. OXFORD:  Objection to the form.
22         A      Well, I can't explain that. I was
23 just asked to be responsible for those members of
24 staff and handle the transfer of tasks from Hoeje
25 Taalstrup to Jutland.

Page 24

1  BY MR. DULBERG:
2          Q      Did you ever discuss with
3  Ms. R☐mer the problem that SKAT did not have enough
4  employees working on dividend withholding tax?
5          MR. OXFORD:  Objection to form.
6          A      No, we did not discuss that.
7  BY MR. DULBERG:
8          Q      Can you turn in your binder to
9  Exhibit 3981. Is this an e-mail you received from
10 Ms. R☐mer in November 2013?
11         A      Correct.
12         Q      She wrote, "We are very vulnerable
13 with only one person on refunds and dividend tax
14 respectively." Do you see that?
15         MR. OXFORD:  Objection.
16         A      Yes, I see that.
17 BY MR. DULBERG:
18         Q      What did you understand her to be
19 saying in that sentence?
20         MR. OXFORD:  Objection to form.
21         A      We had challenges when it came to
22 entering in the declarations that we received. So,
23 Lisbeth and I would bring paper declarations with us
24 on the train when we traveled to Jutland. And then
25 employees, staff, under Kaj Steen would then enter

Page 25

1  the information into the system.
2  BY MR. DULBERG:
3          Q      There was one employee responsible
4  for refunds, is that correct?
5          MR. OXFORD:  Objection to form.
6          A      Yes, one left.
7          Q      Is that Sven Nielsen?
8          A      Correct.
9  BY MR. DULBERG:
10         Q      He was the only employee
11 responsible for processing requests for refund of
12 dividend withholding tax between 2013 and 2015?
13         MR. OXFORD:  Objection to form.
14         A      Yes. Towards the end of 2014 and
15 the beginning of 2015, we started training staff in
16 taking over this task. And those members of staff
17 came from Kaj Steen.
18 BY MR. DULBERG:
19         Q      Were those members of staff
20 processing reclaim requests before August 2015?
21         A      Yes, we started training --
22 training them towards the end of 2014.
23         Q      Before you started training the
24 additional staff, the only person responsible for
25 processing reclaim requests was Sven Nielsen?

CONFIDENTIAL
Dorthe Pannerup Madsen - September 30, 2021

8 (Pages 26 to 29)

## Page 26

1   MR. OXFORD: Objection to form.
2   A        Correct.
3   BY MR. DULBERG:
4       Q    He was responsible for processing
5   thousands of requests per year, correct?
6       A    Yes.
7       Q    Investors were requesting billions
8   of krone of refunds, correct?
9       MR. OXFORD: Objection to form.
10      A    He processed the applications,
11  yes.
12  BY MR. DULBERG:
13      Q    Those applications sought billions
14  of krone, correct?
15      MR. OXFORD: Objection to the form.
16      A    Well, in the end it turned out to
17  be quite a bit of money, yes.
18  BY MR. DULBERG:
19      Q    What did you do to -- if anything,
20  to supervise his work?
21      MR. OXFORD: Objection to form.
22      A    First of all, I reported to my
23  vice director that this was a very vulnerable area.
24  And I was told that I could not use any other
25  members of my staff on these tasks because all of

## Page 27

1   us, including both managers and staff, were to be
2   moved from Hoeje Taalstrup to Jutland.
3       So the only thing I could do was to look
4   into whether we could move any of these tasks to
5   Jutland. So, some of the tasks that we were facing
6   regarding dividend tax that would require a
7   special -- specialized skill set as a caseworker was
8   then moved away from our unit.
9   BY MR. DULBERG:
10      Q    For how long was Sven Nielsen the
11  only person responsible for processing dividend
12  withholding reclaim requests?
13      MR. OXFORD: Objection to form.
14      A    Until towards the end of 2014 when
15  we started training additional staff.
16  BY MR. DULBERG:
17      Q    How about on the other end, was he
18  the only person processing reclaim requests in 2012
19  and 2013?
20      MR. OXFORD: Objection to the form.
21      A    No. Back then there were many
22  more members of staff. I remember drafting a memo
23  that I sent to my vice director, called René Frahm
24  Jørgensen, showing that there were or at least had
25  been 12 members of staff who participated in tasks

## Page 28

1   to do with refund applications.
2   BY MR. DULBERG:
3       Q    By 2013, that number had dwindled
4   to just one, correct?
5       MR. OXFORD: Objection to form.
6       A    Yes, because SKAT became the
7   subject of severe cutbacks, which resulted in
8   dismissal of staff, and for some, they were given a
9   voluntary retirement arrangement.
10  BY MR. DULBERG:
11      Q    Now, you mentioned informing René
12  Frahm Jørgensen that dividend withholding tax was a
13  very vulnerable area, correct?
14      MR. OXFORD: Objection to form.
15      A    Correct. I did that every month.
16  BY MR. DULBERG:
17      Q    Are you referring to the monthly
18  probability checks, plausibility checks that you
19  sent him?
20      MR. OXFORD: Objection to form.
21      A    Yes.
22
23  BY MR. DULBERG:
24      Q    In addition to sending those
25  monthly documents, did you have occasion to speak

## Page 29

1   with Mr. Jørgensen about how vulnerable dividend
2   withholding tax was?
3       MR. OXFORD: Objection to form.
4       A    Yes. We talked about this on
5   several occasions, discussing the fact that this was
6   not doing -- this area was not doing that great.
7   BY MR. DULBERG:
8       Q    What did you mean when you
9   described it as vulnerable?
10      A    I was referring to the limited --
11  limited number of staff working in this area, and
12  the substantial job in front of them.
13      Q    Is it fair to say that the team
14  responsible for dividend withholding tax was
15  significantly understaffed?
16      MR. OXFORD: Objection to the form.
17      A    That is absolutely correct, but
18  management was aware of this.
19  BY MR. DULBERG:
20      Q    Management did nothing to address
21  it during your time, correct?
22      MR. OXFORD: Object to the form. Asked
23  and answered.
24      A    The only thing that was done was
25  to move the tasks to Jutland.

CONFIDENTIAL
Dorthe Pannerup Madsen - September 30, 2021

13 (Pages 46 to 49)

Page 46

1  Q    Did it increase significantly over
2  time?
3       MR. OXFORD: Objection to form.
4  A    It increased.
5  BY MR. DULBERG:
6  Q    And shortly after the end of every
7  month, you were able to calculate the amount of
8  dividend withholding tax reclaims that SKAT had paid
9  during the previous month, correct?
10 A    Correct.
11 Q    Month after month, dividend
12 withholding tax reclaim payments increased, correct?
13      MR. OXFORD: Objection to form.
14 A    Yes.
15 BY MR. DULBERG:
16 Q    Did you ever look into the
17 question of why dividend withholding tax refunds
18 kept increasing?
19 A    No.
20 Q    If you can turn to Exhibit 3984.
21 Do you recognize this e-mail chain?
22 A    Yes.
23 Q    In the very bottom e-mail, from
24 July 1, 2014, you note the amount of reimbursement
25 to foreign shareholders in dividend tax, correct?

Page 47

1  A    Yes.
2  Q    Is this in connection with the
3  monthly probability check?
4  A    Yes.
5  Q    And did you approve the reclaim
6  payments every month as an accounting function?
7       MR. OXFORD: Objection to the form.
8  A    No, I did not.
9  BY MR. DULBERG:
10 Q    Did you -- your e-mail here says
11 that you made an accounting approval, do you see
12 that?
13 A    Yes.
14 Q    What did that mean?
15 A    This means that I were to sign
16 for -- that we had reconciled where we were supposed
17 to and have provided necessary documentation.  I
18 would then go on to describe if there had been
19 special challenges, challenges with respect to
20 staff.
21      So, my local accounting approval would
22 then be passed on to central accounting approval.
23 And then it would be combined from all of the
24 offices carrying out bookkeeping and accounting.
25 And then in another office, there was a central

Page 48

1  accounting approval where they would do -- where
2  they would do analysis to see whether there were any
3  deviations, whether they be large or small.
4       Then they made -- they prepared a
5  accounting approval that would then be signed by my
6  vice director René Frahm Jørgensen and Orla
7  Kristensen, and then it would be sent on from there
8  to the ministry.  It was possible that questions
9  might come back, but they didn't.
10 Q    Questions never came to you about
11 dividend withholding tax reclaims, correct?
12      MR. OXFORD: Objection to form.
13 A    Correct.
14 BY MR. DULBERG:
15 Q    In this e-mail you note that in
16 June 2014, SKAT paid out more than 4.1 billion krone
17 to foreign shareholders up from 2.8 billion relative
18 to 2013, correct?
19      MR. OXFORD: Objection to form.
20 A    So, yes, that is correct, and that
21 is also why I asked Sven, who was a highly valued
22 member of staff who had been there for many years,
23 even under Lisbeth Rømer, asking was there special
24 reason that this was the kind of amount that we were
25 dealing with.

Page 49

1       He explained to me that a cause to this
2  could be that more U.S. pension plans were making
3  acquisitions in Danish companies, and they are not
4  liable to pay taxes in Denmark, so therefore they
5  needed substantial refunds.
6  Q    You provided that explanation to
7  René Frahm Jørgensen, correct?
8  A    Correct.
9  Q    It was not a secret that American
10 pension plans did not have to pay taxes on dividends
11 issued by Danish companies, correct?
12      MR. OXFORD: Objection to form.
13 A    Correct.
14 BY MR. DULBERG:
15 Q    Mr. Jørgensen suggested providing
16 that information that you received from Sven Nielsen
17 in the monthly accounting approval, correct?
18 A    Correct.
19 Q    He said, "It provides a good
20 causal explanation," right?
21 A    Yes, that is what he wrote.
22 Q    And you agreed with that, correct?
23 A    Correct.
24 Q    And that is what you did, right?
25 A    Correct.

Page 50

1  Q    So if we with turn to
2  Exhibit 3985, do you recognize this document?
3  A    Yes.
4  Q    And did you sign it?
5  A    Well, not -- not this one.  I did
6  sign the reconciliation form, but I would usually
7  sign the memo as well.
8  Q    What is this memo?
9  A    This is an accounting approval of
10 the month of July 2014.
11       (Danish clarification.)
12 THE INTERPRETER:  Sorry, I said July, I
13 meant to say June.
14 Q    The memo is dated July, and it
15 refers to activity in the month of June, correct?
16 A    Correct.
17 Q    And you produced these memos every
18 single month, correct?
19 A    Yes.  For several what we refer to
20 as company codes.
21 THE INTERPRETER:  I never got to translate
22 her answer back because I made a mistake with the
23 month.
24 MR. DULBERG:  Okay.  Is -- is there an
25 answer to a question that you would like to

Page 51

1  translate?
2  THE INTERPRETER:  About the memo, the
3  witness said that "this was the contribution from my
4  office to the central accounting approval."
5  Q    Got it.  And this is something
6  that you produced every single month as part of your
7  job at SKAT, correct?
8  MR. OXFORD:  Object to form.
9  A    Correct.
10 BY MR. DULBERG:
11 Q    Is this the local probability
12 control?
13 MR. OXFORD:  Objection to form.
14 A    It is the result of the local
15 probability control.
16 BY MR. DULBERG:
17 Q    Okay.  You determined that the
18 assets and liabilities were accounted for correctly,
19 right?
20 MR. OXFORD:  Objection to form.
21 A    Yes.
22
23 BY MR. DULBERG:
24 Q    That included with respect to
25 dividend withholding tax, correct?

Page 52

1  MR. OXFORD:  Objection to form.
2  A    Yes.
3  BY MR. DULBERG:
4  Q    The second bulleted point in this
5  memo says, "Failure to perform tasks," correct?
6  A    Correct.
7  Q    This is where you noted that
8  dividend tax has become very vulnerable, correct?
9  A    Correct.
10 Q    And then in the -- under the third
11 bullet, you explained that one reason for the
12 increase in dividend withholding tax reclaims may be
13 that American pension funds were making purchases in
14 Danish companies, correct?
15 A    Yes, it is the same causal
16 explanation that we went through a minute ago.
17 Q    Correct.  You stated in this
18 formal final accounting approval that American
19 pension plans do not have to pay Danish tax, and
20 therefore SKAT makes very substantial refund
21 payments to them, right?
22 MR. OXFORD:  Objection to form.
23 A    Yes.  The same explanation about
24 the cause as a minute ago.
25 BY MR. DULBERG:

Page 53

1  Q    Did you expect anyone to raise
2  questions about all of this information?
3  MR. OXFORD:  Objection to the form.
4  A    Yes, that might very well have
5  happened.
6  BY MR. DULBERG:
7  Q    What did you expect to happen in
8  response to your memos?
9  MR. OXFORD:  Objection to the form.
10 Misstates her testimony.
11 A    Well, in connection with central
12 accounting approval, there might be questions from
13 that front to us.
14 BY MR. DULBERG:
15 Q    No questions came, correct?
16 MR. OXFORD:  Objection to the form.
17 A    No.
18 BY MR. DULBERG:
19 Q    Other than your conversations
20 about the increase in refunds with René Frahm
21 Jørgensen, did you also discuss that topic with
22 anyone else at SKAT?
23 A    I did show this to Orla Kristensen
24 at one point.  He was head of the office during the
25 central accounting approval.  I showed him, I can't

Page 86

1  way back to 2008 was reviewed.
2  BY MR. DULBERG:
3      Q    Do you have an understanding of
4  why?
5      MR. OXFORD:  Same --
6      THE WITNESS:  I would like to answer.
7      MR. OXFORD:  Okay.  If that is okay with
8  your Danish lawyer.
9      A    I don't know why we were
10 investigated, and we have been unable to get an
11 explanation as to why.
12 BY MR. DULBERG:
13     Q    Do you have a transcript of any
14 conversation you had or interview you had with SØIK?
15     A    No.
16     Q    Turn back to Exhibit 3989.  In the
17 second e-mail from the top, Mr. Nielsen informs you
18 that at least based on his search, no refunds had
19 been made to any of the companies mentioned in
20 Mr. Ekstrand's e-mails, is that correct?
21     MR. OXFORD:  Object to the form.
22     A    Correct.
23 BY MR. DULBERG:
24     Q    If you could turn to Exhibit 3066.
25 You will find another calendar invitation from you.

Page 87

1  Is that right?
2      A    Yes.
3      Q    And the date here is August 3rd,
4  2015, correct?
5      A    Yes.
6      Q    And you wrote, "It has been agreed
7  that we should meet and talk about the refund of
8  dividend tax - a concrete matter."  Do you see that?
9      A    Yes.
10     Q    What did you mean by, "a concrete
11 matter"?
12     A    This was where we were to have a
13 visit from Christian Ekstrand, that he would -- he
14 would come and talk to us about the tip that they
15 had received, obviously not in detail, and that we
16 would then start finding the relevant material.
17     Q    Before the meeting with
18 Mr. Ekstrand you wanted a separate meeting with
19 Jeanette Nielsen and Sven Nielsen, correct?
20     A    I don't remember.
21     Q    Do you see the reference to that
22 meeting in the third sentence of your calendar
23 invitation?
24     A    Yes, that was because they had
25 established a task force where we were divided into

Page 88

1  groups, and we were to begin the tasks of drafting a
2  description, both of the old and new solution.
3      Q    Do you remember the meeting with
4  Jeanette and Sven Nielsen?
5      A    No.
6      Q    Are they related to each other?
7      A    No.  They are not.
8      Q    Do you remember the meeting with
9  Christian Ekstrand?
10     A    Yes, I do.
11     Q    Did you take notes at that
12 meeting?
13     A    I wrote a summary that I handed
14 over to my vice director.
15     Q    We will take a look at that in a
16 bit.  Can you turn to Exhibit 3301.  You see an
17 e-mail from René Frahm Jørgensen to Jens Sørensen,
18 copying you and Anne Munksgaard?
19     A    Yes.
20     Q    And at that time, did
21 Mr. Jørgensen report directly to Jens Sørensen?
22     A    Yes, he was our director.
23     Q    He attached -- he, Mr. Jørgensen,
24 attached your notes from the meeting with Christian
25 Ekstrand, correct?

Page 89

1      A    Correct.
2      Q    And if you turn to the attachment
3  in the three pages that follow, are these the notes
4  that you typed reflecting your meeting on
5  August 6th, 2015?
6      A    Yes.  And this was also when we
7  found the relevant section that we could apply when
8  it came to stopping payments of reclaims.
9      Q    Were you taking these notes during
10 the meeting?
11     A    Yes.
12     Q    When you mentioned the relevant
13 section, are you referring to section 69-B of the
14 Withholding Tax Act?
15     A    Yes.
16     Q    And that is Danish tax law,
17 correct?
18     MR. OXFORD:  Object to form.
19     A    Yes.  Correct.
20 BY MR. DULBERG:
21     Q    SKAT could decline to pay out
22 reclaims based on that section of Danish tax law,
23 correct?
24     MR. OXFORD:  Objection to form.
25     A    Yes.  People who knew about these

## Page 90

1  things had looked into it and said that.
2  BY MR. DULBERG:
3           Q       And you learned that SKAT could
4  make a decision to approve or to reject a reclaim
5  request based on Danish tax law, true?
6           MR. OXFORD:  Object to the form.
7  Misstates the document.
8                (Danish clarification.)
9           THE INTERPRETER:  Can I ask you to restate
10 the question, please?
11          MR. DULBERG:  Was that your request or the
12 witness's?
13          THE INTERPRETER:  Says Kirsten, the
14 interpreter.
15 BY MR. DULBERG:
16          Q       You learned that SKAT could make a
17 decision to approve or reject a request for dividend
18 withholding tax by applying section 69-B of the
19 Withholding Tax Act, correct?
20          MR. OXFORD:  Object to the form.
21 Misstates the document.
22          A       All we needed 69-B for was to stop
23 payments.
24 BY MR. DULBERG:
25          Q       Okay.  In the third paragraph of

## Page 91

1  your notes underneath the list of attendees, you
2  wrote, "There is an abuse of the double taxation
3  rules."  Do you see that?
4           A       Yes, I was told.
5           Q       Have you personally seen any facts
6  to support that conclusion?
7           MR. OXFORD:  Object to the form.
8           A       No.
9  BY MR. DULBERG:
10          Q       Are you personally aware of any
11 facts supporting the conclusion that this was a
12 fraud?
13          MR. OXFORD:  Object to the form.
14          A       No.
15 BY MR. DULBERG:
16          Q       And at the bottom of the second
17 page, do you see the line that starts, "Payment and
18 Accounting, SAP 38"?
19          A       Yes.
20          Q       It says, "Payment and accounting
21 SAP 38 Hoeje Taalstrup do not have competencies for
22 this."  Correct?
23          MR. OXFORD:  Objection to form.
24          A       Correct.
25 BY MR. DULBERG:

## Page 92

1           Q       What did that mean?
2           A       So, this was that they -- actually
3  just after, on August 7th, they established a task
4  force where they got -- where they included Johnny
5  Hansen and other heads of office, Susanne
6  Thorhauge's office, and then we were made part of
7  various groups.  Some were to work on a description
8  of the old and new process, some were to go through
9  reclaim applications where there was a suspicion of
10 fraud, some were to do analysis, some were to
11 contribute to the presentation to Jesper Rønnow
12 Simonsen.
13          And concurrently we had visits from
14 internal audit and the national audit office.  They
15 asked questions about what had happened, questions
16 about what the thinking was, and everybody was
17 looking to gather the same information.  And all of
18 them wanted the most recent information first.
19          Q       When the statement was made that
20 payment and accounting does not have competencies
21 for this, is that a reference to the inability to
22 support all of those different efforts at the same
23 time?
24          MR. OXFORD:  Object to the form.
25          A       Yes.  And because the minute you

## Page 93

1  stop paying reclaims, that generates a lot of less
2  than happy customers, and it would need a lot of
3  people to handle such communication, both over the
4  phone and e-mail.
5  BY MR. DULBERG:
6           Q       There was a lot of pressure to
7  resume reclaim payments, correct?
8           MR. OXFORD:  Objection to form.
9           A       Correct.
10 BY MR. DULBERG:
11          Q       Please turn to Exhibit 3069.  Do
12 you see the e-mail in the middle of the page from
13 René Frahm Jørgensen, that copies you, among other
14 people?
15          A       Yes.
16          Q       In the second paragraph,
17 Mr. Jørgensen notes that SKAT has stopped all refund
18 payments, do you see that?
19          A       Yes.
20          Q       And he says here, "I believe we
21 need to change course, as we are already seeing
22 pressure from banks, companies, et cetera, that are
23 moving for payment."  Correct?
24          A       Yes.
25          Q       And how did SKAT respond to that

CONFIDENTIAL
Dorthe Pannerup Madsen - September 30, 2021

37 (Pages 142 to 145)

Page 142

1    A     I have no recollection of that.
2    BY MR. DULBERG:
3    Q     While you were supervising
4    dividend tax, did you ever think about the issue of
5    beneficial ownership?
6          MR. OXFORD: Object to the form.
7    A     No.
8    BY MR. DULBERG:
9    Q     Do you know if Sven Nielsen ever
10   thought about the issue of beneficial ownership?
11         MR. OXFORD: Objection to the form.
12   A     I cannot answer that question.
13   BY MR. DULBERG:
14   Q     In August of 2015, roughly, how
15   many employees were responsible for reviewing
16   reclaim applications?
17         MR. OXFORD: Objection to the form. You
18   mean before the fraud was discovered or afterwards,
19   Drew? When in 2015 -- when in August 2015, I should
20   say?
21   BY MR. DULBERG:
22   Q     Before the reclaim payments were
23   stopped, how many employees were responsible for
24   reviewing applications seeking withheld dividend
25   tax?

Page 143

1    A     The five who were in training and
2    Sven, six.
3    Q     And do you have any understanding
4    of whether that has changed since August 2015?
5          MR. OXFORD: Objection to form.
6    A     I have been sent home. I have no
7    knowledge about what has happened in SKAT in this
8    area.
9    BY MR. DULBERG:
10   Q     Did you tell the parliamentary
11   commission that you did not feel like the right
12   person to be responsible for dividend refunds due to
13   your qualifications?
14         MR. OXFORD: Object to the form.
15   A     Yes.
16   BY MR. DULBERG:
17   Q     That was a true statement, right?
18   A     Yes.
19   Q     Did you tell the commission you
20   did not know enough about dividend refunds during
21   the time that you were in charge of dividend tax?
22         MR. OXFORD: Object to the form.
23   A     What I said was that I was put in
24   charge of moving the task to Jutland, and my job was
25   not to delve into the subject matter from a

Page 144

1    technical standpoint because it was on the way of
2    moving from one place to another.
3    BY MR. DULBERG:
4    Q     Your focus as a manager was
5    transitioning from one place to a different place,
6    right?
7    A     Correct.
8    Q     Did you tell the commission that
9    René Frahm Jørgensen deleted all of his e-mails?
10         MR. OXFORD: Object to the form.
11   A     No.
12   BY MR. DULBERG:
13   Q     Do you know whether René Frahm
14   Jørgensen deleted his e-mails in August of 2015?
15         MR. OXFORD: Object to the form.
16   A     I have no knowledge about that.
17   BY MR. DULBERG:
18   Q     How about September 2015?
19         MR. OXFORD: Object to the form.
20   A     I do not know. I know that there
21   was a safety copy made of all of mine.
22         MR. DULBERG: Thank you, Ms. Madsen, at
23   this time I have no further questions.
24         MR. OXFORD: Let's go off the record.
25         THE WITNESS: Thank you. Have a nice day.

Page 145

1          THE VIDEOGRAPHER: Standby. The time is
2    11:43 a.m. New York time. We are going off the
3    record.
4          (Off the record.)
5          THE VIDEOGRAPHER: The time is 12:37 p.m.
6    New York time and we are back on record.
7                    EXAMINATION
8    BY MR. OXFORD:
9    Q     Good afternoon, Ms. Madsen, I am
10   Neil Oxford, as you know I represent SKAT in this
11   matter. I just want to ask you a few follow-up
12   questions based on your testimony earlier today.
13         You told us that you supervised
14   Mr. Nielsen from March 2014, correct?
15   A     Correct.
16   Q     Was Mr. Nielsen a hard-working
17   employee?
18   A     Yes.
19   Q     Was Mr. Nielsen a competent
20   employee?
21   A     Yes.
22   Q     Was Mr. Nielsen someone you
23   trusted?
24   A     Yes.
25   Q     Was Mr. Nielsen the right person

CONFIDENTIAL
Dorthe Pannerup Madsen - September 30, 2021

39 (Pages 150 to 153)

Page 150

1     (Exhibit 4006 was marked for identification.)
2     A    I do recognize this.
3     Q    Is this the list of controls and
4  procedures that your team prepared in connection
5  with the review of dividend withholding tax refund
6  applications?
7     A    Yes.
8     Q    Was it your understanding that
9  Mr. Nielsen and his team applied these procedures in
10 reviewing each and every dividend withholding tax
11 refund application during the time he reported to
12 you?
13    A    Yes.
14    MR. DULBERG:  Objection.
15 BY MR. OXFORD:
16    Q    You have a binder in front of you.
17 Can I ask you to turn to Exhibit 4003.  This should
18 be the e-mail exchange between you and Mr. Orla
19 Kristensen that Mr. Dulberg asked you about.  Do you
20 have that document?
21    A    Yes.
22    Q    Mr. Dulberg asked you about a
23 statement at the top of the page that says
24 something -- withdrawn.  Mr. Dulberg asked you about
25 a statement four lines down from the top of the

Page 151

1  page, "It is not your fault, it is the system's."
2  Do you see that?
3     THE WITNESS:  Yes.
4     Q    Do you remember the questions that
5  Mr. Dulberg asked you about that?
6     A    Yes.
7     Q    Is it correct that these words I
8  have just mentioned, "It is not your fault, it is
9  the system's," those are Mr. Kristensen's words,
10 correct?
11    A    Yes, these are all his words.
12    Q    They are not your words?
13    A    No, not my words.
14    Q    By the time you were sent home in
15 2015, Ms. Madsen, had you learned how the fraud was
16 carried out?
17    MR. DULBERG:  Objection.
18    A    Not in details, but fake
19 applications and documentation had been submitted.
20 BY MR. OXFORD:
21    Q    Do you have any knowledge about
22 any system SKAT could have put in place to prevent
23 the fraud?
24    MR. DULBERG:  Objection.
25    A    No, not to my knowledge.

Page 152

1  BY MR. OXFORD:
2     Q    Do you have any knowledge about
3  any resources SKAT could have spent to prevent the
4  fraud?
5     MR. DULBERG:  Objection.
6     A    No.
7  BY MR. OXFORD:
8     Q    Mr. Dulberg also asked you about
9  some monthly accounting approvals that you prepared
10 and signed, do you remember that?
11    A    Yes.
12    Q    In particular, it is Exhibit 394
13 if you need to look at it.
14    THE INTERPRETER:  394?
15    Q    Sorry, 3984.
16    A    Got it.
17    Q    Actually, I may have the wrong
18 exhibit.  You don't need to have 3984 in front of
19 you.  Let me just clear up the record.
20    Mr. Dulberg asked you about the monthly
21 accounting approvals that you prepared.  Do you
22 remember that topic?
23    A    Yes.
24    Q    And he asked you about some
25 language in those reports that describe the dividend

Page 153

1  withholding tax unit as vulnerable?
2     A    Yes.
3     Q    Did you mean, by using that word,
4  that you considered that SKAT was vulnerable to
5  dividend withholding tax fraud?
6     A    No.
7     Q    What did you mean when you used
8  the phrase, "vulnerable in those approvals"?
9     A    I meant that there were very few
10 employees and that Sven was handling the refund
11 applications.  I worried what would happen if he
12 were to fall ill.  We had nobody to put in his
13 place.
14    Q    Mr. Dulberg also asked you if you
15 considered the monthly accounting approvals you
16 prepared to be a warning.  Do you remember those
17 questions?
18    A    I do remember the question.  I
19 remember this as a status of the work situation at
20 the end of that month.
21    Q    So, is it fair to say that you did
22 not consider, Ms. Madsen, your monthly accounting
23 approvals to be a warning to anyone at SKAT?
24    MR. DULBERG:  Objection.
25    A    No, it was not a warning.

Page 162

1  BY MR. DULBERG:
2      Q     Those are the only items under the
3  heading "Verification of Application," correct?
4      MR. OXFORD:  Object to the form.
5      A     Yes.  But there is also control
6  and reconciliation of amount.
7  BY MR. DULBERG:
8      Q     And the reference to control means
9  that the amount of repayment has been calculated
10 correctly in relation to the relevant double
11 taxation convention, correct?
12     MR. OXFORD:  Object to the form.  You are
13 misstating the document, Drew.
14     A     Yes.
15 BY MR. DULBERG:
16     Q     And then the amount had to be
17 calculated correctly based on the documents
18 supporting it, right?
19     MR. OXFORD:  Objection to form.
20     A     Correct.
21 BY MR. DULBERG:
22     Q     Nowhere in this guide does it say
23 anything about beneficial ownership, correct?
24     MR. OXFORD:  Objection to form.
25     A     It does not, correct.

Page 163

1  BY MR. DULBERG:
2      Q     Nowhere in this guide does it say
3  anything about whether the shareholder had purchased
4  the shares from a borrower of securities, correct?
5      MR. OXFORD:  Object to the form.
6      A     No, it does not.
7  BY MR. DULBERG:
8      Q     It also doesn't ask whether the
9  shareholder had loaned his shares or her shares,
10 correct?
11     MR. OXFORD:  Object to the form.
12     A     No.  But that was not something
13 for us to control.
14 BY MR. DULBERG:
15     Q     It also doesn't ask or include
16 some means of figuring out whether the applicant had
17 sought a refund for the same shares that a different
18 applicant had also sought a refund for, right?
19     MR. OXFORD:  Objection to the form.
20     A     Correct.
21 BY MR. DULBERG:
22     Q     And so the task that Mr. Nielsen
23 was carrying out was making sure that the right
24 papers were in the envelope and that the math was
25 done correctly, is that fair?

Page 164

1      MR. OXFORD:  Objection to form.  You are
2  mischaracterizing what is at least a three-page
3  document.
4      A     I would say that that is a
5  somewhat glib characterization of the job he did,
6  which I feel was done correctly.
7  BY MR. DULBERG:
8      Q     Under section 6 of this exhibit,
9  at the bottom, it says, "The reporting in 3-S
10 ensures that the total payment does not exceed the
11 total declared dividend tax."  Do you see that?
12     A     Correct.
13     Q     And then it says, "However, due to
14 a system error in 3-S, it is not possible to carry
15 out this check in all cases."  Correct?
16     A     Correct.  This was a system error
17 that had been reported to the relevant office and
18 they were working on it.
19     Q     Did you know at any time during
20 your employment by SKAT that SKAT had paid out more
21 in withholding tax than it had collected in
22 connection with certain dividend distributions?
23     MR. OXFORD:  Object to the form.
24     A     No, I did not know.
25 BY MR. DULBERG:

Page 165

1      Q     You were speaking with Mr. Oxford
2  about your understanding of the alleged fraud, and
3  you mentioned fake documentation.  Do you recall
4  that?
5      A     Yes.
6      Q     Sitting here today, can you
7  identify which documents were allegedly fake?
8      MR. OXFORD:  Objection to form.
9      A     I cannot tell the difference
10 between a right one and a fake one.
11 BY MR. DULBERG:
12     Q     Do you know the type of document
13 that you understand to have been false or
14 fraudulent?
15     A     No, I do not know.
16     Q     And you don't know one way or
17 another whether in fact U.S. pension plans submitted
18 false documents to SKAT, right?
19     MR. OXFORD:  Objection to form.
20     A     No, I have no knowledge about
21 that.
22     MR. DULBERG:  I have nothing further.
23
24
25