```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
2                    MASTER DOCKET 18-MD-2865(LAK)
                       CASE NO. 18-CV-09797
3

     _____
4                                        )
     IN RE:                              )
5                                        )
     CUSTOMS AND TAX ADMINISTRATION OF   )
6    THE KINGDOM OF DENMARK              )
     (SKATTEFORVALTNINGEN) TAX REFUND    )
7    SCHEME LITIGATION                   )
                                         )
8    _____)

9

10

11

12

13

14       REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

15                    EXAMINATION OF

16                    SHAHAB HASHEMI

17                DATE: October 7, 2021

18

19

20

21

22

23

24

25          REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

CONFIDENTIAL
Shahab Hashemi - October 7, 2021

```
 1              P R O C E E D I N G S
 2  S H A H A B   H A S H E M I,
 3          called as a witness, having been first
 4  duly sworn according to law, testifies as follows:
 5                  * * * * * *
 6  EXAMINATION BY MR. OXFORD:
 7      Q    Good morning.
 8          I guess it's afternoon where you
 9  are, Mr. Hashemi?
10      A    Just about, yes.
11          MR. BINDER:  I'm sorry.  Neil,
12      before we begin, I just want to -- for
13      the court reporter, we want to review
14      and sign this transcript.  Thank you.
15      Q    Just before I get to my questions,
16  Mr. Hashemi, I just have one objection to put
17  on the record.
18          ED&F Man produced to us late Friday
19  night some 60,000 pages of documents, about
20  11,000 documents, which appear to be accounts
21  from BNP and SEB, two of ED&F Man's
22  custodians or sub-custodians in this case.
23  We've been requesting these documents for at
24  least 18 months and have been told they
25  didn't exist.
```

CONFIDENTIAL
Shahab Hashemi - October 7, 2021

```
 1              ED&F Man Capital Markets is also
 2    known as ED&F MCM?
 3        A    It is referred to as MCM.
 4        Q    Okay.  So if I refer in my
 5    questions to ED&F or ED&F MCM, I'm referring
 6    to the same entity, ED&F Man Capital Markets.
 7              Do you understand that?
 8        A    I understand.
 9        Q    And the parent company of that
10    entity is ED&F Man Holdings, Limited.
11              Correct?
12        A    I believe the ultimate parent to be
13    ED&F Man Holdings.
14        Q    And ED&F used to have an affiliate
15    they operated in Dubai.
16              Correct?
17        A    Sorry?  Could you ask the question
18    again?
19        Q    Sure.
20              ED&F used to have an affiliate that
21    operated out of Dubai.
22              Correct?
23        A    There was a subsidiary of the
24    ultimate parent that operates in Dubai.
25        Q    And that was known as MPT Dubai or
```

```
 1    Man Professional Trading Dubai.

 2            Correct?

 3        A    Yes.

 4        Q    Okay.

 5        A    I believe the entity was ED&F Man

 6    Professional Trading Dubai.

 7        Q    Okay.  So I'll refer to that as

 8    "ED&F Dubai" or "MPT Dubai."

 9            Will we be on the same page if I

10    describe it thus?

11        A    Yes.

12        Q    ED&F also --

13        A    Sorry, Mr. Oxford.  I think

14    Mr. Binder was trying to say something.

15            MR. BINDER:  MPT Dubai, not ED&F,

16        since it -- okay, let's just have, so as

17        not to confuse things.  If you want to

18        refer to it in a shorthand, "MPT Dubai"

19        is how we refer to it.  I think it

20        would -- I think it would be clearer

21        that way.

22            MR. OXFORD:  Okay.  Well, I have

23        the witness' answer.  It seems pretty

24        clear to him.

25        A    I would prefer if -- Mr. Oxford, I
```

CONFIDENTIAL
Shahab Hashemi – October 7, 2021

```
1    would prefer if you would refer to it as "MPT
2    Dubai."
3         Q    Okay.  I'll do my best.  But when I
4    refer to it as "ED&F Dubai," please
5    understand that I'm asking you about
6    MPT Dubai.
7              Okay?
8              MR. BINDER:  Objection.
9         Q    Understood?
10        A    I would prefer if you could use
11   MPT Dubai, but I understand what you said.
12        Q    Okay.  Thank you.
13             ED&F also had an affiliate in
14   Switzerland called Volcafe.
15             Correct?
16        A    There was a subsidiary of the
17   ultimate parent company in Switzerland.
18        Q    Called Volcafe.
19             Correct?
20        A    Called Volcafe, correct.
21        Q    Is Volcafe still operational today?
22        A    I don't know.
23        Q    Is MPT Dubai still operational
24   today?
25        A    I also don't know.
```

Page 62

```
 1        A    An interdealer broker transacts

 2    with other counterparties, but more

 3    specifically, would source shares or

 4    derivatives on instruction.

 5        Q    Did ED&F's interdealer broker ever

 6    hold any proprietary positions 2012 through

 7    2015?

 8             MR. BINDER:  Objection to form,

 9        beyond the scope of his role as a

10        corporate representative for ED&F Man

11        Capital, Limited.

12        Q    Do you know the answer?  Yes or no,

13    sir?

14        A    I don't know the answer.

15        Q    Was Volcafe also an interdealer

16    broker?

17        A    I believe it was.

18        Q    Was MPT Dubai also an interdealer

19    broker?

20        A    I do not believe MPT Dubai was an

21    interdealer broker.

22        Q    What's that belief based on, sir?

23        A    I have seen some prospective

24    documents of MPT Dubai.

25        Q    Are you familiar with a service
```

CONFIDENTIAL
Shahab Hashemi - October 7, 2021

Page 81

```
 1        Q     Okay.  We've talked about the fees
 2    to the investment managers.
 3              You're aware that one of the topics
 4    you're designated on today is the fees by
 5    ED&F Man in connection with the trading in
 6    Danish shares?
 7        A     Yes, I recall the fees being one of
 8    the topics.
 9        Q     Can you tell me generally how ED&F
10    structured the fees that it charged the
11    defendant plans in connection with the
12    trading in Danish shares?
13        A     So, like many of its services, many
14    of its desks, ED&F Man charges a fee to its
15    clients, and -- for the services that it
16    provides.
17              And in this case, for the equity
18    finance desk, the services or the fees that
19    would be charged to the client would be for
20    execution services, custodian services, and,
21    for example, financing of the transactions.
22        Q     So just picking up on the last part
23    of your answer, is it correct that ED&F
24    provided financing or lending to the
25    defendant plans so that they could make their
```

1    trades in Danish securities?

2        A    Excuse me.  One of the services the

3    equity finance desk provided was securities

4    financing to the pension plans.

5        Q    So it lent money –– in essence, it

6    lent money to the plans so they could buy the

7    shares.

8            Correct?

9            MR. BINDER:  Objection to form.

10       A    ED&F Man would receive the funds

11   that were allocated from the group treasury

12   and use them as working capital to provide

13   the service of securities financing to the

14   pension plans to acquire shares.

15       Q    Okay.  And just in layman's terms,

16   because I'm a simple country lawyer, does

17   that mean that ED&F Man's equity finance desk

18   loaned or extended credit to the defendant

19   plans so that they could purchase the Danish

20   securities?

21           MR. BINDER:  Objection, asked and

22       answered, vague.

23       A    The equity finance desk used funds

24   that was allocated to them from the process

25   that I mentioned to provide securities

```
1      financing services to the pension plans.

2             They acquired shares.

3        Q    And did those securities financing

4      services, including -- include extending

5      credit to the plans so they could buy the

6      Danish shares?

7             MR. BINDER:  Objection to form.

8        A    I don't know.

9        Q    So you know the term "securities

10     financing," but you don't know what security

11     financing actually is?

12            MR. BINDER:  Objection, objection.

13     Misstates testimony.  It's also

14     harassment.

15            MR. OXFORD:  It's not harassment.

16       Q    What's securities financing, sir,

17     in your last answer?  What does it mean?

18       A    It means providing the capital for

19     the pension plans to acquire shares.

20       Q    So the pension plans don't have the

21     money to buy shares, so ED&F Man provides

22     that.

23            Correct?

24       A    One of the services that ED&F Man

25     provided was securities financing for the
```

1      pension plans to acquire shares.

2          Q    Okay.  But just –– again, I'm just

3      trying to make sure we have a clear

4      understanding, because you're a banker sir,

5      and I'm just a simple lawyer.

6              Does that mean that ED&F loaned

7      money to the plans so they could buy the

8      Danish shares?

9              MR. BINDER:  Objection to form.

10         Objection to counsel testifying.

11             MR. BLESSINGTON:  Object as to

12         form.

13         A    ED&F Man provided securities

14     financing to the pension plans, Mr. Oxford.

15     I don't know how else to say it, to acquire

16     shares.

17         Q    How did it provide that financing

18     to the plans?

19         A    Through the funds that were drawn

20     down from group treasury, to provide it to

21     acquire the shares.

22         Q    Okay.  But that's kind of the

23     source of where the funds came from.

24             I'm asking how, mechanically, in

25     the securities financing transaction, the

1    ED&F Man provided financing to the plans?

2        A    Of the financing that the equity

3    finance desk would receive, a budget, they

4    would allocate a portion of that as available

5    to the -- to each of the pension plans and

6    their trading structures.

7        Q    Beyond that, do you have anything

8    to add to your answer?

9        A    I do not, no.

10       Q    Do you know the terms on which the

11   financing was provided by ED&F to the

12   defendant plans?

13       A    So what do you mean?

14       Q    Were there terms and conditions?

15   Did ED&F charge interest?

16       A    So ED&F Man would pass through the

17   costs of drawing down those funds to

18   the -- to the pension plans.

19       Q    So, in essence, ED&F would charge

20   interest to the plans on the securities

21   financing?

22       A    They would charge interest that was

23   charged to them by group treasury.

24       Q    Do you know offhand what that

25   interest rate was?

CONFIDENTIAL
Shahab Hashemi - October 7, 2021

```
 1              MR. BINDER:  Objection to form.

 2       A    I do not, no.

 3       Q    Is it correct that, generally

 4  speaking, ED&F charged the plans fees at two

 5  stages of the Danish securities transactions?

 6  Specifically they charged an "up-front" fee

 7  and a "behind" fee.

 8              Are you familiar with those terms?

 9       A    I'm familiar with the terms of an

10  "up-front" fee and a "behind" fee.

11       Q    Are you familiar with those terms

12  in the context of ED&F's fees charged to the

13  defendant plans in this case?

14       A    I'm sorry.  Could you say that

15  again?

16       Q    Sure.

17              Are you familiar with those terms

18  "up-front fee" and "behind fee" and how they

19  worked in the context of ED&F's fees charged

20  to the defendant plans in this case?

21       A    I'm familiar with the up-front fees

22  and the behind fees charged to the pension

23  plans in the scope of this.

24       Q    Okay.  Can you tell me what you

25  know about that topic?
```

CONFIDENTIAL
Shahab Hashemi – October 7, 2021

```
1          A    Of course.  So my understanding is

2     that the up-front fees were charged to the

3     pension plans and covered -- the fees covered

4     certain costs, such as exchange fees, and it

5     covered -- I've seen, Mr. Oxford, in fee

6     agreements that has reference to a custody

7     fee.

8               And the up-front fee is charged to

9     the pension plans prior to the trading

10    strategy maturing.  The behind fee, as I

11    understand it, is a fee that is charged to

12    the pension plans following the trading

13    strategy maturing, and any withholding tax

14    that is received by the pension plan.

15         Q    Is it fair to say that the up-front

16    fee that ED&F charged to the defendant plans

17    was typically 1 percent of the gross

18    dividend?

19         A    I believe the up-front fee varied,

20    and it was on a -- yeah, I don't think it was

21    constant as you're referring to it.  And I

22    believe it also, as it captured exchange

23    fees, for example, it would have varied on a

24    case-by-case basis.

25         Q    Okay.  Do you have any
```

1    understanding of what it varied between?

2    What the range of up-front fees was charged

3    to the various defendant plans?

4        A    I don't know.

5        Q    Is it fair to say that the behind

6    fee that ED&F charged the plans ranged from

7    27 to 50 percent of the pension plan's

8    transaction profit?

9        A    From the spreadsheets that I saw, I

10    recall that the behind fees would be

11    calculated after the trading strategy

12    matured, as I mentioned, any withholding tax

13    to be received by the pension plans, and

14    covered all of the costs and -- associated

15    with it.

16            I don't know of the range,

17    Mr. Oxford.  However, I don't recall seeing

18    any that exceeded 50 percent.

19        Q    Okay.  Can I ask you to turn to

20    Tab -- Exhibit 4151, please?  First binder,

21    Tab 29?

22        A    Okay.

23        Q    Can I ask you to turn to Page 39 of

24    that document?  And I direct your attention

25    to Paragraph 140.

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK
 2                 MASTER DOCKET 18-MD-2865(LAK)
                       CASE NO. 18-CV-09797
 3

 4    _____
                                             )
      IN RE:                                 )
 5                                           )
      CUSTOMS AND TAX ADMINISTRATION OF      )
 6    THE KINGDOM OF DENMARK                 )
      (SKATTEFORVALTNINGEN) TAX REFUND       )
 7    SCHEME LITIGATION                      )
                                             )
 8    _____)

 9

10

11              C O N F I D E N T I A L

12

13

14      REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

15                    EXAMINATION OF

16                    SHAHAB HASHEMI

17                      VOLUME II

18                DATE: October 8, 2021

19

20

21

22

23

24

25         REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

GregoryEdwards, LLC │  Worldwide Court Reporting
GregoryEdwards.com │ 866-4Team GE

Page 249

```
 1                    P R O C E E D I N G S

 2

 3     S H A H A B   H A S H E M I,,

 4            called as a witness, having been first

 5     duly sworn according to law, testifies as follows:

 6                        * * * * * *

 7     CONTINUED EXAMINATION BY MR. OXFORD:

 8        Q    Good afternoon and good morning,

 9     Mr. Hashemi.

10            Could you please turn back to

11     Binder 1, Tab 28, which is the Notice of

12     Deposition?

13        A    Okay.

14        Q    You can turn to Topic 23, please.

15        A    Okay.

16        Q    Topic 23 concerns Annex E.

17            Correct?

18        A    So I missed the beginning of your

19     sentence.

20        Q    Topic 23 concerns Annex E.

21            Correct?

22        A    I can see that, yes.

23        Q    Great.

24            Tell me what you did to prepare

25     yourself on this topic.
```

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

Page 252

1    Mr. Oxford?

2         Q    It's just a general question.

3    ED&F Man's position is that Annex E

4    references tax vouchers that are inaccurate.

5              I'm asking for your understanding,

6    as a corporate representative on a notice

7    topic here, whether you have any

8    understanding of what those inaccuracies are?

9         A    The inaccuracies are that the tax

10   vouchers in Annex E were incorrectly

11   produced.

12        Q    Can you explain what you mean,

13   "incorrectly produced?"

14        A    What I mean is that they should not

15   have been produced.

16        Q    Why should they not have been

17   produced?

18        A    Because they are inaccurate.

19        Q    In what sense are they inaccurate?

20        A    Could you repeat the question,

21   please?

22        Q    In what sense are they inaccurate?

23        A    Because -- they were inaccurate

24   because the pension plans weren't due a

25   dividend from the company.

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

1          had, right?

2                MR. OXFORD:  Understood, clear, no

3          suggestion to the contrary.  I think we

4          just were trying to clear up

5          certain -- basically version control

6          between the version we had marked

7          yesterday and a version of the same

8          document, which I freely acknowledge was

9          negotiated and drafted between counsel

10         for SKAT in England and counsel for

11         ED&F Man in England.

12                (Whereupon the above mentioned was

13         marked for Identification.)

14         Q    Okay.  So with that violate

15     agreement in place, can you take a look,

16     please, at Exhibit 4430, Mr. Hashemi?

17         A    Okay.  I have it in front of me.

18         Q    Can you confirm that is, in fact,

19     the version of the -- that is, in fact, a

20     version of the draft Schedule of Agreed Facts

21     that you reviewed in preparation for your

22     deposition?

23         A    (Witness reviewing.)

24                Yes, it appears to be the version

25     that I had reviewed.

```
 1        Q    Okay.  Are you aware of any

 2   incorrect statements in this document?

 3        A    (Witness reviewing.)

 4             I'm not aware of any incorrect

 5   statements in this document.

 6        Q    Okay.  So, from ED&F's point of

 7   view, the statements in here, you believe,

 8   are accurate?

 9        A    This document reflects ED&F Man's

10   position.

11        Q    Okay.  Thank you.  That's helpful.

12             So can I ask you just to quickly

13   turn to Paragraphs 20 and 2 -- sorry, 21 and

14   22, which are on Page 6 of the document?

15        A    Okay.

16        Q    And the heading is "B-5 Contractual

17   Documentation."

18             Do you see that?

19        A    I do.

20        Q    And then it lists five agreements

21   that were -- withdrawn.

22             It says, "In relation to the

23   services provided by ED&F Man, ED&F Man and

24   each pension plan or GP."

25             Do you know what the reference to
```

1    "GP" is?

2         A    I believe it's Gibraltarian

3    partnerships.

4         Q    "In relation to the services

5    provided by ED&F Man, ED&F Man on the one

6    hand, and on the other, each pension plan or

7    Gibraltarian partnership executed or agreed

8    to the terms of the following documents," and

9    then it lists a custody agreement, the

10   security and setoff date, the ISDA agreement,

11   the fee agreement letter, and ED&F Man's

12   terms of business.

13             Do you see that?

14        A    I do see that.

15        Q    And then 22 goes on to say that

16   "some but not all pension plans also executed

17   a global master securities lending agreement

18   with ED&F Man."

19             Do you see that?

20        A    I do see that.

21        Q    All right.  I take it from your

22   general comments that that -- those

23   statements in 21 and 22 are accurate from

24   ED&F Man's perspective?

25        A    I believe them to be accurate.

```
 1        Q    And that's a complete list of the

 2   agreements governing the relationship between

 3   ED&F Man and the defendant pension plans?

 4             MR. BINDER:  Objection to form.

 5        A    (Witness reviewing.)

 6             I believe them to be a list of

 7   agreements executed between ED&F Man and each

 8   of the pension plans.

 9        Q    Okay.  And do you believe it to be

10   a complete list?

11             MR. BINDER:  Objection to form.

12        A    I'm not sure.  I don't know.

13        Q    Okay.  New topic.

14             Are you familiar with the term

15   "payment agent," sir, in the context of this

16   case?

17        A    Could you -- can you explain to me

18   what you mean by "payment agent?"

19        Q    Yeah, sure.  I'm just referring to

20   the agent of the pension plan that submitted

21   reclaim applications to SKAT.

22        A    Okay.  I think I know the term "tax

23   reclaim agent."

24        Q    Okay.  We're talking about the same

25   thing.
```

CONFIDENTIAL
Shahab Hashemi — October 8, 2021

Page 332

```
 1        A    From my preparations for this

 2    deposition, I understand that when the

 3    withholding tax was paid, this was either

 4    received by ED&F Man from the tax reclaim

 5    agent, which I understand is the more common

 6    way.

 7             I believe occasionally it was

 8    received from SKAT directly, and sometimes it

 9    went direct to the pension plans.

10        Q    Okay.  And when it went direct to

11    the pension plans, did it go to their pension

12    plan accounts at ED&F?

13        A    I don't believe it was received via

14    ED&F Man.

15        Q    Okay.  And in the circumstances

16    where the withholding tax reclaim was

17    received by ED&F Man from the tax reclaim

18    agent, was ED&F involved in the distribution

19    of the proceeds of that reclaim?

20             MR. BINDER:  Objection to form,

21        vague.

22        A    When -- from the documentation that

23    I've seen, when the withholding tax was

24    received, it was credited in the pension

25    plans cash account.
```

1    says.

2         Q    Okay.  And then there's a

3    spreadsheet at the back.

4              Can you just take a moment to

5    review the spreadsheet and tell me whether

6    you've ever seen it before?

7         A    Sorry.  Where am I looking for the

8    spreadsheet?

9         Q    It's attached to the letter, sir.

10        A    So in this -- in the binder in

11   front of me --

12        Q    We even have it -- I'm told we

13   might even have it in a native Excel.

14        A    Okay.

15        Q    So this is Exhibit 4259.

16        A    Okay.  It is -- I have it open.

17        Q    Great.  Just take a moment and let

18   me know if you've ever seen this before.

19        A    (Witness reviewing.)

20             MR. BINDER:  I'm going to object

21        because you're showing this to him in a

22        format of an Excel.  So, to the extent

23        he has -- he has seen this document in

24        the form it was attached to the letter,

25        I would -- I would just want the record

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

```
 1          to be clear that he's viewing this in an

 2          Excel format, not as it would have been

 3          attached originally as a PDF or however

 4          it was delivered.

 5     A    (Witness reviewing.)

 6          MR. OXFORD:  Mr. Binder, I can note

 7          for the record that your objection is

 8          without foundation.  Because, as

 9          provided to us, I understand there was

10          not a PDF, but an Excel file.

11          MR. BINDER:  All I'm saying is

12          I -- if he has seen it, he'll have to

13          answer that.  I don't know whether he

14          would have seen it in Excel or in PDF.

15          So it's just -- to the extent that the

16          formatting impacts his answer, I just

17          want that noted.

18          Mr. Hashemi, if you can answer

19          Mr. Oxford's question, if you're

20          familiar with this document?

21     A    Yeah, I'm just going through the

22     tabs.

23          (Witness reviewing.)

24          Mr. Oxford, this spreadsheet looks

25     familiar, and it's difficult for me to
```

```
 1    identify if I've seen this exact version,

 2    and -- but the contents of this spreadsheet

 3    look familiar to me.

 4        Q    Okay.  Can you tell us if

 5    this -- the data in this spreadsheet is

 6    accurate?

 7        A    (Witness reviewing.)

 8             If it's the same spreadsheet that

 9    I've seen, I think it might be.  I believe

10    the data in this document is accurate.

11        Q    Okay.  So just looking -- are you

12    on the first tab, sir, which I believe is

13    Acer?

14        A    Yeah.

15        Q    Okay.  Do you see there's a number

16    of column headings about two-thirds of the

17    way across the page.  There's one called

18    "Trading Loss on Share Acquisitions and

19    Hedging Transactions."

20        A    Column I.

21        Q    Yes.

22        A    Yes, I see Column I.

23        Q    How was -- well, withdrawn.

24             What information is contained in

25    that column?
```

```
 1        vague.

 2        A    Mr. Kaplan, I don't know the answer

 3   to your broad question.  But if you'd like to

 4   bring up a specific confirmation, I can try

 5   and point it out to you.

 6        Q    We can do that.  I'm trying to do

 7   this quickly as per our earlier discussion.

 8   Let me ask you this.

 9             Do you think a customer of ED&F Man

10   who receives a confirmation from ED&F Man can

11   rely on that confirmation as being accurate?

12             MR. BINDER:  Objection.

13             MR. OXFORD:  Objection to form.

14        A    I don't know.

15        Q    And do you have any knowledge as

16   to -- withdrawn.

17             You've identified various tax

18   vouchers earlier and there were discussions.

19   And again, I'm trying to do this quickly.

20             You know what I mean by "the tax

21   voucher."

22             Correct?

23        A    I do know what you're referring to

24   when you say "tax vouchers."

25        Q    And if I understood your testimony
```

1    earlier, you said that those tax vouchers

2    were prepared by ED&F Man?

3         A    Those tax vouchers were prepared by

4    ED&F Man.

5         Q    Do you believe that a customer

6    is -- can rely on tax vouchers prepared by

7    ED&F Man?

8              MR. BINDER:  Objection, beyond the

9         scope of the notice topics.

10        A    I don't know.

11        Q    Okay.  Do you know whether or not

12   the former ED&F Man associated persons or

13   people who worked at the equity finance desk

14   received severance?

15             MR. BINDER:  Objection.

16        A    I don't know.

17        Q    Are you aware of what the financial

18   arrangement was prior to the closing of the

19   equity financing desk between the various

20   people who worked at the desk and ED&F Man?

21        A    In line with the other desks in

22   ED&F Man, there was a P&L for the equity

23   finance desk.

24        Q    Did you say "CMO?"

25        A    Sorry.  No.  Let me start again.



**Via US Mail**

John McGoey, Esq.
Hughes Hubbard & Reed
One Battery Park Plaza
New York, NY 10004

Re:    IN RE:
CUSTOMS AND TAX ADMINISTRATION OF
THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX REFUND
SCHEME LITIGATION

MASTER DOCKET 18-MD-2865 (LAK)

CASE NO. 18-CV-09797

Dear Mr. McGoey;

In connection with the deposition taken on October 7, 2021 & October 8, 2021 in the above mentioned matter; attached please find the signed errata sheets as executed by Shahab Hashemi.

If you need any further assistance, please do not hesitate to contact our office.

Sincerely,

Victoria Jones

cc:
Counsel of Record with Attachments

1-866-483-2643    PRODUCTION@GREGORYEDWARDS.COM    WWW.GREGORYEDWARDS.COM

Washington, DC | Hyattsville | Richmond | New York | San Francisco | Palo Alto | Denver | Houston | Los Angeles | Hong Kong | London