

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE:
CUSTOMS AND TAX ADMINISTRATION OF
THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX REFUND
SCHEME LITIGATION

No. 18-MD-2865-LAK

# REBUTTAL REPORT OF BRUCE G. DUBINSKY
# MST, CPA, CFE, CVA, CFF, CAMS, MAFF

# February 1, 2022

CONFIDENTIAL
Rebuttal Report of Bruce G. Dubinsky
February 1, 2022
Page 5

    contain no evidence of such holdings at the sub-custodians.

- Carr also assumes that the Plans did in fact receive cash dividend payments from the Danish companies that they purportedly invested in. However, it appears that he did not conduct a forensic accounting investigation to identify the Plans' receipt of any cash dividend payments, which had he done so, would have shown that the Plans never received cash dividend payments from the Danish companies.

**III.   CARR'S CONCLUSION THAT "BECAUSE THE PLANS PURCHASED THE SHARES PRIOR TO WHAT IS KNOWN AS THE 'EX-DIVIDEND' DATE FOR THE STOCK, THE PLANS PAID A 'CUM-DIVIDEND' PRICE, MEANING THAT THE PURCHASER HAD AN ECONOMIC CLAIM TO THE FORTHCOMING DIVIDEND" IS FATALLY FLAWED AS IT IGNORES CRITICAL FACTS AND EVIDENCE THAT THE PLANS NEVER OWNED ACTUAL SHARES OF THE DANISH COMPANIES NOR EVER RECEIVED DIVIDENDS ISSUED BY THE DANISH COMPANIES**

8. Solo Capital, over a period of approximately three years, orchestrated 2,559 purported Solo Trades on behalf of the Plans on the over-the-counter market.[6] As I have concluded based upon my investigation, what in fact happened was that Solo Capital fabricated supporting documentation such as trade confirmations and account statements and used a complex web of affiliated brokers to orchestrate 2,559 fictitious transactions.

9. Although the Solo Custodians and affiliated entities generated trade confirmations and account statements purportedly showing the securities that were owned in, or had been traded through, the Pension Plans' accounts, these documents were a complete fabrication. There is no evidence of actual trading in any Danish securities on behalf of the Plans. In fact, the evidence shows that these purported transactions were fictitious as there is no evidence of the underlying Danish shares ever being owned by the purported sellers of the shares or by the Plans and there is no evidence of the related dividend payments ever being received by either Solo Capital as the custodian for the Plans, or for that matter the Plans themselves.

10. Forensic accountants are typically engaged to investigate potential instances of fraud. This can involve a lengthy process of reviewing and analyzing the books and records of a company, which may potentially contain fictitious and/or illegal activity, in order to

---

[6] *See* Expert Report at 146-157.

determine what has transpired. Forged, altered, fabricated, and other suspicious documents are routinely present in fraud cases. In fact, based on my prior experience working as a forensic accountant on some of the largest fraud cases in the world, including the Madoff Ponzi, I note that many financial frauds are "book entry" frauds (i.e., the fraud is reflected in the business records). These documents are many times used as evidence in establishing that a fraud was committed, in determining the nature and scope of the fraud, and in identifying the parties responsible.[7]

11. However, the mere fact that the forensic accountant relies on potentially fictitious business records to perform an investigation does not lend credibility to those same records being relied upon for the purpose of establishing that the transactions contained therein are real.

    A.    **Improper Factual Assumptions in the Carr Report**

        1.    **Carr incorrectly assumes that actual shares of Danish securities were held in custody at Solo Capital and Old Park Lane**

12. As stated in the Carr Report, "custodians 'provide their clients with reports about their cash and securities holdings and transactional activities, which can be tailored or customized for specific client purposes, including for monitoring the financial performance of securities and other assets…' With regard to the Analyzed Transactions, the RJM Plan and the Proper Pacific Plan custodied their stock holdings at Solo Capital and Old Park Lane, respectively."[8]

13. As the Carr Report reveals, any securities that were purchased by the Plans would have ultimately been held at a custodian. If the Plans had actually held any shares of Danish securities, or received dividend payments from Danish companies, there would be a record of the transactions reflecting that the shares were in fact held in custody and that dividends were in fact received. However, this is not the case here.

14. As discussed in my Expert Report, Solo Capital had identified three financial institutions that acted as sub-custodians for its purported holdings of Danish securities for Solo Capital's clients. Specifically, Shah claimed that Solo Capital had a sub-custodian arrangement with JPMorgan Chase from August 2012 through October 2013, and a sub-custodian arrangement

---

[7] Fraud Examiners Manual, Section 3.204, Association of Certified Fraud Examiners, 2015.
[8] Carr Report at 54-55.

CONFIDENTIAL
Rebuttal Report of Bruce G. Dubinsky
February 1, 2022
Page 8

### 2. Carr ignores the evidence that the Plans never received the purported dividends from the trades he analyzed

18. Carr inherently assumes that, for the Analyzed Transactions, the purported dividends were actually received by the Plans.[12] For example, when discussing the dividend for MAERSKB that was supposedly received by the RJM Plan in April 2013, Carr cites to a Solo Capital custodian account statement as evidence that the dividend was paid. However, the dividend in the custodian account statement is simply a book entry.[13] There is no evidence that the RJM Plan actually received the cash from this supposed cash dividend. In fact, the evidence shows that no cash dividends were received by or on behalf of the Plans.

19. Carr relies exclusively on the book entries in the Plans' Solo Custodians' account statements as evidence that the Plans received dividends. However, while it is interesting to analyze Solo's treatment of the purported receipt of dividends and the actual receipt of refund payments in the Solo account statements, Solo's account statements are not evidence that cash was actually received in a bank account and to rely upon them for such is misplaced. To determine whether actual cash dividends were received, there are two relevant places to look: Solo Capital's bank account records, and the Plans' bank account records. Using third party documents to verify a transaction(s) is one of the basic investigative steps in auditing and forensic accounting.

20. As mentioned in my Expert Report, I performed a forensic analysis of the bank account records and the related cash activity for Solo Capital and the Bellwether Plans (which includes the RJM Plan). I have not found evidence that Solo Capital or the Plans received dividend payments in their respective bank accounts.

21. For example, I have reviewed the Solo Capital bank accounts and have not seen any evidence of the receipt of the April 17, 2013 MAERSKB dividend. I would expect any such dividend payments to be sent to the custodian's bank account. To the extent that the dividend was sent directly to the Plan's own bank account, I have also reviewed the RJM Plan's account. In

---

[12] Carr Report at 128.

[13] As was the case in the Madoff Ponzi, the mere fact that trading documents listed stock trades, option trades and the purchase of Treasury Bills, was not in and of itself proof the transactions were real. Similar to what happened here, Madoff generated detailed account statements reflecting hundreds of thousands of purported transactions. My forensic examination of Madoff's records revealed that the transactions did not actually take place and were instead fictitious book entries.

CONFIDENTIAL
Rebuttal Report of Bruce G. Dubinsky
February 1, 2022
Page 12

24. Similarly, when Carr discusses the dividend from Chr. Hansen of DKK 5,092,889 (approximately USD $850,000) that was purportedly received by the Proper Pacific Plan in December 2014, Carr cites to the Old Park Lane custodian statement as evidence that the dividend was paid.[22] However, the dividend in the custodian account statement is only a book entry. There is no evidence that the Proper Pacific Plan actually received the cash from this supposed dividend. Further, the date included next to the purported dividend on the Old Park Lane statement is November 28, 2014,[23] which is the ex-date of the dividend and pre-dates the issuer's payment date (December 2, 2014). This further highlights the fictitious nature of this transaction, as it is simply impossible to receive a cash dividend 4 days <u>before</u> the actual dividend payments were made to real holders of the Chr. Hansen stock.[24]

25. Further, I have reviewed all the Solo Capital bank statements which have been produced to date and have seen no evidence of the purported dividends being received for the Proper Pacific Plan or any other Plan for holdings of Chr. Hansen shares.[25] By contrast, there is evidence, as one would expect, that Solo Capital received actual cash payments from the tax reclaim agents (Goal, Syntax and Acupay) of the proceeds from the refund payments made by SKAT. For example, the Proper Pacific Plan sought a refund of DKK 854,527.05 for its purported ownership of 839,500 shares of Chr. Hansen.[26] On May 22, 2015, Goal Taxback sent an email to Old Park Lane informing Old Park Lane that Goal Taxback initiated a payment of DKK 345,671,015.02 in connection with Danish refund payments.[27] Goal Taxback attached a spreadsheet identifying each of the 51 refund payments on behalf of 17 pension plans and other entities which were included in the total payment made by Goal to Old Park Lane.[28] Among the specific refund payments is the DKK 854,527.05 refund payment for the Proper Pacific Plan's reclaim application for Chr. Hansen shares. I have traced Goal Taxback's payment of DKK 345,671,015.02 into Solo Capital's DKK bank

---

[22] Carr interestingly never discusses the fact that Old Park Lane was an entity related to Shah and Solo. Related party transactions are transactions that auditors and forensic accountants must pay particular attention to as many frauds occur through the manipulation and/or fabrication of documents between related parties. *See* my Expert Report for discussion on related parties in the Solo Trades.
[23] PROPPACIF00000955.
[24] S&P Capital IQ.
[25] SCPADMINISTRATORS_00000001- SCPADMINISTRATORS_00005864.
[26] SKAT_MDL_001_00088872 at 88900.
[27] ELYSIUM-04281988.
[28] ELYSIUM-07574930.

CONFIDENTIAL
Rebuttal Report of Bruce G. Dubinsky
February 1, 2022
Page 13

account at Barclays on May 22, 2015 (see **Figure 4** below).[29]



Figure 4 – Solo Capital's Barclays Account Statement for May 2015

26. An internal Old Park Lane cash summary spreadsheet shows that Old Park Lane credited the refund payment of DKK 845,982 for Chr. Hansen shares to the Proper Pacific Plan's custodian account on the date the payment was received (May 22, 2015).[30]

27. I reviewed each Bellwether Plan and found that there is no evidence of funds from dividends being paid to the Plans' bank account statements and only evidence of money from the tax reclaims being received by the Plans (if any money was received at all), which is further detailed in the analysis performed in Exhibit 4 of my Expert Report.

---

[29] SCPADMINISTRATORS_00005493 at 96.
[30] ELYSIUM-10379199 at PPL01.

## IV.  CONCLUSION

28. Based on my review of the Carr Report, I conclude that Carr's opinions and conclusions are fatally flawed for the following reasons:

    - Carr relies on the false assumption that the trade confirmations and customer account statements reflect real securities transactions.
    - Carr failed to perform a forensic accounting analysis to independently confirm the existence of the shares and receipt of the cash dividends.  As demonstrated in my Expert Report and this Rebuttal Report, a forensic accounting analysis establishes that the purported facts on which Carr relies are not real.
    - Carr failed to consider evidence that shows that the shares did not exist.
    - Carr failed to consider evidence that shows that the dividends were never received by, or on behalf of the Plans.



Bruce G. Dubinsky, MST, CPA, CFE, CFF, MAFF, CAMS

February 1, 2022