**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION<br><br>This document relates to:    18-cv-09797<br><br>-----------------------------------------------------------<br><br>DARREN WITTWER,<br><br>        Third-Party Plaintiff,<br><br>v.<br><br>ED&F MAN CAPITAL MARKETS LTD.,<br><br>        Third-Party Defendant. | MASTER DOCKET<br><br>18-md-2865 (LAK)<br><br><br><br><br><br>**<u>DARREN WITTWER'S FIRST AMENDED THIRD-PARTY COMPLAINT AND JURY DEMAND</u>** |

Pursuant to Rule 14 of the Federal Rules of Civil Procedure, Defendant/Third-Party Plaintiff Darren Wittwer (the "Third-Party Plaintiff") brings the following amended third-party claims against Third-Party Defendant ED&F Man Capital Markets Ltd. ("ED&F").

The DW Construction, Inc. Retirement Plan (the "DW Construction Plan," or the "Plan") submitted withholding-tax refund requests to Plaintiff Skatteforvaltningen ("SKAT") based on information provided to the DW Construction Plan by ED&F, including ED&F's "tax vouchers" that confirmed the Plan's receipt of dividends net of withholding taxes, suffering of withholding taxes, and entitlement to tax reclaims. ED&F has since admitted that five (5) of the tax vouchers on which the DW Construction Plan relied were inaccurate.

The Plan's withholding-tax refund requests were based on ED&F's signed tax vouchers that certified the Plan's ownership and holding of Danish securities. Third-Party Plaintiff believed that the documents and information that ED&F would provide were truthful representations. Third-Party Plaintiff and the Plan relied on ED&F's representations when they continued trading through ED&F for many years. Now, ED&F has admitted that some of the tax vouchers it created for the Plan were false and should never have been created in the first place. If SKAT's allegations against Third-Party Plaintiff are proven to be true or if SKAT is otherwise entitled to a return of the tax refunds from Third-Party Plaintiff, then ED&F — not Third-Party Plaintiff — should be responsible because ED&F (1) managed, controlled, and executed the Plan's Danish securities transactions, which are the focus of SKAT's claims; (2) provided all of the information concerning the Plan's securities, dividends, and withholding-tax information on which Third-Party Plaintiff relied, including the Disavowed Tax Vouchers; and (3) collected fees in connection with the Plan's securities transactions and withholding-tax refunds, including in connection with the inaccurate tax vouchers.

## PARTIES

1.      Darren Wittwer is a citizen of the United States and a Resident of the state of Utah. At all relevant times, Darren Wittwer was the sole participant of the DW Construction Plan.

2.      ED&F is a financial brokerage business and financial servicer headquartered at 3 London Bridge Street, London, SE1 9SG, United Kingdom. At all relevant times, ED&F managed and controlled a brokerage account for the DW Construction Plan, executed trades in Danish securities for the Plan, provided documentation and information to the Plan in connection with the Plan's account, securities transactions, dividend receipts, and tax vouchers, and collected fees in connection with the Plan's withholding-tax refund requests.

## JURISDICTION AND VENUE

3.      This Court has subject-matter jurisdiction over these third-party claims pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and because the claims are between a U.S. citizen and a citizen of a foreign state.  This Court also has subject-matter jurisdiction over these third-party claims pursuant to 28 U.S.C. § 1367 because the third-party claims form part of the same case or controversy as SKAT's claims against Darren Wittwer.

4.      This action was transferred from the United States District Court for the District of Utah to this Court for pretrial purposes only pursuant to 28 U.S.C. § 1407.  This Court, as the transferee court, must apply the law the transferor court to determine whether it can exercise personal jurisdiction.

5.      This Court has personal jurisdiction over ED&F because ED&F's conduct giving rise to these third-party claims was purposefully directed toward residents of the State of Utah. ED&F transacted business with the Plan directly and/or through the Plan's Utah-based representative and caused tortious injury to the Plan and Darren Wittwer in Utah.  ED&F established a continuing and ongoing relationship with the Plan directly and/or through the Plan's Utah-based representative, Acer, and therefore created a substantial connection to the State of Utah.

6.      These third-party claims are properly venued for pretrial purposes in the United States District Court for the Southern District of New York because this action was transferred to this Court for pretrial purposes only pursuant to 28 U.S.C. § 1407.  These third-party claims are properly venued for trial in the United States District Court for the District of Utah because ED&F is subject to that court's personal jurisdiction.

7.     By filing these third-party claims in the United States District Court for the Southern District of New York, Darren Wittwer does not waive his right to have SKAT's claims or these third-party claims transferred back to the United States District Court for the District of Utah for purposes of trial.

## STATEMENT OF FACTS

**A. ED&F entered into various agreements with the Plan pursuant to which ED&F agreed to exercise reasonable care in relation to the Plan's transactions and account.**

8.     ED&F is a broker registered with the Financial Conduct Authority ("FCA"), which regulates the UK financial and securities markets.

9.     In 2012, the Plan and ED&F executed an agreement (the "Agreement") that set forth ED&F's obligations as broker-custodian for the DW Construction Plan.  The Agreement includes the Plan's Custody Agreement, Security and Set-Off Deed, ISDA Master Agreement, and Terms and Condition of Business.

10.     Attached hereto as Exhibit A is the DW Construction Plan's Custody Agreement.

11.     Third-Party Plaintiff, as the sole participant of the Plan, is a third-party beneficiary of the Plan's relationship with ED&F.

12.     The Agreement identifies Utah as the location of the DW Construction Plan.  The Plan designated Acer, operating out of Utah, as its attorney in fact to manage the Plan's ED&F account.

13.     At all relevant times, the Plan used a Utah address and its two trustees, Stacey Kaminer and Third-Party Plaintiff (also the plan participant), resided in the State of Utah.

14.     Pursuant to the Agreement, the Plan maintained a brokerage account with ED&F since at least June 2012, with Acer as the authorized agent for the Plan.

15.    ED&F was required to exercise reasonable care when, among other things, (i) buying or selling securities for the Plan; (ii) settling the Plant's trades; (iii) managing the Plan's custodian and sub-custodian accounts; (iv) keeping records and statements concerning the Plan's account and securities; (v) acting on the Plan's instructions; (vi) registering the Plan's securities in compliance with FCA regulations; and (vii) crediting all income, dividends, and other proceeds on the Plan's securities only after actual receipt and reconciliation.

16.    ED&F was prohibited from, among other things, falsifying account statements, buy/sell confirmations, dividend receipts, tax vouchers, or other documentation in relation to the Plan's securities holdings and brokerage account.

17.    The Plan designated Acer as its attorney-in-fact in connection with investments in U.S. and foreign securities transactions conducted through the Plan's ED&F brokerage account.

18.    At all relevant times, Acer operated out of its business address in Park City, Utah.

19.    Stacey Kaminer, a principal of Acer, and a Utah resident, was nominated by the Plan to operate the Plan's ED&F accounts.  The Plan designated Stacey Kaminer as the Plan's authorized signatory for the Plan's ED&F account.  The Plan provided ED&F with the contact information for Acer/Kaminer, including telephone and fax numbers in Utah.

20.    ED&F agreed to communicate with the Plan through Acer and, during all relevant times, ED&F routinely communicated with the Plan through Acer in relation to ED&F's dealings with the Plan, which are described more fully below.

21.    Thus, at all relevant times, ED&F purposefully engaged in a business relationship with the Plan in Utah and facilitated transactions for the Plan by working with Acer.

22.    ED&F's business relationship with the Plan began in 2012 and lasted through 2016, during which time ED&F executed trades in Danish securities for the Plan, provided accounts

statements related to the Plan's account, and prepared tax vouchers to support the Plan's refund applications.

23.     Third-Party Plaintiff's claims against ED&F arise out of ED&F's business relationship with Acer and the Plan in Utah.

**B. The Plan traded in Danish securities through ED&F and intended to receive dividends net of withholding taxes from Danish companies and to apply for withholding-tax refunds based on the information provided by ED&F.**

24.     At all relevant times herein, Danish law required Danish companies to withhold and report to SKAT 27% of the dividends Danish companies distribute to their respective shareholders.

25.     Pursuant to the U.S.-Denmark Tax Treaty, Denmark cannot tax dividends paid to a U.S. pension plan by a Danish company.

26.     At all relevant times, SKAT served the Danish government as the agency responsible for administering Danish taxes and refunding dividend withholding taxes, including refunds of dividend withholding taxes owed to U.S. pension plans.

27.     Between March 2014 and August 2015, the Plan traded in shares of certain Danish companies through ED&F.

28.     As a result, ED&F generated a number of documents detailing and describing each of the transactions, including buy/sell confirmations for the Plan's transactions, account statements showing that the transactions occurred, and tax vouchers describing the Plan's security holdings and receipt of dividends net of withholding-taxes.

29.     ED&F provided documents and information concerning the Plan's holdings, security interests, and withholding-taxes to the Plan through Acer.

30.     According to the information and documents provided by ED&F, the Plan's holding of shares in Danish companies resulted in the crediting of dividends net of withholding taxes to the Plan's brokerage account.

31.     Based on the documents and information provided by ED&F, the Plan was led to believe that it held securities in Danish companies in its ED&F brokerage account on or around the relevant record dates for payment of dividends (the "Holdings") and received dividends net of withholding taxes on those securities (the "Dividends").

32.     ED&F provided these documents, including account statements and tax vouchers, to Acer and Stacey Kaminer, the Utah-based Acer principal authorized to operate the ED&F accounts for the Plan.

**C. Third-Party Plaintiff relied on ED&F when the Plan applied for withholding-tax refunds from SKAT.**

33.     Third-Party Plaintiff entrusted ED&F, as broker/custodian for the Plan, with the management and control of the Plan's brokerage account, the execution and settlement of securities transactions for the Plan, and the preparation of any tax vouchers related thereto.

34.     ED&F prepared such tax vouchers (the "Tax Vouchers") by which ED&F purportedly confirmed the Plan's relevant shareholdings over the applicable dividend dates and described the Dividends received by the Plan net of withholding taxes.

35.     ED&F prepared a Tax Voucher for the Plan's Holdings and Dividends.

36.     ED&F knew that the Plan intended to request withholding-tax refunds from SKAT through Goal Taxback Ltd. ("Goal Taxback"), a third-party payment-processing agent.

37.     Accordingly, ED&F would send the Tax Vouchers directly to Goal Taxback, who would then submit the applications for withholding-tax refunds to SKAT on behalf of the Plan.

38.    ED&F would also email copies of the Tax Vouchers to Acer in Utah.  The Plan, through Acer, received the Tax Vouchers from ED&F when Goal Taxback received the Tax Vouchers so the Plan would be aware whether a withholding-tax refund application would be submitted by Goal Taxback on its behalf.

39.    With each of the Tax Vouchers, ED&F confirmed the Plan's relevant shareholding over the applicable dividend dates, described the Dividends received by the Plan net of withholding taxes and stated that ED&F "has no beneficial interest in the holding and will not be reclaiming

the tax.  The dividends specified on this credit advice were paid net of withholding tax to [the] DW Construction Inc. Retirement Plan."  For example:



40.    Each of the Tax Vouchers stated that ED&F had "confirm[ed]" the dividend "received" by the Plan and the withholding-tax "suffered" by the Plan.

41.    Attached hereto as Exhibit B are the seven (7) Tax Vouchers provided by ED&F for the DW Construction Plan's withholding-tax refunds.

42.    At all relevant times, ED&F owed a duty to the Plan to create true and accurate documents and was uniquely positioned to confirm the status of the Plan's Holdings, Dividends,

brokerage account, securities transactions, and entitlement to dividend withholding taxes. Darren Wittwer placed his confidence in ED&F to act primarily for the benefit of the Plan and placed the Plan's property, interests, and trust in the charge of ED&F.

43.     On information and belief, ED&F was the only entity that had direct control over the information concerning, among other things, ED&F's custody account(s), the Plan's brokerage account, securities in that account, receipt of dividends, withholding-tax suffered in relation to those dividends, and entitlement to dividend withholding taxes.

44.     After ED&F apparently confirmed that the Plan received the Dividends from the Danish issuer net of withholding taxes, ED&F sent the Tax Vouchers to Goal Taxback.

45.     ED&F provided the Plan with account statements reflecting all Danish securities transactions in its ED&F brokerage account. The account statements confirmed that for each transaction reflected on the Tax Vouchers, the Plan owned the relevant shares on the respective record dates and was paid the applicable dividend from the Danish issuer, minus Danish withholding taxes.

46.     Third-Party Plaintiff, as a representative of the Plan, reasonably relied on the Tax Vouchers and other information provided by ED&F, including buy/sell confirmations and account statements, when the Plan requested the withholding-tax refunds from SKAT through Goal Taxback.

47.     ED&F's Tax Vouchers were a critical component of the Plan's transactions and were required for the Plan's tax-refund requests submitted to SKAT. The Tax Vouchers were the only documents submitted to SKAT that explained and apparently verified the Plan's share holdings, receipt of dividends, and dividend-taxes withheld.

48.     SKAT paid the Plan through Goal Taxback for all of the Plan's withholding-tax refunds until August 2015, at which point SKAT stopped paying withholding-tax refund claims.

49.     In 2018, SKAT sued the Plan seeking damages and/or restitution in the amount of the withholding-tax refunds SKAT paid to the Plan, alleging fraud, aiding and abetting fraud, negligent misrepresentation, unjust enrichment, and money had and received.

50.     SKAT seeks to have $2,130,000 in refunds returned in its action against the Third-Party Plaintiff.

**D. Third-Party Plaintiff relied on information provided by ED&F, including the Tax Vouchers, when choosing to defend SKAT's claims and pursue appeals in Denmark challenging SKAT's revocations of its tax-refund payments to the Plan.**

51.     On or about the same day SKAT sued U.S. pension plans in the United States concerning withholding-tax refunds, SKAT also rendered its "final determination" concerning the Plan's withholding-tax refund applications.

52.     In that final determination, SKAT determined that the Plan was not entitled to the withholding-tax refunds paid by SKAT because SKAT's initial decisions to pay the Plan had been made on a false basis.

53.     Relying on the purported truthfulness of the documents and information provided by ED&F, including the Tax Vouchers, the Plan appealed SKAT's decision in August 2018.

54.     Since August 2018, significant amounts have been spent in pursuit of the appeals in Denmark, trusting that ED&F provided truthful documentation, including truthful Tax Vouchers, which showed the Plan was entitled to the withholding-tax refunds from SKAT.

55.     Likewise, since at least April 2020, significant amounts have been spent in defense of the Third-Party Plaintiff in the action filed by SKAT.

**E. In September 2019, ED&F admitted that certain of the Tax Vouchers that it created for the Plan were inaccurate.**

56.     SKAT sued ED&F in the United Kingdom (the "U.K. Proceeding") over the same transactions that are the basis of SKAT's claims against Third-Party Plaintiff.

57.     In September 2019, ED&F filed its Amended Defence in the U.K. Proceeding and identified 80 tax vouchers issued by ED&F to pension plans that it now, for the first time, stated were inaccurate.

58.     ED&F stated that five (5) of the seven (7) tax vouchers it prepared for the Plan contained false information and listed those tax vouchers (the "Disavowed Tax Vouchers") in Annex E to its Amended Defence.

59.     ED&F's list of the Disavowed Tax Vouchers is attached hereto as Exhibit C, with the tax vouchers relevant to the Plan's third-party claims highlighted.

60.     ED&F stated that each of the Disavowed Tax Vouchers was "inaccurate in that the [Plan] identified therein: had not '*received*' the amount set out therein by way of dividend from the Danish Listed Company; and had not '*suffered*' [withholding tax] in the amount set out therein in relation to such dividend at the stated (27%) or any rate."

61.     According to ED&F, the Disavowed Tax Vouchers are wholly inaccurate in that the Plan did not receive the actual dividend from a Danish company and did not suffer any withholding taxes.

62.     ED&F determined that these Disavowed Tax Vouchers were false because at the time of their creation, ED&F did not hold the rights to the shares which they sold to the Plan.

63.     Upon information and belief, at the time of the creation of the Disavowed Tax Vouchers, ED&F knew or should have known that it did not hold the rights to the shares which they sold to the Plan.

64.     Even though ED&F has since admitted that the Disavowed Tax Vouchers contained false information and should never have been prepared, the Disavowed Tax Vouchers were nevertheless transmitted from ED&F to the Plan, through Acer.

65.     The Plan submitted withholding-tax refund requests based on those Disavowed Tax Vouchers in reliance on the perceived truthfulness of ED&F's representations.

66.     If the Plan had not received the inaccurate information contained in the Disavowed Tax Vouchers from ED&F, the Plan would never have submitted refund applications to SKAT.

67.     Because of ED&F's unique position as broker-custodian for the Plan and its access to all relevant information concerning the Plan's securities, holdings, receipt of dividends, withholding-tax suffered in relation to those dividends, and entitlement to dividend withholding taxes, ED&F possessed all of the information necessary to determine the accuracy of the information of the Disavowed Tax Vouchers at the time ED&F sent the them to the Plan.

68.     With the Disavowed Tax Vouchers, ED&F misrepresented the Plan's dividend receipts and withholding-tax-entitlement status while knowing that the Plan intended to rely on that information to support the Plan's refund applications.

69.     ED&F was motivated to create the Disavowed Tax Vouchers because only with the creation of a tax voucher (which was required for SKAT to pay a withholding-tax refund) could ED&F secure its fees from the Plan.

70.     When ED&F transmitted the Disavowed Tax Vouchers, on behalf of the Plan, ED&F knew or should have known that the dividend and withholding-tax information in the Disavowed Tax Vouchers was false.

71.     As a result of the now-disavowed Tax Vouchers according to ED&F's Annex E, attached hereto as Exhibit C, ED&F's Tax Vouchers for the Plan were inaccurate to the amount of $1,790,560.98.[1]

72.     According to the information provided by ED&F, including account statements and trade confirms, the Plan purchased the Danish-listed shares described in the Disavowed Tax Vouchers.

73.     Third-Party Plaintiff never had reason to doubt the veracity of the Tax Vouchers provided by ED&F until September 2019, after ED&F filed its Amended Defence in the U.K. proceedings.

74.     ED&F Man never warned the Plan that it had determined that the Disavowed Tax Vouchers were wrongful or that it would be filing documents in proceedings in the U.K. in which it would declare the Disavowed Tax Vouchers false.

75.     Indeed, it has only been through litigation involving SKAT that ED&F has communicated the apparent falsehoods to the Plan.

76.     Despite multiple inquires, ED&F has refused to explain why the Disavowed Tax Vouchers are false or how ED&F reached that determination.  It has only been through litigation that ED&F has tried to explain the problems with the Disavowed Tax Vouchers.

77.     Even more concerning is that the Disavowed Tax Vouchers are identical in appearance, format and language to the other two (2) Tax Vouchers issued to the Plan by ED&F that ED&F has not identified as being inaccurate.

---

[1] This amount is the result of a conversion from Danish Krone ("DKK") to U.S. Dollars performed on January 27, 2021, utilizing a conversion rate of 1 U.S. Dollar to 6.15 DKK.

78.    ED&F has offered no evidence that it did not know the Disavowed Tax Vouchers were false when first transmitted to the Plan and Goal Taxback.

79.    Despite being in possession of information upon which it has subsequently determined that there were five (5) transactions in which the Plan did not receive a dividend from a Danish listed company and did not suffer withholding tax at any rate, ED&F fraudulently issued the Disavowed Tax Vouchers reflecting that the Plan had actually received dividends from the Danish-listed company and had suffered withholding tax at a rate of 27% of such dividends.

80.    Third-Party Plaintiff reasonably relied on all Tax Vouchers issued by ED&F, including the Disavowed Tax Vouchers, and other information provided by ED&F, including buy/sell confirmations and account statements, to form the belief that with respect to the securities reflected on the Tax Vouchers (i) the Plan's Holdings and Dividends were accurate; (ii) the Plan actually held the securities it represented to SKAT that it owned; (iii) the Plan received the Dividends; (iv) dividend tax was withheld in relation to the Dividends and the Holdings; and (v) the Plan was entitled to withholding-tax refunds from SKAT in the amount set out in the Tax Voucher.

81.    Third-Party Plaintiff reasonably relied on the Tax Vouchers, including the Disavowed Tax Vouchers, and other information provided by ED&F, including buy/sell confirmations and account statements, when requesting the withholding-tax refunds from SKAT through Goal Taxback and when continuing to engage in further trades through ED&F, including the transactions at issue in SKAT's claims.

82.    Third-Party Plaintiff relied on ED&F's misrepresentations, including the Tax Vouchers, by maintaining the Plan's business relationship with ED&F and continuing the Plan's trading of Danish securities through ED&F. Indeed, had Third-Party Plaintiff known that some of

the earliest Tax Vouchers that ED&F had created had been falsified—or if ED&F never created those tax vouchers in the first place—then Third-Party Plaintiff would have ensured that the Plan cease its relationship with ED&F.

83.     Third-Party Plaintiff reasonably relied on the Tax Vouchers, including the Disavowed Tax Vouchers, and other information provided by ED&F, including buy/sell confirmations and account statements, when a Danish law firm was hired at significant cost to pursue appeals of SKAT's final determinations regarding the Plan's withholding tax refund applications.

**F.  If SKAT proves the Plan did not own the shares it claimed to own, did not earn the dividends it claimed to have earned, or was otherwise not entitled to the withholding taxes it claimed, then ED&F should be responsible for any amounts claimed by SKAT.**

84.     SKAT alleges Third-Party Plaintiff misrepresented the Plan's Holdings and Dividends when the Plan requested the withholding-tax refunds.

85.     SKAT alleges that the Plan did not own the shares that it claimed to own, did not earn the dividends it claimed to have earned, and was not entitled to the tax refunds that it claimed.

86.     SKAT also alleges that ED&F provided statements falsely representing that the Plan owned shares in Danish companies and had earned dividends on those shares.  To be clear, the Plan has never attempted to defraud or commit other wrongful actions against SKAT.

87.     If, however, SKAT proves its claims and establishes that the Third-Party Plaintiff is liable to SKAT for some or all of SKAT's alleged damages or amounts it claims to be owed, then ED&F should be responsible for such damages because of ED&F's obligations under the Agreement, its duty to transmit only truthful and accurate information to the Plan, and because of its unique position by which it managed and controlled the Plan's brokerage account, executed

securities transactions for the Plan, and could confirm the Plan's Holdings, Dividends, and withholding-tax refunds.

### G. Alternatively, ED&F must repay the fees it collected in relation to the Plan's transactions and withholding-tax refunds if SKAT is entitled to damages or restitution.

88.     Parties that facilitate securities transactions and related transactions typically charge fees. Fees are often charged as a percentage of the total profit or cost of the transaction. This is common in many service-oriented industries and is simply understood as the "cost of doing business."

89.     As should be expected, ED&F collected fees from the Plan in connection with the Plan's transactions, Holdings, Dividends, and/or withholding-tax refunds.

90.     In its Amended Defence, ED&F admitted that it "received fees out of the proceeds of any successful [withholding-tax] applications which included a Tax Voucher prepared by ED&F."

91.     ED&F charged fees to and collected fees from the Plan out of the proceeds of the successful withholding-tax applications which included Disavowed Tax Vouchers prepared by ED&F.

92.     If SKAT's allegations are proven to be true or if SKAT is otherwise entitled to reimbursement of some or all of the amounts that SKAT reimbursed or refunded to the Plan, then ED&F should be required, at a minimum, to return any fees it collected from the Plan in connection with the Plan's transactions, Holdings, Dividends, and/or withholding-tax refunds, including the fees charged to the Plan and collected by ED&F in relation to the Disavowed Tax Vouchers.

## THIRD-PARTY CLAIM COUNT I
### <u>Fraud</u>

93.     Third-Party Plaintiff repeats and realleges paragraphs 1 through 92 of this Third-Party Complaint as if set forth fully herein.

94.     ED&F prepared and transmitted the Tax Vouchers, including the Disavowed Tax Vouchers, to the Plan.

95.     According to ED&F's recent admissions, the Disavowed Tax Vouchers contain false statements of material fact concerning the Plan's receipt of dividends and suffering of dividend-withholding taxes.

96.     ED&F intentionally, knowingly, and/or recklessly made or caused to be made the false statements in the Disavowed Tax Vouchers for the purpose of inducing Third-Party Plaintiff to act upon those false statements.

97.     ED&F had a financial interest in making the misstatements in the Disavowed Tax Vouchers because, in making those misstatements, it put itself in a position to charge the Plan for custody and clearance fees after SKAT accepted the withholding-tax applications based on the Disavowed Tax Vouchers.

98.     Third-Party Plaintiff, without knowledge or reason to know of any false statements in the Tax Vouchers or the Disavowed Tax Vouchers, reasonably relied on ED&F's statements in the Tax Vouchers, including the false statements in the Disavowed Tax Vouchers, when the Plan requested the dividend-withholding taxes SKAT now wants returned in its actions against Third-Party Plaintiff.

99.     Third-Party Plaintiff also relied on ED&F's statements in the Tax Vouchers, including the false statements in the Disavowed Tax Vouchers, when a Danish law firm was hired

at significant cost to pursue appeals of SKAT's final determinations regarding the Plan's withholding tax refund applications.

100.    If SKAT is entitled to the amounts it claims to be owed, then ED&F should be liable to Third-Party Plaintiff for any amounts or other remedies Third-Party Plaintiff is found to owe SKAT, including, but not limited to damages, restitution, punitive damages, and/or fees and costs, plus interest, and for any and all legal fees spent in defense of Third-Party Plaintiff against SKAT.

101.    ED&F should further be liable to Third-Party Plaintiff for any and all legal fees spent in pursuit of the appeal of SKAT's final determination, as that appeal was premised on the truthfulness of documentation and information provided by ED&F, including the Tax Vouchers and the Disavowed Tax Vouchers.

102.    ED&F's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty, entitling Third-Party Plaintiff to punitive damages.

### THIRD-PARTY CLAIM COUNT II
### Negligent Misrepresentation

103.    Third Party Plaintiff repeats and realleges paragraphs 1 through 102 of this Third-Party Complaint as if set forth fully herein.

104.    At all relevant times herein, ED&F had a duty to provide truthful and accurate tax vouchers and other documentation concerning the Plan's securities.

105.    According to ED&F's own admissions, ED&F made material, factual statements in the Disavowed Tax Vouchers that it represented were true, but which were, in fact, not true when made.

106.    ED&F knew or should have known that the Disavowed Tax Vouchers were inaccurate when it prepared them for the Plan.

107.    ED&F failed to use reasonable care to determine whether misstatements in the Disavowed Tax Vouchers were true.

108.    ED&F was in a better position than Third-Party Plaintiff to know the true facts.

109.    Third-Party Plaintiff, without knowledge or reason to know of any false statements in the Tax Vouchers or the Disavowed Tax Vouchers, reasonably relied on ED&F's statements in the Tax Vouchers, including the false statements in the Disavowed Tax Vouchers, when the Plan requested the dividend-withholding taxes SKAT now wants returned in its actions against Third-Party Plaintiff.

110.    If SKAT is entitled to the amounts it claims to be owed, then ED&F should be liable to Third-Party Plaintiff for any amounts or other remedies the Third-Party Plaintiff is found to owe SKAT, including, but not limited to damages, restitution, punitive damages, and/or fees and costs, plus interest.

111.    ED&F should further be liable to Third-Party Plaintiff for any and all legal fees spent in pursuit of the appeal of SKAT's final determination, as that appeal was premised on the truthfulness of the Tax Vouchers, including the Disavowed Tax Vouchers.

### THIRD-PARTY CLAIM COUNT III
### Breach of Fiduciary Duty

112.    Third-Party Plaintiff repeats and realleges paragraphs 1 through 111 of this Third-Party Complaint as if set forth fully herein.

113.    ED&F, as custodian to the Plan, had a fiduciary relationship with Third-Party Plaintiff.  Third-Party Plaintiff, as trustee and sole participant for the Plan, placed his confidence in ED&F to act in good faith and primarily for the benefit of the Plan and placed the Plan's property, interests, and trust in the charge of ED&F.  ED&F was uniquely positioned to confirm

the Plan's Holdings, Dividends, brokerage account, securities transactions, and entitlement to dividend withholding taxes.

114.    On information and belief, ED&F was the only entity that had direct control over information concerning, among other things, the Plan's brokerage account, securities transactions, receipt of dividends, and entitlement to dividend withholding taxes.

115.    Because of its fiduciary relationship, ED&F was required to deal truthfully and primarily for the benefit of the Plan at all times, to exercise reasonable care, skill, and diligence, and to advise Third-Party Plaintiff and the Plan of all relevant facts and circumstances known to ED&F.

116.    ED&F's fiduciary duties are separate and distinct from its contractual obligations to the Plan under the Agreements.

117.    ED&F breached its fiduciary duties by, at the very least, making the false statements in the Disavowed Tax Vouchers for the Plan's withholding-tax applications.

118.    If SKAT's allegations are proven to be true or if SKAT is otherwise entitled to the amounts it claims to be owed, then ED&F breached its fiduciary obligations, and Third-Party Plaintiff will have been damaged, in an amount to be determined, as a direct result of ED&F's breaches.

119.    Thus, if SKAT's allegations are proven to be true or if SKAT is otherwise entitled to the amounts it claims to be owed, then ED&F should be liable to Third-Party Plaintiff for any amounts or other remedies Third-Party Plaintiff is found to owe SKAT, including, but not limited to, damages, restitution, punitive damages, and/or fees and costs, plus interest.

120.    ED&F should further be liable to Third-Party Plaintiff for any and all legal fees spent in pursuit of the appeal of SKAT's final determination, as that appeal was premised on the

truthfulness of documentation and information provided by ED&F, including the Tax Vouchers and the Disavowed Tax Vouchers.

### THIRD-PARTY CLAIM COUNT IV
#### Promissory Estoppel

121.    Third-Party Plaintiff repeats and realleges paragraphs 1 through 120 of this Third-Party Complaint as if set forth fully herein.

122.    ED&F promised to exercise reasonable care when, among other things, (i) buying or selling securities for the Plan; (ii) settling the Plan's transactions; (iii) managing the Plan's custodian and sub-custodian accounts; (iv) keeping records and statements concerning the Plan's brokerage account and ownership of securities; (v) acting on the Plan's instructions; (vi) registering the Plan's securities in compliance with all applicable rules and regulations; and (vii) crediting all income, dividends, and other proceeds on the Plan's securities only after actual receipt and reconciliation.

123.    ED&F promised to create only truthful and accurate documents in relation to the Plan's account statements, buy/sell confirmations, dividend receipts, tax vouchers, or other documentation in relation to the Plan's securities holdings and brokerage account.

124.    ED&F should have reasonably expected — and, on information and belief, did reasonably expect — its promises to induce Third-Party Plaintiff to rely on the Tax Vouchers and other information provided by ED&F, including buy/sell confirmations and account statements, to form the belief that (i) the Plan's Holdings and Dividends were, in fact, accurate and legitimate; (ii) the Plan actually held the securities it represented to SKAT that it owned; (iii) the Plan actually received the Dividends it claimed to have received; (iv) taxes were withheld in relation to the Dividends and Holdings; and (v) the Plan was entitled to the withholding-tax refunds.

125.     Third-Party Plaintiff acted with prudence and in reasonable reliance on ED&F's promises when authorizing Goal Taxback to submit applications for the withholding-tax refunds from SKAT and refrained from seeking from any other party a tax voucher or other documentation to support the Plan's tax-withholding refund claims.  On information and belief, ED&F knew that Third-Party Plaintiff so relied on ED&F's promises.

126.     ED&F knew all important and material facts concerning its promises, the Holdings, the Dividends, the Tax Vouchers, and the withholding-tax refunds.

127.     ED&F failed to fulfill its promises by, at the very least, making the false statements in the Disavowed Tax Vouchers for the Plan's withholding-tax applications.

128.     If, as SKAT alleges, the Plan never held the shares it claimed to own, never received the dividends it claimed to have received, and/or are otherwise not entitled to the withholding-tax refunds, then ED&F failed to fulfill its promises, and Third-Party Plaintiff will have been damaged, in an amount to be determined, as a result of ED&F's failure to fulfill its promises.

129.     Thus, if SKAT's allegations are proven to be true or if SKAT is otherwise entitled to the amounts it claims to be owed, then ED&F should be liable to Third-Party Plaintiff for any amounts or other remedies Third-Party Plaintiff is found to owe SKAT, including, but not limited to, damages, restitution, punitive damages, and/or fees and costs, plus interest.

130.     ED&F should further be liable to Third-Party Plaintiff for any and all legal fees spent in pursuit of the appeal of SKAT's final determination, as that appeal was premised on the truthfulness of documentation and information provided by ED&F, including the Tax Vouchers and the Disavowed Tax Vouchers.

### THIRD-PARTY CLAIM COUNT V
**<u>Unjust Enrichment</u>**

131.    Third-Party Plaintiff repeats and realleges paragraphs 1 through 130 of this Third-Party Complaint as if set forth fully herein.

132.    ED&F collected fees from the Plan in connection with the Plan's transactions, Holdings, Dividends, withholding-tax refunds, and Tax Vouchers, including the Disavowed Tax Vouchers.

133.    SKAT has alleged that the Plan's transactions, Holdings, Dividends, and Tax Vouchers were falsified and that the Plan was not entitled to the withholding-tax refunds from SKAT.

134.    ED&F has admitted that the Disavowed Tax Vouchers contained false information.

135.    It would be unjust for ED&F to retain the fees it collected from the Plan if SKAT's allegations are proven to be true or if SKAT is otherwise entitled to reimbursement of some or all of the amounts that SKAT paid the Plan.

136.    On information and belief, ED&F knowingly possesses the fees it collected from the Plan.

137.    Thus, if SKAT's allegations are proven to be true or if SKAT is otherwise entitled to reimbursement of some or all of the amounts that SKAT paid the Plan, then ED&F will have been unjustly enriched in the amount of the fees it collected from the Plan, and ED&F should be liable to account and return the fees, plus interest.

### THIRD-PARTY CLAIM COUNT VI
**<u>Equitable Indemnification</u>**

138.    Third-Party Plaintiff repeats and realleges paragraphs 1 through 137 of this Third-Party Complaint as if set forth fully herein.

139.    If SKAT's allegations are proven to be true or if SKAT is otherwise entitled to the amounts it claims to be owed, then Third-Party Plaintiff will be liable to SKAT or will be obligated to repay SKAT the entire amount of the withholding-tax refunds paid by SKAT to the Plan.

140.    However, as alleged herein, Third-Party Plaintiff relied on ED&F and ED&F's own statements, including the Disavowed Tax Vouchers.

141.    Furthermore, SKAT has alleged that it was ED&F that provided the statements falsely representing that the Plan owned shares in Danish companies and had earned dividends on those shares.

142.    Thus, if SKAT's allegations are proven to be true or if SKAT is otherwise entitled to the amounts it claims to be owed, then ED&F should be obligated to indemnify Third-Party Plaintiff for all costs incurred and that Third Party Plaintiff may incur as a result of any of SKAT's claims, including, but not limited to, (i) any amounts owed by Third-Party Plaintiff to SKAT or, in the alternative, any amounts ED&F received in connection with the Plan's transactions, Holdings, Dividends, withholding-tax refunds, and Tax Vouchers and (ii) any of the Third-Party Plaintiff's attorneys' fees and costs, plus pre-judgment interest and other expenses arising out of or related to these third-party claims and SKAT's claims against the Third-Party Plaintiff in this or any jurisdiction.

143.    ED&F should further be liable to Third-Party Plaintiff for any and all legal fees spent in pursuit of the appeal of SKAT's final determination, as that appeal was premised on the truthfulness of documentation and information provided by ED&F, including the Tax Vouchers and the Disavowed Tax Vouchers.

## THIRD-PARTY CLAIM COUNT VII
### Apportionment of Fault

144.    Third-Party Plaintiff repeats and realleges paragraphs 1 through 143 of this Third-Party Complaint as if set forth fully herein.

145.    SKAT has filed claims against Third-Party Plaintiff for damages and restitution arising out of and related to Plan's dealings with ED&F.

146.    SKAT alleged that ED&F provided statements falsely representing that the Plan owned shares in Danish companies and had earned dividends on those shares, and thus, if SKAT proves its claims, then ED&F should be responsible for all or a portion of SKAT's alleged harm.

147.    Pursuant to the Utah Liability Reform Act, Utah Code §§ 78B-5-817, et seq., Third-Party Plaintiff allege that all fault should be apportioned to ED&F for SKAT's claims against Third-Party Plaintiff, including, but not limited to, damages, restitution, punitive damages, and/or fees and costs, plus interest.

148.    Third-Party Plaintiff intends to include ED&F on a special verdict form for the purposes of allocation of fault, consistent with the above.

### JURY DEMAND

Third-Party Plaintiff demands a jury trial on all issues so triable.

### REQUEST FOR RELIEF

WHEREFORE, Darren Wittwer respectfully requests that this Court enter judgment in his favor and against ED&F as follows:

I.    Enter judgment in favor of Darren Wittwer and against ED&F on the third-party claims against ED&F;

II.    Apportion all fault to ED&F for SKAT's claims against Darren Wittwer, pursuant to the Utah Liability Reform Act, Utah Code §§ 78B-5-817, et seq.;

III. In the event SKAT successfully proves its claims against Darren Wittwer, require ED&F to indemnify Darren Wittwer for all costs arising out of or related to SKAT's claims against Darren Wittwer and these third-party claims, including Darren Wittwer's attorneys' fees and costs, plus pre-judgment interest, costs, and expenses;

IV. Award Darren Wittwer his attorneys' fees and costs; and

V. Grant such other preliminary, permanent, compensatory, or punitive relief against ED&F and in favor of Darren Wittwer as the Court deems just and proper.

May 28, 2024                         Respectfully submitted,

                                    K&L GATES LLP


                                    */s/ John C. Blessington*
                                    John C. Blessington (*pro hac vice*)
                                      john.blessington@klgates.com
                                    Brandon R. Dillman (*pro hac vice*)
                                      brandon.dillman@klgates.com
                                    Michael R. Creta (pro hac vice)
                                      michael.creta@klgates.com
                                    John L. Gavin (pro hac vice)
                                      john.gavin@klgates.com
                                    K&L GATES LLP
                                    State Street Financial Center
                                    One Lincoln Street
                                    Boston, MA  02111
                                    T: 617.261.3100
                                    F: 617.261.3175

                                    *Attorneys for Defendant / Third-Party Plaintiff
                                    Darren Wittwer*

# EXHIBIT A

CUSTODY AGREEMENT

**THIS CUSTODY AGREEMENT** is made on 21 June 2012

**BETWEEN:**

(1)     **E D & F MAN CAPITAL MARKETS LIMITED**, registered in England and Wales with company number 1292851, whose registered office is at Cottons Centre, Hay's Lane, London, SE1 2QE (the "**Custodian**"); and

(2)     **D W CONSTRUCTION, INC RETIREMENT PLAN** the "**Client**").

**IT IS AGREED** as follows:

1.     **DEFINITIONS AND INTERPRETATION**

1.1     **Definitions**

Capitalised terms in this Agreement have the meaning given to them below:

"**Authorised Signatory**" means any person who is designated in writing by the Client from time to time to act on behalf of the Client in respect of this Agreement;

"**Business Day**" means a day on which the Trans-European Automated Real-time Gross settlement Express Transfer (TARGET) system is open;

"**Client Cash**" means cash in any currency arising out of or in connection with the Client Securities and any amounts standing to the credit of the Client Cash Account;

"**Client Property**" means the Client Cash and/or the Client Securities;

"**Client Securities**" means any securities (including evidence thereof, evidence of title thereto and all rights in respect thereof) deposited or transferred by the Client or on the Client's behalf to the Custodian or a Sub-Custodian or collected by the Custodian or a Sub-Custodian for the Client's account;

"**Client Securities Voting Rights**" means each and any right to vote exercisable in respect of the Client Securities;

"**Costs and Expenses**" means costs, charges, losses, liabilities, expenses and other sums (including legal, accountants' and other professional fees) and any Tax thereon;

"**Custody Accounts**" means the Client Cash Accounts and the Client Securities Accounts, and "Custody Account" shall mean any or a particular one of them as the context requires;

"**FSA**" means the Financial Services Authority of the United Kingdom (including any successor or replacement regulatory authority);

"**FSA Rules**" means the rules promulgated by the FSA pursuant to FSMA and set out in the FSA's handbook of rules and guidance, as updated, amended or repealed from time to time;

"**FSMA**" means the Financial Services and Markets Act 2000;

"**Secured Liabilities**" has the meaning given to such term in the Security and Set-Off Deed;

"**Security and Set-Off Deed**" means the security and set-off deed dated on or about the date hereof between the Custodian and the Client;

"**Sub-Custodian**" means "Deutsche Bank Custody Services" or any other sub-custodian appointed by the Custodian from time to time;

"**Tax**" or "**taxation**" or "**tax**" includes any tax, levy, impost, duty, charge, fee, contribution, deduction or withholding of any nature, and any interest or penalties in respect thereof.

1.2     **Construction of particular terms**

Unless otherwise specified, any reference to:

(a)     an "**affiliate**" means in relation to any person, a subsidiary of that person or a holding company of that person or any other subsidiary of that holding company;

(b)     "**assets**" includes properties, revenues and rights of every kind, present, future and contingent, and whether tangible or intangible;

(c)     a "**company**" includes any company, corporation or other body corporate, wherever and however incorporated or established;

(d)     "**holding company**" means a holding company within the meaning of section 1159 of the Companies Act 2006;

(e)     "**law**" includes common or customary law, principles of equity and any constitution, code of practice, decree, judgement, decision, legislation, order, ordinance, regulation, bye-law, statute, treaty or other legislative measure in any jurisdiction or any present or future directive, regulation, guideline, request, rule or requirement (in each case, whether or not having the force of law but, if not having the force of law, the compliance with which is in accordance with the general practice of persons to whom the directive, regulation, guideline, request, rule or requirement is intended to apply) of any governmental, intergovernmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(f)     "**liability**" includes, and "**liabilities**" include, any loss, damage, cost, charge, claim, demand, expense, judgement, action, proceeding or other liability whatsoever (including, without limitation, in respect of taxes, duties, levies, imposts and other charges);

(g)     a "**person**" includes any natural person, firm, company, corporation, undertaking, government, state or agency of a state, any local or municipal authority, trust, any association or partnership (whether or not having separate legal personality) of two or more of the foregoing or other legal entity;

(h)     a "**regulation**" includes any regulation, rule, official directive, request or guideline (in each case, whether or not having the force of law but, if not having the force of law, the compliance with which is in accordance with the general practice of

persons to whom the regulation, rule, official directive, request or guideline is intended to apply) of any governmental, intergovernmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(i)     "**rights**" includes all rights, title, benefits, powers, privileges, interests, claims, authorities, discretions, remedies, liberties, easements, quasi easements and appurtenances (in each case, of every kind, present, future and contingent);

(j)     "**security**" or "**security interest**" includes any mortgage, charge, pledge, lien, security assignment, hypothecation or trust arrangement for the purpose of providing security and any other encumbrance or security interest of any kind having the effect of securing any obligation of any person (including, without limitation, the deposit of moneys or property with a person with the intention of affording such person a right of set-off or lien) and any other agreement or any other type of arrangement having a similar effect; and

(k)     "**subsidiary**" means a subsidiary within the meaning of section 1159 of the Companies Act 2006 and a subsidiary undertaking within the meaning of section 1161 of the Companies Act 2006.

**1.3    Interpretation**

(a)     Words importing the singular shall include the plural and vice versa.

(b)     Unless a contrary indication appears, a reference to any party or person shall be construed as including its and any subsequent successors in title, permitted transferees and permitted assigns, in each case in accordance with their respective interests.

(c)     Unless a contrary indication appears, a reference to a time of day shall be construed as referring to London time.

(d)     Section, clause and Schedule headings are for ease of reference only and shall be ignored in construction.

(e)     Unless a contrary indication appears, references to any provision of any law or regulation are to be construed as referring to that provision as it may have been, or may from time to time be, amended or re enacted, and as referring to all bye laws, instruments, orders and regulations for the time being made under or deriving validity from that provision.

(f)     A reference to any document is a reference to that document as amended, restated, supplemented, novated or replaced from time to time (except where the context otherwise requires).

**2.    APPOINTMENT**

(a)     The Client hereby appoints the Custodian to act as bare trustee for the purposes of safekeeping the Client Property upon the terms of this Agreement and the Custodian agrees to act as such upon the terms and conditions set out in this Agreement.

(b)     The Custodian shall open the following accounts:

(i)   one or more custody accounts in the Custodian's books recording any Client Securities (the "**Client Securities Accounts**"); and

(ii)  one or more accounts in the Custodian's books recording any Client Cash held by or on behalf of the Custodian on account of the Client (the "**Client Cash Account**").

(c)   Each Custody Account shall be maintained in London, England.

(d)   Subject to Clause 2(c), the Client Property may be held by the Custodian at any of the Custodian's places of business or (in accordance with Clause 4 (*Use of Sub-Custodians*)) by a Sub-Custodian in the United Kingdom or elsewhere, at the Custodian's absolute discretion.

(e)   The Client Securities shall be held, recorded, registered and segregated in accordance with the FSA Rules or, where held outside the United Kingdom, the equivalent of the FSA Rules relating solely to these matters, provided that the Custodian shall not be required to comply with any equivalent of the FSA Rules which require any consent to be obtained or notification to be given by the Custodian.

(f)   The Custodian shall only accept custody under this Agreement of Client Property.

## 3.    CATEGORISATION

(a)   The Client hereby acknowledges that the Custodian shall classify the Client as a "Elective Professional Client" for the purpose of the FSA Rules; that the Client has not objected to this classification; and the Client hereby confirms that it consents to such classification.

(b)   The Client may be entitled to request a different categorisation under the FSA Rules. However, a different categorisation could result in the loss of certain client protections.

## 4.    USE OF SUB-CUSTODIANS

(a)   The Custodian may from time to time delegate to a Sub-Custodian any of the Custodian's duties under this Agreement, including (without limitation) the safekeeping of the Client Property, and each such Sub-Custodian shall hold the Client Property at the Client's risk and, subject to Clauses 2(e) and 4(b), on such terms and conditions as such Sub-Custodian may require.

(b)   The Client acknowledges that any Sub-Custodian may delegate or appoint an agent or sub-custodian to perform any of its duties as Sub-Custodian.

(c)   Holdings of the Client Property by Sub-Custodians will be subject to applicable laws and regulations including, without limitation, any applicable rules of the relevant Sub-Custodian and the Custodian is under no obligation to take or refrain from taking any action in relation to such Client Property, whether pursuant to a Client Instruction or otherwise, except to the extent the Custodian has a right to require the Sub-Custodian to take or refrain from taking such action.

(d)   Notwithstanding any other provision of this Agreement, where the Client Property is held by a Sub-Custodian the Custodian has no liability or responsibility of any nature whatsoever to the Client in relation to the Client Property except to the

extent that the Sub-Custodian has an equivalent liability to the Custodian in relation to the Client Property under the Sub-Custody Agreement.

**5.    CUSTODY OF THE CLIENT SECURITIES**

(a)    The Client shall deliver assets intended for custody under this Agreement to the Custodian or as the Custodian may direct at the Client's expense and risk, in the manner, and accompanied by such documents, as the Custodian may require.

(b)    The Custodian will identify in the Custodian's books that the Client Securities are beneficially owned by the Client.  The Custodian will require Sub-Custodians to identify in their books that the Client Securities are held to the order of the Custodian.

(c)    The Custodian may pool the Client Securities with securities held by the Custodian for other clients.  The Client Securities may be held by the Custodian or by any Sub-Custodian in a fungible account in which case the Custodian will identify in its books that such Client Securities belong to the Client.  The Custodian may use the Client Securities for the account of another customer and vice versa.

(d)    The Custodian may hold any document of title or document evidencing title to the Client Securities:

(i)     in the Custodian's physical possession;

(ii)    with a Sub-Custodian; or

(iii)   otherwise, with the prior written consent of the Client.

(e)    Notwithstanding any other provision of this Agreement, but without prejudice to the Client's proprietary rights, the Client Securities will be deemed to be fungible for the purposes of this Agreement.  Accordingly, the Customer's redelivery rights in respect of the Client Securities are not in respect of the Securities actually deposited with the Custodian from time to time but rather in respect of Securities of the same number, class, denomination and issue as those Securities originally deposited with the Custodian from time to time.  A reference in this Agreement to "Client Securities" (and similar expressions) shall be construed accordingly.

**6.    REGISTRATION OF SECURITIES**

(a)    All Client Securities delivered to the Custodian shall be registered in the name of the Client, Custodian, nominee or agent of the Custodian, or Sub-Custodian in compliance with FSA Rules.

(b)    The Client acknowledges that where Client Securities are registered in the name of the Custodian, the Client Securities may not be segregated from other securities held by the Custodian and the Client Securities and may not be identifiable by separate certificates or other physical documents of title.  Consequently, should the Custodian become insolvent, the Client securities may not be protected from claims made on behalf of the general creditors of the Custodian.

(c)    The Client acknowledges that where the Client Securities are held by a Sub-Custodian outside the United Kingdom, different settlement, legal and regulatory

requirements, and different practices relating to the segregation of those securities, may apply.

(d) Where the Client Securities are registered in the same name as the securities of other clients of the Custodian, the Client is warned that its entitlements to particular Client Securities may not be identifiable by separate certificates or other physical documents of title, and that, should the Custodian default, any shortfall in the Client Securities registered in that name may be shared pro rata among all Clients whose securities are registered.

(e) Where the Client has instructed the Custodian on the holding, registration or recording of Client Securities, the Client is hereby notified that the consequences of doing so are at the Client's own risk unless the Custodian has agreed otherwise.

(f) Where any Client Securities are in uncertified form or are otherwise transferable by book entry transfer, the Client agrees that the Custodian may (where this is market practice) use the services of any securities depository, clearing or settlement system, account controller or other participant in the relevant system, on such terms as the Custodian may think fit, for the purposes of the holding and transfer of such Client Securities (or entitlements thereto).  Such Client Securities or entitlements will, so far as is practicable, be separately identifiable from any Client Securities or entitlements held within the same system for the account of the Custodian.

## 7.    AUTHORISED SIGNATORIES

The Client shall provide the Custodian with a list of Authorised Signatories together with specimens of their signatures and the Custodian shall be entitled to rely upon the continued authority of the Authorised Signatories until the Custodian receives written notice from the Client to the contrary.

## 8.    CLIENT INSTRUCTIONS

(a) The Custodian may act on instructions ("**Client Instructions**") from an Authorised Signatory or Client Instructions purporting to be given by an Authorised Signatory received by the Custodian in writing, or by electronic or other medium agreed in writing between the parties.  Client Instructions given by an agreed electronic medium shall be deemed to have been given by an Authorised Signatory.

(b) Client Instructions shall continue in full force and effect until cancelled or suspended.

(c) The Custodian may, in the Custodian's absolute discretion (but shall be under no duty to), refuse to act on Client Instructions which are not given in accordance with this Agreement.

(d) If any Client Instructions are incomplete, unclear, ambiguous, and/or in conflict with other Client Instructions, the Custodian may at the Custodian's absolute discretion and without any liability on the Custodian's part, act upon what the Custodian believes in good faith such Client Instructions to be or refuse to act on such Client Instructions until any incompleteness, lack of clarity, ambiguity and/or conflict has been resolved to the Custodian's satisfaction.

(e) The Custodian will promptly inform an Authorised Signatory if it is not going to act on a particular Client Instruction received from such individual.

(f) Client Instructions shall be carried out subject to the rules, operating procedures and market practice of any relevant stock exchange, Sub-Custodian or market (the "**Custody Rules**"). The Custodian may refuse to carry out Client Instructions if in the Custodian's reasonable opinion they are contrary to the Custody Rules or any applicable law, or other regulatory or fiscal requirement and shall be entitled at the Custodian's absolute discretion to amend Client Instructions so that they comply with the Custody Rules, in which case the Custodian shall promptly notify the Client of such amendment.

(g) The Custodian shall be under no duty to challenge or make any enquires concerning any Client Instruction and, subject to Clause 8(d), all Client Instructions shall be deemed to be conclusive of the Client's order or instruction.

## 9.    SETTLEMENT AND REDELIVERY

(a) In accordance with Client Instructions and subject to Clause 8 (*Client Instructions*), the Custodian will arrange for the settlement of transactions which have been executed by the Client or on the Client's behalf.

(b) The Custodian shall credit the Client Cash Account with the proceeds of any sale or exchange of Client Securities and debit the Client Cash Account for the cost of any Client Securities purchased or acquired only on the date on which such proceeds or Client Securities are received by the Custodian.

(c) If Client Instructions are given to transfer to Client or at its direction, Client Property other than as contemplated by the foregoing provisions of this Clause 9 then, subject to Clauses 8 (*Client Instructions*) and 9(d) and subject to the Custodian being able to give effect to such Client Instructions in accordance with their terms, the Custodian shall give effect to the relevant transfer.

(d) The Custodian shall be under no obligation to act on Client Instructions:

(i) to settle any purchase of Client Securities unless and until there is sufficient Client Cash in the Client Cash Account (or other arrangements for payment satisfactory to the Custodian have been made);

(ii) to settle or give effect to any sale or other transfer of Client Securities unless the Client Securities are in deliverable form in the relevant Client Securities Accounts; or

(iii) to give effect to any transfer to the Client or at its direction, of Client Cash unless there is sufficient Client Cash in the Client Cash Account.

## 10.    ACTIONS NOT REQUIRING CLIENT INSTRUCTIONS

In the absence of contrary Client Instructions, the Custodian is authorised by the Client to carry out the following actions relating to Client Property without reference to the Client, namely:

(a) to take such actions as are necessary to settle: (i) the transactions contemplated by the Transaction Documents (as defined in the Security and Set-Off Deed); and (ii)

transactions contemplated by any instruction in respect of the Client Securities given by the Client to its broker;

(b)    to collect and receive, for the Client's account, all payments (whether income or capital), income and dividends in respect of Client Property and to credit such to the Client Cash Account, and to take any action necessary and proper in connection with the same and the endorsement for collection of cheques, drafts and other negotiable instruments and the deduction or withholding of any sum on account of any Tax which may be due from either the Custodian or the Client in respect of Client Property;

(c)    to execute on the Client's behalf such ownership and other certificates as may be required to obtain payment in respect of the Client Securities;

(d)    to exchange interim or temporary documents of title to the Client Securities for definitive ones; and

(e)    to perform and carry out on the Client's behalf or otherwise all acts which, in the Custodian's reasonable opinion or the reasonable opinion of any Sub-Custodian, are requisite or desirable to enable the Custodian or a Sub-Custodian, to implement any Client Instructions or otherwise to perform the Custodian's duties and exercise the Custodian's rights under this Agreement.

## 11.    OTHER SERVICES AND SCOPE OF RESPONSIBILITY

(a)    The Custodian shall use all reasonable care in performing its obligations under this Agreement and shall look after the Client Securities with all reasonable care.

(b)    Income, dividends and redemption proceeds on the Client Securities will only be credited (net of Taxes) after actual receipt and reconciliation.

(c)    Provided the Custodian receives the requisite information acting in its capacity as custodian under this Agreement, the Custodian shall use reasonable endeavours to notify the Client of all calls for redemption, grants or expiration of conversion rights or subscription rights, mergers, takeover or other offers, consolidations, reorganisations and capitalisations affecting the Client Securities.

(d)    For the avoidance of doubt, and subject to Clause 10 (*Actions not requiring Client Instructions*), the Custodian shall not, except in accordance with Client Instructions, take any action in relation to the matters referred to in Clause 11(c) and the Custodian is not responsible for the exercise of any conversion or subscription rights or for dealing with takeover or other offers or capital restructuring.

(e)    The Custodian shall notify the Client when the Client Securities Voting Rights become exercisable by the Custodian in respect of any Client Securities promptly upon becoming aware of the same and shall, subject to Clause 11(f), exercise such Client Securities Voting Rights in accordance with the Client's written instructions provided such instructions are received so as to allow the Custodian acting on its best efforts to do so.  If no such instructions are received from the Client then the Custodian shall not exercise such Client Securities Voting Rights.

(f)    The Custodian shall not be obliged to act in accordance with the written instructions given under Clause 11(e) unless:

(i)    such instructions are clear, unambiguous and lawful; and

(ii)    the exercise by the Custodian of the Client Securities Voting Rights in accordance with such instructions is lawful; and

(iii)    the proposed resolution or matter in respect of which the Client Securities Voting Rights are to be exercised in accordance with such instructions is lawful.

(g)    Unless otherwise agreed in writing and subject to Clause 10 (*Actions not requiring Client Instructions*), the Client shall be responsible for all filings, Tax returns and reports on any transactions undertaken or settled pursuant to this Agreement which must be made to any relevant authority whether governmental or otherwise for the payment of all unpaid calls, Taxes (including, without limitation, any value added tax) or any other liability or payment arising out of or in connection with the Client Property.

(h)    The Client shall, if required in connection with any Taxes required to be withheld or otherwise paid in respect of interest, dividends, redemption proceeds or other income arising from the Client Property, provide any relevant information to the Custodian and co-operate with the Custodian in furnishing information, executing documents or otherwise.  The Custodian shall rely on such information as has been provided by the Client, and the Client shall be responsible for notifying the Custodian of any changes affecting its Tax position or status.  Other than as may be expressly provided in this Agreement, the Custodian shall have no responsibility with regard to the Client's Tax position or status in any jurisdiction.

(i)    Neither the Custodian nor any Sub-Custodian shall be obliged to:

(i)    institute legal or administrative proceedings on behalf of the Client or in respect of any Client Property or any Tax; or

(ii)    file a claim or proof of claim in any insolvency proceedings.

(j)    The Custodian shall be under no duty or obligation to insure the Client Property or any part of the Client Property, for the Client against any risk.

(k)    The Custodian shall be under no duty to take or omit to take any action with respect to the Client Property or otherwise except in accordance with this Agreement.

(l)    Without prejudice to Clause 11(g) above, the Client will be responsible for all filings, returns, reports and statements with any regulatory authority which it is required to make either by that authority or under applicable laws, rules or regulations.

(m)    The Custodian does not act as manager or investment adviser to the Client under this Agreement, and responsibility for the selection, acquisition and disposal of the Client Property remains with the Client at all times.

(n)    The Custodian may appoint agents to conduct any of the services referred to in this Clause 11 (or in any other agreement expressed to form part of this Agreement) including, without limitation, any of its affiliates or persons connected with any Sub-Custodian.

12. **RECORDS AND STATEMENTS**

(a)   The Custodian shall keep all records and statements as may be necessary to give the Client a complete record of all Client Property held by it on behalf of the Client from time to time and of all material actions taken by it pursuant to this Agreement.

(b)   The Custodian shall provide the Client with a statement of Client Property held by the Custodian on behalf of the Client at intervals to be agreed with the Client.

(c)   The basis on which Client Property is valued as shown in such statements shall be notified to the Client.

13. **LIMITATIONS OF LIABILITY**

(a)   The Custodian shall only be liable to the Client for any liability, loss or cost suffered by or incurred by the Client to the extent that such liability, loss or cost is a direct result of its own breach of duty, the wilful default, fraud or negligence of the Custodian in providing services under this Agreement.

(b)   Subject to Clause 13(a) above, the Custodian shall not be liable to the Client for any liability, loss or cost suffered by the Client arising from:

(i)   the acts, omissions or the insolvency of any Sub-Custodian or its agent in the absence of breach of duty, negligence or wilful default by the Custodian in the initial selection of any Sub-Custodian;

(ii)   the collection or deposit or crediting to the relevant Client Securities Account of invalid, fraudulent or forged Client Securities or any entry in the Client Securities Accounts or the Client Cash Account which may be made in connection with that collection, deposit, crediting or entry;

(iii)   any delay arising while the Custodian obtains clarification of Client Instructions in accordance with Clause 8(d);

(iv)   acting on what the Custodian in good faith believes to be valid Client Instructions or in relation to notices, requests, waivers, consents, receipts, corporate resolutions or their equivalent or other documents which the Custodian in good faith believes to be genuine; or

(v)   effecting delivery or payment against an expectation of receipt, except where such delivery or payment is contrary to the Client Instruction or relevant local market practice.

(c)   Investing in foreign markets and holding assets overseas may involve special risks. The Client should be aware that there may be different settlement, legal and regulatory requirements in overseas jurisdiction from those applying in the United Kingdom, together with different practices for the separate identification of Client Securities where the Custodian arranges for such Client Securities to be held overseas.

(d)   For the avoidance of doubt and subject to Clause 13(a) above, the Custodian accepts no liability whatsoever for any liability, loss or cost suffered or incurred by the Client resulting from the general risks of investment or the holding of assets including, but not limited to, losses arising from nationalisation, expropriation or

other governmental actions, regulations of the banking or securities industries, including changes in market rules, currency restrictions, devaluations or fluctuations, and market conditions affecting the execution or settlement of transactions or the value of assets.

(e)    The Custodian shall not be responsible for any loss resulting from acts of war, terrorism, insurrection, revolution, acts of God, strikes or work stoppages, failures of settlement systems to settle transactions, or other events beyond the reasonable control of the Custodian.

(f)    Any liability of any nature which arises from the provision by the Custodian of its services under this Agreement shall be limited to the amount of the Client's actual loss at the time the loss is discovered (which loss shall, in respect of any asset which has been mislaid or lost, be determined solely by reference to the market value of that asset) but without reference to any special conditions or circumstances known to the Custodian at the time of entering into this Agreement, or at the time of accepting any Client Instructions, which increases the amount of the loss.  In no event shall the Custodian be liable for any consequential or special damages, including, without limitation, any loss of reputation, goodwill or business suffered by the Client.

(g)    The Custodian and each of its affiliates may have an interest in or in relation to, as the case may be, any Client Property or transaction held, executed or settled, as the case may be under this Agreement as investment manager, investment adviser, broker, underwriter, counterparty or creditor or in any other capacity.  The Custodian and each of its affiliates may receive and retain any fee or brokerage due or paid, as the case may be, to it or any of them, as the case may be, and shall not be liable to account to the Client for any such fee or brokerage or any information obtained by it or any of them as the case may be, by reason of the interest referred to above.

## 14.    FEES AND EXPENSES

(a)    The Client shall pay such fees ("**Fees**") to the Custodian in respect of the services provided under this Agreement as the Custodian may, from time to time, determine and notify to the Client.

(b)    The Client shall on demand reimburse the Custodian's reasonable Costs and Expenses properly incurred in connection with this Agreement.

## 15.    INTEREST

To the extent permitted by applicable law, if any sum of money payable to the Custodian is not paid when due, interest shall accrue upon such unpaid sum as a separate debt, at such reasonable market rate as the Custodian may determine, for the actual number of days during the period from and including the date on which payment was due but excluding the date of payment.

**16. INDEMNITY**

(a) The Client hereby agrees on demand to indemnify the Custodian, and keep the Custodian fully and effectively indemnified against:

  (i) each liability, loss and cost which may be suffered or incurred by the Custodian in connection with the Client Property, this Agreement or the performance of the Custodian's obligations under this Agreement (other than Tax); and

  (ii) any Tax for which the Custodian is or may be liable or accountable in connection with the Client Property, this Agreement or the performance of the Custodian's obligations under this Agreement (including without limitation the purchase and/or sale of Client Securities, the collection and/or realisation of coupons, dividends, interest or other payments, the receipt of or entitlement to receive any income, and the Custodian acting as or being deemed to be a trustee, branch or agent of the Client) provided that this indemnity shall not extend to Tax on or attributable to any Fees.

(b) The indemnity in Clause 16(a) shall not extend to any liability, loss or cost arising out of the wilful default, fraud or negligence of the Custodian or any Sub-Custodian appointed by the Custodian under this Agreement.

**17. REPRESENTATIONS AND WARRANTIES**

(a) The Client hereby represents and warrants to the Custodian that:

  (i) the Client is 401K Plan

  (ii) the Client was, on or immediately prior to the deposit or transfer of any Client Securities by the Client or on the Client's behalf with or to the Custodian or a Sub-Custodian, the beneficial owner of such Client Securities free of mortgage, charge, pledge, lien, right of set-off or any security interest, encumbrance and claim whatsoever in favour of a third party;

  (iii) the Client is acting as principal and not as agent with respect to each transaction or asset that is the subject of this Agreement; and

  (iv) the Client has not relied on or been induced to enter into this Agreement by any representations other than those expressly set out in this Agreement and the Custodian is not liable to the Client for any representation that is not set out in this Agreement.

(b) The representations and warranties set out in Clause 17(a) shall be continuing and shall be deemed repeated by the Client on the date of this Agreement and each time the Client deposits Client Property with, or withdraws Client Property from, the Custodian.

**18. CONFIDENTIALITY**

(a) The Custodian will not (subject to the other provisions of this Agreement, including Clauses 18(b) and 18(c)) disclose to any other person any confidential information

acquired as a result of or pursuant to this Agreement ("**Client Confidential Information**") except: (a) to an affiliate of the Custodian; (b) as appropriate to perform its services under this Agreement; or (c) as authorised by the Client.

(b)  Client Confidential Information may be disclosed by the Custodian if the Custodian is required to do so by any applicable law, statute or other regulation or by any court order or similar process enforceable in any relevant jurisdiction and if required to do so by any fiscal body or regulatory body or self-regulatory organisation (whether of a governmental nature or otherwise) in any relevant jurisdiction.

(c)  Client Confidential Information may be disclosed to any Sub-Custodian.

(d)  The Custodian may collect, use and disclose personal data about individuals associated with the Client, in connection with the services to be provided under this Agreement and in compliance with all applicable laws.  The Custodian may also transfer this personal data to any country, including countries outside the European Economic Area, for any of the purposes set out above.

**19.  NOTICES**

(a)  Any communication to be made under or in connection with this Agreement shall be made in writing and, unless otherwise stated, may be made by fax, e-mail or letter to the following:

(i)  in the case of the Client to:

| | |
|---|---|
| Address: | 5532 Lillehammer Lane |
| | Suite 103 |
| | Park City |
| | UT 84098 |
| | USA |
| Attention: | Darren Wittwer, Stacey Kaminer |
| Email: | |
| Tel: | |

(ii)  in the case of the Custodian to:

| | |
|---|---|
| Address: | E D& F Man Capital Markets Limited |
| Attention: | Legal & Compliance |
| Address: | Cottons Centre |
| | Hays Lane |
| | London, |
| | SE1 2QE |
| | England. |
| Email: | BackOffice@edfmcs.com & compliance@edfmca.com |
| Tel: | +44 20 7089 8000 |

or any substitute address or fax number or e-mail address as a party to this Agreement may notify to the other parties hereto by not less than five Business Days' notice.

(b) Any notice or other communication required in this Agreement to be given in writing by the Client to the Custodian shall be signed by one or more Authorised Signatories and sent by post or delivered personally to the address for the Custodian specified in Clause 19(a) and marked with any contact name for the Custodian identified in Clause 19(a).

(c) Any communication made by one party to this Agreement to another under or in connection with this Agreement will only be effective:

    (i) if by way of fax, at the time when the fax transmission has been sent in its entirety and the sender's fax machine shall have generated a successful transmission report; or

    (ii) if by way of e-mail electronic messaging, at the time that the e-mail electronic message is sent for the attention of the legal department and trading desk detailed in Clause 19 and the sender's e-mail electronic messaging system shall not immediately thereafter have generated an unsuccessful transmission report, and, in either case, if made to the Custodian, only if addressed in such manner as the Custodian may from time to time specify for this purpose; or

    (iii) if by way of letter, when such letter has been delivered at the relevant address noted in Clause 19 or, in the case of posting, upon one Business Day after the date of registered or recorded delivery posting addressed to it at that address,

    (iv) and, if a particular department, officer or person is specified as part of its address details provided under Clause 19(a), if addressed to that department, officer or person.

## 20.  MISCELLANEOUS

(a) The Client undertakes upon request to notify the Custodian its place of incorporation, principal place of business, residence, control or management, home office, tax file number or other information which may affect the Client's status or accessibility for taxation purposes in any country by reason of this Agreement.

(b) The Client acknowledges that the provision of services outlined in this Agreement by the Custodian to the Client arose solely as a consequence of the initiative of the Client and did not result from any form of solicitation on the part of the Custodian.

(c) Unless otherwise agreed in writing, this Agreement may only be amended by written agreement of the parties except that the Custodian may amend this Agreement on written notice to the Client if the Custodian believes the amendments are requisite or desirable in order for the Custodian to comply with, or reflect in the Agreement, any applicable law or regulation or any rule of any governmental agency to which the Custodian or any Sub-Custodian may become

subject in any jurisdiction, including without limitation, in USA or the United Kingdom or its obligations under Clause 2(e).

(d)     If any of the provisions of this Agreement become invalid, or illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired.

(e)     The rights and obligations of the parties under this Agreement shall not, other than pursuant to the Security and Set-Off Deed, be assigned, charged or otherwise dealt with by either of them.  The Custodian may however assign, charge or otherwise deal with its rights and obligations under this Agreement with or to any of its affiliates, including without limitation by delegating any of its rights and obligations to an affiliate. Subject to this Clause 20(e), this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.

(f)     The parties to this Agreement do not intend that any term of this Agreement should be enforceable, by virtue of the Contracts (Rights of Third Parties) Act 1999, by any person who is not a party to this Agreement.

(g)     A waiver (whether express or implied) by one party of any provision of this Agreement or of any breach of or default of the other party under this Agreement shall not constitute a continuing waiver and that waiver shall not prevent the waiving party from subsequently enforcing any of the provisions of this Agreement not waived or from acting on any subsequent breach of or default by the other party under any of the provisions of this Agreement.

(h)     Telephone conversations between the Client and the Custodian may be recorded and monitored by the Custodian and any recording may be used as evidence in the case of any dispute.

(i)     The Custodian may be required by law or the rules and regulations of the FSA and/or other relevant regulatory agencies, authorities and exchanges to perform or refrain from certain acts or report or disclose details of Client Instructions or transactions effected with or for the Client or any other matters. In particular, disclosure and reporting obligations may arise under the rules referred to in Clause 8(f) and the Money Laundering Regulations 2003 (and related legislation).  The Client hereby authorises the Custodian to do or refrain from such acts, and consents to such reporting or disclosure.

(j)     The Client and the Custodian agree that any services provided by the Custodian to the Client under this Agreement shall be deemed to be a "Netting Transaction" for the purposes of any Terms of Business (as defined in the Security and Set-Off Deed).

(k)     The Client and the Custodian agree that this Agreement is in all respects subject to the terms of the Security and Set-off Deed and that, in the event of any inconsistency between this Agreement and the Security and Set-off Deed, the terms of the Security and Set-off Deed shall prevail to the extent of any inconsistency.

21.  **TERMINATION**

(a)  The Custodian may terminate this Agreement on giving not less than 30 calendar days' written notice to the Client.

(b)  The Client may terminate this Agreement on giving not less than 45 calendar days' written notice to the Custodian, provided that the Client shall not be entitled to terminate this Agreement until all the Secured Liabilities have been irrevocably paid or discharged in full.

(c)  All remedies under this Agreement shall survive the termination of this Agreement.

(d)  Subject to the completion of transactions already initiated under this Agreement and the exercise by the Custodian of the Custodian's rights under this Agreement, the Custodian shall as soon as reasonably practicable after termination of this Agreement deliver to the Client the Client Property held by the Custodian.

(e)  Clauses 13 (*Limitations of Liability*), 14 (*Fees and Expenses*), 15 (*Interest*) and 16 (*Indemnity*) will continue to be effective despite the termination of this Agreement.

22.  **GOVERNING LAW, LANGUAGE AND JURISDICTION**

(a)  This Agreement shall be governed by, and shall be construed in accordance with, the laws of England.

(b)  Any notice given under or in connection with this Agreement shall be in English.

(c)  All other documents provided under or in connection with this Agreement shall be:

(i)  in English; or

(ii)  if not in English, accompanied by a certified English translation if requested by the relevant recipient and, in this case, the English translation shall prevail unless the document is a statutory or other official document.

(d)  The courts of England have non-exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute regarding the existence, validity or termination of this Agreement) (a "Dispute").

(e)  The parties to this Agreement agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no party will argue to the contrary.

(f)  The parties to this Agreement shall not be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction.  To the extent allowed by law, the parties may take concurrent proceedings in any number of jurisdictions.

(g)  The parties irrevocably consent to service of process or any other documents in connection with proceedings in any court by personal service at any address specified in Clause 19, by mail, by facsimile or in any other manner permitted by English law, or by the law of the place of service and the law of the jurisdiction where proceedings are instituted.

**IN WITNESS WHEREOF** the parties to this Agreement have executed this Agreement as of the date first above written.

## SIGNATURES

**The Client**

**SIGNED BY** DARREN WITTWER                )
for and on behalf of                                        )
**D W Construction, INC Retirement Plan**    )


**The Custodian**

**SIGNED BY** _____ Verrona Browne    )
for and on behalf of          COO Operations   )
**E D & F MAN CAPITAL MARKETS LIMITED**    )
                                                                    )

Sharon Heath
Compliance / Documentation

# EXHIBIT B



# E D & F MAN CAPITAL MARKETS LIMITED

# Tax Voucher

We ED&F Man Capital Markets Ltd, based at Cotton's Centre, Hays Lane, London SE1 2QE and registered in the United Kingdom – confirm, DW CONSTRUCTION INC RETIREMENT PLAN - 5532 Lillehammer Lane, Suite 103, Park City, Utah, 84098, USA, was holding the below security over the dividend date.

| | |
|---|---|
| Security Description: | Coloplast A/S |
| ISIN: | DK0060448595 |
| SEDOL: | B8FMRX8 |
| Ex Date: | 05/12/2014 |
| Record Date: | 08/12/2014 |
| Pay Date: | 09/12/2014 |
| Quantity: | 600,000.00 |
| Gross Div Rate: | 7.5 |
| Amount Received: | 3,285,000.00 |
| WHT Suffered: | 1,215,000.00 |
| Currency | DKK |
| WHT %: | 27% |

ED&F Man Capital Markets Limited has no beneficial interest in the holding and will not be reclaiming the tax. The dividends specified on this credit advice were paid net of withholding tax to DW CONSTRUCTION INC RETIREMENT PLAN. If you have any further concerns or issues please do not hesitate to contact us.

AUTHORISED SIGNATORY

Christina MacKinnon

Head of Securities Operations

Cottons Centre
Hay's Lane
London SE1 2QE

Regulated by the Financial Services Authority
Registered in England No.1292851

Telephone: +44 (0)20 7089 8000

CONFIDENTIAL



# E D & F MAN CAPITAL MARKETS LIMITED

## Tax Voucher

We ED&F Man Capital Markets Ltd, based at Cotton's Centre, Hays Lane, London SE1 2QE and registered in the United Kingdom – confirm, DW CONSTRUCTION INC RETIREMENT PLAN - Suite 103, 5532 Lillehammer Lane, Park City, Utah, 84098, USA, was holding the below security over the dividend date.

| | |
|---|---|
| Security Description: | TDC A/S |
| ISIN: | DK0060228559 |
| SEDOL: | 5698790 |
| Ex Date: | 08/08/2014 |
| Record Date: | 12/08/2014 |
| Pay Date: | 13/08/2014 |
| Quantity: | 3,400,000.00 |
| Gross Div Rate: | 1.5 |
| Amount Received: | 3,723,000.00 |
| WHT Suffered: | 1,377,000.00 |
| Currency | DKK |
| WHT %: | 27% |

ED&F Man Capital Markets Limited has no beneficial interest in the holding and will not be reclaiming the tax. The dividends specified on this credit advice were paid net of withholding tax to DW CONSTRUCTION INC RETIREMENT PLAN. If you have any further concerns or issues please do not hesitate to contact us.

AUTHORISED SIGNATORY

Christina MacKinnon

Head of Securities Operations

Cottons Centre
Hay's Lane
London SE1 2QE

Regulated by the Financial Services Authority
Registered in England No.1292851

Telephone: +44 (0)20 7089 8000

CONFIDENTIAL

DWC_00000090



## ED&F MAN

E D & F MAN CAPITAL MARKETS LIMITED

# Tax Voucher

We ED&F Man Capital Markets Ltd, based at Cotton's Centre, Hays Lane, London SE1 2QE and registered in the United Kingdom – confirm, DW Construction Inc Retirement Plan – 5532 Lillehammer Lane, Park City, Utah, 84098, United States of America, was holding the below security over the dividend date.

| | |
|---|---|
| Security Description: | TDC A/S |
| ISIN: | DK0060228559 |
| SEDOL: | 5698790 |
| Ex Date: | 07th March 2014 |
| Record Date: | 11th March 2014 |
| Pay Date: | 12th March 2014 |
| Quantity: | 3,300,000 Shares |
| Gross Div Rate: | DKK 2.20 |
| Amount Received: | DKK 5,299,800.00 |
| WHT Suffered: | DKK 1,960,200.00 |
| WHT %: | 27% |

ED&F Man Capital Markets Limited has no beneficial interest in the holding and will not be reclaiming the tax. The dividends specified on this credit advice were paid net of withholding tax to DW Construction Inc Retirement Plan. If you have any further concerns or issues please do not hesitate to contact us.

AUTHORISED SIGNATORY

Christina MacKinnon

Head of Securities Operations

Cottons Centre
Hay's Lane
London SE1 2QE

Regulated by the Financial Services Authority
Registered in England No.1292851

Telephone: +44 (0)20 7089 8000

CONFIDENTIAL

DWC_00000059



# E D & F MAN CAPITAL MARKETS LIMITED

# Tax Voucher

We ED&F Man Capital Markets Ltd, based at Cotton's Centre, Hays Lane, London SE1 2QE and registered in the United Kingdom – confirm, DW CONSTRUCTION INC RETIREMENT PLAN - 5532 Lillehammer Lane, Park City, UT 84098, USA was holding the below security over the dividend date.

|  |  |
|---|---|
| Security Description: | Novo Nordisk A/S |
| ISIN: | DK0060534915 |
| SEDOL: | BHC8X90 |
| Ex Date: | 21/03/2014 |
| Record Date: | 25/03/2014 |
| Pay Date: | 26/03/2014 |
| Quantity: | 3,850,000.00 |
| Gross Div Rate: | 4.5 |
| Amount Received: | 12,647,250.00 |
| WHT Suffered: | 4,677,750.00 |
| Currency | DKK |
| WHT %: | 27% |

ED&F Man Capital Markets Limited has no beneficial interest in the holding and will not be reclaiming the tax. The dividends specified on this credit advice were paid net of withholding tax to DW CONSTRUCTION INC RETIREMENT PLAN. If you have any further concerns or issues please do not hesitate to contact us.

AUTHORISED  SIGNATORY

Christina MacKinnon

Head of Securities Operations

Cottons Centre
Hay's Lane
London SE1 2QE

Regulated by the Financial Services Authority
Registered in England No.1292851

Telephone: +44 (0)20 7089 8000

CONFIDENTIAL

DWC_00000050



ED&F
MAN

E D & F MAN CAPITAL MARKETS LIMITED

# Tax Voucher

We ED&F Man Capital Markets Ltd, based at Cotton's Centre, Hays Lane,  London SE1 2QE and registered in the United Kingdom – confirm, DW CONSTRUCTION INC RETIREMENT PLAN - 5532 Lillehammer Lane, Park City, UT 84098, USA, was holding the below security over the dividend date.

| | |
|---|---|
| Security Description: | AP Moeller - Maersk A/S |
| ISIN: | DK0010244508 |
| SEDOL: | 4253048 |
| Ex Date: | 01/04/2014 |
| Record Date: | 03/04/2014 |
| Pay Date: | 04/04/2014 |
| Quantity: | 5,000.00 |
| Gross Div Rate: | 1400 |
| Amount Received: | 5,110,000.00 |
| WHT Suffered: | 1,890,000.00 |
| Currency | DKK |
| WHT %: | 27% |

ED&F Man Capital Markets Limited has no beneficial interest in the holding and will not be reclaiming the tax. The dividends specified on this credit advice were paid net of withholding tax to DW CONSTRUCTION INC RETIREMENT PLAN. If you have any further concerns or issues please do not hesitate to contact us.

AUTHORISED  SIGNATORY

Christina MacKinnon

Head of Securities Operations

Cottons Centre
Hay's Lane
London SE1 2QE

Regulated by the Financial Services Authority
Registered in England No.1292851

Telephone: +44 (0)20 7089 8000

CONFIDENTIAL

DWC_00000042



### E D & F MAN CAPITAL MARKETS LIMITED

# Tax Voucher

We ED&F Man Capital Markets Ltd, based at Cotton's Centre, Hays Lane, London SE1 2QE and registered in the United Kingdom – confirm, DW CONSTRUCTION INC RETIREMENT PLAN - 5532 Lillehammer Lane, Suite 103, Park City, UT 84098, USA, was holding the below security over the dividend date.

|  |  |
|---|---|
| Security Description: | Coloplast A/S |
| ISIN: | DK0060448595 |
| SEDOL: | B8FMRX8 |
| Ex Date: | 09/05/2014 |
| Record Date: | 13/05/2014 |
| Pay Date: | 14/05/2014 |
| Quantity: | 1,300,000.00 |
| Gross Div Rate: | 4 |
| Amount Received: | 3,796,000.00 |
| WHT Suffered: | 1,404,000.00 |
| Currency | DKK |
| WHT %: | 27% |

ED&F Man Capital Markets Limited has no beneficial interest in the holding and will not be reclaiming the tax. The dividends specified on this credit advice were paid net of withholding tax to DW CONSTRUCTION INC RETIREMENT PLAN. If you have any further concerns or issues please do not hesitate to contact us.

A U T H O R I S E D   S I G N A T O R Y

Christina MacKinnon

Head of Securities Operations

Cottons Centre
Hay's Lane
London SE1 2QE

Regulated by the Financial Services Authority
Registered in England No.1292851

Telephone: +44 (0)20 7089 8000

CONFIDENTIAL

DWC_00000012



**E D & F MAN CAPITAL MARKETS LIMITED**

# Tax Voucher

We ED&F Man Capital Markets Ltd, based at Cotton's Centre, Hays Lane,  London SE1 2QE and registered in the United Kingdom – confirm, DW CONSTRUCTION INC RETIREMENT PLAN - 5532 Lillehammer Lane, Park City, UT 84098, USA, was holding the below security over the dividend date.

| | |
|---|---|
| Security Description: | Danske Bank A/S |
| ISIN: | DK0010274414 |
| SEDOL: | 4588825 |
| Ex Date: | 19/03/2014 |
| Record Date: | 21/03/2014 |
| Pay Date: | 24/03/2014 |
| Quantity: | 2,000,000.00 |
| Gross Div Rate: | 2 |
| Amount Received: | 2,920,000.00 |
| WHT Suffered: | 1,080,000.00 |
| Currency | DKK |
| WHT %: | 27% |

ED&F Man Capital Markets Limited has no beneficial interest in the holding and will not be reclaiming the tax. The dividends specified on this credit advice were paid net of withholding tax to DW CONSTRUCTION INC RETIREMENT PLAN. If you have any further concerns or issues please do not hesitate to contact us.

A U T H O R I S E D   S I G N A T O R Y

Christina MacKinnon

*Mackinnon*

Head of Securities Operations

Cottons Centre
Hay's Lane
London SE1 2QE

Regulated by the Financial Services Authority
Registered in England No.1292851

Telephone: +44 (0)20 7089 8000

CONFIDENTIAL

DWC_00000031

EXHIBIT C



**Annex E – incorrect Tax Vouchers (2)**

1. ED&F Man produced 80 Tax Vouchers as particularised in Schedule 1 (64 Tax Vouchers) and Schedule 2 (16 Tax Vouchers) to this Annex E (**the Annex E Tax Vouchers**).

2. The information in the Annex E Tax Vouchers was inaccurate in that the PP identified therein:

   2.1. had not "*received*" the amount set out therein by way of dividend from the Danish Listed Company; and

   2.2. had not "*suffered*" WHT in the amount set out therein in relation to such dividend at the stated (27%) or any rate.

3. Insofar as SKAT accepted or paid WHT reclaims in the sum of DKK183,902,400 or any sum in relation to the Relevant WHT Applications which included the Annex E Tax Vouchers, SKAT's own negligence was the real and substantial cause of such payments and/or eclipsed any causative effect of ED&F Man's negligence in relation to the Annex E Tax Vouchers (if proven). Paragraphs 40 and 41 of the Amended Defence are repeated.

**Annex E: Schedule 1 – incorrect Tax Vouchers**

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| | Schedule 1 reference | Pension Plan | Shareholding | Ex Date | Withheld dividend tax (DKK) | Withheld dividend tax entitlement (DKK) | Amount of overpayment by SKAT (DKK) |
| 1. | 505 | DEL MAR ASSET MANAGEMENT SAVING & RETIREMENT PLAN | 500,000 Coloplast A/S – B | 06/12/2013 | 945,000.00 | - | 945,000 |
| 2. | 535 | DEL MAR ASSET MANAGEMENT SAVING & RETIREMENT PLAN | 7,850,000 Novozymes A/S - B | 27/02/2014 | 5,298,750.00 | - | 5,298,750 |
| 3. | 606 | DEL MAR ASSET MANAGEMENT SAVING & RETIREMENT PLAN | 24,000,000 TDC A/S | 07/03/2014 | 14,256,000.00 | - | 14,256,000 |
| 4. | 629 | DW CONSTRUCTION, INC. RETIREMENT PLAN | 3,300,000 TDC A/S | 07/03/2014 | 1,960,200.00 | - | 1,960,200 |
| 5. | 632 | KAMCO INVESTMENTS, INC. PENSION PLAN | 2,000,000 TDC A/S | 07/03/2014 | 1,188,000.00 | - | 1,188,000 |
| 6. | 634 | LINDEN ASSOCIATES DEFINED BENEFIT PLAN | 2,150,000 TDC A/S | 07/03/2014 | 1,277,100.00 | - | 1,277,100 |
| 7. | 637 | NEWSONG FELLOWSHIP CHURCH 401 (K) PLAN | 2,500,000 TDC A/S | 07/03/2014 | 1,485,000.00 | - | 1,485,000 |
| 8. | 640 | RIVERSIDE ASSOCIATES DEFINED BENEFIT PLAN | 2,150,000 TDC A/S | 07/03/2014 | 1,277,100.00 | - | 1,277,100 |
| 9. | 646 | THE GOLDSTEIN LAW GROUP PC 401(K) PROFIT SHARING PLAN | 2,200,000 TDC A/S | 07/03/2014 | 1,306,800.00 | - | 1,306,800 |
| 10. | 659 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 8,000,000 TDC A/S | 07/03/2014 | 4,752,000.00 | - | 4,752,000 |
| 11. | 698 | AMERICAN INVESTMENT GROUP OF NEW YORK, L.P. PENSION PLAN | 3,500,000 Novo Nordisk A/S - B | 21/03/2014 | 4,252,500.00 | - | 4,252,500 |
| 12. | 699 | DEL MAR ASSET MANAGEMENT SAVING & RETIREMENT PLAN | 2,600,000 Novo Nordisk A/S - B | 21/03/2014 | 3,159,000.00 | - | 3,159,000 |

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| | Schedule 1 reference | Pension Plan | Shareholding | Ex Date | Withheld dividend tax (DKK) | Withheld dividend tax entitlement (DKK) | Amount of overpayment by SKAT (DKK) |
| 13. | 700 | DW CONSTRUCTION, INC. RETIREMENT PLAN | 2,000,000 Danske Bank A/S | 19/03/2014 | 1,080,000.00 | - | 1,080,000 |
| 14. | 701 | DW CONSTRUCTION, INC. RETIREMENT PLAN | 3,850,000 Novo Nordisk A/S - B | 21/03/2014 | 4,677,750.00 | - | 4,677,750 |
| 15. | 702 | FEDERATED LOGISTICS LLC 401(K) PLAN | 16,500,000 Danske Bank A/S | 19/03/2014 | 8,910,000.00 | - | 8,910,000 |
| 16. | 703 | FEDERATED LOGISTICS LLC 401(K) PLAN | 10,000,000 Novo Nordisk A/S - B | 21/03/2014 | 12,150,000.00 | - | 12,150,000 |
| 17. | 704 | KAMCO INVESTMENTS, INC. PENSION PLAN | 2,000,000 Danske Bank A/S | 19/03/2014 | 1,080,000.00 | - | 1,080,000 |
| 18. | 705 | KAMCO INVESTMENTS, INC. PENSION PLAN | 2,000,000 Novo Nordisk A/S - B | 21/03/2014 | 2,430,000.00 | - | 2,430,000 |
| 19. | 706 | KAMCO LP PROFIT SHARING PENSION PLAN | 7,375,000 Danske Bank A/S | 19/03/2014 | 3,982,500.00 | - | 3,982,500 |
| 20. | 708 | LINDEN ASSOCIATES DEFINED BENEFIT PLAN | 2,000,000 Danske Bank A/S | 19/03/2014 | 1,080,000.00 | - | 1,080,000 |
| 21. | 709 | LINDEN ASSOCIATES DEFINED BENEFIT PLAN | 2,000,000 Novo Nordisk A/S - B | 21/03/2014 | 2,430,000.00 | - | 2,430,000 |
| 22. | 710 | MOIRA ASSOCIATES LLC 401 (K) PLAN | 2,000,000 Danske Bank A/S | 19/03/2014 | 1,080,000.00 | - | 1,080,000 |
| 23. | 711 | MOIRA ASSOCIATES LLC 401 (K) PLAN | 3,150,000 Novo Nordisk A/S - B | 21/03/2014 | 3,827,250.00 | - | 3,827,250 |
| 24. | 712 | NEWSONG FELLOWSHIP CHURCH 401 (K) PLAN | 2,000,000 Danske Bank A/S | 19/03/2014 | 1,080,000.00 | - | 1,080,000 |
| 25. | 713 | RIVERSIDE ASSOCIATES DEFINED BENEFIT PLAN | 2,000,000 Danske Bank A/S | 19/03/2014 | 1,080,000.00 | - | 1,080,000 |

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| | Schedule 1 reference | Pension Plan | Shareholding | Ex Date | Withheld dividend tax (DKK) | Withheld dividend tax entitlement (DKK) | Amount of overpayment by SKAT (DKK) |
| 26. | 714 | RIVERSIDE ASSOCIATES DEFINED BENEFIT PLAN | 2,000,000 Novo Nordisk A/S - B | 21/03/2014 | 2,430,000.00 | - | 2,430,000 |
| 27. | 715 | THE GOLDSTEIN LAW GROUP PC 401(K) PROFIT SHARING PLAN | 2,000,000 Danske Bank A/S | 19/03/2014 | 1,080,000.00 | - | 1,080,000 |
| 28. | 716 | THE GOLDSTEIN LAW GROUP PC 401(K) PROFIT SHARING PLAN | 2,000,000 Novo Nordisk A/S - B | 21/03/2014 | 2,430,000.00 | - | 2,430,000 |
| 29. | 829 | DEL MAR ASSET MANAGEMENT SAVING & RETIREMENT PLAN | 350,000 Tryg A/S | 04/04/2014 | 2,551,500.00 | - | 2,551,500 |
| 30. | 830 | DEL MAR ASSET MANAGEMENT SAVING & RETIREMENT PLAN | 12,000 A.P. Møller Mærsk A/S - B | 01/04/2014 | 4,536,000.00 | - | 4,536,000 |
| 31. | 831 | FEDERATED LOGISTICS LLC 401(K) PLAN | 300,000 Tryg A/S | 04/04/2014 | 2,187,000.00 | - | 2,187,000 |
| 32. | 832 | FEDERATED LOGISTICS LLC 401(K) PLAN | 18,000 A.P. Møller Mærsk A/S - B | 01/04/2014 | 6,804,000.00 | - | 6,804,000 |
| 33. | 843 | DW CONSTRUCTION, INC. RETIREMENT PLAN | 5,000 A.P. Møller Mærsk A/S - B | 01/04/2014 | 1,890,000.00 | - | 1,890,000 |
| 34. | 844 | KAMCO LP PROFIT SHARING PENSION PLAN | 5,000 A.P. Møller Mærsk A/S - B | 01/04/2014 | 1,890,000.00 | - | 1,890,000 |
| 35. | 845 | LINDEN ASSOCIATES DEFINED BENEFIT PLAN | 175,000 Tryg A/S | 04/04/2014 | 1,275,750.00 | - | 1,275,750 |
| 36. | 846 | MOIRA ASSOCIATES LLC 401 (K) PLAN | 225,000 Tryg A/S | 04/04/2014 | 1,640,250.00 | - | 1,640,250 |
| 37. | 847 | MOIRA ASSOCIATES LLC 401 (K) PLAN | 5,000 A.P. Møller Mærsk A/S - B | 01/04/2014 | 1,890,000.00 | - | 1,890,000 |
| 38. | 848 | NEWSONG FELLOWSHIP CHURCH 401 (K) PLAN | 225,000 Tryg A/S | 04/04/2014 | 1,640,250.00 | - | 1,640,250 |

3

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| | Schedule 1 reference | Pension Plan | Shareholding | Ex Date | Withheld dividend tax (DKK) | Withheld dividend tax entitlement (DKK) | Amount of overpayment by SKAT (DKK) |
| 39. | 849 | RIVERSIDE ASSOCIATES DEFINED BENEFIT PLAN | 175,000 Tryg A/S | 04/04/2014 | 1,275,750.00 | - | 1,275,750 |
| 40. | 850 | TVETER LLC PENSION PLAN | 1,000,000 TDC A/S | 07/03/2014 | 594,000.00 | - | 594,000 |
| 41. | 851 | TVETER LLC PENSION PLAN | 390,000 Danske Bank A/S | 19/03/2014 | 210,600.00 | - | 210,600 |
| 42. | 852 | TVETER LLC PENSION PLAN | 225,000 Novo Nordisk A/S - B | 21/03/2014 | 273,375.00 | - | 273,375 |
| 43. | 853 | TVETER LLC PENSION PLAN | 800 A.P. Møller Mærsk A/S - B | 01/04/2014 | 302,400.00 | - | 302,400 |
| 44. | 854 | TVETER LLC PENSION PLAN | 100,000 Tryg A/S | 04/04/2014 | 729,000.00 | - | 729,000 |
| 45. | 1092 | ACORN CAPITAL STRATEGIES LLC EMPLOYEE PENSION PROFIT SHARING PLAN & TRUST | 20,000 A.P. Møller Mærsk A/S - B | 01/04/2014 | 7,560,000.00 | - | 7,560,000 |
| 46. | 1093 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 5,000,000 Danske Bank A/S | 19/03/2014 | 2,700,000.00 | - | 2,700,000 |
| 47. | 1094 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 612,500 Tryg A/S | 04/04/2014 | 4,465,125.00 | - | 4,465,125 |
| 48. | 1095 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 20,000 A.P. Møller Mærsk A/S - B | 01/04/2014 | 7,560,000.00 | - | 7,560,000 |
| 49. | 1096 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 2,000,000 Novo Nordisk A/S - B | 21/03/2014 | 2,430,000.00 | - | 2,430,000 |
| 50. | 1163 | LINDEN ASSOCIATES DEFINED BENEFIT PLAN | 322,500 Dampskibsselskabet Norden A/S | 24/04/2014 | 435,375.00 | - | 435,375 |

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| | Schedule 1 reference | Pension Plan | Shareholding | Ex Date | Withheld dividend tax (DKK) | Withheld dividend tax entitlement (DKK) | Amount of overpayment by SKAT (DKK) |
| 51. | 1164 | RIVERSIDE ASSOCIATES DEFINED BENEFIT PLAN | 322,500 Dampskibsselskabet Norden A/S | 24/04/2014 | 435,375.00 | - | 435,375 |
| 52. | 1165 | THE GOLDSTEIN LAW GROUP PC 401(K) PROFIT SHARING PLAN | 215,000 Dampskibsselskabet Norden A/S | 24/04/2014 | 290,250.00 | - | 290,250 |
| 53. | 1166 | TVETER LLC PENSION PLAN | 240,000 Dampskibsselskabet Norden A/S | 24/04/2014 | 324,000.00 | - | 324,000 |
| 54. | 1391 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 425,000 Dampskibsselskabet Norden A/S | 24/04/2014 | 573,750.00 | - | 573,750 |
| 55. | 1508 | DEL MAR ASSET MANAGEMENT SAVING & RETIREMENT PLAN | 3,000,000 Coloplast A/S - B | 09/05/2014 | 3,240,000.00 | - | 3,240,000 |
| 56. | 1510 | DW CONSTRUCTION, INC. RETIREMENT PLAN | 1,300,000 Coloplast A/S - B | 09/05/2014 | 1,404,000.00 | - | 1,404,000 |
| 57. | 1511 | FEDERATED LOGISTICS LLC 401(K) PLAN | 1,300,000 Coloplast A/S - B | 09/05/2014 | 1,404,000.00 | - | 1,404,000 |
| 58. | 1513 | KAMCO INVESTMENTS, INC. PENSION PLAN | 1,300,000 Coloplast A/S - B | 09/05/2014 | 1,404,000.00 | - | 1,404,000 |
| 59. | 1520 | LINDEN ASSOCIATES DEFINED BENEFIT PLAN | 850,000 Coloplast A/S - B | 09/05/2014 | 918,000.00 | - | 918,000 |
| 60. | 1525 | RIVERSIDE ASSOCIATES DEFINED BENEFIT PLAN | 850,000 Coloplast A/S - B | 09/05/2014 | 918,000.00 | - | 918,000 |
| 61. | 1537 | TVETER LLC PENSION PLAN | 115,000 Coloplast A/S - B | 09/05/2014 | 124,200.00 | - | 124,200 |

5

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| | Schedule 1 reference | Pension Plan | Shareholding | Date | Withheld dividend tax (DKK) | Withheld dividend tax entitlement (DKK) | Amount of overpayment by SKAT (DKK) |
| 62. | 1583 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 2,850,000 Coloplast A/S - B | 09/05/2014 | 3,078,000.00 | - | 3,078,000 |
| 63. | 1945 | NEWSONG FELLOWSHIP CHURCH 401 (K) PLAN | 50,000 IC Group A/S | 25/09/2014 | 40,500.00 | - | 40,500 |
| 64. | 2064 | AMERICAN INVESTMENT GROUP OF NEW YORK, L.P. PENSION PLAN | 750,000 Novozymes A/S - B | 26/02/2015 | 607,500.00 | - | 607,500 |
| | | | | | | Total | 161,586,900 |



**Annex E: Schedule 2 – incorrect Tax Vouchers**

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| | Schedule 1 reference | Pension Plan | Shareholding | Ex Date | Withheld dividend tax (DKK) | Withheld dividend tax entitlement (DKK) | Amount of overpayment by SKAT (DKK) |
| 1. | 527 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 2,000,000 Coloplast A/S - B | 06/12/2013 | 3,780,000.00 | 2,835,000 | 945,000 |
| 2. | 615 | AMERICAN INVESTMENT GROUP OF NEW YORK, L.P. PENSION PLAN | 5,000,000 TDC A/S | 07/03/2014 | 2,970,000.00 | 1,782,000 | 1,188,000 |
| 3. | 617 | AUTOPARTS PENSIONS GROUP TRUST | 3,705,000 TDC A/S | 07/03/2014 | 2,200,771.00 | 1,525,037 | 675,734 |
| 4. | 620 | BLUEGRASS INVESTMENT MANAGEMENT, LLC RETIREMENT PLAN | 4,248,000 TDC A/S | 07/03/2014 | 2,523,312.00 | 1,815,264 | 708,048 |
| 5. | 621 | BLUEGRASS RETIREMENT GROUP TRUST | 1,610,000 TDC A/S | 07/03/2014 | 956,340.00 | 716,958 | 239,382 |
| 6. | 623 | CASTING PENSIONS GROUP TRUST | 3,402,400 TDC A/S | 07/03/2014 | 2,021,025.60 | 1,543,628 | 477,398 |
| 7. | 624 | CENTRAL TECHNOLOGIES PENSIONS GROUP TRUST | 1,570,000 TDC A/S | 07/03/2014 | 932,580.00 | 700,920 | 231,660 |
| 8. | 631 | INDUSTRIAL PENSIONS GROUP TRUST | 3,713,200 TDC A/S | 07/03/2014 | 2,205,640.80 | 1,515,947 | 689,693 |
| 9. | 633 | KAMCO LP PROFIT SHARING PENSION PLAN | 5,000,000 TDC A/S | 07/03/2014 | 2,970,000.00 | 1,782,000 | 1,188,000 |
| 10. | 636 | MOIRA ASSOCIATES LLC 401 (K) PLAN | 6,000,000 TDC A/S | 07/03/2014 | 3,564,000.00 | 1,188,000 | 2,376,000 |
| 11. | 642 | SV HOLDINGS, LLC RETIREMENT PLAN | 3,073,200 TDC A/S | 07/03/2014 | 1,825,480.80 | 1,131,332 | 694,148 |
| 12. | 644 | TEW ENTERPRISES, LLC RETIREMENT PLAN | 4,569,000 TDC A/S | 07/03/2014 | 2,713,986.00 | 2,040,390 | 673,596 |

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| | Schedule 1 reference | Pension Plan | Shareholding | Date | Withheld dividend tax (DKK) | Withheld dividend tax entitlement (DKK) | Amount of overpayment by SKAT (DKK) |
| 13. | 645 | TEW, LP RETIREMENT PLAN | 4,959,200 TDC A/S | 07/03/2014 | 2,945,764.80 | 1,989,425 | 956,340 |
| 14. | 658 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 7,900,000 Novozymes A/S - B | 27/02/2014 | 5,332,500.00 | 877,500 | 4,455,000 |
| 15. | 697 | AMERICAN INVESTMENT GROUP OF NEW YORK, L.P. PENSION PLAN | 7,750,000 Danske Bank A/S | 19/03/2014 | 4,185,000.00 | 1,620,000 | 2,565,000 |
| 16. | 707 | KAMCO LP PROFIT SHARING PENSION PLAN | 4,400,000 Novo Nordisk A/S - B | 21/03/2014 | 5,346,000.00 | 1,093,500 | 4,252,500 |
| | | | | | | Total | 22,315,499 |





<u>Amended by Order of The Honourable Mr Justice Teare dated 6 March 2019 (as varied by Order of The Honourable Mrs Justice Cockerill dated 20 May 2019)</u>

Claim Nos.: CL-2018-000297; CL-2018-000404; CL-2018-000590

IN THE HIGH COURT OF JUSTICE

BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES

COMMERCIAL COURT

B E T W E E N:

SKAT

(THE DANISH CUSTOMS AND TAX ADMINISTRATION)

<u>Claimant</u>

- and -

ED&F MAN CAPITAL MARKETS LIMITED AND OTHERS

<u>Defendants</u>

---

<u>AMENDED</u> DEFENCE

---

Rosenblatt
9-13 St Andrew Street
London EC4A 3AF
Tel: (020) 7955 0880
Fax: (020) 7955 0888
DX: LDE 493

Solicitor's Ref: TS/ASF/EDF/1/57